**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REGINALD GREEN,<br><br>              Plaintiff,<br><br>        v.<br><br>AMERICAN UNIVERSITY, et al.,<br><br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No.  1:07-cv-0052 (RBW)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Christine N. Kearns (D.C. Bar No. 416339)
Rebecca M. Carr (D.C. Bar No. 488274)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, DC  20037-1122
Telephone: (202) 663-8000
Facsimile: (202) 663-8007
christine.kearns@pillsburylaw.com
rebecca.carr@pillsburylaw.com

*Counsel for Defendants*
*American University and Benjamin Ladner*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     PROCEDURAL HISTORY................................................................................. 3

III.    FACTUAL BACKGROUND .............................................................................. 3

IV.     ARGUMENT ...................................................................................................... 3

        A.      Mr. Green's Claim for a "Failure to Accommodate" His
                Alleged Disability Must Be Dismissed.................................................. 4

                1.      The Only Request for Accommodation Before
                        the Court is for Bathroom Breaks on Car Trips........................... 4

                2.      Mr. Green Cannot Prove a Failure to Accommodate ................. 6

                        a.      Mr. Green is Not Disabled............................................ 6

                        b.      Defendants Did Not Deny Mr. Green His Request for
                                Accommodation............................................................ 13

        B.      Defendants Did Not Terminate Mr. Green's
                Employment Because Of His "Disability." ........................................ 14

                1.      Mr. Green Can Not Prove a Prima Facie Case of Discrimination............ 14

                2.      The University Terminated Mr. Green
                        Because of His Poor Performance. ........................................... 16

                3.      There is No Evidence of Pretext at All. .................................... 16

        C.      Defendants Did Not Wrongfully Terminate Mr. Green....................... 19

V.      CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Adams v. George W. Cochran & Co.*, 597 A.2d 28 (D.C. 1991)......................................19

*Adeyemi v. Dist. of Columbia*, No. 04-1684 (CKK), 2007 U.S. Dist. LEXIS 24179
    (D.D.C. Mar. 31, 2007).........................................................................................14, 17

*Banks v. CBOCS West, Inc.*, No. 01 C 795, 2005 U.S. Dist. LEXIS 9503
    (N.D. Ill. May 9, 2005) ......................................................................................12

*Barbour v. Browner*, 181 F.3d 1342 (D.C. Cir. 1999)......................................................17

*Brown v. Small*, No. 02-1268 (RWR), 2005 U.S. Dist. LEXIS 5664
    (D.D.C. Mar. 31, 2005)........................................................................................6

*Brown v. Snow*, 407 F. Supp. 2d 61 (D.D.C. 2005)................................................ 4, 7-8

*Brunke v. Goodyear Tire & Rubber Co.*, 344 F.3d 819 (8th Cir. 2003)...........................13

*Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120 (D.D.C. 2003) .....................4, 5

*Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997).........................................................19

*Carpenter v. Hampton Roads Shipping Ass'n*, No. 2:04cv757,
    2005 U.S. Dist LEXIS 34186 (E.D. Va. Dec. 8, 2005) .........................................11, 12

*Carter v. Washington Post*, No. 05-1712 (RMC), 2006 U.S. Dist. LEXIS 29424
    (D.D.C. May 15, 2006) ........................................................................................4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................4

*Crawford v. N.Y. Life Ins. Co.*, No. 04-CV-1853, 2006 U.S. Dist. LEXIS 69585
    (E.D.N.Y. Sept. 27, 2006)................................................................................. 10-11

*Croy v. Cobe Labs., Inc.*, 345 F.3d 1199 (10th Cir. 2003) .................................................13

*Duncan v. Washington Metro. Area Transit Auth.*, 240 F.3d 1110
    (D.C. Cir. 2001) ....................................................................................9-10, 14, 15

*EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir. 2001)....................................................12

*Flemmings v. Howard Univ.*, 198 F.3d 857 (D.C. Cir. 1999).............................................13

*Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158 (D.D.C. 2002).......................................7

*Hicks v. Ass'n of Am. Med. Colls.*, 503 F. Supp. 2d 48 (D.D.C. 2007) ......................19-20

*Kassem v. Washington Hosp. Ctr.*, No. 05-2352 (JR), 2006 U.S. Dist. LEXIS 60302 (D.D.C. Aug. 25, 2006), *aff'd in part and rev'd in part*, No. 06-7161, 2008 U.S. App. LEXIS 1174 (D.C. Cir. Jan. 22, 2008)................................................20

*Lytes v. D.C. Water & Sewer Auth.*, No. 05-204 (RMC), 2007 U.S. Dist. LEXIS 91154 (D.D.C. Dec. 13, 2007) ........................................................................................4, 7

*Marshall v. Fed. Express Corp.*, 130 F.3d 1095 (D.C. Cir. 1997) ..............................5, 17

*Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675 (8th Cir. 2001)...................................11

*Mazza v. Bratton*, 108 F. Supp. 2d 167 (E.D.N.Y. 2000), *aff'd*, 9 Fed. Appx. 36 (2d Cir. 2001) ....................................................................................12

*McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...............................................14

*Morgenstein v. Morgan Stanley DW Inc.*, No. 05-2123 (JR), 2007 U.S. Dist. LEXIS 6781 (D.D.C. Jan. 31, 2007) ......................................................................................6, 18

*Nolting v. Nat'l Capital Group, Inc.*, 621 A.2d 1387 (D.C. 1993)...................................19

*Posey v. E.I. Dupont De Nemours & Co.*, No. 98-1719, 1999 U.S. App. LEXIS 4742 (4th Cir. Mar. 19, 1999) ...........................................................................................12

*Rivera v. Orange County Sch. Bd.*, No. 6:98-CV-1153-ORL-3ABL(19), 2000 U.S. Dist. LEXIS 14304 (M.D. Fla. May 1, 2000) ........................................ 11-12

*Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867 (2d Cir. 1998) ............................................12

*Salim v. MGM Grand Detroit, LLC*, 106 Fed. Appx. 454 (6th Cir. 2004) ................. 12-13

*Singleton v. Potter*, 402 F. Supp. 2d 12 (D.D.C. 2005) ............................................. 17-18

*Spelke v. Gonzales*, 516 F. Supp. 2d 76 (D.D.C. 2007)...............................................7, 16

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) ................................................ 9-10

*Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)......................................... 16-17

*Thompson v. Rice*, 422 F. Supp. 2d 158 (D.D.C. 2006) ......................................... *passim*

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002).................................... 6-7

*Waldrip v. Gen. Elec. Co.*, 325 F.3d 652 (5th Cir. 2003) ................................................12

*Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1 (D.D.C. 2000)......................... 17-18

*Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007)....................................................17, 18

400652302v2

## **Statutes and Rules**

Americans with Disabilities Act ("ADA")
    42 U.S.C. § 12102(2)(A).............................................................................................6

Fed. R. Civ. P. 56(c) ...........................................................................................................3

400652302v2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| REGINALD GREEN, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) Case No.  1:07-cv-0052 (RBW) |
| AMERICAN UNIVERSITY, et al., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Defendants American University (the "University") and Benjamin Ladner submit this memorandum in support of their motion for summary judgment on all of the claims presented in the Complaint filed by Reginald Green.

Mr. Green was employed by the University as a driver for its then President, Benjamin Ladner, and was terminated shortly before the end of his four-month probationary period.  During his short period of employment, Mr. Green exhibited unprofessional, if not outright odd, behavior that was contemporaneously documented by his supervisor, the Executive Assistant to Dr. Ladner.  For example, he drove the car excessively slow, keeping it five car lengths from any other.  He made right-hand turns from the left-hand lane.  He missed appointments and slept in the car.  He even attempted to pick up Dr. Ladner on his motorcycle wearing full motorcycle gear.  Dr. Ladner understandably felt Mr. Green was unprofessional and his driving unsafe and decided to terminate his employment for failing to meet the job requirements during the probationary period.

Plaintiff then filed this case making the nonsensical claim that he was fired because on one occasion he stopped to use a bathroom on a long car trip. He asserts that the Defendants denied his request for reasonable accommodation and discriminated against him in violation of the Americans with Disabilities Act ("ADA") and the D.C. Human Rights Act ("DCHRA") (Counts I and II); and that the Defendants wrongfully terminated him in contravention of public policy (Counts III and IV). Not one of these claims has legal merit or a factual basis.

Mr. Green's claim that the Defendants denied his request for reasonable accommodation has two insurmountable obstacles. First, Mr. Green is not disabled under the relevant statutes. He has absolutely no evidence that he had an impairment that substantially limited him in any major life activity during his employment with the University. In fact, when asked directly by a medical examiner prior to his employment whether any medical condition posed a limitation, he answered "No Limitations." Second, Mr. Green's single request for accommodation – to stop to use the bathroom during car trips – was not denied. Rather, Mr. Green testified that he took bathroom breaks and that no one at the University ever suggested to him, "in words or otherwise," that he could not take a bathroom break when he needed one. Mr. Green's claim that the Defendants terminated him because of his alleged disability is equally flawed. Again, Mr. Green is not disabled. Further, Mr. Green was terminated shortly before the end of a four-month probationary period on the basis of his unsatisfactory work performance that was contemporaneously documented by his supervisor. Mr. Green has no evidence at all to demonstrate that the Defendants' legitimate reasons for his termination were pretextual. Finally, Mr. Green's wrongful termination claim is both precluded by the ADA and DCHRA's remedial provisions and falls well outside the wrongful termination exception to the at-will doctrine.

400652302v2

## II.    PROCEDURAL HISTORY

Mr. Green filed a charge of discrimination (hereinafter the "Charge") with the District of

Columbia Human Rights Commission (hereinafter "DCHRC") on December 21, 2004.[1]  The

Charge alleged that Mr. Green was denied the accommodations of "having to use the bathroom

on long trips, and being allowed not to move as fast as possible on a fractured ankle," and that he

was terminated because he had stopped to use the bathroom during the return of a trip to and

from Philadelphia.  The DCHRC dismissed the Charge with a no-probable cause determination.

Mr. Green filed a request for reconsideration with the DCHRC, and the DCHRC affirmed the

finding of no probable cause on January 24, 2006.  The U.S. Equal Employment Opportunity

Commission (hereinafter "EEOC") reviewed the Commission's findings and issued a Dismissal

and Notice of Rights dated August 28, 2006.

Plaintiff filed his Complaint in the Superior Court for the District of Columbia on

November 27, 2006.  Defendants removed the case to this Court on January 10, 2006.

## III.    FACTUAL BACKGROUND

The relevant facts are set forth in the accompanying Statement of Undisputed Material

Facts ("the Statement"), which will be referred to throughout this motion.

## IV.    ARGUMENT

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate when the

pleadings and the evidence demonstrate that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c);

*Thompson v. Rice*, 422 F. Supp. 2d 158, 165 (D.D.C. 2006) (granting summary judgment on

plaintiff's failure to accommodate claim because the plaintiff was not disabled under the

---

[1] Mr. Green's Charge (Green Dep. Exhibit 15) is attached to the Statement in Exhibit 1.

3

Rehabilitation Act).[2]  All "justifiable inferences" are to be drawn in the nonmoving party's favor;

however, in order to avoid summary judgment, the non-moving party must establish "more than

the mere existence of a scintilla of evidence in support of its position."  *See Lytes v. D.C.  Water*

*& Sewer Auth.,* No. 05-204 (RMC), 2007 U.S. Dist. LEXIS 91154, at *16 (D.D.C. Dec. 13,

2007) (granting summary judgment on plaintiff's failure to accommodate and wrongful

termination claim under the ADA because the plaintiff was not disabled) (internal citation and

quotations omitted); *see also Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 125-26

(D.D.C. 2003) (granting summary judgment on plaintiff's ADA and DCHRA claims because she

had not requested an accommodation, her employer nevertheless reasonably accommodated her,

and she failed to exhaust her administrative remedies for her claim).  Particularly relevant to this

case, "[b]y pointing to the absence of evidence proffered by the non-moving party, a moving

party may succeed on summary judgment."  *Lytes*, 2007 U.S. Dist. LEXIS 91154, at *17 *citing*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Based upon these standards and the

undisputed record in this case, Defendants are entitled to summary judgment on all claims.

>    **A.    Mr. Green's Claim for a "Failure to Accommodate"
>        His Alleged Disability Must Be Dismissed.**

>        **1.    The Only Request for Accommodation Before
>            the Court is for Bathroom Breaks on Car Trips.**

ADA plaintiffs, like Title VII plaintiffs, are required to exhaust their administrative

remedies before the EEOC prior to filing suit in court.  *See Carter v. Washington Post*, No. 05-

1712 (RMC), 2006 U.S. Dist. LEXIS 29424, at **14-17 (D.D.C. May 15, 2006) (holding that the

court lacked jurisdiction over plaintiff's failure to accommodate claim under the ADA where the

---

[2] The Rehabilitation Act "expressly incorporates the standards of the ADA for claims of
employment discrimination."  *Brown v. Snow*, 407 F. Supp. 2d 61, 67 n.5 (D.D.C. 2005).

EEOC charge did not mention his request for accommodation or any refusal to accommodate). The scope of a subsequent lawsuit is limited "to the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Bugg-Barber*, 271 F. Supp. 2d at 131 (granting summary judgment where plaintiff failed to properly exhaust her failure to accommodate claim because the EEOC charge did not mention that she had requested an accommodation or that her request had been denied ) (internal citations and quotations omitted). "A vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims it does not fairly embrace.  Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (affirming grant of summary judgment on ADA discriminatory termination and failure to accommodate claim where plaintiff's EEOC charge made no mention of her termination or any refusal to accommodate) (internal citation and quotations omitted).

The Charge filed by Mr. Green with the DCHRC states, "when I was hired in August 2004, I informed Respondent that I had medical problems which would require certain accommodations such as having to use the bathroom on long car trips and being allowed not to move as fast as possible in a fractured ankle."[3]  The Charge also states that "on December 3, 2004, Respondent terminated my employment upon our return from a trip to Philadelphia because I had stopped to use the bathroom."[4]  Neither the DCHRC, in investigating the Charge,

---

[3] In his Complaint, Mr. Green abandoned the theory that he was disabled due to a fractured ankle.

[4] Likewise, Mr. Green testified that his only request for an accommodation from the University was to be able to stop to use the bathroom when he needed to do so during car rides.  (Statement at ¶ 20)

nor the University, in responding to it, had any notice of any other alleged requests for an accommodation.  As a result, the sole request for a reasonable accommodation currently before this Court is Mr. Green's request "to use the bathroom on long car trips."

### 2.    Mr. Green Cannot Prove a Failure to Accommodate

To establish failure to accommodate under the ADA, Mr. Green must show that he (1) was an individual with a disability; (2) that the University had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of his position; and (4) the University refused to make such accommodations.  *See Thompson*, 422 F. Supp. 2d at 165-66 (granting summary judgment on plaintiff's failure to accommodate claim because the plaintiff was not disabled under the Rehabilitation Act); *Brown v. Small*, No. 02-1268 (RWR), 2005 U.S. Dist. LEXIS 5664, at *7 (D.D.C. Mar. 31, 2005) (granting summary judgment on plaintiff's failure to accommodate claim where plaintiff failed to establish that defendant was aware of any physical limitations and failed to reasonably accommodate her).[5]

### a.    Mr. Green is Not Disabled.

A disability covered by the ADA and DCHRA is a "physical or mental impairment that substantially limits one or more of the major life activities . . . ."  42 U.S.C. § 12102(2)(A).  The Supreme Court has cautioned that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled" in order to be consistent with the legislative purposes behind the ADA and the legislative findings regarding the number of disabled

---

[5] DCHRA claims are analyzed under the ADA rubric.  *Morgenstein v. Morgan Stanley DW Inc.*, No. 05-2123 (JR), 2007 U.S. Dist. LEXIS 6781, at *14 n.7 (D.D.C. Jan. 31, 2007) ("Because the DCHRA and the Americans with Disabilities Act (ADA) are substantially similar, courts considering DCHRA claims frequently look to ADA case law for persuasive authority.").

Americans. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197-98 (2002). *See also Spelke v. Gonzales*, 516 F. Supp. 2d 76, 81-82 (D.D.C. 2007) (granting summary judgment to employer on plaintiff's failure to accommodate claim where plaintiff failed to "articulate with any particularity the major life activity that has been substantially limited, or that any such limitation is substantial"); *Brown v. Snow*, 407 F. Supp. 2d 61, 68-69 (D.D.C. 2005) (granting summary judgment on plaintiff's failure to accommodate claim under the Rehabilitation Act where the plaintiff failed to raise a genuine issue that he was disabled because his conditions did not substantially limit a major life activity).

When determining whether an individual is substantially limited in a major life activity, the following factors are considered: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact of the impairment. *See Thompson*, 422 F. Supp. 2d at 170. The ADA requires that plaintiffs offer "evidence that the extent of the limitation caused by their impairment in terms of their own experience . . . is substantial." *Toyota Motor Mfg.*, 534 U.S. at 198 (internal citation and quotations omitted).

Significantly, the plaintiff also needs to demonstrate that he or she was disabled at the time that he or she requested an accommodation. *Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 167 (D.D.C. 2002) ("To receive ADA protection, a disability must be demonstrated at the time plaintiff requested and was refused a reasonable accommodation."); *Lytes*, 2007 U.S. Dist. LEXIS 91154, at **24-25 (Granting Defendant's motion for summary judgment because "it is not relevant that Mr. Lytes was once truly disabled. He did not qualify as disabled according to the ADA in September 2003, when he requested light/sedentary duty, or in March 2004, when he was discharged."); *Brown*, 407 F. Supp. 2d at 69 n.8 ("Because the plaintiff has not shown that

7

one of his major life activities was substantially limited during the time period relevant to the instant dispute, he has not established the first prong of his prima facie case of disability discrimination.").

While Mr. Green complains that he suffers from a multitude of medical conditions, the only condition conceivably raised in his Complaint is his anal fissure (or fecal urgency) requiring bathroom breaks.[6]  Mr. Green has no evidence at all of an impairment.  It is undisputed that there is not a single medical record in this case regarding any symptoms for an anal fissure or fecal urgency during Mr. Green's employment with the University despite the fact that he regularly attended medical appointments during that time period.  (Statement at ¶ 35).  Mr. Green produced no records of making any requests to take time off to attend medical appointments for his anal fissure or any other medical problem.  (Statement at ¶ 35).  Mr. Green also states that he signed a medical release form authorizing Kaiser Permanente to produce his medical records to the University; however, the University has no record of that release or ever receiving any medical records from Kaiser Permanente.  Even if the University had received those records, as Mr. Green admitted during his deposition, those records reflect that he had surgery to alleviate his symptoms associated with his anal fissure on May 21, 2003; that by June 9, 2003, his pain and had become "minimal," that he could sit and drive, and he agreed to go through withdrawal from his pain medication; and by January 1, 2004, he had no "pain, nausea, vomiting, constipation, diarrhea, blood, [or] melena" and he presented to the doctors with "resolution of

---

[6] In his Interrogatory Responses, Mr. Green asserted that he also suffers from post-traumatic stress disorder, chronic headaches, and esophageal reflux and related disorder, none of which are relevant to this motion.

anal fissure." (Statement at ¶ 31).[7]  Finally, Mr. Green claims that he included a Washington Times article about disabled veterans to the University when he submitted his application for employment and that this article is evidence of his disability.  However, this article states only that Mr. Green suffered a "stress-related injury during his service in the Army" and that Mr. Green had colon surgery.  In addition to the fact that the article is hearsay, it says nothing about a specific medical condition or how that condition affects Mr. Green.

Mr. Green's own assessment of his condition also does not establish a disability.  He never missed a day of work or was prevented from completing his duties due to his anal fissure. (Statement at ¶ 34).  He never saw a doctor about the condition while he was employed at the University (although he had eleven trips to the doctor for other unrelated problems between July and December 2004).  (Statement at ¶ 35).  Although he felt like he needed to go to the bathroom ten to fifteen times a day, he actually had only three or four bowel movements.  (Statement at ¶ 34).  He testified to one accident in which he soiled himself while employed by the University, but that did not interfere with his duties.  (Statement at ¶ 34).  Any bleeding was addressed by wearing a pad.  (Statement at ¶ 34).[8]

Mr. Green also cannot prove he was substantially limited in the major life activity of working.  The D.C. Circuit has held that to do so a plaintiff must allege that he is "unable to

---

[7] While there is evidence that on April 14, 2004, he had certain symptoms, the medical records confirm that "nitroglycerin ha[d] been helping."  Statement at ¶ 33.  The only other evidence of symptoms occurred nine months <u>after</u> his termination.  Statement at ¶ 33.

[8] Mr. Green claims that he had made doctors appointments to address the bleeding, but that "[o]n several occasions they asked me to reschedule, reschedule, and reschedule and I told Meg that I had to go, that I needed to go the hospital and she said well, Reggie, try to, you know, re-book the appointments because Dr. Ladner has got this going on and that going on and he really wants you to drive this and that." (Green Deposition at 196:21 to 197:5; see Statement at Exhibit 1)  These facts are disputed and accepted as true only for the purposes of summary judgment.  Even if accepted as true, these facts are immaterial as Mr. Green's own assessment of this condition is insufficient to demonstrate a disability, as a matter of law.

9

work in a broad class of jobs." *Duncan v. Washington Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc) (holding that plaintiff failed to satisfy burden of showing that he was disabled within the meaning of the ADA because he failed to demonstrate that he was precluded from a broad range of jobs) (quoting *Sutton v. United Air Lines, Inc.* 527 U.S. 471, 491-92 (1999)). Further, the ADA requires a plaintiff to "produce some evidence of the number and types of jobs in the local employment market in order to show he is disqualified from a substantial class or broad range of such jobs . . . ." *Duncan*, 240 F.3d at 1115-16.

Mr. Green can not demonstrate that he was precluded from a broad range of jobs or provide evidence of the number and types of jobs from which he is disqualified. According to Mr. Green, he was capable of performing a broad of range of jobs at the time he applied for the driver position, including security services, any services a driver might need to provide, office duties, operating office machinery or processing passports or other classified materials. (Statement at ¶ 1). When filling out his Medical Examination Report, Mr. Green did not identify any current limitations due to his anal fissure. To the contrary, the doctor wrote "no limitations" on the Medical Examination Report after specifically asking Mr. Green if his doctor had given him any restrictions due to the anal fissure. (Statement at ¶¶ 3-4). Indeed, the only medical record that Mr. Green claims to have provided directly to the University was a note from a Dr. Candace Love stating "that it was ok for [him] to go back to work." (Statement at ¶ 12). There is simply no evidence that Mr. Green was substantially limited in the major life activity of working. *Compare Crawford v. N.Y. Life Ins. Co.,* No. 04-CV-1853, 2006 U.S. Dist. LEXIS 69585, at **15-16 (E.D.N.Y. Sept. 27, 2006) (granting summary judgment on plaintiff's ADA claims where plaintiff "conceded that [her irritable bowel syndrome] did not prevent her from completing any work assignment or otherwise limit her life activities beyond requiring frequent

10

trips to the bathroom") *with Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 680 (8th Cir. 2001) (finding that Maziarka had presented evidence that would allow a trier of fact to find that he is substantially limited in the major life activity of working where his irritable bowel syndrome was chronic, incurable and usually severe and during his periods of incapacitation, which were unpredictable, he was "prevented from leaving his home to go to work, performing manual tasks, or interacting with supervisors, co-workers, and store patrons, and is afflicted with substantial pain and intestinal discomfort" and presented evidence that he was precluded from performing a broad range of jobs).

Mr. Green also fails to establish that he is substantially limited in the major life activity of eliminating waste. "[T]he substantial limitation requirement mandates that the restriction of bowel movements must manifest with extremely negative symptoms." *Carpenter v. Hampton Roads Shipping Ass'n*, No. 2:04cv757, 2005 U.S. Dist. LEXIS 34186, at **21-22 (E.D. Va. Dec. 8, 2005) (granting summary judgment) (internal citation and quotations omitted). As described above, Mr. Green testified during his deposition that although he feels like he needs to have a bowel movement ten to fifteen times a day, he actually has a bowel movement three of four times a day and that he had only one accident in which he soiled himself during his four months at the University. (Statement at ¶ 34). That one accident did not prohibit him from completing his duties that day. (Statement at ¶ 34). He never missed work or was unable to complete a task due to the condition. (Statement at ¶ 34). He never saw a doctor for the condition while at the University. (Statement at ¶¶ 35-36). This evidence falls short of what is required to demonstrate a disability based on the major life activity of eliminating waste under the ADA. *See Rivera v. Orange County Sch. Bd.*, No. 6:98-CV-1153-ORL-3ABL(19), 2000 U.S. Dist. LEXIS 14304, at **14-19 (M.D. Fa. May 1, 2000) (granting summary judgment on plaintiff's ADA claim because

11

she failed to establish that her irritable bowel syndrome substantially limited her major life activities: "Although Rivera testified that she needed to use the restroom approximately fifteen times during the day, the evidence reflects that she was able to control the timing of her use of a restroom to a significant degree."); *Carpenter*, 2005 U.S. Dist. LEXIS 34186, at **21- 25 (granting summary judgment on plaintiff's disability discrimination case because there was no evidence that his "bowel movements interfere[d] with his ability to perform any other kind of activity . . . the record suggests otherwise by demonstrating that he is fully capable of working productively and having a successful career").[9]

Finally, Mr. Green's general characterization of his condition as "chronic" does not establish that he is substantially limited in any life activity.[10]

---

[9] Cases in which a court has found a substantive limitation on the major life activity of eliminating waste provide a useful contrast to the facts presented here. *See Mazza v. Bratton*, 108 F. Supp. 2d 167, 174-175 (E.D.N.Y. 2000) (a trier of fact could reasonably find that plaintiff was disabled where he described "severe limitations upon his ability to control elimination of wastes and to work during the relevant period, and the hospital records and undisputed medical evidence substantiate the severity of his condition"), *aff'd*, 9 Fed. Appx. 36 (2d Cir. 2001); *Banks v. CBOCS West, Inc.*, No. 01 C 795, 2005 U.S. Dist. LEXIS 9503 (N.D. Ill. May 9, 2005) (finding that plaintiff's Crohn's disease substantially limited his major life activity of proper waste processing because it produced pain and diarrhea daily, required him to use the bathroom up to a dozen times a day, and caused sporadic flare-ups preventing him from attending or performing work).

[10] *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871 (2d Cir. 1998) (affirming district court's grant of summary judgment to defendant because "although [plaintiff] will always be bothered by the possibility of a colitis attack, she will not at all times suffer from the symptoms (and concomitant limitations) of her colitis. We find that although Ryan's colitis is a permanent affliction, the fact that it is asymptomatic for long periods, and varies in intensity, weighs against a finding of substantial limitation.); *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (affirming district court's judgment that plaintiff who suffered from epilepsy was not disabled under the ADA because the plaintiff's epilepsy only manifested itself intermittently and was therefore not substantially limiting); *Posey v. E.I. Dupont De Nemours & Co.*, No. 98-1719, 1999 U.S. App. LEXIS 4742, at **5-6 (4th Cir. Mar. 19, 1999) (affirming district court's grant of summary judgment to defendant because plaintiff's lupus was not a disability as her illness only prevented her from performing the duties associated with shift work); *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655-57 (5th Cir. 2003) (affirming district court's grant of summary judgment to defendant because plaintiff was not disabled as his chronic pancreatitis was not substantially limiting where he only occasionally missed a few days of work when his pancreatitis flared up); *Salim v. MGM Grand Detroit, LLC*, 106 Fed. Appx. 454, 459-60 (6th Cir. 2004) (affirming district court's grant of summary judgment to defendant because plaintiff failed to provide sufficient evidence that her diabetes (Continued on next page)

Given the complete lack of evidence in support of Mr. Green's claims that he had an impairment that substantially limited a major life activity, his failure to accommodate claims fail.

### b. Defendants Did Not Deny Mr. Green His Request for Accommodation.

Mr. Green's failure to accommodate claim also must fail because there is no evidence an accommodation was denied. "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) (reversing the district court's entry of summary judgment in favor of plaintiff, the D.C. Circuit held that defendant granted plaintiff's only request for reasonable accommodation during the relevant period of time and, therefore, defendant had not denied plaintiff a reasonable accommodation). It is undisputed that Mr. Green never provided medical certification or information from a health care professional concerning a requested accommodation in accordance with the Staff Personnel Policies Manual. (Statement at ¶ 13). Rather, Mr. Green testified that he mentioned his need for an accommodation during his interviews[11] and later in

_____

substantially limited her ability to think and care for herself where even though her ability to control her blood sugar was a problem before, during, and after she worked for defendant she was still able to hold a five-day-a-week job); *Brunke v. Goodyear Tire & Rubber Co.*, 344 F.3d 819, 821-22 (8th Cir. 2003) (affirming district court's grant of summary judgment to defendant because "the summary judgment record is devoid of evidence that Brunke's epilepsy substantially limited one or more of his major life activities at the time he was discharged . . . . [I]n 1992, his personal physician advised Goodyear that his seizures were under control . . . . It is uncontroverted that Brunke suffered only one seizure at work . . . "); *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1204 (10th Cir. 2003) (Affirming district court's grant of summary judgment to defendant because plaintiff's multiple sclerosis was not substantially limiting as she "has not shown that her limitations prohibit her from completing her job or that she is unable to perform any of the life activities completely . . . . She has merely shown that she has had to take many unscheduled absences.").

[11] This fact is disputed, but accepted as true for purposes of summary judgment.

connection with the trip to Philadelphia. (Statement at ¶ 23). His only request for accommodation while working at the University was to be able to stop to use the bathroom while driving. (Statement at ¶ 20) That is also the only alleged accommodation raised with the DCHRC. It is undisputed that Ms. Clemmer told him shortly after he started work that bathroom breaks would not be a problem and that, later, she and Dr. Ladner both said that it would be fine if Mr. Green needed to stop to use the bathroom during the trip to Philadelphia. (Statement at ¶¶ 15, 23). It is undisputed that Mr. Green stopped to use the bathroom on several occasions: once when he was driving Mrs. Ladner, once after he had dropped Dr. Ladner off at the Metropolitan Club, and during the return trip from Philadelphia. (Statement at ¶¶ 21, 25). In fact, according to Mr. Green, no one at the University ever suggested to him that he could not take a bathroom break when he needed one. (Statement at ¶ 22). Due to the fact that Mr. Green's only requested accommodation was granted, Mr. Green's failure to accommodate claims must be dismissed.

**B.    Defendants Did Not Terminate Mr. Green's Employment Because Of His "Disability."**

**1.    Mr. Green Can Not Prove a Prima Facie Case of Discrimination.**

The D.C. Circuit applies the burden-shifting framework established by the Supreme Court in *McDonnel Douglas Corp. v. Gree*n, 411 U.S. 792 (1973), to ADA claims of disability discrimination where the plaintiff offers no direct evidence of discrimination and the defendant denies that its actions were motivated by the plaintiff's disability. *Duncan*, 240 F.3d at 1114.

Under the McDonnell Douglas framework, the burden is first on the plaintiff to establish by a preponderance of the evidence a prima facie case of disability discrimination. *See Adeyemi v. Dist. of Columbia*, No. 04-1684 (CKK), 2007 U.S. Dist. LEXIS 24179, at *7 (D.D.C. Mar. 31, 2007) (granting summary judgment on plaintiff's ADA claims where plaintiff failed to establish by a preponderance of the evidence that he was not hired because of his disability). To do so, the

14

Plaintiff must demonstrate that (1) he was disabled within the meaning of the ADA, (2) that he was qualified for the position with or without a reasonable accommodation, and (3) that he suffered an adverse employment action because of his disability. *See Thompson*, 422 F. Supp. 2d at 165-66 (granting summary judgment on plaintiff's prohibited employment discrimination claim under the Rehabilitation Act where plaintiff was not disabled) (citing *Duncan*, 240 F.3d at 1114).

Mr. Green's prima facie case has two fundamental flaws. First, as described above, Mr. Green is not disabled within the meaning of the ADA.

Second, Mr. Green was not qualified for the position. It is undisputed that he could not adequately perform the job. Throughout his probationary period, Ms. Clemmer contemporaneously documented the problems with Mr. Green's work performance. (Statement ¶ 16). Ms. Clemmer's notes reflect that Mr. Green's probationary period was plagued with performance problems despite constant meetings and discussions with Ms. Clemmer and a meeting regarding needed "course corrections" with Dr. Ladner. (Statement at ¶¶ 15, 17). Her notes reflect Dr. Ladner's view that Mr. Green was an unsafe and unprofessional driver. For example, Mr. Green drove dangerously slowly on the highway, always maintained five-car lengths of distance between other cars, turned right from the left-hand lanes, failed to learn how to use the GPS system, left rags and food in the cars at the end of the day, greeted Mrs. Ladner with a hug when meeting at her at the airport, appeared at the Ladners' residence and sat in the driveway for hours when he did not have a scheduled pick-up, and, one occasion, showed up to pick up Dr. Ladner in his motorcycle attire after having missed the initial pick-up entirely. (Statement at ¶¶ 17, 19). This trend of incompetence continued through the trip to Philadelphia

15

on December 1, 2004, during which Mr. Green drove Dr. Ladner and a guest. (Statement at ¶¶ 23-24, 26). Mr. Green cannot, therefore, establish that he was qualified for the position.

**2.    The University Terminated Mr. Green Because of His Poor Performance.**

Even if a plaintiff successfully establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *See Spelke*, 516 F. Supp. 2d at 79-80. The University had a well-documented legitimate, non-discriminatory reason for the termination of Mr. Green – his poor work performance described above.

It is undisputed that Mr. Green was an at-will probationary employee who could be terminated at any time. (Statement at ¶ 9). The probationary period was designed to assess whether an employee could handle the responsibilities of the job. (Statement at ¶ 10). Mr. Green could not.

After the trip to Philadelphia, Dr. Ladner reviewed Mr. Green's past problems with Ms. Clemmer, as well as the recent performance problems on the Philadelphia trip. (Statement at ¶ 26). It is undisputed that Dr. Ladner did not even mention the bathroom stop when describing the problems in Philadelphia. (Statement at ¶ 27). Dr. Ladner "just did not feel safe in the car with [Mr. Green.]" (Statement at ¶ 29). Both Dr. Ladner and Ms. Clemmer understood that his probationary period was coming to an end. (Statement at ¶ 28). Accordingly, the University terminated Mr. Green's probationary employment on December 3, 2004, and paid him through the end of the probationary period (December 16, 2004). (Statement at ¶ 30). The University had a legitimate business reason for its decision.

**3.    There is No Evidence of Pretext at All.**

Where, as here, a legitimate nondiscriminatory reason for termination is presented, the burden then shifts back to the plaintiff who has the burden of persuasion to show that the

defendant's preferred reason is in fact a pretext for discrimination. *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). To survive summary judgment, "the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *See Adeyemi*, 2007 U.S. Dist. LEXIS 24179, at *11 (internal citations and quotations omitted).

Mr. Green simply has no evidence that he was terminated because of his alleged disability and that the University's preferred reasons are pretextual. First, it is undisputed that the University had terminated two of the three prior drivers for performance deficiencies. (Statement at ¶ 7). Second, Mr. Green was an unsafe and unprofessional driver, according to Dr. Ladner and Ms. Clemmer, long <u>before</u> the Philadelphia trip. (Statement at ¶¶ 17, 19, 29). Courts do not review "the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Woodruff v. Peters*, 482 F.3d 521, 531 (D.C. Cir. 2007) (internal citations and quotations omitted). There is no evidence to suggest that their views were not genuine. *See Marshall*, 130 F.3d at 1100 ("[A] rational fact-finder would need more than Marshall has provided before it could second-guess an employer's personnel decision absent demonstrably discriminatory motive.") (internal citations and quotations omitted). *See also Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) ("Title VII, it bears repeating, does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions.") (internal citations and quotations omitted). Likewise, Mr. Green's personal beliefs as to the quality of his work are irrelevant and not evidence of pretext. *Singleton v. Potter*, 402 F. Supp. 2d 12, 31 (D.D.C. 2005) (Plaintiff "cannot establish pretext simply based on [his] own subjective assessment of [his] own performance, for plaintiff's perception of [himself], and of [his] work performance is not relevant. It is the

17

perception of the decisionmaker which is relevant.") (citing *Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000)); *Thompson*, 422 F. Supp. 2d at 180 ("A plaintiff's subjective belief as to her qualifications is irrelevant.")

Third, timing of the decision does not establish pretext. It is undisputed that the University terminated Mr. Green within two weeks of the conclusion of his probation and knowing that the period was coming to an end. (Statement at ¶¶ 28, 30). The fact that the University terminated Mr. Green the day after he stopped to use the bathroom on the return trip from Philadelphia is insufficient evidence of pretext. The D.C. Circuit recently addressed this precise point in *Woodruff* when it affirmed summary judgment on an ADA retaliation claim:

> If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim. Assuming the intention behind the ADA's retaliation provisions was to protect the remedial scheme but not create a permanent discipline-free zone for complainants, we conclude positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.

*Woodruff*, 482 F.3d at 530.

*See also Morgenstein*, 2007 U.S. Dist. LEXIS 6781, at **17-18 (holding "proximity alone does not defeat a motion for summary judgment . . . . Plaintiff is unable to overcome defendant's legitimate, non-discriminatory reason for pushing him into retirement: his deteriorating job performance was objectively unacceptable."). Indeed, it is undisputed that the University made the decision at that time because Mr. Green was approaching the end of his probationary period. (Statement at ¶ 28). Finally, Mr. Green used the bathroom whenever he needed to do so and admitted that no one at the University suggested he could not. (Statement at ¶¶ 21-22). As a result, there is no evidence of pretext at all.

### C.    Defendants Did Not Wrongfully Terminate Mr. Green.

The D.C. Court of Appeals recognized an intentional tort for wrongful discharge in *Adams v. George W. Cochran & Co.*, 597 A.2d 28 (D.C. 1991), holding that "there is a very narrow exception to the at-will doctrine under which a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." *Id.* at 34. The court then later reconsidered this "narrow exception" in *Carl v. Children's Hospital*, 702 A.2d 159 (D.C. 1997). There the court considered the appellant's contention that the narrow exception should be expanded "to include the rights of employees to speak out publicly on issues affecting the public interest without fear of retaliation by their employers." *Id.* at 159. A majority of the en banc court agreed and held that the "very narrow exception in *Adams* should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition." *Id*. at 160. Mr. Green attempts to bring his claims within this narrow exception by alleging that he was terminated "without just cause or provocation, contrary to the clear mandate of public policy set forth by the ADA and DCHRA." Complaint at ¶¶ 32, 34. However, his attempts fail.

First, Mr. Green cannot invoke this narrow exception because the ADA and the DCHRA already contain "a specific and significant remedy" for Mr. Green. *Nolting v. Nat'l Capital Group, Inc.*, 621 A.2d 1387, 1390 (D.C. 1993) (While the *Adams* exception may apply in certain circumstances, "we do not think it can be invoked where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation."). *See also Hicks v. Ass'n of Am. Med. Colls.*, 503 F. Supp. 2d 48, 55 (D.D.C. 2007) ("even assuming that plaintiff's activity was protected by the FLSA and the DCMWA . . . those statutes provide plaintiff's exclusive remedy and preclude application of wrongful discharge in

19

violation of public policy"); *Kassem v. Washington Hosp. Ctr.*, No. 05-2352 (JR), 2006 U.S. Dist. LEXIS 60302, at **6-7 (D.D.C. Aug. 25, 2006) ("Because the [Energy Reorganization Act] both establishes the NRC's authority and creates an administrative remedy for employees discharged for refusing to violate that authority, Kassem cannot invoke the *Adams* exception to the at-will employment doctrine as an alternative to that remedy."), *aff'd in part and rev'd in part*, No. 06-7161, 2008 U.S. App. LEXIS 1174 (D.C. Cir. Jan. 22, 2008).  Second, Mr. Green's factual allegations do not bring him within this narrow exception to the at-will employment doctrine.  He does not allege that he was terminated for his refusal to violate the law under *Adams* or that he was terminated for speaking out against policy or practice under *Carl* – Mr. Green alleges (wrongfully) that he was terminated because of his alleged disability.  Therefore, Mr. Green's wrongful termination claim should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court enter summary judgment in favor of Defendants.

DATED:        January 25, 2008                Respectfully submitted,


                                 _____/s/_____
                                 Christine N. Kearns (D.C. Bar No. 416339)
                                 Rebecca M. Carr (D.C. Bar No. 488274)
                                 PILLSBURY WINTHROP SHAW PITTMAN LLP
                                 2300 N Street, N.W.
                                 Washington, DC  20037-1122
                                 Telephone: (202) 663-8000
                                 Facsimile: (202) 663-8007
                                 christine.kearns@pillsburylaw.com
                                 rebecca.carr@pillsburylaw.com

                                 *Counsel for Defendants*
                                 *American University and Benjamin Ladner*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| | ) |
| REGINALD GREEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    Case No.  1:07-cv-0052 (RBW) |
| AMERICAN UNIVERSITY, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

---

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to LCvR 56.1, Defendants American University and Benjamin Ladner (collectively "Defendants"), respectfully submit the following statement of material undisputed facts in support of their motion for summary judgment.

**A.    Mr. Green's Application for Employment at American University**

1.    On May 3, 2004, Plaintiff Reginald Green wrote a letter to American University (the "University") inquiring about several open positions at the University.  Deposition of Reginald Green (hereinafter "Green Dep."), 35:9-19; 37:11-20; 38:11-14.[1]  According to Mr. Green, he felt he was capable at that time of performing a broad range of jobs for the University including, security services, any services that a driver might need to provide, office duties, operating office machinery, and the processing of passports and classified materials. (Green Dep. 38:11 to 43:1)

2.    Mr. Green then underwent two rounds of interviews with Mary Hentschel, then a generalist in the University's Human Resources Department and Margaret Clemmer, Assistant to

---

[1] Cited portions of, and Exhibits from, Mr. Green's deposition are attached hereto as Exhibit 1.

the President, and one interview with Dr. Ladner, for the position of driver for the President. (Green Dep. 53:8-15, 59:17 to 60:9, 64:2-6)  According to Mr. Green, he was everyone's first choice for the driver position.  (Green Dep. 55:17-21 (Ms. Henstchel "was pretty sure that I was the one for Dr. Ladner."); 56:13-14 ("[Ms. Clemmer] pretty much told me that she wanted me[.]"); 66:1-6 (Dr. Ladner "wanted me to start immediately."))

3.     Before beginning his employment, Mr. Green was required by the University to successfully complete a Commercial Driver Fitness Determination ("Fitness Determination"). (Green Dep. 77:1-8)  Mr. Green's Fitness Determination took place on July 14, 2004.  (Green Dep. 66:7-14)  At his Fitness Determination, Mr. Green filled out the first two sections of the Medical Examination Report for Commercial Driver Fitness Determination ("Medical Examination Report").  (Green Dep. Exhibit 7 at AU 0116 ("Medical Examination Report"); Green Dep. 67:13-68:17)  In section two, health history, Mr. Green only checked "Yes" to having "any illness or injury in the last five years" and "digestive problems."  (Green Dep. Exhibit 7 at AU 0116 ("Medical Examination Report"); Green Dep. 68:8-10)  Directly below the health history box, Mr. Green was to indicate "the onset date, diagnosis, treating physician's name and address, and any current limitation" for any "Yes" answer and list "all medications used regularly or recently."  (Green Dep. Exhibit 7 at AU 0116 ("Medical Examination Report")) Mr. Green listed three medications next to which he wrote: "Sometime for anal fissure," and the names of three health care providers.  (Green Dep. Exhibit 7 at AU 0116 ("Medical Examination Report"); Green Dep. 69:12-20)  Mr. Green did <u>not</u> identify any current limitations.  (Green Dep. Exhibit 7 at AU 0116 ("Medical Examination Report"))    Immediately below that section, Mr. Green signed and dated the document certifying "that the above information is complete and

true."  (Green Dep. Exhibit 7 at AU 0116 ("Medical Examination Report"); Green Dep. 69:21 to

70:1)

4.    After completing the first two sections of the Medical Examination Report,

Mr. Green gave the Medical Examination Report to Dr. Rolf Neiman who then asked Mr. Green

a few questions.  (Green Dep. 72:17 to 73:6)  Dr. Rolf Neiman asked Mr. Green if his doctor had

given him "any restrictions" because of his anal fissure.  Deposition of Rolf Neiman (hereinafter

"Neiman Dep."), 11:14-16.[2]  Mr. Green answered that his doctor had not, and Dr. Neiman wrote

the words "No Limitations" on the Medical Examination Report to record Mr. Green's response.

(Neiman Dep. 11:6-18; Green Dep. Exhibit 7 at AU 0116 ("Medical Examination Report"))

5.    On July 21, 2004, Ms. Hentschel emailed Ms. Clemmer to inform her that the

Human Resources Department had received the Medical Examination Report: "I just received

the results from Reggie Green's drug screening and physical.  Nothing came out in the drug

screening and the physical that would keep us from hiring Reggie."  Declaration of Margaret

Clemmer (hereinafter "Clemmer Dec."), ¶ 3.[3]

**B.    Mr. Green's Employment at American University**

6.    Mr. Green commenced working at the University on August 16, 2004.  Complaint

¶ 10.  Mr. Green's job duties included driving Dr. Ladner, other University officials, and other

individuals designated by Dr. Ladner, including his wife; caring for the vehicles owned by the

University and Dr. Ladner; and various administrative responsibilities.  (Green Dep. Exhibit 10

at AU 0129 – AU 0131 ("Driver's Duties and Responsibilities"))

---

[2] Cited portions of Dr. Neiman's deposition are attached hereto as Exhibit 2.

[3] The Declaration of Margaret Clemmer is attached hereto as Exhibit 3.

7.    The University had terminated two of the three previous drivers for performance related issues.  Deposition of Margaret Clemmer (hereinafter "Clemmer Dep."), 41:16 to 44:5.[4]

8.    Mr. Green executed a Staff Personnel Policies and Benefits Manual Acknowledgement certifying that he had "received and [would] keep in [his] possession American University's Staff Personnel Policies and Benefits Manual" and that he "agree[d] as a condition of employment to follow the policies contained in the Staff Personnel Policies Manual."  (Green Dep. 77:11 to 78:13; Green Dep. Exhibit 8 at AU 0082 ("Staff Policies Acknowledgement"))

9.    The Staff Personnel Policies Manual states the terms of probationary employment:

> Staff members serve a probationary period of four months.  During the probationary period, a staff member may be removed from his or her position at any time for any reason without prior notice.

(Green Dep. Exhibit 9 at AU 000218 ("Staff Personnel Policies Manual"))

10.    The probationary period allows the University to determine whether a new staff member will be able to appropriately carry out all aspects of his or her duties.  (Clemmer Dec. at ¶ 3)

11.    The Staff Personnel Policies Manual also explains the procedure for requesting accommodations under the American With Disabilities Act:

> American University supports the policies of the Americans with Disabilities Act and is completely committed to treating all applicants and employees with disabilities in accordance with the requirements of that statute.  The university judges individuals by their abilities, not their disabilities, and seeks to give full and equal employment opportunities to all persons capable of performing successfully in the university's positions.  American University will provide reasonable accommodations to any qualified persons

---

[4] Cited portions of, and Exhibits from, Ms. Clemmer's deposition are attached hereto as Exhibit 4.

with disabilities who require them, and urges employees and applicants who may be disabled and require accommodation to advise the university of their particular needs. . .

When considering a requested accommodation, American University will require medical certification or information from a health care professional concerning the requested accommodation. Medical certification or other information may be requested at the time of the initial request or any time thereafter, for the purpose of determining whether the individual still meets the definition of a disabled person or whether an accommodation is still necessary. Employees or applicants who want to request a reasonable accommodation should contact human resources employee relations, extension 2607.  Any staff employee or applicant who believes that they may have been discriminated against based on their disability should refer to the staff EEO complaint procedures or contact the executive director of human resources.

American University is firmly committed to the principle of equal employment opportunity.  The university recognizes that the implementation of such a policy requires constant effort and supervision.  Every necessary step will be taken to guarantee that this commitment is honored in principle and practice.

(Green Dep. Exhibit 9 at AU 0229 ("Staff Personnel Policies Manual"))

12.    According to Mr. Green, the only medical record that he provided to the University was a note from Dr. Candace Love stating "that it was ok for me to go back to work" and documents about his broken ankle, none of which he produced.  (Green Dep. 60:16 to 61:2; 81:1 to 82:5)

13.    Mr. Green never provided medical certification or information from a health care professional concerning a requested accommodation, as required by the Staff Personnel Policies Manual. (Green Dep. 60:16-20; 79:14 to 82:7)  Mr. Green also never contacted the EEO officer of Human Resources or the executive director of Human Resources to complain that he had been discriminated against based on his disability.  (Green Dep. 101:3-10; 137:20 to 138:11)

14.    Ms. Clemmer was Mr. Green's direct supervisor.  (Clemmer Decl. at ¶ 2)  She met with Mr. Green shortly after he began his employment with the University and provided him with a document entitled "Driver's Duties and Responsibilities."  (Green Dep. 91:22 to 92:6;

5

Green Dep. Exhibit 10 ("Driver's Duties and Responsibilities.")).  She also provided Mr. Green

with a document listing problems that they had encountered in the past with previous drivers,

entitled "For Conversation with Reggie."  (Green Dep. 93:10-18; Green Dep. Exhibit 11 ("For

Conversation with Reggie."); Clemmer Dep. 33:10 to 34:4)  The "For Conversation with

Reggie" document was created because Dr. Ladner wanted "to gather the mistakes made by

previous drivers as [] a guideline of things that had gotten previous drivers into problems so to

avoid the pitfalls[.]" (Clemmer Dep. 33:10-20)  Mr. Green admits that he received both of these

documents.  (Green Dep. 93:17-19)

      15.     One of the items identified on the "For Conversation with Reggie" document

stated: "Minimize bathroom stops on long trips - such as to New York.  (In the past there have

been as many as 4 stops for bathroom in the 4 hour trip.)  One is acceptable - zero is preferable."

(Green Dep. Exhibit 11 ("For Conversation with Reggie."))  Mr. Green expressed concern

regarding this item stating that he "can't drive a long period of time without stopping to take a

bathroom break."  (Green Dep. 95:1-4)  According to Mr. Green, Ms. Clemmer explained that

"they had a problem with drivers asking to use the restroom . . .[but] they weren't really using

the restroom.  They would say they had to use the restroom, but they were taking smoke

breaks[.]"  (Green Dep. 95:12-20)  Ms. Clemmer likewise described the basis for this item:

"When I reviewed this list of items with Reggie, when we go that particular item, I told him that

Dr. Ladner had reacted strongly to Jeff Madden [the previous driver], who was a smoker, for

taking multiple stops on a return trip from New York so that he could smoke.  Mrs. Ladner was

acutely allergic to smoke, so coming back in the car wreaking of cigarettes attacked her allergies,

and Jeff was using I need to go to the bathroom for the excuse to smoke I was told." (Clemmer

Dep. 45:7-15)

16.     It is Ms. Clemmer's practice to take handwritten notes throughout each day "of things that happen, things I need to remember, and things I need to fix. I make notes of things or problems or things that don't stick in my head." (Clemmer Dep. 67:12-15; Deposition of Benjamin Ladner (hereinafter "Ladner Dep.), 52:18-10 ("I do know that it was her habit to take notes on what was going on every day for her area of responsibility[.]"))[5] Ms. Clemmer used those contemporaneous notes to create a chronology of Mr. Green's work performance while employed by the University. (Clemmer Dep. 67:5 to 68:21; Clemmer Dep. Exhibit 6 ("Chronology"))

17.     Ms. Clemmer and Dr. Ladner had meetings with Mr. Green throughout his probationary period regarding needed "course corrections." (Clemmer Dep. Exhibit 6 at AU 0134 - AU 0136 ("Chronology")) A few of the problematic issues that concerned Dr. Ladner and that, as reflected in Ms. Clemmer's notes, were discussed with Mr. Green included:

- On September 27 and October 1, 2004, Mr. Green was told to drive at a normal rate of speed. (Clemmer Dep. Exhibit 6 at AU 0134 – AU 0135 ("Chronology"); Ladner Dep. 73:9-19 ("Let me just say, in general, that he drove so slowly that it was, in my judgment, a safety issue. He would drive 45 miles an hour on the interstate, for example, and, then, he would speed up and, then, drop down to 35. He would drive the speed limit going downtown to Washington, and, then he'd drop down to 15 miles an hour for no reason . . . it was a bizarre driving pattern[.]"))

- On September 27 and October 1, 2004, Mr. Green was told to keep a normal distance between cars rather than five-car lengths. (Clemmer Dep. Exhibit 6 at AU0135 ("Chronology"); Ladner Dep. 71:11-17 (This practice "confused the cars around us, because they would blow their horns. People would try to cut in front of us. They didn't know if we were stalled. I think you have to admit that, driving in Washington, D.C., you rarely see a car five car lengths back, stopped at the stoplight, so I felt it was not a safe practice." Driving with this distance between cars created the same safety hazards))

- On September 27 and October 1, 2004, Mr. Green was told to turn right from the right-hand lane rather than the left-hand lane. (Clemmer Dep. Exhibit 6 at AU

---

[5] Cited portions of Dr. Ladner's deposition are attached hereto as Exhibit 5.

0135 ("Chronology"); Ladner Dep. 74:8 to 75:10 ("Coming to the president's office and hitting Ward Circle, which is the main circle there, he would be in the left lane and refuse to get into the right lane until it was time to turn and, then, cut in front of other cars.  He always did that. . . it was typical of him to not be able to judge when he was going to turn appropriately, and sometimes he would straddle a line of two lanes, and sometimes he would be in the left lane and turn right and sometimes in the right lane and turn left."))

- October 1 and October 28, 2004, Mr. Green was told that he must learn to use the GPS system.  (Clemmer Dep. Exhibit 6 at AU 0135 ("Chronology"); Ladner Dep. 58: 5-8 (He was totally unable to deal with the GPS, to enter navigational data, which is a fairly simple thing to do, to navigate, especially when you're out of town."))

- On October 1, 2004, Mr. Green was told to cross speed bumps at a normal rate of speed.  (Clemmer Dep. Exhibit 6 at AU 0135 ("Chronology"); Ladner Dep. 72:10 to 73:3 ("It was ordinary speed bumps that are built into routine streets that, ordinary drivers in driving, you would simply show down and go over them, which is the intent of a speed bump.  He would come to a complete stop as if there was a stop sign there and, then, very slowly creep over it…[That practice] gives you a heightened sense of going up, and it's also so unnatural and weird that it caused me each time to stop what I was doing in the back[.]"))

- On September 9, October 1, November 2, and during the week of November 8, 2004, Mr. Green was told not to leave personal items in the car at the end of the day.  (Clemmer Dep. Exhibit 6 at AU 0134 – AU 0135, AU 0137, AU0140 ("Chronology"); Ladner Dep. 19:5-6 ("[Mr. Green] would leave rags and food in the car."))

18.    Mr. Green testified that he was never nervous when called into Dr. Ladner's office and that "Dr. Ladner never said anything harsh to [him] in reference to [his] duties[.]" (Green Dep. 145:11-16, 146:5-10)  In addition, Mr. Green testified that his working relationship with Ms. Clemmer was "pretty good."  (Green Dep. 157:15-18)

19.    Despite the guidance and support Ms. Clemmer and Dr. Ladner provided to him, Mr. Green continued to have performance issues.  For example:

- Mrs. Ladner complained to Dr. Ladner and then to Ms. Clemmer that Mr. Green had hugged her at the airport, which she felt was inappropriate.  (Clemmer Dep. 29:9-16; 93:9 to 95:2; Ladner Dep. 54:6 to 56:6; Clemmer Dep. Exhibit 6 at AU 0137)  Ms. Clemmer spoke to Mr. Green about this on October 29 and November 2, 2004.  (Clemmer Dep. Exhibit 6 at AU 0136 – AU 0137 ("Chronology"))

8

- On November 7 and November 28, 2004, Mr. Green arrived at the Ladner's residence at either the wrong time or when there was no scheduled pick-up at all and sat outside of their home for hours.  (Clemmer Dep. Exhibit 6 at AU 0138-AU 0141 ("Chronology"); Clemmer Dep. 71:20 to 72:7 ("There were entries on Reggie's calendar in a category at 9:00a.m. that were general, and they were put there to sort of mark a place, at some time on that particular day, something like this might happen, whatever it was, and there were, I think, two different times that Reggie responded to that as an actual call for him to drive without even looking into inside of it, where it was say see notes and read what the notes are, and without asking questions about what he's to do."); Ladner Dep. 34:21 to 35:4 ("I can remember an occasion – I think it was a Sunday morning or Saturday morning – when he was sitting in the driveway early in the day, and it was discovered that he had not read his Blackberry by Margaret, which said there was to be no pick-up )

- On November 30, 2004, Dr. Ladner found Mr. Green sleeping in the car outside of the President's office and had to wake him up so that he could drive. (Clemmer Dep. Exhibit 6 at AU 0141 ("Chronology"))

- After missing a scheduled pick of Dr. Ladner entirely on December 1, 2004, Mr. Green showed up at Dr. Ladner's dentist appointment in his motorcycle attire. (Clemmer Dep. Exhibit 6 at AU 0142 ("Chronology"); Clemmer Dep. 66:14-15 ("showing up in an office to pick up [Dr. Ladner] in a motorcycle outfit"); Ladner Dep. 58:16-18("[Mr. Green] showed up in his motorcycle uniform and his helmet to drive one day."))

20.    Mr. Green testified that he only requested one accommodation from the University, which was to take bathroom breaks during car rides.  (Green Dep. 90:12-20) ("Q In connection with your anal fissure I believe you testified that you asked Mrs. Clemmer whether you could take bathroom breaks on car rides or long car rides, is that correct?  A  Yes.  A  Did you ask for any other accommodation from AU in connection with your anal fissure?  A.  I believe that's it.")

21.    Mr. Green did in fact stop to use the bathroom on several occasions.  According to Mr. Green, he stopped to use the bathroom once when he was driving Mrs. Ladner.  (Green Dep. 132:2-12)  Mr. Green also testified that he once used the bathroom at the Metropolitan Club after he had driven Dr. Ladner there and let him out of the car.  (Green Dep. 133:14-19)

22.     According to Mr. Green, no one at the University ever suggested to him "in words or otherwise" that he could not take a bathroom break when he needed one.  (Green Dep. 97:3-8)

23.     On October 28, 2004, Ms. Clemmer entered into Mr. Green's calendar a trip with Dr. Ladner to Philadelphia from December 1, 2004 to December 2, 2004.  (Clemmer Dep. Exhibit 6 at AU 0136 ("Chronology"))  On November 30, 2004, Mr. Green expressed concern to Ms. Clemmer about needing to stop to use the bathroom during the drive.  (Clemmer Dep. Exhibit 6 at 0142 ("Chronology"))  According to Mr. Green, Ms. Clemmer discussed Mr. Green's concerns with Dr. Ladner and, "[m]aybe a couple of days before [they] were to leave to go to Philadelphia," Ms. Clemmer told Mr. Green "[t]hat she had spoken with Dr. Ladner and he somewhat said it would be okay or something to that nature."  (Green Dep. 96:11-16).  According to Ms. Clemmer, she stated Mr. Green's concerns to Dr. Ladner, who replied: "Margaret, that related to Jeff Madden; if Reggie needs to go to the bathroom, he needs to go to the bathroom; of course, we can stop." (Clemmer Dep. 55:21 to 56:10)  Dr. Ladner likewise testified that when Ms. Clemmer brought Mr. Green's concerns to his attention he said "that's no problem; certainly we can stop if he needs to stop." (Ladner Dep. 26:9-14)

24.     Mr. Green drove Dr. Ladner to Philadelphia as planned on December 1, 2004. (Green Dep. 157:19-21)

25.     On the drive back to Washington from Philadelphia on December 2, 2004, Mr. Green asked Dr. Ladner if he could stop to use the bathroom.  (Green Dep. 161:21 to 162:1) According to Mr. Green, Dr. Ladner did not want to stop and "was adamant about continuing on to D.C." (Green Dep. 162:3-4)  Mr. Green told Dr. Ladner that he "must use the restroom" and he "proceeded to go and stop at the rest stop [.]" (Green Dep. 162:9-17)  According to Dr. Ladner, after Mr. Green asked him if he could stop to use the restroom, Dr. Ladner said

10

"sure." (Ladner Dep. 48:10-14) It is undisputed that Mr. Green did stop to use the bathroom. (Green Dep. 162:13-16; Ladner Dep. 48:15-16)

### C.    Mr. Green's Termination

26.    After the trip to Philadelphia, Dr. Ladner reported to Ms. Clemmer numerous issues that he had with Mr. Green's performance during the Philadelphia trip including "Reggie getting lost on the way into Philadelphia[,] Reggie was unaware where to pick Dr. Ladner and [his guest] up at the restaurant that he dropped them off at, [and] not using the GPS system in the car, which was to ensure that he didn't get lost." (Clemmer Dep. 59:14 to 59:19; Clemmer Dep. Exhibit 6 at AU 0143 ("Chronology")).

27.    Dr. Ladner did not mention to Ms. Clemmer that Mr. Green had stopped to use the bathroom. (Clemmer Dep. 60:16-19; Clemmer Dep. Exhibit 6 at AU 0143 – AU 0144 ("Chronology"))

28.    Dr. Ladner then told Ms. Clemmer that he had decided to terminate Mr. Green's employment before he completed his probationary period, which was just two weeks away. (Clemmer Dep. Exhibit 6 at AU 0144 ("Chronology"); Clemmer Dep. 61:18-21 ("Q  Was there any discussion between the two of you about whether this was a termination that occurred during Mr. Green's probationary period?  A  Yes."); Ladner Dep. 37:14-21 ("Q  You were aware of the beginning and ending dates approximately of that four-month probationary period was due by sometime in mid-December – A  I knew at the time, yes."), 51:3-6 ("I had to make a decision about his going off of probation and continuing or not continuing, so we [Dr. Ladner and Ms. Clemmer] met and thoroughly reviewed all of his performance."))

29.    Dr. Ladner testified that it was not the Philadelphia trip that caused Mr. Green's termination, but rather that he had "reviewed [Mr. Green's] total performance, and the trip to Philadelphia was certainly a disaster in terms of his performance, and it confirmed tendencies we

observed in other contexts." (Ladner Dep. 52:4-8) Dr. Ladner explained to Ms. Clemmer that "he just did not feel safe in the car with Reggie and [that Reggie] had demonstrated many instances of both unprofessional behavior and extremely poor judgment." (Clemmer Dep. Exhibit 6 at AU 0144 ("Chronology"); Clemmer Dep. 60:6-7 ("He was concerned about safety. He said I think it's an issue of safety."))

30. The University terminated Mr. Green's employment on December 3, 2004. (Green Dep. 11:11-14) He was paid through the end of his probationary period, December 16, 2004. (Green Dep. 98:15-18)

### D. Mr. Green's Alleged Disability

31. Mr. Green had surgery on May 21, 2003, to alleviate his symptoms associated with an anal fissure. (Green Dep. 88:6-12) Mr. Green's medical records provided by Kaiser Permanente state that by June 9, 2003, his pain had become "minimal," that he could he could sit and drive, and that he was weaning off his medication. (Kaiser Permanente records dated June 9, 2003)[6] In addition, Mr. Green agreed to go through withdrawal from Percocet. (Kaiser Permanente records dated June 9, 2003) Mr. Green's medical records state that by January 1, 2004, he presented to the doctors with "resolution of anal fissure" and that there were "no issues to address at [that] time." (Kaiser Permanente records dated January 1, 2004) Further, Mr. Green denied that he had any "pain, nausea, vomiting, constipation, diarrhea, blood, [or] melena." (Kaiser Permanente records dated January 1, 2004) According to Mr. Green, this is the information that the University would have learned from his medical records had it reviewed his medical records at the time it hired him. (Green Dep. 90:2-6)

---

[6] Cited medical records from Kaiser Permanente are attached hereto as Exhibit 6.

32.    During Mr. Green's deposition the following exchange regarding this anal fissure surgery and his recovery took place:

Q    Is it correct that you had surgery performed by a
       Dr. Davis on May 21st, 2003?

A    Yes, ma'am.

Q    And that surgery was in connection with correcting
       or alleviating your symptoms associated with your
       anal fissure?

A    Yes.

Q    Where was the surgery performed?

A    Washington Hospital Center.

Q    And did you stay overnight after surgery?

A    Yes.

Q     How long were you in the hospital?

A    Exact days I don't – I can't remember.

Q    And after the surgery did you return to the hospital
       for post-surgery visits?

A    Oh, yes.

Q    And among the physicians you visited with post-
       surgery in connection with that surgery was
       Dr. Candace Love; isn't that correct?

A    Yes.

Q    And isn't it correct that by June 9th following your
       surgery your pain had become minimal and you
       could sit and drive?

A    With some – with a lot of difficulty.

Q    Isn't it true that by June 9th you were weaning off
       your medications?

A    Yes, ma'am.

13

Q    By June 9th your rectal pain was much better; isn't
     that correct?

A    Yes.

Q    And at that point you agreed to go through
     withdrawal from Percocet?

A    Yes.

Q    And by January 1st of 2004 you had no pain, no
     nausea, no vomiting, no constipation, no diarrhea,
     not blood, no melena; isn't that right?

A    You said by when?

Q    January 1st, 2004.

A    If that's what the records says, yes, ma'am.

Q    So if AU had received your medical records from
     Kaiser Permanente like you wanted them to that's
     what they would have learned; isn't that correct?

A    Yes.

        (Green Dep. 88:6 – 90:6)

    33.    The single record referring to any symptoms for an anal fissure or fecal urgency

between January 1, 2004, and Mr. Green's termination on December 3, 2004, was on April 14,

2004.  (George Washington University Medical Record dated April 14, 2004) (Mr. Green had

"rectal pain and fecal urgency which ha[d] been bothering him," but "nitroglycerin ha[d] been

helping.")[7]  The first medical record regarding any such symptoms after April 14, 2004, is dated

September 6, 2005, nine months after the University terminated Mr. Green.  (George

---

[7] Cited medical records from George Washington University are attached hereto as Exhibit 7.

Washington University Medical Record dated September 6, 2005) ("He has seen bright red blood in his stool once 3 weeks ago.  He has a history of an anal fissure, and had a colonoscopy 3 years ago.  He has experienced no recent weight loss, and has noted no change in bowel habits.")

34.     Mr. Green testified that he never missed a day of work while working at the University for medical reasons.  (Green Dep. 33:19 to 34:4)  According to Mr. Green, as of the summer of 2004, he had a bowel movement "maybe three or four times" a day.  (Green Dep. 130:14-21)  He felt like he had to go to the bathroom about ten to fifteen times a day.  (Green Dep. 130:18-21)  He claims that during the almost four months that he worked at the University he had only one accident where he soiled himself because he could not get to the bathroom on time.  (Green Dep. 135:16-20)  After soiling himself, he went to the bathroom and cleaned himself off and changed his underwear.  (Green Dep. 136:2-7) Despite that incident, Mr. Green testified that he was able to complete his job duties that day.  (Green Dep. 136:10-12)  While he was working at the University, Mr. Green claims to have "bled regularly."  (Green Dep. 196:2-8) This bleeding did not go through his clothes because he would wear a pad.  (Green Dep. 198:5-8)

35.     Mr. Green's medical records reflect that he was seen by doctors on a regular basis for a broken ankle between July and December 2004, attending at least eleven medical appointments.  (George Washington University Medical Records dated July 15, July 16, July 20, July 27, August 10, August 31, September 10, December 14, December 27, and December 29, 2004; Kaiser Permanente Record dated October 19, 2004)

36.     There are no medical records of Mr. Green making any requests to take time off from his duties at the University to attend medical appointments for his anal fissure or any other medical problem.

DATED:        January 25, 2008                Respectfully submitted,


                                    _____/s/_____
                                    Christine N. Kearns (D.C. Bar No. 416339)
                                    Rebecca M. Carr (D.C. Bar No. 488274)
                                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                                    2300 N Street, N.W.
                                    Washington, DC  20037-1122
                                    Telephone: (202) 663-8000
                                    Facsimile: (202) 663-8007
                                    christine.kearns@pillsburylaw.com
                                    rebecca.carr@pillsburylaw.com

                                    *Counsel for Defendants*
                                    *American University and Benjamin Ladner*

# EXHIBIT 1

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------:

REGINALD GREEN,                         :

              Plaintiff,                :

        vs.                             : No.:

AMERICAN UNIVERSITY,                    : 07-52

              Defendant.                :

------------------------------------:

                          Washington, D.C.

                    Monday, August 27, 2007

Deposition of:

                    REGINALD GREEN

called for oral examination by counsel for

Defendant, pursuant to notice, at Pillsbury,

Winthrop, Shaw, Pittman, L.L.P., 2300 N Street,

Northwest, Washington, D.C., before Terri L.

Hamilton of Capital Reporting Company, a Notary

Public in and for the District of Columbia,

beginning at 10:17 a.m., when were present on behalf

of the respective parties:

Page 10

1    there?
2        A   I felt that it wasn't an organization
3    that I wanted to continue to work with.  Very
4    unorganized.
5        Q   Did you resign your position there?
6        A   Yes, ma'am, and due to the business being
7    slow and unorganized.
8        Q   When did you quit your job at U.S. Sedan
9    Services?
10       A   I would say about maybe 60 days ago, 2
11   months.
12       Q   And what was your compensation at U.S.
13   Sedan Services?
14       A   I was making about $35 an hour.
15       Q   How long had you worked there?
16       A   For one year.
17       Q   During that year did you have any other
18   employers?
19       A   No, ma'am.
20       Q   Where did you work prior to U.S. Sedan
21   Services?
22       A   In the White House.

Page 11

1        Q   And what dates did you work at the White
2    House?
3        A   From May of, I want to say, 2004 up until
4    the time I went to work for American University.
5        Q   I want to focus exclusively on the period
6    of time since you were employed at American
7    University.
8        A   Since?
9        Q   Yes.
10       A   Okay.
11       Q   I think the record will reflect that you
12   were terminated by American University on
13   December 3rd, 2004?
14       A   Yes, ma'am.
15       Q   Since that time have you had any
16   employers other than U.S. Sedan Services and Lemay
17   Limousine Services?
18       A   No, ma'am.
19           MS. KEARNS:  Can we mark our first
20   exhibit. We'll call it Green Exhibit 1.
21           (Green Exhibit Number 1
22           was marked for identification.)

Page 12

1
2    BY MS. KEARNS:
3        Q   Mr. Green, I'd like you to look at the
4    exhibit we've marked as Exhibit 1, which is
5    plaintiff, Reginald Green's, answers to defendant,
6    American University's, first set of
7    interrogatories. Feel free, sir, to review any
8    aspect of it you want, but I'm interested in
9    whether you can confirm that your signature appears
10   at the bottom of page 11.
11       A   That is my signature.
12       Q   And did you sign the document on or
13   around April 23rd, 2007?
14       A   I believe that was the date.
15       Q   Could you turn with me to interrogatory
16   number two and your answer.  The question was
17   "Describe in detail all efforts you have made to
18   obtain employment since December 3rd, 2004
19   including the identity of all employers and
20   potential employers and any employment offers
21   received since that date." Do you see that?
22       A   Yes, ma'am.

Page 13

1        Q   Under the answer you indicate America's
2    Pride Supporting Services, security escort
3    supervisor, obtained.  Did you work for America's
4    Pride Supporting Services since December 3rd, 2004?
5        A   Repeat that question, please.
6        Q   Did you work for America's Pride
7    Supporting Services since December 3rd, 2004?
8        A   In reference to your question when I went
9    back -- when I left -- when I was fired from
10   American University, I was able to obtain part-time
11   security work to go back into the White House.
12       Q   So since December 3rd, 2004 you had
13   part-time work through America's Pride which placed
14   you at the White House; is that right?
15       A   Yes, ma'am.
16       Q   And going further down you've indicated
17   U.S. Sedan Services, which we've previously talked
18   about this morning, as an employer that you've had
19   since December 2004?
20       A   Yes, ma'am.
21       Q   Then you have Chevy Chase Bank,
22   chauffeur, obtained. Were you employed by Chevy

Page 30

1
2    BY MS. KEARNS:
3        Q    Okay.
4        A    Yes.
5        Q    Have you filed any claims or charges
6    against America's Pride in connection with your
7    employment there?
8        A    No.
9        Q    Have you filed any claims or charges
10   against U.S. Sedan Services?
11       A    No, ma'am.
12       Q    Do you intend to?
13       A    No.
14       Q    Have you filed any claims or charges
15   against Chevy Chase Bank?
16       A    No, ma'am.
17       Q    Do you intend to?
18       A    No, ma'am.
19       Q    Have you filed any claims or charges
20   against Intercontinental Commerce Corp.?
21       A    No, ma'am.
22       Q    Do you intend to?

Page 31

1        A    No, ma'am.
2        Q    How did you come to apply for a job at
3    American University?
4        A    I read an add in the newspaper.
5        Q    Were you employed at the time you read
6    the add?
7        A    Yes, ma'am.
8        Q    Where were you employed?
9        A    At America's Pride in the White House.
10       Q    Did you resign your job at the White
11   House to work for American University?
12       A    I didn't resign per se. I told them
13   that -- put me -- I will let them know how it
14   worked out. I didn't give an official letter of
15   resignation if that's what your question is.
16       Q    Well, did you stop working at the White
17   House in order to work at American University?
18       A    No, ma'am.
19       Q    Had you been performing services for the
20   White House at the time you read the add for a
21   position at American University?
22       A    You're asking me was I continually

Page 32

1    working while I --
2        Q    Yes.
3        A    Yes, ma'am.
4        Q    And you were working at the White House?
5        A    Yes.
6        Q    And were you being paid?
7        A    Yes, ma'am.
8        Q    And eventually you did go to work for
9    American University?
10       A    Yes.
11       Q    And that was in August of 2004?
12       A    Yes.
13       Q    Did you cease performing services for the
14   White House in order to go to American University?
15       A    On a full-time basis, yes.
16       Q    Did you continue on a part time basis
17   after?
18       A    Yes, ma'am.
19       Q    And that was through America's Pride?
20       A    Yes.
21       Q    During the time you were at American
22   University how many hours a week did you work for

Page 33

1    America's Pride?
2        A    I would say maybe four. How many hours a
3    week? I would try to get 20 hours if I could.
4        Q    And when you said you would try to, did
5    you achieve that?
6        A    Sometimes yes, sometimes no.
7        Q    And during the period you were working at
8    American University and also working for America's
9    Pride did you miss any work at the White House due
10   to medical reasons?
11       A    Yes.
12       Q    So between August 16th, 2004 and December
13   3rd, 2004 you missed work at the White House for
14   medical reasons?
15       A    Yes.
16       Q    On how many occasions?
17       A    The exact time occasion I can't remember,
18   but there was a period of a couple days.
19       Q    In that same period while you were
20   working at American University, that would be from
21   August 16th, 2004 through December 3rd, 2004, did
22   you miss work on any of those days for medical

# Capital Reporting Company

10 (Pages 34 to 37)

| Page 34 | Page 36 |
|---|---|
| 1 reasons? | 1 Hentschel? |
| 2    A   At American University? | 2    A   I had a friend of mine that faxed this |
| 3    Q   Yes. | 3 document. |
| 4    A   I -- I don't think so. | 4    Q   From OPIC? |
| 5    Q   I'd like to put in front of you Exhibit | 5    A   From OPIC, yes, ma'am. |
| 6 6. | 6    Q   You were no longer working at OPIC at |
| 7        (Green Exhibit Number 6 | 7 that time? |
| 8     was marked for identification.) | 8    A   No, ma'am. |
| 9 BY MS. KEARNS: | 9    Q   And just so the record is clear, Mary |
| 10    Q   Mr. Green, Exhibit Number 6 is a set of | 10 Hentschel is in HR personnel at American |
| 11 documents that American University has produced in | 11 University; isn't that right? |
| 12 this case. I'd like you to take a look at the | 12    A   Yes, ma'am. |
| 13 exhibit and take your time to look through it as | 13    Q   How did you know to send the fax to her? |
| 14 much as you want and I'm going to ask you about | 14 I'm sorry, how did you know to have the document |
| 15 some of the documents that are included within it. | 15 faxed to her? |
| 16        THE WITNESS: Can I -- | 16    A   Because she had given me her fax number |
| 17        MR. GNATT: Mr. Green seems to have a | 17 and I had called and asked a friend of mine would |
| 18 question for me. I'm not sure how you feel about | 18 she kindly fax the document over for me because I |
| 19 that. Is it a question that you feel like you need | 19 know she had a copy of my resume. |
| 20 to ask me in private? | 20    Q   So let me back up. You said you read an |
| 21        THE WITNESS: Yes -- no, I think we need | 21 ad in the newspaper? |
| 22 to ask this during the session here because there's | 22    A   Uh-huh. |

| Page 35 | Page 37 |
|---|---|
| 1 one document that I don't see that is here. | 1    Q   And do you recall what the ad was |
| 2        MR. GNATT: You say a document that you | 2 advertising? |
| 3 think should be there that is not? | 3    A   It was advertising for I believe it said |
| 4        THE WITNESS: Should be here that's not. | 4 security driver or something like that. |
| 5 BY MS. KEARNS: | 5    Q   Which newspaper? |
| 6    Q   Okay. We can get into that. Okay, | 6    A   Washington Post. |
| 7 that's fine. I'll give you an opportunity to | 7    Q   And did you, at that time, contact |
| 8 identify that. | 8 American University about the position? |
| 9        My first question, Mr. Green, now that | 9    A   I did. |
| 10 you've looked at Exhibit Number 6, relates to the | 10    Q   Who did you contact? |
| 11 first two pages of the exhibit which are a May 3rd, | 11    A   I called and inquired about the position |
| 12 2004 letter to Mary Hentschel from Reginald Green. | 12 and someone told me -- well, they took my name and |
| 13 Do you see that? | 13 number and Mary Hentschel called me back and told |
| 14    A   Yes, ma'am. | 14 me I needed to go online and complete the formal |
| 15    Q   Is that a letter that you prepared on or | 15 application process and in the beginning I had |
| 16 around May 3rd, 2004? | 16 already faxed my resume to her so she had informed |
| 17    A   Yes, it is. | 17 me to go online and complete the process. |
| 18    Q   And did you fax it to Mary Hentschel? | 18    Q   Did you fax your resume with the May 3rd, |
| 19    A   I believe it was faxed. | 19 2004 letter? |
| 20    Q   Now, there's a fax line at the top and it | 20    A   Yes, ma'am. |
| 21 says 5/3/2004, 17:19, fax (202) 408-0297 OPIC legal | 21    Q   In the exhibit I note that there is |
| 22 affairs 001. Did you fax it from OPIC to Mary | 22 following the letter a three page resume. Is that |

# Capital Reporting Company

11 (Pages 38 to 41)

| Page 38 | Page 40 |
|---|---|
| 1 the resume that you had a friend fax from OPIC for | 1 you were capable of working in a security job? |
| 2 you? | 2   A   Yes, ma'am. |
| 3   A   Yes, ma'am. | 3   Q   Then you've written or typed "logistics." |
| 4   Q   Just going back to the first page of | 4 What did you mean by that? |
| 5 Exhibit 6, did you prepare the letter? | 5   A   Anything that would go along with |
| 6   A   Yes, ma'am. | 6 providing the services that some drivers have to |
| 7   Q   It says "RE: considerations for the | 7 provide. |
| 8 following positions within your organization," do | 8   Q   So logistics goes with transportation? |
| 9 you see that? | 9   A   Yes, it does, ma'am. |
| 10   A   Yes. | 10   Q   It says "equipment, supplies, office |
| 11   Q   Was it your understanding, as of that | 11 space, et cetera." You've written that? |
| 12 date, that there were several open positions at | 12   A   Yes. |
| 13 American University? | 13   Q   What did you mean by office space? |
| 14   A   Yes. | 14   A   Some drivers have to provide services |
| 15   Q   And one was related to transportation? | 15 along with being a driver. Some of these basic |
| 16   A   Yes. | 16 listings that I put down here and that's the reason |
| 17   Q   And you believed you were capable of | 17 why I put it down right here that say I'm capable |
| 18 performing the job -- | 18 of providing various services that some drivers |
| 19   A   Yes. | 19 have to provide. |
| 20   Q   -- the transportation job? Okay. Did | 20   Q   I understand that. I'm just trying to |
| 21 anyone describe to you what that job was? | 21 understand what the service of office space meant |
| 22   A   They had a layout. | 22 to you when you wrote this. |

| Page 39 | Page 41 |
|---|---|
| 1   Q   They had a job description in -- | 1   A   As you notice, I put et cetera. |
| 2   A   Job description. | 2   Q   I see that. |
| 3   Q   I'm sorry, you really have to let me | 3   A   Because some drivers have to perform |
| 4 finish before you answer, okay. Was there a job | 4 duties with inside of the office, not just driving. |
| 5 description in the advertisement in the Washington | 5   Q   And you believed as of May 3rd, 2004 you |
| 6 Post? | 6 could perform those duties? |
| 7   A   Yes, there was. | 7   A   Yes, ma'am. |
| 8   Q   And you believed you could do that job? | 8   Q   In that same line you have the word |
| 9   A   Yes, ma'am. | 9 "equipment." What did you mean by that? |
| 10   Q   Under transportation it says "security, | 10   A   Operating of office machinery, fax |
| 11 personal or building." Did you understand that | 11 machines, copier machines. |
| 12 there was a job opening relating to security? | 12   Q   And you believed that, as of that date, |
| 13   A   Yes. | 13 you were capable of performing those type of |
| 14   Q   And did you know what the job duties | 14 services? |
| 15 were? | 15   A   I have in the past. |
| 16   A   Involving security or transportation? | 16   Q   But did you believe that as of May 3rd, |
| 17   Q   Security. | 17 2004 you could? |
| 18   A   No, I didn't. | 18   A   Yes, ma'am. |
| 19   Q   But you believed you were capable of | 19   Q   Then you've got "Processing of passports |
| 20 performing security services as of that date? | 20 and classified materials." Do you see that? |
| 21   A   I have in the past. | 21   A   Yes, ma'am. |
| 22   Q   And did you believe as of May 3rd, 2004 | 22   Q   What did you mean by that? |

## Capital Reporting Company

### Page 42

1    A   If it should be required of me to take
2  passports to the state department. Processing, for
3  example, airplane tickets, transportation, handling
4  classified materials, which what I have done in my
5  previous employers, anything relating to processing
6  of passport applications, Visa applications. You
7  don't really want to word it out the entire
8  description, but you kind of abbreviate it.
9    Q   And that's what you've done here, you've
10  abbreviated the entire class of duties and services
11  relating to the processing of classified documents
12  and applications?
13    A   Yes, ma'am.
14    Q   And that was a service that you thought
15  you could provide as of May 3rd, 2004?
16    A   When you say thought?
17    Q   Yes.
18    A   Are you saying do I think I'm capable of
19  doing it or could I provide the service?
20    Q   I wanted to know as of May 3rd, 2004
21  whether you believed you could provide those
22  services?

### Page 43

1    A   Yes, ma'am.
2    Q   If you could turn to your resume which is
3  attached to the letter. I'm sorry, who was your
4  friend at OPIC who faxed this for you?
5    A   I have various friends there, ma'am.
6  When you say the individual that faxed this letter
7  here...
8    Q   Yes, you testified a moment ago that a
9  friend of yours at OPIC faxed the cover letter to
10  American University with the resume attached
11  because your friend had a copy of your resume. I
12  want to know who was your friend.
13    A   I believe it was Jacques Wilson.
14    Q   If we could look at your resume for a
15  moment, please. Could you turn to page three of
16  your resume. It says U.S. Army, I don't know how
17  to pronounce that.
18    A   Protocol.
19    Q   It says H-G-J-U-S. Is that a code?
20    A   That's abbreviation for headquarters U.S.
21  armed forces services. It's the way that the
22  military breaks down a code of description

### Page 44

1  versus -- it's an acronym.
2    Q   It's an acronym. Does it mean you were
3  placed in Korea?
4    A   Yes, ma'am.
5    Q   And your position protocol, APO SF 96301,
6  June 1978 to January 1982. And as of January 1982
7  you were no longer in that position in the U.S.
8  Army; is that right?
9    A   That is correct, ma'am.
10    Q   Is it correct that you were dishonorably
11  discharged from the Army?
12    A   That is totally incorrect.
13    Q   Is it correct that you were court
14  martialed in the Army?
15    A   Yes, ma'am.
16    Q   What was the year of your court martial?
17    A   Exact date -- day I don't know, but I
18  think it was 1981. I -- I did what was the
19  sentencing and I went back on active duty to
20  complete the rest of my enlistment obligation and I
21  left the military with an honorably discharged.
22    Q   What was the period of your sentencing?

### Page 45

1    A   For four months.
2    Q   In what year?
3    A   I believe it was '81 or '82.
4    Q   Between January 1982 and 1989 where were
5  you employed?
6    A   January '82?
7    Q   Let me do it in baby steps if you don't
8  mind. It says on your resume that you completed
9  your military duty in January of 1982; do you see
10  that?
11    A   Yes, ma'am.
12    Q   On your resume the next entry is Diplomat
13  Limousine Services, 1989 to 1990. Do you see that
14  if you turn to the second page of your resume?
15    A   Okay. Yes.
16    Q   What were you doing professionally
17  between 1982 and 1989?
18    A   I was going to school in Killeen, Texas
19  going to college.
20    Q   For the entire period of 1982 to 1989 you
21  were going to college?
22    A   No, ma'am, not the entire time.

## Capital Reporting Company

| Page 50 | Page 52 |
|---|---|
| 1   A   Yes, ma'am. | 1   Do you know whether documents were faxed to |
| 2   Q   Are those letters that you provided to | 2   American University from another source other than |
| 3   American University? | 3   OPIC on your behalf? |
| 4   A   Yes, they are. | 4   A   No, ma'am. |
| 5   Q   In connection with your application for a | 5   Q   Did you provide the remaining documents |
| 6   job? | 6   in this exhibit to American University in |
| 7   A   Yes. | 7   connection with applying for a job there? |
| 8   Q   And what were the circumstances that led | 8   A   I may have at a later date. I just -- |
| 9   OPIC personnel to write reference letters for you | 9   I'm not sure. |
| 10   in the year 2000? | 10   Q   But do you believe you're the source of |
| 11   A   What was the reference? | 11   the documents in this exhibit? |
| 12   Q   Why did they write these letters in 2000, | 12   A   Yes, ma'am. |
| 13   if you know? | 13   Q   And when you say at a later date, do you |
| 14   A   Because I had taken the lead on an | 14   mean prior to commencing employment? |
| 15   advanced party diplomatic mission and anybody that | 15   A   If I can interject this: When I came |
| 16   I guess did an outstanding job, as I was told, | 16   into the interview, they asked me to bring other |
| 17   provided the services that I had rendered, they | 17   documents like I was earlier wanting to speak of |
| 18   should receive an accommodation. | 18   that there was one document missing. I believe |
| 19   Q   And so these were letters recognizing | 19   that these were the documents that I had brought in |
| 20   your good performance at OPIC? | 20   along with the Washington Times article that's |
| 21   A   Yes, ma'am. | 21   missing from this group of documents. |
| 22   Q   Then after the letters is a personal | 22   Q   So as I understand it you had a friend |

| Page 51 | Page 53 |
|---|---|
| 1   information sheet. Is that a document that you had | 1   fax some documents for you? |
| 2   sent to American University on your behalf? | 2   A   Yes, ma'am. |
| 3   A   Yes. | 3   Q   And after you did that were you contacted |
| 4   Q   On the next page, Mr. Green, is a | 4   for an interview? |
| 5   document titled memorandum, and the fax line says | 5   A   Yes. |
| 6   May 3rd, 2004, Monday; do you see that? | 6   Q   And did you go to the interview? |
| 7   A   Yes. | 7   A   Several times, yes. |
| 8   Q   But this document was not faxed from | 8   Q   How many interviews did you have before |
| 9   OPIC; isn't that right? | 9   you were offered a job? |
| 10   A   This document I believe was part -- was | 10   A   Two, and then I had an interview with |
| 11   faxed from OPIC, yes. | 11   Dr. Ladner which made it three. |
| 12   Q   Could you turn to the previous page, | 12   Q   Who was the first interview with? |
| 13   please. | 13   A   Mary Hentschel. |
| 14   A   If you look where it says 202-2899 this | 14   Q   Anyone else present? |
| 15   is the number where these documents were faxed to. | 15   A   Meg Hawthorne. Meg. |
| 16   Q   To or from? | 16   Q   Was it that interview that you brought |
| 17   A   To. | 17   additional documents? |
| 18   Q   If you could look at the first set of | 18   A   Yes, ma'am. |
| 19   pages in this exhibit, at the top of each one | 19   Q   How long did the interview last? |
| 20   you'll see OPIC legal affairs. Do you see that? | 20   A   One of them lasted about an hour. |
| 21   A   Yes, ma'am. | 21   Q   Well, let's just focus on the first one |
| 22   Q   Until we get to the reference letters. | 22   with Mary Hentschel and Meg Hawthorne. How long |

# Capital Reporting Company

15 (Pages 54 to 57)

Page 54

1   did that interview last?
2       A   Forty-five minutes to an hour.  It was
3   very intense.
4       Q   And what do you recall Ms. Hentschel
5   saying during the interview?
6       A   She wanted to make sure that I was the
7   person for Dr. Ladner because they had had problems
8   with previous drivers in the past.  She wanted to
9   check my credentials.  She wanted me to sign a
10  medical release statement, several forms that she
11  wanted me to sign.  She asked me how would I
12  think -- how did I -- would like to work at
13  American University and I told her I would like
14  that very much.
15      Q   Can you think of anything else that Ms.
16  Hentschel said during that interview?
17      A   She wanted to know how well did I know
18  the city and I told her that I've been driving
19  professionally as a chauffeur, professional
20  chauffeur in the metropolitan area for a very long
21  time and the same job that I'm doing now is what I
22  did in the military also.  She asked me questions

Page 55

1   on how do you handle the protocol of a person like
2   Dr. Ladner and I gave her my response.  We talked
3   pretty intense.
4       Q   Do you know the date of this interview?
5       A   It was before May.
6       Q   Was it before May 3rd, 2004 when you
7   faxed your resume?
8       A   Yes, ma'am.
9       Q   You had the interview --
10      A   No, no, I'm sorry.  I had the interview
11  after I faxed the resume.
12      Q   So after May 3rd, 2004 you had the
13  interview?
14      A   Yes.
15      Q   And can you think of anything else that
16  Mary Hentschel said during that interview?
17      A   That she was in a hurry to get a driver
18  on board and they had like 150 applicants that
19  applied for the job and they had narrowed it down
20  to me and several other guys and she was pretty
21  sure that I was the one for Dr. Ladner.
22      Q   And do you remember anything that Ms.

Page 56

1   Hawthorne said during the interview?
2       A   Meg is Hawthorne.
3       Q   Yes.
4       A   When I say Meg, I mean Ms. Hawthorne.
5       Q   Yes, so do I.  She was later married and
6   became Mrs. Clemmer.
7       A   Mrs. Clemmer, okay.
8       Q   So just to be clear why don't we just use
9   the name Clemmer.
10      A   That's -- that's better.
11      Q   Do you remember what Mrs. Clemmer said
12  during the interview, if anything?
13      A   She pretty much told me that she wanted
14  me and they discussed it over and over and then
15  they called me back in there for a second interview
16  and we shook on it.
17      Q   Just returning to the first interview for
18  a moment, what do you remember saying, yourself,
19  during the first interview that you haven't
20  discussed already?
21      A   We had talked about my medical condition.
22  She had read the article from the Washington Post

Page 57

1   that describing my previous medical condition and
2   she asked me how was I doing at this point and I
3   told her that I feel like I'm ready to come back to
4   work, my health has improved somewhat, but I still
5   have some small problems that I can conquer at this
6   point and she told me that we would get back and
7   talk again.
8       Q   And when you say you discussed your
9   medical condition, were you referring to the
10  medical condition that's discussed in the
11  Washington Post article?
12      A   Washington Times article.
13      Q   I'm sorry, Washington Times.  And did you
14  discuss any other medical conditions?
15      A   I discussed about my colon surgery, the
16  urgency to use the bathroom because, let's face it,
17  I have the condition.
18      Q   Did you discuss any other medical
19  conditions?
20      A   About my stomach, yes.
21      Q   What did you stay about your stomach?
22      A   That -- I told her I had esophageal

**Capital Reporting Company**

Page 58

1    reflux and how many surgeries I have had in the
2    past and she basically asked me was I doing okay
3    and I told her yes.
4        Q    And it was after you described these
5    medical conditions that they told you they thought
6    you were the one for the job?
7        A    Yes.
8        Q    Can you remember anything else that was
9    discussed during that first interview?
10       A    It's been a long time.
11       Q    I understand. I'm just asking from your
12   memory is there anything else you can think of?
13       A    We talked about the type of driver that
14   they were looking for to make sure that Dr. Ladner
15   didn't feel like he was a piece of cargo versus
16   chauffeuring an individual. They asked me for my
17   references and I provided them all.
18       Q    And by that point you had been a
19   professional driver for quite a while; isn't that
20   right?
21       A    I've been doing it since I've been in the
22   military, ma'am, since 1975.

Page 59

1        Q    And you understood that as a professional
2    driver, chauffeuring an individual is something
3    different than treating them as a piece of cargo?
4        A    Totally different.
5        Q    And under your professional standards you
6    wanted to be a chauffeur?
7        A    Yes, ma'am.
8        Q    Did you take any notes during that
9    interview?
10       A    Yes, I did.
11       Q    Where are they?
12       A    I don't have those notes right now,
13   ma'am.
14       Q    When you say you don't have them right
15   now, do they exist?
16       A    I believe I got rid of those notes.
17       Q    After the interview with Mrs. Clemmer,
18   Ms. Hawthorne soon to be Mrs. Clemmer, and
19   Ms. Hentschel you said you came back for a second
20   interview; is that right?
21       A    Yes.
22       Q    Who was that interview with?

Page 60

1        A    Mary Hentschel.
2        Q    The same Mary Hentschel?
3        A    Yes.
4        Q    Anyone else present for the second
5    interview?
6        A    Her and Meg, Mrs. Clemmer.
7        Q    So the two of them interviewed you a
8    second time?
9        A    Uh-huh.
10       Q    What did you discuss during that
11   interview?
12       A    They were basically -- I guess by then
13   they had made their mind up that I was the right
14   person for the job.
15       Q    Okay.
16       A    She may have asked me to bring something
17   from my doctor saying that I was okay to work, some
18   type of statement.
19       Q    And did you do that?
20       A    Yes, I did.
21       Q    Which doctor?
22       A    Dr. Candace Love.

Page 61

1        Q    Do you have a copy of that statement?
2        A    I don't, ma'am.
3        Q    What is Dr. Candace Love's area of
4    specialty?
5        A    General medicine.
6        Q    How long has she been your physician?
7        A    I would say probably about three years at
8    that time.
9        Q    Was your experience with her that she was
10   a competent physician?
11       A    Yes, ma'am.
12       Q    Is she still a treating physician for
13   you?
14       A    No, ma'am.
15       Q    When did she cease being a treating
16   physician for you?
17       A    Maybe about three years ago.
18       Q    Did she cease being a treating physician
19   for you before or after you were terminated from
20   American University?
21       A    Could you say that again, please.
22       Q    Did she treat you after you were fired

## Capital Reporting Company

17 (Pages 62 to 65)

Page 62

1    from American University in December of 2004?
2        A    Yes.
3        Q    Did she treat you in 2005?
4        A    Maybe towards the early part I would say.
5        Q    Is that when you believe she ceased
6    treating you?
7        A    I believe she stopped treating me in
8    2005.
9        Q    What was the reason for her ceasing to
10   treat you?
11       A    Because I could no longer afford two
12   medical insurances.
13       Q    What provider were you using to see
14   Dr. Love?
15       A    Kaiser, Kaiser Permanente.
16       Q    Were you seeing any other specialist in
17   general medicine during the period you were seeing
18   Dr. Love?
19       A    Dr. Bradley.
20       Q    Was through a different provider?
21       A    No, ma'am, through Kaiser.
22       Q    Hold on one second. Are you still seeing

Page 63

1    Dr. Bradley?
2        A    No, ma'am.
3        Q    Did you cease seeing Dr. Bradley at
4    approximately the same time?
5        A    Yes.
6        Q    Have you had any general medicine doctor
7    since that time?
8        A    Yes.
9        Q    Who is that?
10       A    Dr. Jain Kirkpatrick. Dr. Jain at GW.
11       Q    Are you still seeing that doctor?
12       A    Yes, ma'am, on a regular basis.
13       Q    During the second interview you said they
14   may have asked you to bring a statement of ability
15   to work from a physician. Do you remember anything
16   else about the second interview?
17       A    As I said before, earlier, just to let me
18   know that I had the job because I went back and
19   told American University that I would be leaving
20   soon.
21       Q    When you say American University, do you
22   mean --

Page 64

1        A    I mean America's Pride.
2        Q    You testified a few minutes ago that you
3    also interviewed with Dr. Ladner; is that correct?
4        A    Yes, ma'am.
5        Q    When was that?
6        A    For the third interview.
7        Q    And do you know what the date of that
8    interview was?
9        A    I surely don't.
10       Q    How long did your meeting with Dr. Ladner
11   last?
12       A    Perhaps maybe a half an hour to 40
13   minutes.
14       Q    And where did that take place?
15       A    Inside of his office.
16       Q    And do you recall what he said during the
17   interview?
18       A    He kind of made me feel accepted, kind of
19   told me what his schedule would be and what he
20   expected.
21       Q    Do you remember anything else more
22   specific than that?

Page 65

1        A    He told me about his wife, whom I would
2    be driving for also. He told me what he expected
3    of me on a daily basis as far as the vehicles, what
4    I would be doing, the detailing and refueling the
5    vehicles at the end of the day, some of the job
6    descriptions that Meg later had reemphasized on.
7        Q    Was there anything about the duties and
8    responsibilities that was not acceptable to you?
9        A    No, ma'am, everything was acceptable to
10   me.
11       Q    Do you remember anything that you said
12   during the meeting with Dr. Ladner?
13       A    Yes, I did.
14       Q    What did you say?
15       A    We got into detail about my colon issues.
16   We talked about how long I had been disabled, what
17   I had been doing while I was disabled, and he asked
18   me was I ready to come back to work and I said yes,
19   sir.
20       Q    Did you form an impression of
21   Dr. Ladner's interest in hiring you?
22       A    I'm sorry?

## Capital Reporting Company

Page 66

1    Q   Did you form any impression as to whether
2  Dr. Ladner wanted to hire you?
3    A   Yes, I did.
4    Q   And what was your impression?
5    A   A very good one, that he wanted me to
6  start immediately.
7    Q   Now, in connection with your starting at
8  American University you had to go through a medical
9  examination; isn't that right?
10   A   Yes, ma'am.
11   Q   And that took place, I think the record
12  will reflect, on July 14th, 2004.  Does that sound
13  about right to you?
14   A   Yes, ma'am.
15   Q   Were your interviews that you've just
16  testified about before or after the medical
17  examination?
18   A   I'm sorry, repeat that.
19   Q   Did the interviews take place before or
20  after the medical examination?
21   A   My interviews took place after completing
22  the medical examination upon American University.

Page 67

1         MS. KEARNS:  What don't we mark the next
2  exhibit.
3         (Green Exhibit Number 7
4         was marked for identification.)
5  BY MS. KEARNS:
6    Q   I believe this is Exhibit 7.  Mr. Green,
7  this is a medical examination report for commercial
8  driver fitness determination.  Do you see that?
9    A   Yes, ma'am.
10   Q   It says date of exam July 14th, 2004.  Do
11  you agree?
12   A   Yes, ma'am.
13   Q   Now, looking at the first page of the
14  document is there any handwriting on that page that
15  belongs to you?
16   A   Is there any handwriting on this page
17  that belongs to me?
18   Q   Yes.
19   A   The top portion right here.
20   Q   Under section one, driver's information?
21   A   Is that where we're speaking of right
22  here?

Page 68

1    Q   No, I'm at the top of the page where it
2  says one, driver's information.
3    A   Yes, this is all mine.
4    Q   You completed all of section one --
5    A   Yes, ma'am.
6    Q   -- is that right?
7    A   Yes, ma'am.
8    Q   Under section two, health history, did
9  you complete that section?
10   A   Yes.
11   Q   Under section two, health history,
12  there's a box that says "for any yes answer
13  indicate" and asks for additional information; do
14  you see that?
15   A   Uh-huh.
16   Q   Did you complete that box?
17   A   Yes.
18   Q   Is there any handwriting in that box that
19  does not belong to you?
20   A   Are we speaking of this box or this box?
21   Q   When you're pointing, it doesn't help the
22  court reporter so let me see if I can do it in a

Page 69

1  different way.  Under two, health history, there is
2  a series of three boxes which have questions to
3  check yes or no; do you agree with me on that?
4    A   Yes.
5    Q   And you completed all those check marks?
6    A   Yes.
7    Q   Underneath that is another box asking for
8  a written response to a question; is that correct?
9    A   Yes.
10   Q   It starts with "for any yes answer."
11   A   Yes.
12   Q   What portion, if any, of the written
13  response in that box was completed by you?
14   A   The top portion.
15   Q   Could you please read what you wrote?
16   A   Where it says "Oxycodone 5/325, Ultracet
17  Oramorph SR 30 milligrams, Kaiser Permanente and
18  GWU, general Percocet 5/325 sometime for anal
19  fissure, Dr. Candace Love."  Below that "onset
20  2003, no limitations" is not my handwriting.
21   Q   Is that your signature, Reginald Green,
22  next to the words driver's signature?

**Capital Reporting Company**

Page 70

1    A   Yes, ma'am.
2    Q   Did you sign it on or around 7/14/04?
3    A   Yes, I did.
4    Q   If you can continue through the document
5  are there any other handwritings that belong to
6  you?
7    A   On this front page?
8    Q   Throughout the document.
9    A   Everything else as I repeated is my
10 handwriting except where it says "onset 2003, no
11 limitations."
12    Q   Just so we're absolutely clear, Mr.
13 Green, if you'll look at the second page of the
14 document at the top of the page it says "Green,
15 Reginald Calvin." Did you fill that in?
16    A   Yes, ma'am.
17    Q   Did you fill in anything else on that
18 page?
19    A   Yes.
20    Q   Are you certain the doctor didn't fill
21 this medical information in?
22    A   I think the doctor did this portion here.

Page 71

1  I filled out the top.
2    Q   You filled out where it says Green,
3  Reginald Calvin and the doctor filled in everything
4  else on the page; is that right?
5    A   Yes, ma'am.
6    Q   Would you turn to the next page. Did you
7  fill in Green, Reginald Calvin at the top of the
8  document?
9    A   Yes, ma'am.
10    Q   Are you 5 foot 7?
11    A   Yes.
12    Q   Do you weight 165 pounds today?
13    A   I believe so.
14    Q   And you weighed 165 pounds at that time?
15    A   I believe so.
16    Q   Has your weight fluctuated at all since
17 2004 when you took this medical exam?
18    A   Yes.
19    Q   Has it gone up?
20    A   It's gone up and it's gone down.
21    Q   It's gone up and it's gone down but it's
22 the same today as it was in July of 2004?

Page 72

1    A   I believe so. Excuse me, ma'am, can we
2  take a break?
3    Q   A couple more questions and then we'll
4  take a break.
5        Same question about this page. Is the
6  only handwriting on this page that belongs to you
7  Green, Reginald Calvin?
8    A   Yes.
9        MR. GNATT: What Bates stamp page number
10 are we talking about, the one you just talked
11 about?
12        MS. KEARNS: AU 0118.
13        MR. GNATT: Okay. Thanks.
14        MS. KEARNS: We can take a break.
15        (Brief recess.)
16 BY MS. KEARNS:
17    Q   I'm still looking at Exhibit 7, please,
18 the medical examination report. After you
19 completed the portions that you have identified as
20 yours on the report, what did you do with this
21 document?
22    A   After I completed this document I gave it

Page 73

1  to the attending physician.
2    Q   And was that Rolf Nieman, M.D.?
3    A   I believe so, yes, ma'am.
4    Q   And did Dr. Nieman then ask you some
5  questions?
6    A   Yes.
7    Q   And did he have the report in his hand
8  when he was asking questions?
9    A   Yes.
10    Q   And did he take any notes that you
11 noticed while he was asking questions?
12    A   He was taking notes.
13    Q   Onto the document?
14    A   Onto his personal pad.
15    Q   And did you observe him making any notes
16 onto the document?
17    A   Yes, I did.
18    Q   And when I say the document, I mean
19 Exhibit 7.
20    A   I didn't notice he wrote anything on this
21 paper here.
22    Q   When you say this paper here, you're

**Capital Reporting Company**

20 (Pages 74 to 77)

| Page 74 |
|---|

1 referring to Exhibit 7?

2    A  The Exhibit 7, yes, ma'am.

3    Q  Can you say with certainty that he did

4 not write onto the paper?

5    A  To the best of my knowledge, yes.

6    Q  So on page two of Exhibit 7 who completed

7 all the information under vision, hearing, blood

8 pressure, laboratory, and other test findings?

9    A  I believe he did this.

10    Q  So he did write on this?

11    A  He did write on this, yes.

12    Q  Was it in your presence?

13    A  Yes, it was.

14    Q  And do you believe he completed the

15 portions of the document on the third page which is

16 AU0118 that are not yours?

17    A  Would you repeat that, please.

18    Q  Are you looking on the third page under

19 item seven, physical examination?

20    A  Yes, ma'am.

21    Q  Do you believe that Dr. Nieman completed

22 the items on that page?

| Page 75 |
|---|

1    A  Yes, he did.

2    Q  Did he do that in your presence?

3    A  Yes, he did.

4    Q  On the first page of the document there

5 is handwriting that you have identified as not

6 being yours?

7    A  Yes, ma'am.

8    Q  It says "onset 2003, no limitations."

9    A  Yes.

10    Q  Do you see that?

11    A  Yes.

12    Q  Did you see Dr. Nieman write those words?

13    A  I did not.

14    Q  Do you know whether he did or not?

15    A  I don't know.

16    Q  You don't know, okay. And at the time

17 you completed the portions of Exhibit 7 which you

18 completed you certainly intended to be complete and

19 accurate; isn't that correct?

20    A  Yes, ma'am.

21    Q  And you understood that successfully

22 completing the medical examination was a condition

| Page 76 |
|---|

1 of your employment?

2    A  Yes.

3      MR. GNATT: I'm sorry, I apologize. Your

4 use of the word complete, I'll object just for the

5 record for the form of the question. Your

6 understanding that successfully completing the

7 medical examination was a requirement for the job.

8 Completing it meaning what?

9      MS. KEARNS: It's a fine clarification.

10 BY MS. KEARNS:

11    Q  Did you understand that submitting to a

12 medical examination by a healthcare provider was a

13 condition of your employment?

14    A  Yes, I did, and passing the completion of

15 the format.

16    Q  Passing the --

17    A  The physical examination, yes, ma'am.

18    Q  You understood that passing the medical

19 examination --

20    A  Was a precondition.

21    Q  You've got to let me finish.

22    A  I'm sorry.

| Page 77 |
|---|

1    Q  Did you understand that passing the

2 medical examination was a condition of your

3 employment?

4    A  Yes.

5    Q  After you completed and passed the

6 medical examination you commenced work at America

7 University; isn't that correct?

8    A  Yes.

9    Q  On August 16th, 2004?

10    A  Yes.

11    Q  And on the day you arrived for work you

12 were provided with a copy of the American

13 University staff personnel policies manual; isn't

14 that correct?

15    A  The first day, yes, ma'am.

16      MS. KEARNS: Can we mark the next

17 exhibit, please.

18      (Green Exhibit Number 8

19      was marked for identification.)

20 BY MS. KEARNS:

21    Q  Looking at Exhibit 8, Mr. Green, is that

22 your signature on the first page next to the word

# Capital Reporting Company

Page 78

1    signature?
2        A    Yes, it is.
3        Q    Did you sign it on or around August 16th,
4    2004?
5        A    Yes, ma'am.
6        Q    Did you read it before you signed it?
7        A    Yes, ma'am.
8        Q    Was it correct that you had received the
9    AU staff personnel policies and benefits manual at
10    the time you signed this?
11        A    Yes, it is.
12        Q    And that is your Social Security number?
13        A    Yes, ma'am.
14        MS. KEARNS:  We can mark the next
15    exhibit.
16        (Green Exhibit Number 9
17        was marked for identification.)
18    BY MS. KEARNS:
19        Q    Is this, Mr. Green, Exhibit 9, is this
20    the staff personnel polices manual that you
21    received when you commenced employment at American
22    University?

Page 79

1        A    I'm -- give me one second, please.
2        Q    Sure.  Take your time.
3        A    I do believe that I've seen this before.
4        Q    And is this the personnel manual that you
5    received at the time you signed the acknowledgment
6    form that we just looked at?
7        A    I believe it is to the best of my
8    knowledge.
9        Q    In this case, Mr. Green, you're alleging
10    that American University and Dr. Ladner violated
11    the American's with Disabilities Act; isn't that
12    right?
13        A    Yes, ma'am.
14        Q    Can you tell me what medical
15    certification you provided to American University
16    in connection with your alleged disability?
17        A    I signed a -- a medical release form to
18    give American University a copy of my medical
19    records.  I also had discussed with Dr. Ladner and
20    Meg in reference to my medical condition and I
21    provided documentation -- I'm sorry, in reference
22    to the medical condition that I presently have.

Page 80

1        Q    Let me just make sure I understand your
2    answer.  You testified previously that you signed a
3    medical release form; is that correct?
4        A    For them to obtain my medical records.
5        Q    And that you did prior to obtaining your
6    offer at American University?
7        A    Yes, ma'am.
8        Q    And then you said you discussed with
9    Dr. Ladner your medical conditions?
10        A    Yes.
11        MR. GNATT:  And Meg I think.
12        THE WITNESS:  And Meg.
13    BY MS. KEARNS:
14        Q    And Meg.  And I believe you testified
15    earlier with Mary in HR --
16        A    Yes, ma'am.
17        Q    -- during your interviews.  And I believe
18    you said a moment ago something about submitting
19    documentation?
20        A    Yes, ma'am.
21        Q    What was that?
22        A    My medical records.

Page 81

1        Q    Did you actually physically provide your
2    medical records?
3        A    Personally I didn't give them the medical
4    records.  They -- I was informed that they would
5    obtain the medical records themselves because they
6    wanted them to come from the medical provider, not
7    from my hands.
8        Q    Did you provide any other documentation
9    other than what you've just described?
10        A    1 -- I obtained a statement from
11    Dr. Candace Love in relations to my medical
12    condition.  It states that it was okay for me to go
13    back to work because I was asked directly from Meg,
14    Mrs. Clemmer, to get that statement considering I
15    had a previous condition and I didn't work for
16    almost three years and they wanted to know how was
17    my medical condition at the time, at the present
18    time.
19        Q    And did you provide any other
20    documentation other than what you've just testified
21    to in connection with your medical condition?
22        A    Yes, I did.

## Capital Reporting Company

Page 82

1    Q    What was that?
2    A    In reference to my leg I had provided
3    them with some form of documentation about my leg,
4    the broken leg that I had they had asked about
5    that.
6    Q    And --
7    A    From Dr. Davidson was his name.
8    Q    Now, when you refer to your leg, are you
9    referring to the broken leg that you suffered in
10   the Summer of 2004 as a result of a motorcycle
11   accident?
12   A    Yes, ma'am.
13   Q    And you had a cast on when you commenced
14   work at American University?
15   A    Yes.
16   Q    And at some point you removed the cast
17   yourself; isn't that correct?
18   A    Yes, and the doctors put it right back
19   on.
20   Q    Because you taking it off yourself was
21   not good medical judgment?
22   A    Yes, it was very uncomfortable.

Page 83

1    Q    And the doctors put it back on?
2    A    Yes, ma'am.
3    Q    And that is one of the medical conditions
4    you discussed with AU before you were hired?
5    A    Yes, because -- if you let say this here,
6    American University they wanted -- I told them
7    about the broken leg at the time they wanted me to
8    start and they told me Reggie, don't worry, we're
9    going to wait for you, we want you and we're
10   willing to wait until your leg somewhat heals up
11   and then you can start.
12   Q    And did you take additional time?
13   A    Yes, I did.
14   Q    Other than your leg, which medical
15   conditions did you discuss with Meg Clemmer prior
16   to your employment?
17   A    About my fecal urgency, the colon surgery
18   that I had, and I discussed about the PTSD that I
19   suffered from.
20   Q    And did you discuss any other medical
21   conditions with Mrs. Clemmer before you commenced
22   work?

Page 84

1    A    Besides my present condition, no, ma'am.
2    Q    What's the present condition?
3    A    About the PTSD, the anal fissure, the
4    fecal urgency, about me needing to be close to a
5    bathroom.
6    Q    And the being close to the bathroom
7    relates to the fecal urgency problem?
8    A    Yes, ma'am.
9    Q    And is the fecal urgency as a result of
10   the anal fissure or it's related to it?
11   A    It's -- I have irritable bowel syndrome
12   and I had discussed with them about -- for example,
13   they had talked to me about driving Dr. Ladner to
14   New York and Philadelphia and I related my concerns
15   about that I would be having to stop to use the
16   restroom.  I just can't keep driving.  I have to
17   stop.
18   Q    Was that during the first or second
19   interview?
20   A    I believe that was during the second
21   interview.
22   Q    And what was the response to your request

Page 85

1    to be able to stop and use the bathroom?
2    A    She told me not to worry, that she would
3    discuss it with Dr. Ladner.
4    Q    And you say you discussed your
5    post-traumatic stress disorder with Mrs. Clemmer
6    during your interviews?
7    A    Yes, ma'am.
8    Q    Did you request any accommodation
9    associated with that disorder?
10   A    No.
11   Q    And you discussed your fecal urgency with
12   Mrs. Clemmer during your interviews?
13   A    Yes, I did.
14   Q    And what accommodation, if any, did you
15   request from her?
16   A    I had spoken with her -- I had spoken
17   with Meg and she just said that she would talk to
18   Dr. Ladner and get back to me.
19   Q    Did you ask whether you could stop to use
20   the bathroom during long car rides in connection
21   with your fecal urgency?
22   A    During that interview?

# Capital Reporting Company

Page 86

1    Q    Yes.
2    A    I had -- I had mentioned it to her and we
3    had talked several times about that.
4    Q    And that's when she said that should be
5    fine?
6    A    Yes.
7    Q    Did you ever provide any medical records
8    or did you ask anyone to provide any medical
9    records to AU relating to your post-traumatic
10   stress disorder?
11   A    Just the post-traumatic stress disorder?
12   Q    Yes.
13   A    I -- I -- I can't remember, ma'am.  If --
14   if -- I signed a release for them to obtain the
15   medical record in its entirety.  I even went to --
16   I went to Kaiser Permanente and signed a specific
17   letter authorizing American University to get
18   released that information.
19   Q    But my question, just to be clear, is did
20   you provide them with any medical, them meaning AU,
21   with any medical records relating to post-traumatic
22   stress disorder specifically?

Page 87

1    A    They didn't want it from my hands.  They
2    wanted to get it directly from the provider from
3    what I was told.
4    Q    My question, sir, relates only to your
5    post-traumatic disorder.
6    A    No, ma'am.  Okay, I'm sorry.
7    Q    My question is did you provide or did you
8    ask anyone to provide information to American
9    University relating to your post-traumatic stress
10   disorder specifically?
11   A    I can't recollect that I did, ma'am.
12   Q    Did you provide or ask anyone to provide
13   any medical information to AU regarding your
14   irritable bowel syndrome specifically?
15   A    I may have.  I just don't remember.
16   Q    And same question regarding your anal
17   fissure.  Did you provide or ask anyone to provide
18   medical information about that to AU?
19   A    Specifically the anal fissure?
20   Q    Yes, sir.
21   A    I believe I did because they clearly
22   asked me about the surgery.  Yes, I did.  Yes, I

Page 88

1    did.
2    Q    And when you say the surgery, are you
3    referring to the surgery that you had in May of
4    2003?
5    A    Yes, ma'am.
6    Q    Is it correct that you had surgery
7    performed by a Dr. Davis on May 21st, 2003?
8    A    Yes, ma'am.
9    Q    And that surgery was in connection with
10   correcting or alleviating your symptoms associated
11   with your anal fissure?
12   A    Yes.
13   Q    Where was the surgery performed?
14   A    Washington Hospital Center.
15   Q    And did you stay overnight after surgery?
16   A    Yes.
17   Q    How long were you in the hospital?
18   A    Exact days I don't -- I can't remember.
19   Q    And after the surgery did you return to
20   the hospital for post-surgery visits?
21   A    Oh, yes.
22   Q    And among the physicians you visited with

Page 89

1    post-surgery in connection with that surgery was
2    Dr. Candace Love; isn't that correct?
3    A    Yes.
4    Q    And isn't it correct that by June 9th
5    following your surgery your pain had become minimal
6    and you could sit and drive?
7    A    With some -- with a lot of difficulty.
8    Q    Isn't it true that by June 9th you were
9    weaning off your medications?
10   A    Yes, ma'am.
11   Q    By June 9th your rectal pain was much
12   better; isn't that correct?
13   A    Yes.
14   Q    And at that point you agreed to go
15   through withdrawal from Percocet?
16   A    Yes.
17   Q    And by January 1st of 2004 you had no
18   pain, no nausea, no vomiting, no constipation, no
19   diarrhea, no blood, no melena; isn't that right?
20   A    You said by when?
21   Q    January 1st, 2004.
22   A    If that's what the record says, yes,

# Capital Reporting Company

24 (Pages 90 to 93)

## Page 90

1  ma'am.
2      Q   So if AU had received your medical
3  records from Kaiser Permanente like you wanted them
4  to that's what they would have learned; isn't that
5  correct?
6      A   Yes.
7      Q   Are you aware of any medical records from
8  Kaiser Permanente or anyone else that indicates any
9  problem in connection with your anal fissure after
10  your surgery?
11      A   Can you repeat that question, please.
12      Q   Never mind. Never mind. In connection
13  with your anal fissure I believe you testified that
14  you asked Mrs. Clemmer whether you could take
15  bathroom breaks on car rides or long car rides; is
16  that correct?
17      A   Yes.
18      Q   Did you ask for any other accommodation
19  from AU in connection with your anal fissure?
20      A   I believe that's it.
21      Q   When you started at AU on the 16th, Mrs.
22  Clemmer was not at the office; isn't that right?

## Page 91

1      A   Correct.
2      Q   She was on her honeymoon?
3      A   Correct.
4      Q   And Dr. Ladner and Mrs. Ladner were not
5  there either?
6      A   They were there.
7      Q   They were, okay.
8      A   Yes, they were.
9      Q   At some point after you started did
10  someone sit down with you and talk to you about
11  your duties and responsibilities?
12      A   Yes.
13      Q   Who was that?
14      A   When Meg came back in she talked with me.
15      Q   And she provided you with some documents
16  relaying your duties and responsibilities?
17      A   Yes, ma'am.
18      MS. KEARNS: Let's mark the next exhibit.
19      (Green Exhibit Number 10
20      was marked for identification.)
21  BY MS. KEARNS:
22      Q   Mr. Green, is this one of the documents

## Page 92

1  that Mrs. Clemmer provided to you shortly after you
2  started work?
3      A   Yes.
4      Q   Driver's duties and responsibilities.
5  Did you read it when you received it?
6      A   Yes, I did.
7      Q   Was there any aspect about it which you
8  had a question?
9      A   Would you repeat that last statement you
10  just said.
11      Q   Did you have any questions about the
12  content of the document called driver's duties and
13  responsibilities?
14      A   Yes, I did.
15      Q   What was your question?
16      A   To Meg in general it was about the
17  bathroom breaks and basically...
18      Q   What question did you have about bathroom
19  breaks?
20      A   I'm just trying to see where it was on
21  here.
22      Q   I don't want to be presumptuous, but I

## Page 93

1  believe you're thinking of a different document, an
2  additional document that she provided to you which
3  I can mark and put in front of you. It might help.
4      MS. KEARNS: Can we just mark the next
5  exhibit.
6      (Green Exhibit Number 11
7      was marked for identification.)
8      THE WITNESS: Yes.
9  BY MS. KEARNS:
10      Q   If you could look, Mr. Green, at both
11  Exhibits 10 and 11. Do you see those two
12  documents? Exhibit 10, driver's duties and
13  responsibilities.
14      A   Yes.
15      Q   Exhibit 11 for conversation with Reggie.
16      A   Yes.
17      Q   Isn't it correct, sir, that Mrs. Clemmer
18  provided you with both of these documents?
19      A   Yes, it is.
20      Q   I believe before I gave you Exhibit 11
21  you were searching for a portion of the document
22  relating to bathroom breaks?

Page 94

1    A   Yes.
2    Q   And I will direct you, although you can
3    look at anything you want, to Exhibit 11 about one
4    quarter from the bottom, the third bullet point up.
5    Is that what you were looking for?
6    A   Yes, ma'am.
7    Q   And it says "Minimize bathroom stops on
8    long trips such as to New York.  In the past there
9    have been as many as four stops for bathroom on the
10   four-hour trip.  One is acceptable, zero is
11   preferable."  Is what you were looking for?
12   A   Yes, ma'am.
13   Q   And you had a question about that item?
14   A   Yes, ma'am.
15   Q   What was the question?
16   A   This was the one that I elaborated on
17   with Meg, in the presence of Meg, and we had also
18   discussed out of town knowledge of places which
19   wasn't a problem to me because she clearly asked me
20   about that.
21   Q   What was your question about bathroom
22   breaks?

Page 95

1    A   This was the one that I was particularly
2    concerned about because I clearly told her that I
3    -- I really can't drive a long period of time
4    without stopping to take a bathroom break.
5    Q   What, in your view, is a long period of
6    time?
7    A   Three hours, two hours.
8    Q   And did you tell her that's the kind of
9    time frame you were thinking of?
10   A   Yes.
11   Q   What was her reaction?
12   A   That she would discuss it with Dr. Ladner
13   because in the past she had -- they had a problem
14   with drivers asking to use the restroom and she
15   told me that they weren't really using the
16   restroom.  They would say they had to use the
17   restroom, but they were taking smoke breaks and
18   then when they got back in the car the Ladner's
19   could smell the smoke on their clothes.  I didn't
20   smoke.
21   Q   That was the objection the Ladners had to
22   bathroom breaks as far as you know?

Page 96

1    MR. GNATT:  Objection.  Form of the
2    question.  You may answer it.
3    THE WITNESS:  The Ladners had -- from
4    what I was told the Ladners had a problem with the
5    drivers requesting a bathroom break, not a
6    cigarette break.
7    BY MS. KEARNS:
8    Q   And did Mrs. Clemmer ever get back to
9    you, as she said she would, regarding talking to
10   Dr. Ladner about stopping for the bathroom?
11   A   Maybe a couple days before we were to
12   leave to go to Philadelphia.
13   Q   And what did she say?
14   A   That she had spoken with Dr. Ladner and
15   he somewhat said it would be okay or something to
16   that nature.
17   Q   Did anyone at AU ever tell you you could
18   not take a bathroom break when you needed one?
19   A   Not like that, no.
20   MS. KEARNS:  Can I mark the next exhibit,
21   please.
22   (Green Exhibit Number 12

Page 97

1    was marked for identification.)
2    BY MS. KEARNS:
3    Q   Before we turn to the last exhibit, in
4    your last answer you said not like that, no.  My
5    question is did anyone at AU ever suggest to you in
6    words or otherwise that you could not take a
7    bathroom break when you needed one?
8    A   No, ma'am.
9    Q   Could you look at Exhibit 12, please.
10   This is a document dated December 3rd, 2004.  Have
11   you seen this document before?
12   A   Yes.
13   Q   How did you receive a copy of this
14   document?
15   A   From Mrs. Clemmer.
16   Q   And what did she say to you when she gave
17   it to you?
18   A   Mrs. Clemmer came down to my office
19   almost in tears when she handed me this document
20   and she said Reggie, I'm sorry that we have to let
21   you go by Dr. Ladner.
22   Q   She was saying that Dr. Ladner made the

# Capital Reporting Company

Page 98

1 decision to let you go?
2     A    Yes.
3     Q    And did she explain to you what the
4 reason was for that decision?
5     A    She did not.
6     Q    And what did you say after Mrs. Clemmer
7 gave you that information?
8     A    I -- I asked her what did I do wrong and
9 she said that she couldn't say.
10     Q    Did you understand her to mean she didn't
11 know what you did wrong or that she was forbidden
12 to say?
13     A    I -- my understanding was that she didn't
14 know what I had done wrong.
15     Q    And it says in this letter that you'll be
16 paid through December 16th, 2004. Were you in fact
17 paid through that date?
18     A    Yes, ma'am.
19     Q    It says at the bottom if you have
20 questions you may contact employee relations; do
21 you see that?
22     A    Uh-huh.

Page 99

1     Q    Did you contact employee relations?
2     A    Yes.
3     Q    Who did you talk to?
4     A    I can't remember who it was.
5     Q    What did you say?
6     A    I asked them what rights did I have and
7 they basically said you don't have any rights.
8     Q    Did they discuss with you the fact that
9 you were a probationary employee?
10     A    They didn't -- they said -- my -- my
11 recollection is they just said we can't discuss
12 anything and they may have said you were
13 probationary. I don't remember.
14     Q    Is it true that you were probationary?
15     A    I don't believe that I was when I was
16 terminated.
17     Q    Did you understand you were on probation
18 at any time?
19     A    For 90 days, yes. That's my clearly -- I
20 clearly understood 90 days.
21     Q    Ninety days from August 16th?
22     A    That's what I understood.

Page 100

1     Q    What was the basis for that
2 understanding?
3     A    During the discussion they told me that I
4 had 90 days of being a probationary employee.
5     Q    Who told you that?
6     A    Meg told me that, Mary Hentschel told me
7 that. I just went off the belief that I was a
8 90-day employee.
9     Q    When did they tell you that?
10     A    During the orientation.
11     Q    During the orientation?
12     A    Yes.
13     Q    You mean after you had started work?
14     A    After I started work that I was a 90-day
15 probationary employee at will.
16     Q    What did you understand at will to mean?
17     A    That I could be fired at any time within
18 the 90 days if I didn't meet the standard procedure
19 guidelines that a driver would follow. If I did
20 something wrong, I could be fired.
21     Q    And then what did you understand, if
22 anything, about your rights after the 90 days?

Page 101

1     A    That I would become a full-time employee
2 at American University.
3     Q    At any time while you were employed at
4 American University did you bring any complaints to
5 AU's employee relations group?
6     A    No, I didn't.
7     Q    At any time while you were an employee at
8 American University did you make any complaints to
9 the HR department?
10     A    No, I didn't.
11     MS. KEARNS:  This actually might be a
12 good time for me to break.
13     MR. GNATT:  Okay.
14     (Whereupon, at 12:20 p.m., a
15 luncheon recess was taken.)
16     (Green Exhibit Numbers 13 through 19
17 were marked for identification.)
18     * * * * *
19
20
21
22

# Capital Reporting Company

Page 130

1  else about it. We talked about me having to run up
2  the steps whereas the one time I fell and injured
3  myself and she said I can egress through the bottom
4  door downstairs.
5      Q   And was your request to be near a
6  bathroom related to your anal fissure?
7      A   Relating to my anal fissure, relating to
8  my leg because it was very difficult for me to hop
9  up -- I had to hop three flights of stairs to use
10  the restroom.
11     Q   And it was difficult with your cast on on
12  your injured leg to go up and down the stairs?
13     A   Very difficult.
14     Q   Now, with your fecal urgency that you've
15  talked about, how often during the day, as of the
16  Summer of 2004, did you go to the bathroom?
17     A   In reference to physically having a bowel
18  movement maybe three or four times. In reference
19  to having the urge to go to the bathroom in one
20  day's time I feel like I have to go to the bathroom
21  about 10 to 15 times, even right now.
22     Q   And I take it you're not going to the

Page 131

1  bathroom right now?
2      A   No, ma'am, I'm not.
3      Q   So you can control that?
4      A   Yes.
5      Q   So at that time how much time did you
6  spend in the car versus in your office while you
7  worked at AU?
8      A   How much time did I spend in the car?
9      Q   Driving versus sitting in the office?
10     A   45/50 percent of my time --
11     Q   Driving?
12     A   -- in an eight hour day.
13     Q   Driving?
14     A   Yes, ma'am.
15     Q   And at any time while you were driving
16  did you feel such an urge to go to the bathroom
17  that you had to pull over?
18     A   With Dr. Ben Ladner in the car?
19     Q   With anybody in the car.
20     A   I stop and use the bathroom when I have
21  to use the bathroom. If I'm alone, I will stop.
22     Q   That's a different question.

Page 132

1      A   Okay.
2      Q   At any time while you were driving a
3  passenger for AU did you have to stop and use the
4  bathroom?
5      A   With Mrs. Ladner in the car one time.
6      Q   And did you stop?
7      A   Yes, I did.
8      Q   And did she raise any objection to you
9  stopping?
10     A   She didn't say anything because we
11  stopped to get gas I believe one time and I stopped
12  and used the restroom at the gas station.
13     Q   Is that the only time during the driving
14  portion of your job you remember having to use the
15  bathroom while you worked at AU?
16     A   To the best of my --
17         MR. GNATT: I'm sorry, I need to clarify
18  the question. Having to use the bathroom or
19  stopping to use the bathroom?
20  BY MS. KEARNS:
21     Q   We'll try that over. Other than the
22  incident you just described with Mrs. Ladner did

Page 133

1  you ever use the bathroom while on a driving
2  assignment with passengers for AU?
3      A   I can't remember, no.
4      Q   Well, there is the incident on the way
5  back from Philadelphia, right?
6      A   Besides that.
7      Q   So two times?
8      A   Okay.
9      Q   Okay. You agree with me, two times?
10     A   I agree.
11     Q   Was there any time where you were driving
12  and needed to use the bathroom but were not
13  permitted to do so?
14     A   Not to change that question, but there
15  was a time I had the urge to use the bathroom and
16  we were not far from the Metropolitan Club where
17  immediately when I let Dr. Ben Ladner out of the
18  vehicle, I ran inside to use the restroom in the
19  Metropolitan Club, yes.
20     Q   Any other incidents?
21     A   That was it.
22     Q   Now, during the portion of the time that

## Capital Reporting Company

35 (Pages 134 to 137)

| Page 134 | Page 136 |
|---|---|

**Page 134**

1  you were in the office, referring to the
2  President's Office Building at AU; is that right?
3      A   Yes, ma'am.
4      Q   And you actually were given an office?
5      A   Yes, in the basement.
6      Q   And where was the bathroom located that
7  you used in that building?
8      A   There was a -- that I used?
9      Q   Yes.
10     A   I used the one upstairs on the top floor
11 of the office building. I felt very uncomfortable
12 being that the space was so small inside of the
13 main administrative office and the President's
14 Office that I didn't want to offend anyone in there
15 and I did say something that I, you know, I needed
16 to use another restroom.
17     Q   Was there a restroom on the first floor
18 of that building?
19     A   Yes, only one.
20     Q   Only one. And it was the smell you
21 though would offend?
22     A   The smell, yes, ma'am.

**Page 135**

1      Q   And so you wanted to go to the bathroom
2  on the second floor?
3      A   Yes.
4      Q   And it was in connection with that that
5  you asked could I be moved because your foot was
6  aggravated by this?
7      A   Yes, and -- and I had expressed my
8  concern inside the office in front of several
9  people that worked there.
10     Q   And did you identify a location where you
11 could move in that building?
12     A   The only place where you could think that
13 another bathroom was upstairs.
14     Q   Was there an office there?
15     A   Yes, there's plenty of space upstairs.
16     Q   Did you ever, while you were at AU, have
17 any accidents where you soiled yourself because you
18 couldn't get to a bathroom on time?
19     A   I believe I had an accident going up the
20 steps one time.
21     Q   Do you know when that was?
22     A   Exact date and time I don't, but I

**Page 136**

1  remember there was an accident one time.
2      Q   And what did you do to clean yourself
3  off?
4      A   I went in the bathroom and cleaned myself
5  up.
6      Q   Did you change your clothes?
7      A   I changed my underwear.
8      Q   So you carry additional underwear?
9      A   Yes, I do.
10     Q   The day that you soiled yourself were you
11 able to complete your job duties?
12     A   Yes.
13     Q   What time of day was that?
14     A   Right around noontime after we had came
15 back in with -- after I came back in with
16 Dr. Ladner.
17     Q   Did you ever contact anyone in the
18 employee relations department or the HR department
19 to request any kind of accommodation while you were
20 employed at AU?
21     A   The first day I came in there, AU, I had
22 requested combinations and they told me I needed to

**Page 137**

1  talk to Meg on my very first day. I had even
2  written down on the paper, I don't know which form
3  it was, but the young lady that was handling the
4  processing she told me that I needed to take that
5  up with my immediate supervisor office manager,
6  whoever I was working for, which was Meg. Meg was
7  on marriage leave, honeymoon leave.
8      Q   When she was on her honeymoon. And when
9  she came back you took it up with her?
10     A   Yes, I did.
11     Q   And we discussed that this morning about
12 what you discussed with her. And one of the things
13 you say you talked about with her was the
14 difficulty having to go up and down the stairs with
15 your cast?
16     A   Yes, ma'am.
17     Q   And she didn't address that or change
18 that for you?
19     A   No, she didn't.
20     Q   And did you ever go back to the HR
21 department or employee relations and complain and
22 say I've made this request and they're not doing

**Capital Reporting Company**

36 (Pages 138 to 141)

| Page 138 | Page 140 |
|---|---|

Page 138

1  anything about it?

2    A   Well, to be honest, ma'am, I didn't want

3  to make a nuisance of myself being that I was a new

4  employee and I really wanted that job. Like I

5  said, I didn't want to make a nuisance. I was

6  really afraid.

7        MS. KEARNS:  Could you read my question

8  back?

9        (The reporter read the record as

10        requested.)

11       THE WITNESS: No, I didn't.

12 BY MS. KEARNS:

13    Q   You were afraid. What were you afraid

14 of?

15    A   I was afraid they would consider me a

16 pain in the ass and fire me.

17    Q   Was there anything that Meg Clemmer had

18 done or said that made you afraid of her?

19    A   Well, I wasn't really afraid of her. I

20 was afraid that what Dr. Ladner would probably say

21 considering the way that, you know, people said how

22 Dr. Benjamin Ladner is -- was.

Page 140

1    A   Because I figured if you -- I'm sorry.

2    Q   Well, we've talked about two

3  accommodations I believe now. One was moving you

4  out of the basement?

5    A   Yes.

6    Q   And you made that request very early on

7  in your employment?

8    A   Yes.

9    Q   And nothing happened and you never asked

10 again; is that correct?

11    A   I just wanted to be close to a bathroom.

12 That's all.

13    Q   Well, I'm sorry, didn't you tell the D.C.

14 Office of Human Rights that you wanted to be out of

15 the basement because of your fractured ankle?

16    A   The leg was a problem at hopping up the

17 steps to get to the bathroom. I know that I

18 discussed it with them when I first came in there.

19 I didn't want to be a nuisance and keep going to

20 them with the same request and them not doing

21 anything about it.

22    Q   So just answer my question so I get it.

Page 139

1    Q   How did people say he was?

2    A   That he can be a -- a hard ass.

3    Q   In what sense?

4    A   Don't become a nuisance.

5    Q   And who told you that?

6    A   I just heard it. I heard it in the

7  office. I don't want to call anyone's name. I

8  heard it in the office.

9    Q   And you don't want to tell me who it was?

10    A   I don't want to discuss the person's name

11 who it was in the office. It was someone that

12 worked in the office with me.

13    Q   In the office at AU?

14    A   Yes, ma'am.

15    Q   Anyone else make that comment to you?

16    A   No.

17    Q   So you talked about these requested

18 accommodations early on in your employment and

19 nothing happened. Did you stop asking because you

20 didn't want to be a nuisance or what happened?

21    A   I did stop asking.

22    Q   So --

Page 141

1  You started work there and you said I don't want to

2  be in the basement, I need to be near a bathroom;

3  is that what you said?

4    A   Okay, I mean with all due respect I

5  didn't say I don't want to be in a basement. I

6  just said it would be nice if I could be near a

7  restroom. I didn't care where they placed me as

8  long as I was near a restroom.

9    Q   Could you look back at your affidavit

10 that you submitted to the D.C. Office of Human

11 Rights and tell me where you said that to the D.C.

12 Office of Human Rights?

13    A   If you can tell me where it...

14    Q   Exhibit 16.

15        MR. GNATT:  She's asking you in the text

16 of this affidavit is there something specific that

17 says that you asked them to put you near a

18 bathroom.

19        THE WITNESS:  Ma'am, as I said before, I

20 had verbally requested through Meg -- I talked with

21 Meg several occasions about this.

22 BY MS. KEARNS:

## Capital Reporting Company

Page 142

1    Q   My question is really simple.  Where in
2    Exhibit 16 do you say that, if anywhere?
3    A   Okay, ma'am, perhaps I didn't put it
4    in here, the bathroom issue was discussed several
5    times with Meg, as I said before, if I could
6    finish.  I put in here about the long trips, yes, I
7    did and having to use the bathroom.  Maybe perhaps
8    I didn't put in here that I request to be moved to
9    be near a bathroom.  I thought that I had put this
10   in here in the complaint itself, but the bathroom
11   was discussed several times with Ms. Meg.
12   Q   Are you agreeing with me that Exhibit 16
13   doesn't refer to any request on your part to be
14   near a bathroom; yes or no?
15   A   No, it's not in here.
16   Q   If you'll look at Exhibit 15 it's not in
17   there either?
18   A   No, I don't see it in there, ma'am.
19   Q   Do you remember having a meeting with Meg
20   Clemmer and Dr. Ladner in his office at any time?
21   A   Yes, I do.
22   Q   What was the purpose of this meeting?

Page 143

1    A   The first meeting was to inform me number
2    one, how -- how good things were going because I --
3    I had clearly asked and at the same time I had
4    asked Meg was there anything that I could do in
5    help facilitating and make this transition a little
6    bit more easier on all parties in reference to
7    Dr. Ladner.
8    Q   And in response to that she set up a
9    meeting between you and Dr. Ladner?
10   A   Yes, the first -- the first request that
11   I had asked for one also.
12   Q   How many meetings did you have with Meg
13   Clemmer in Dr. Ladner's office?
14   A   I believe it was two.
15   Q   What was the second meeting in connection
16   with?
17   A   The second meeting was to let me know
18   that -- well, may -- may I tell you what happened?
19   Q   No, I just want to know why you had a
20   meeting?
21   A   Because Meg wanted to let me know that
22   don't greet Dr. Ladner's wife with a hug even

Page 144

1    though she had hugged me getting off the airplane.
2    Q   And that was the complete substance of
3    your meeting?
4    A   That was the meeting right there.
5    Q   So do you know when the first meeting
6    took place?
7    A   Sometime at the end of September.
8    Q   And when did the second meeting take
9    place?
10   A   May have been October I believe.
11   Q   Did you take any notes of these meetings?
12   A   Yes, I did.  I don't have the notes on
13   me.
14   Q   Well, do you have the notes in your
15   possession somewhere?
16   A   I don't -- I don't have the note.
17   Q   They're destroyed?
18   A   Yes, they are.
19   Q   Did you notice if Mrs. Clemmer was taking
20   notes?
21   A   She -- she may have been.  I -- I can't
22   recollect.

Page 145

1    Q   Weren't you somewhat nervous in
2    connection with the second meeting?
3    A   No, I wasn't.
4    Q   You didn't say that going to the office
5    scared you a little bit?
6    A   You said going into his office?
7    Q   Yes.
8    A   No, ma'am.  I went to his office
9    regularly to -- he would call me and ask me for
10   something.
11   Q   But you testified a minute ago that he
12   was such a hard ass.  You weren't a little nervous
13   going in there?
14   A   I was not nervous whatsoever in going in
15   his office.  He would call me in to give me
16   directives sometime.
17   Q   Were you a little nervous about what he
18   wanted to talk to you about?
19   A   No, ma'am, none whatsoever.
20   Q   Even though you had this idea he was a
21   hard ass?
22   A   I heard he was a hard ass.

## Capital Reporting Company

38 (Pages 146 to 149)

| Page 146 |
|---|

1    Q   But you didn't believe it?
2    A   I had to find out for myself. I didn't
3    see that he was -- like said anything harsh to me
4    in reference to my duties or anything.
5    Q   Not at all during the entire time that
6    you were there he never said anything harsh to you
7    in connection with your duties?
8    A   Dr. Ladner never said anything harsh to
9    me in reference to my duties that I can recollect,
10   ma'am.
11   Q   Okay. So you had two meetings in
12   Dr. Ladner's office with Meg Clemmer and one had to
13   do with hugging Mrs. Ladner when she got off the
14   airplane?
15   A   No, Mrs. Ladner greeted me with a hug.
16   She was drunk.
17   Q   And the conversation was to counsel you
18   about not hugging her back?
19   A   About not greeting Mrs. Ladner with a
20   hug.
21   Q   And did you say that was fine with you?
22   A   I said I'd be more than pleased not to.

| Page 147 |
|---|

1    Q   Did you have the impression that Mrs.
2    Ladner had complained?
3    A   I think what happened was Mrs. Ladner may
4    have told how nice a guy Reggie is and Dr. Ladner
5    kind of got offended that I -- I returned a hug to
6    her.
7    Q   What makes you think that?
8    A   Because of the way that he came off and
9    said it. I mean it's typical for -- I see people
10   greeting people in hugs all the time, the clients
11   that I deal with.
12   Q   But my question is what made you think
13   that Dr. Ladner was upset?
14   A   Well, I just -- the way Meg told me don't
15   do that with an authoritarian rule. Don't do that.
16   Q   She was counseling you not to do that
17   again?
18       MR. GNATT: Objection.
19   BY MS. KEARNS:
20   Q   Yes?
21   A   She told me don't do that again. That's
22   a no-no.

| Page 148 |
|---|

1    Q   Did you ever meet with Meg Clemmer and
2    Sally Ekfelt, the three of you together while you
3    were at AU?
4    A   Can you tell me where we had a meeting?
5    Q   Do you know who Sally is?
6    A   Sally is Mrs. Ladner's executive
7    assistant.
8    Q   Yes, I'm just asking whether you and Meg
9    and Sally ever met together while you were at AU?
10   A   Down at the residence one time, yes.
11   Q   Just one time?
12   A   Yes, one time only.
13   Q   And why did you have that meeting?
14   A   To go and pick up some items and put it
15   on a university credit card. That was it.
16   Q   You didn't have a meeting with the two of
17   them at the residence to go over your
18   responsibilities as they related to the residence?
19   A   Yes, we did, and that was at the same
20   time they was telling me to go and get these items
21   with this credit card.
22   Q   So during that meeting the three of you

| Page 149 |
|---|

1    talked about your duties and then they gave you an
2    assignment; is that right?
3    A   Yes, ma'am, the responsibilities of the
4    residence.
5    Q   After that did you have any meetings with
6    just Sally and you?
7    A   Many to ask me to -- to give me
8    directives. That was basically it. No counseling
9    sessions or nothing like that.
10   Q   Who did you believe you reported to?
11   A   To Meg.
12   Q   And did she tell you that was the case?
13   A   Whom are you speaking of?
14   Q   Meg. Did Meg tell you that you reported
15   to her?
16   A   Yes, clearly.
17   Q   In your memory were you ever late to pick
18   up any passengers during the time you were working
19   at AU?
20   A   I was late to pick up Dr. Ladner one
21   morning. Nothing on my part. There was a flat
22   tire in reference to in the rain. I had a flat

Page 154

1    used that particular system, I had requested time
2    to go to the dealership which I made available
3    myself while I wasn't working for Dr. Ladner to go
4    over there and get taught some instructions on how
5    the usage of that system was in the car.
6        Q    And did you take the course?
7        A    Yes, ma'am.
8        Q    Did you understand how to use the GPS?
9        A    Yes, I did.
10        Q    Did anyone prevent you from taking the
11    course?
12        A    They didn't want to give me the time off
13    to go and per se to -- to learn at a -- in a
14    certain amount of hours a day because the time
15    wasn't available in accordance with Dr. Ben
16    Ladner's schedule. So when Dr. Ben Ladner wasn't
17    around, I went over to the dealership with
18    authorization from Meg to get the hours and
19    instructions on that system.
20        Q    And was that a course someone had to pay
21    for?
22        A    No, ma'am. I went over there and learned

Page 155

1    from the salesmens and the mechanics.
2        Q    And when did you take that course?
3        A    Two, three times a week in accordance
4    with the time that was available for me to go over
5    there and do it.
6        Q    Was it at the Rosenthal dealership?
7        A    Yes, it was.
8        Q    And did you feel you learned how to use
9    the GPS system?
10        A    To the best of my knowledge.
11        Q    Well, did you ever have a problem using
12    the GPS system after you took the course?
13        A    No. No.
14        Q    Did Meg Clemmer ever talk to you about
15    comments that one of the trustees had made about a
16    conversation she had with you?
17        A    I'm sorry?
18        Q    Did you ever talk to Meg Clemmer about
19    complaints made by one of the trustees about you as
20    a driver?
21        A    I can't recollect.
22        Q    Did you ever talk to Meg Clemmer about

Page 156

1    concerns you had about how long it took to hire
2    you? Did you ever tell Meg Clemmer that you
3    thought it took too long for AU to hire you?
4        A    No, I didn't. I can't remember.
5        Q    Did you have that conversation with
6    anyone related to AU?
7        A    I don't -- I don't believe so.
8        Q    You're not sure?
9        A    I'm not sure.
10        Q    Did you ever have a circumstance where
11    you had a misunderstanding with Mrs. Ladner about
12    whether or not to take or pick up her family from
13    the airport?
14        A    Okay, give me that again.
15        Q    Was there ever a circumstance while you
16    were at AU where you had a misunderstanding with
17    Mrs. Ladner about whether you should take or pick
18    up her family at the airport?
19        A    Okay. Yes, I clearly remember that.
20    There was a misunderstanding between Meg and
21    Mrs. Ladner due to the fact that Reggie Green was
22    stuck in -- sitting inside of the garage for two

Page 157

1    hours and the Ladners never did come outside
2    because Mrs. Ladner and Meg was not communicating.
3    I had to call Meg to tell her to call Mrs. Ladner
4    to let her know that Reggie was sitting outside in
5    the garage waiting to take her family to the
6    airport.
7        Q    And did Meg point out to you that there
8    was a note on your Blackberry about that
9    assignment?
10        A    There was never a note sent that's why I
11    was sitting outside in the garage.
12        Q    And how was your working relationship
13    with Sally Ekfelt?
14        A    I thought it was pretty good.
15        Q    And how was your working relationship
16    with Meg Clemmer?
17        A    I thought it was pretty good. She didn't
18    give me any indication that it wasn't.
19        Q    Did you drive to Philadelphia on
20    December 1st, 2004 with Dr. Ladner?
21        A    Yes, ma'am. Just myself and Dr. Ladner.
22        Q    And during that car ride did you have any

# Capital Reporting Company

41 (Pages 158 to 161)

Page 158

1    conversation with him?
2        A    Going up to Philadelphia?
3        Q    Yes.
4        A    I don't believe I did.
5        Q    Did you, upon arriving in Philadelphia,
6    get lost on your way to the Four Seasons?
7        A    That is incorrect.
8        Q    You had no difficulty finding the hotel?
9        A    No, ma'am. I've been in Philadelphia
10    many times and to the Four Seasons hotel.
11        Q    And you didn't go down an alley where a
12    truck was unloading produce?
13        A    No, ma'am. Can I tell you?
14        Q    Yes.
15        A    Upon arriving in Philadelphia to get to
16    the Four Seasons hotel there was an exit. The
17    first exit for the Four Seasons was blocked off,
18    they were doing road work. I immediately went to
19    the next exit, dropped down in the ramp and there
20    was a warehouse exit area here and I rode along the
21    side of the road until you enter in the circle
22    of down -- I guess it's Liberty Square and the Four

Page 159

1    Seasons hotel is right around that circle. I went
2    directly to the hotel without stopping to ask
3    anybody anything and the GPS was pointing out to go
4    that way anyway, the next available exit.
5        Q    And you and Dr. Ladner had no discussion
6    at all about what you were doing?
7        A    None whatsoever.
8        Q    And he expressed no concern about it?
9        A    He asked me why didn't I take that exit.
10    I said it's blocked, they're doing work, we can't
11    exit there, I have to take the next upcoming exit.
12        Q    And after you dropped him at the hotel
13    did you stay in for the evening or was there more
14    driving that day?
15        A    There was some more driving that evening.
16        Q    And what was that?
17        A    If I'm not mistaken either that night I
18    may have taken him and this gentleman Al Checcio to
19    a restaurant right down the street maybe less than
20    three blocks from the hotel, dropped them off in
21    front of the restaurant, and I parked the car like
22    a few cars on the left hand side on the same

Page 160

1    street, parked the car, got out, went and got me
2    some dinner, came right back and sit in the car. I
3    could see them when they walked out the restaurant.
4        Q    Who is Al Checcio?
5        A    I guess maybe one of his associates.
6        Q    Is he related to AU?
7        A    I think he does some work with AU.
8        Q    And what information did Mr. Checcio have
9    about your alleged disability?
10        A    I'm sorry?
11        Q    What did he know about your disability?
12        A    I -- I didn't think that he -- I don't
13    think he didn't know anything about my
14    disabilities. He shouldn't have known anything
15    about them.
16        Q    And there was no problem picking them up
17    from the dinner and getting them back to the hotel?
18        A    When he walked outside the restaurant --
19    there's no parking in front of the restaurant. He
20    got on the phone and called and said where are you.
21    I said Mr. Al, I'm sitting right here, I'll be
22    right there to get you and I pulled the car right

Page 161

1    up and got them. I never left from view of the
2    front door of the restaurant. When I dropped them
3    off, I parked the car right on the corner.
4        Q    And Mr. Checcio called you on your cell
5    phone?
6        A    I believe Dr. Ladner may have called.
7    Dr. Ladner, not Checcio.
8        Q    And did Mr. Checcio get on the cell phone
9    after Dr. Ladner?
10        A    I don't remember even talking to him.
11        Q    And did you drive with Mr. Checcio and
12    Dr. Ladner back from Philadelphia the next day?
13        A    That is incorrect. No one was in the car
14    but me and Dr. Ladner.
15        Q    And did you and Dr. Ladner have any
16    conversation on the ride back?
17        A    When Dr. Ladner's in the car he likes to
18    listen to jazz music. He's not -- he doesn't
19    really talk to you unless he asks you a particular
20    question.
21        Q    At one point did you ask Dr. Ladner if
22    you could stop to use the restroom?

# Capital Reporting Company

42 (Pages 162 to 165)

Page 162

1   A   Yes, I did.
2   Q   And what did he say?
3   A   He was adamant about going onto
4   Washington, D.C., could I wait.
5   Q   So he said no?
6   A   He was adamant about continuing to go on
7   to D.C.
8   Q   And did you continue on to D.C.?
9   A   I told him that I must use the restroom.
10  If I don't stop, I'm going to soil the seat in his
11  car.
12  Q   What did he do?
13  A   He kind of turned blue and pink in the
14  face and mumbled some words and I proceeded to go
15  and stop at the rest stop at the Maryland House or
16  Chesapeake House, one of those.
17  Q   And when you got back in the car did he
18  say anything to you?
19  A   He didn't say one word to me. He looked
20  like he was very perturbed at what I just did.
21  Q   And did you drive straight to the
22  university after that?

Page 163

1   A   Yes, ma'am.
2   Q   When you returned to the university, did
3   you tell Mrs. Clemmer about Dr. Ladner's reaction
4   to you using the bathroom?
5   A   Really I didn't have a chance to because
6   when I came in that following morning it was -- it
7   happened so fast, you're fired, and she was -- as I
8   said, she was in tears.
9   Q   And did you at that point ask her whether
10  it had anything to do with you going to the
11  bathroom?
12  A   She couldn't talk. She couldn't say
13  anything.
14  Q   Could you say anything, were you able to
15  talk?
16  A   I was in shock.
17  Q   So you were unable to speak?
18  A   I could speak, but I was -- I was in
19  shock. I mean I wanted to talk about it, but she
20  was is in no -- no position to speak.
21  Q   Well, did you contact Dr. Ladner?
22  A   No. I didn't -- I didn't feel the need

Page 164

1   to contact him. I mean what is he going to say?
2   He wouldn't even talk to me anyway, so. Like I
3   said, he was mad from the previous night when I
4   stopped the car to use the bathroom.
5   Q   And the reason you know he's mad is
6   because he turned pink and blue in the face?
7   A   Well, he mumbled some words up under his
8   mouth and he could see when I requested to use the
9   bathroom that I had to use the bathroom bad enough
10  that I was rocking forth in the car. I had to stop
11  and use the bathroom or else I would soil, as I
12  said, the seat of the car.
13  Q   How far into the trip was it when you
14  needed to use the bathroom?
15  A   We had stopped at the Maryland House I
16  believe it was. Over an hour.
17  Q   I thought you said it was the Chesapeake
18  House?
19  A   I said the Chesapeake or the Maryland
20  House. I believe it was the Maryland House.
21  Q   What time of day was that?
22  A   It was at night. In fact, it was raining

Page 165

1   I clearly remember.
2   Q   When you say he mumbled, do you remember
3   what he said?
4   A   I didn't hear. I can't remember exactly
5   what he said. He had the radio on and I -- I -- he
6   expressed concern that he was in a hurry to get
7   back to D.C.
8   Q   Other than that do you have any memory of
9   what he said?
10  A   I can't recollect his exact words he
11  said, ma'am. It's been awhile.
12  Q   Now, since you left AU you have had
13  employment with U.S. Sedan, and Lemay Limousine
14  Services, Chevy Chase Bank, and Intercontinental;
15  is that right?
16  A   That's it.
17  Q   Those are all your driving jobs since you
18  left?
19  MR. GNATT: I'm sorry, did we figure out
20  that Intercontinental had only been in 2005 and
21  that he may have misspoken when he named
22  Intercontinental as a 2007 or 2006?

## Capital Reporting Company

49 (Pages 190 to 193)

| Page 190 | Page 192 |
|---|---|
| 1  extremely hard around there.  He told me that I was | 1  A  Okay. |
| 2  one of the best drivers that they ever had. | 2  Q  We've talked about Dr. Jain.  When was |
| 3  Q  Did you have occasions to drive | 3  the last time you saw Dr. Bradley? |
| 4  Mr. Taylor? | 4  A  About four or five years ago. |
| 5  A  No, ma'am. | 5  Q  When was the last time you saw Adrienne |
| 6  Q  Does Mr. Taylor know anything about your | 6  Clamp? |
| 7  disability? | 7  A  About five years ago. |
| 8  A  I'm not sure. | 8  Q  When was the last time you saw Laura |
| 9  Q  When was the last time you talked to him? | 9  Isensee? |
| 10  A  Probably three years, two years. | 10  A  About 2003. |
| 11  Q  Who is Shaka Sakar? | 11  Q  Dr. Mohammed Ali, when was the last time |
| 12  A  Sakar was the receptionist. | 12  you saw him? |
| 13  Q  In the President's Office Building? | 13  A  About maybe three, four years ago. |
| 14  A  Yes. | 14  Q  Great name.  I'm sure every single day he |
| 15  Q  What does she know about your physical | 15  must hear ten times a day oh, what about your name. |
| 16  and mental impairments? | 16      MR. GNATT:  How's your daughter Laila. |
| 17  A  I've talked to Sakar many times inside | 17  BY MS. KEARNS: |
| 18  the office.  Such a small space there and we | 18  Q  Right.  When was the last time you saw |
| 19  discussed about how my stomach was and my medical | 19  David Butler? |
| 20  condition in general we talked about it. | 20  A  Dr. David Butler I think when I had a |
| 21  Q  When was the last time you spoke to her? | 21  heart attack. |
| 22  A  Been a long time, probably three years. | 22  Q  Well, it says he has knowledge of stomach |

| Page 191 | Page 193 |
|---|---|
| 1  Q  When was the last time you spoke to Jeri | 1  and colon conditions. |
| 2  Rice? | 2  A  About two, maybe three years ago.  I |
| 3  A  Three years. | 3  talked to him about a year ago. |
| 4  Q  And what was her position? | 4  Q  What about Dr. Benzel, when was the last |
| 5  A  She was Meg's secretary or something like | 5  time you saw him? |
| 6  that. | 6  A  Six years. |
| 7  Q  And you talked to her about your health | 7  Q  Are you currently being treated by a |
| 8  conditions, too? | 8  mental health specialist? |
| 9  A  Yeah. | 9  A  At present, right this moment, no. |
| 10  Q  Did you ever specifically talk to her | 10  Q  When was the last time you saw a mental |
| 11  about your request to use bathroom breaks while you | 11  health specialist? |
| 12  took long car trips? | 12  A  I'm guessing maybe close to a year ago, |
| 13  A  We talking about Jeri Rice? | 13  but I keep -- I take that back.  I take that back. |
| 14  Q  We are. | 14  The VA Hospital. |
| 15  A  I believe she overheard the conversation | 15  Q  When was that? |
| 16  because the office is so small there's no way | 16  A  Six months. |
| 17  you can't overhear it. | 17  Q  Six months ago.  And was that a mental |
| 18  Q  Could you look back at answer number ten, | 18  health specialist you had seen before? |
| 19  if you will. | 19  A  Yes. |
| 20      MR. GNATT:  Page eight still? | 20  Q  Do you remember that doctor's name? |
| 21  BY MS. KEARNS: | 21  A  The one that I'm seeing now at VA? |
| 22  Q  Yes. | 22  Q  Uh-huh.  Well, by the one you're seeing |

## Capital Reporting Company

50 (Pages 194 to 197)

| Page 194 | Page 196 |
|---|---|
| 1 now are you referring to the one you saw six months | 1    A   It's on and off. |
| 2 ago. | 2    Q   I meant to ask you when we were talking |
| 3    A   Dr. Ooka Booka Dooka (ph) something. | 3 before about your intermittent bleeding or |
| It's an African gentleman. | 4 irregular bleeding, can you recall any instances |
| 5    Q   I'm sorry.  Is the one you refer to as | 5 while you worked at American University where you |
| 6 the one you're seeing now the same one you saw six | 6 had one of those experiences of bleeding? |
| 7 months ago? | 7    A   While I was at American University I bled |
| 8    A   Yes. | 8 regularly.  I just -- I tried to go to the doctor, |
| 9    Q   And you saw him six months ago? | 9 but I couldn't go to the doctor because Dr. Ladner |
| 10    A   Yes. | 10 had overlapping schedules and the doctors got on me |
| 11    Q   And have you seen him since? | 11 about not coming to the hospital and like I told |
| 12    A   Four, maybe four months.  I saw the same | 12 Meg that I had to go to the hospital because I even |
| 13 guy six months and I went back in to see him about | 13 informed Meg about my bleeding problem. |
| 14 four months maybe. | 14    Q   When did you do that? |
| 15    Q   And you can't remember his name? | 15    A   A couple of occasions. |
| 16    A   I don't.  I'm sorry. | 16    Q   And is it your testimony you were |
| 17    Q   I'm going to assume, because I think I'm | 17 prevented from seeking medical attention by |
| 18 entitled to, that because his name doesn't appear | 18 Dr. Ladner? |
| 19 in response to either interrogatory 10 or 11 that | 19    A   I won't say by Dr. Ladner, but because of |
| 20 he's not responsive to either request.  I'm going | 20 his schedule they wanted me to reschedule my |
| 21 to say that for the record giving you a chance to | 21 appointments.  On several occasions they asked me |
| 22 amend your interrogatory answer.  Now, with respect | 22 to reschedule, reschedule, and reschedule and I |

| Page 195 | Page 197 |
|---|---|
| 1 to Dr. Jain. | 1 told Meg that I had to go, that I needed to go to |
| 2       MS. KEARNS:  I'm sorry, could you mark | 2 the hospital and she said well, Reggie, try to, you |
| 3 the next exhibit. | 3 know, re-book the appointments because Dr. Ladner |
| 4       (Green Exhibit Number 20 | 4 has got this going on and that going on and he |
| 5       was marked for identification.) | 5 really wants you to drive this and that. |
| 6 BY MS. KEARNS: | 6    Q   So you cancelled each appointment you had |
| 7    Q   Mr. Green, this is a document that you | 7 made? |
| 8 produced in this case which is a medical record | 8    A   Yeah. |
| 9 from Dr. Jain.  Have you seen this document before? | 9    Q   Do you have any records of those |
| 10    A   Yes, ma'am. | 10 appointments? |
| 11    Q   Did you ask her to prepare this document? | 11    A   I don't have the papers on me, no, I |
| 12    A   I didn't ask her to prepare it.  I may | 12 don't. |
| 13 have went in and got a copy of it for my record.  I | 13    Q   Do you have any records of making the |
| 14 didn't ask for it to be prepared. | 14 request to take time off for your appointments? |
| 15    Q   You took it from your medical records at | 15    A   I -- I could -- I could research it and |
| 16 George Washington University? | 16 find it out, but I don't have record of it myself |
| 17    A   Yeah. | 17 personally. |
| 18    Q   And is it correct that since your | 18    Q   And on how many occasions did Mrs. |
| 19 termination from AU you've had your gallbladder | 19 Clemmer say you should reschedule your doctor |
| 20 removed? | 20 appointments? |
| 21    A   Yeah. | 21    A   Maybe about four or five of them. |
| 22    Q   Is that fully healed? | 22    Q   And were each of those occasions in |

# Capital Reporting Company

| Page 198 | Page 200 |
|---|---|
| 1  connection with your bleeding? | 1  university's President's illegal activity and is |
| 2  A  I think one of them was for my leg and | 2  now involved in lawsuits in relation to those |
| 3  the other one was for the bleeding because I was | 3  allegations."  We talked earlier about the fact you |
| 4  bleeding pretty bad. | 4  wrote your anonymous letter and then you were |
| 5  Q  When you say you were bleeding pretty | 5  identified by someone and you've admitted that it |
| 6  bad, did you have any accidents where the bleeding | 6  was you who wrote the letter? |
| 7  went through your clothes? | 7  A  (Nods head.) |
| 8  A  No, I had a pad on. | 8  Q  Yes?  You've got to answer out loud, Mr. |
| 9  Q  Could you look down on Dr. Jain's notes | 9  Green. |
| 10  under social Hx.  I believe that means history. | 10  A  Yes, yes. |
| 11  It's on the first page. | 11  Q  Yes to all those questions? |
| 12  A  Okay.  Admits to social EtOH. | 12  A  Yes. |
| 13  Q  Yes.  Do you know that means? | 13  Q  And what lawsuits, if any, are you |
| 14  A  I'm sorry.  I have no idea. | 14  involved in relating to Dr. Ladner's alleged |
| 15  Q  Do you drink socially?  Do you drink | 15  illegal activity at the university? |
| 16  alcohol socially? | 16  A  I don't know any. |
| 17  A  A little bit of wine that's about it. | 17  Q  She's wrong about that, too? |
| 18  Q  Now, Dr. Jain reports that you had a | 18  A  She's wrong.  I think she's speculating |
| 19  lawsuit against the government which has since been | 19  when she was writing this right here. |
| 20  resolved.  What lawsuit is that? | 20  Q  "He's been married for the past four |
| 21  A  She was talking about OPIC.  OPIC is a | 21  years but admits to having one extramarital affair |
| 22  federal government agency. | 22  during that time;" is that true? |

| Page 199 | Page 201 |
|---|---|
| 1  Q  And based on what you know, is she | 1  A  Wrong. |
| 2  referring to the settlement that we described | 2  Q  She just made that up, too? |
| 3  before our break? | 3  A  That's wrong.  No. |
| 4  A  Right. | 4  Q  "He states that he is not currently |
| 5  Q  She says "He still has two lawsuits | 5  sexually active due to erectile dysfunction brought |
| 6  pending against government agencies." | 6  on by stress;" right or wrong? |
| 7  A  That's incorrect. | 7  A  True. |
| 8  Q  "And reports that many of his issues are | 8  Q  Well, atleast it's true as of March 21, |
| 9  stress induced." | 9  2006? |
| 10  A  That's incorrect. | 10  A  Yes. |
| 11  Q  That was an incorrect statement? | 11  MS. KEARNS:  Let's go off the record for |
| 12  A  That's incorrect. | 12  one second. |
| 13  Q  You don't have two lawsuits pending? | 13  (Discussion off the record.) |
| 14  A  No, ma'am, no. | 14  MS. KEARNS:  I don't have any further |
| 15  Q  She states "Was employed through American | 15  questions. |
| 16  University as a driver to the university President | 16  MR. GNATT:  Thank you.  I'm not going to |
| 17  and he claims to have been unjustly fired due to | 17  ask any questions.  Do you want to explain about |
| 18  issues relating to fecal urgency on the job."  And | 18  reading and signing? |
| 19  that's the lawsuit we're here talking about, right? | 19  MS. KEARNS:  Sure.  You have the right to |
| 20  A  Yeah. | 20  review your deposition and correct it for any |
| 21  Q  She says "In response, leaked information | 21  inaccuracies, not to change the substance, but to |
| 22  to the press and the university about the | 22  correct anything the court reporter may have taken |

649-F (Rev. 10/03) (6045)

# Medical Examination Report
## FOR COMMERCIAL DRIVER FITNESS DETERMINATION

**EXHIBIT**
Green #9
TH 8-27-07

## 1. DRIVERS INFORMATION
Driver completes this section.

**Driver's Name (Last, First, Middle):** Green, Reginald Calvin

**Address:** 9108 Lola Ct

**City, State, Zip Code:** Ft Washington MD 20744

**Social Security No.:** 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

**Birthdate:** 02 05 58

**Age:** 46

**Sex:** ☑M ☐F

**Work Tel:** 202-744-3508
**Home Tel:** 301-265-1901

Driver License No.: G650734108096

**Date of Exam:** JUL 14 2004

**License Class:** ☐A ☐C ☐B ☐D ☑Other

**State of Issue:** M.D.

☐ New Certification
☐ Recertification
☐ Follow Up

## 2. HEALTH HISTORY
Driver completes this section, but medical examiner is encouraged to discuss with driver.

**Yes/No**
- ☑ Any illness or injury in the last 5 years?
- ☐ Head/Brain injuries, disorders or illnesses
- ☐ Seizures, epilepsy
- ☐ medication
- ☑ Eye disorders or impaired vision (except corrective lenses)
- ☑ Ear disorders, loss of hearing or balance
- ☐ Heart disease or heart attack; other cardiovascular condition
- ☐ medication
- ☑ Heart surgery (valve replacement/bypass, angioplasty, pacemaker)
- ☑ High blood pressure ☐ medication
- ☐ Muscular disease
- ☑ Shortness of breath

**Yes No**
- ☐☐ Lung disease, emphysema, asthma, chronic bronchitis
- ☐☐ Kidney disease, dialysis
- ☐☐ Liver disease
- ☑☐ Digestive problems
- ☐☐ Diabetes or elevated blood sugar controlled by: ☐diet ☐pills ☐insulin
- ☑☐ Nervous or psychiatric disorders, e.g., severe depression
- ☐ medication
- ☐☐ Loss of, or altered consciousness

**Yes No**
- ☑☐ Fainting, dizziness
- ☐☐ Sleep disorders, pauses in breathing while asleep, daytime sleepiness, loud snoring
- ☐☐ Stroke or paralysis
- ☐☐ Missing or impaired hand, arm, foot, leg, finger, toe
- ☐☐ Spinal injury or disease
- ☐☐ Chronic low back pain
- ☑☐ Regular, frequent alcohol use
- ☐☐ Narcotic or habit forming drug use

For any YES answer, indicate onset date, diagnosis, treating physician's name and address, and any current limitation. List all medications (including over-the-counter medications) used regularly or recently.

OXYCODONE 5/325 ULTRACET ORAMORPH SR 30 MG Kaiser Permanente & GWU
Gen Percocet 5/325  Sometime for anal Fissure Dr Constance Love
OXIt 2003
No Limitation

I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate.

**Driver's Signature** [signature]   **Date** 07-14-04

**Medical Examiner's Comments on Health History** (The medical examiner must review and discuss with the driver any "yes" answers and potential hazards of medications, including over-the-counter medications, while driving. This discussion must be documented below.)

[signature] M.D.

## TESTING (Medical Examiner completes Section 3 through 7)

Name: Last, Green    First, Reginald    Middle, Calvin

### 3. VISION

**Standard:** At least 20/40 acuity (Snellen) in each eye with or without correction. At least 70° peripheral in horizontal meridian measured in each eye. The use of corrective lenses should be noted on the Medical Examiner's Certificate.

**INSTRUCTIONS:** When other than the Snellen chart is used, give test results in Snellen-comparable values. In recording distance vision, use 20 feet as normal. Report visual acuity as a ratio with 20 as numerator and the smallest type read at 20 feet as denominator. If the applicant wears corrective lenses, these should be worn while visual acuity is being tested. If the driver habitually wears contact lenses, or intends to do so while driving, sufficient evidence of good tolerance and adaptation to their use must be obvious. Monocular drivers are not qualified.

Numerical readings must be provided.

| ACUITY | UNCORRECTED | CORRECTED | HORIZONTAL FIELD OF VISION |
|---|---|---|---|
| Right Eye | 20/ 20 | 20/ | Right Eye 80 ° |
| Left Eye | 20/ 20 | 20/ | Left Eye 80 ° |
| Both Eyes | 20/ 16 | 20/ | |

Complete next line only if vision testing is done by an ophthalmologist or optometrist

Applicant can recognize and distinguish among traffic control signals and devices showing standard red, green, and amber colors? ☒Yes ☐No

Applicant meets visual acuity requirement only when wearing:
☐ Corrective Lenses

Monocular Vision: ☐Yes ☒No

Date of Examination ___    Name of Ophthalmologist or Optometrist (print) ___    Tel. No. ___    License No./State of Issue ___    Signature ___

### 4. HEARING

**Standard:** a) Must first perceive forced whispered voice ≥ 5 ft, with or without hearing aid, or b) average hearing loss in better ear ≤ 40 dB

☐ Check if hearing aid used for tests. ☐ Check if hearing aid required to meet standard.

**INSTRUCTIONS:** To convert audiometric test results from ISO to ANSI, -14 dB from ISO for 500 Hz, -10 dB for 1,000 Hz, -8.5 dB for 2,000 Hz. To average, add the readings for 3 frequencies tested and divide by 3.

Numerical readings must be recorded.

a) Record distance from individual at which forced whispered voice can first be heard.

| | Right Ear | Left Ear |
|---|---|---|
| | \Feet | \Feet |

b) If audiometer is used, record hearing loss in decibels. (acc. to ANSI Z24.5-1951)

| | Right Ear | | | Left Ear | | |
|---|---|---|---|---|---|---|
| | 500 Hz | 1000 Hz | 2000 Hz | 500 Hz | 1000 Hz | 2000 Hz |
| | 20 | 20 | 20 | 20 | 20 | 20 |
| Average: | 20 | | | Average: | 20 | |

### 5. BLOOD PRESSURE / PULSE RATE

Numerical readings must be recorded. Medical examiner should take at least two readings to confirm BP.

| | Reading | Category | Expiration Date | Recertification |
|---|---|---|---|---|
| | 140-159/90-99 | Stage 1 | 1 year | 1 year if ≤ 140/90. One-time certificate for 3 months if 141-159/91-99. |
| | 160-179/100-109 | Stage 2 | One-time certificate for 3 months. | 1 year from date of exam if ≤ 140/90 |
| | ≥ 180/110 | Stage 3 | 6 months from date of exam if ≤ 140/90 | 6 months if ≤ 140/90 |

| Blood Pressure | Systolic 150 | Diastolic 100 |
|---|---|---|

Driver qualified if ≤ 140/90.

Pulse Rate: ☒Regular ☐Irregular

Record Pulse Rate: 72

### 6. LABORATORY AND OTHER TEST FINDINGS

Numerical readings must be recorded.

Urinalysis is required. Protein, blood or sugar in the urine may be an indication for further testing to rule out any underlying medical problem.

Other Testing (Describe and record)

| URINE SPECIMEN | SP. GR. 2.010 | PROTEIN neg | BLOOD neg | SUGAR neg |
|---|---|---|---|---|

AU 0117

## 7. PHYSICAL EXAMINATION

Height: __67__ (in.)    Weight: __62__ (lbs.)    Name: Last, __Green__    First, __Reginald__   Middle, __Colvin__

The presence of a certain condition may not necessarily disqualify a driver, particularly if the condition is controlled adequately, is not likely to worsen or is readily amenable to treatment. Even if a condition does not disqualify a driver, the medical examiner may consider deferring the driver temporarily. Also, the driver should be advised to take the necessary steps to correct the condition as soon as possible particularly if the condition, if neglected, could result in more serious illness that might affect driving.

Check YES if there are any abnormalities. Check NO if the body system is normal. Discuss any YES answers in detail in the space below, and indicate whether it would affect the driver's ability to operate a commercial motor vehicle safely. Enter applicable item number before each comment. If organic disease is present, note that it has been compensated for.
*See Instructions to the Medical Examiner for guidance.*

| BODY SYSTEM | CHECK FOR: | YES* | NO | BODY SYSTEM | CHECK FOR: | YES* | NO |
|---|---|---|---|---|---|---|---|
| 1. General Appearance | Marked overweight, tremor, signs of alcoholism, problem drinking, or drug abuse. | | ✓ | 7. Abdomen and Viscera | Enlarged liver, enlarged spleen, masses, bruits, hernia, significant abdominal wall muscle weakness. | | ✓ |
| 2. Eyes | Pupillary equality, reaction to light, accommodation, ocular motility, ocular muscle imbalance, extraocular movement, nystagmus, exophthalmos. Ask about retinopathy, cataracts, aphakia, glaucoma, macular degeneration and refer to a specialist if appropriate. | | ✓ | 8. Vascular System | Abnormal pulse and amplitude, carotid or arterial bruits, varicose veins. | | ✓ |
| | | | | 9. Genito-urinary System | Hernias. | | ✓ |
| 3. Ears | Scarring of tympanic membrane, occlusion of external canal, perforated eardrums. | | ✓ | 10. Extremities - Limb impaired. Driver may be subject to SPE certificate if otherwise qualified. | Loss or impairment of leg, foot, toe, arm, hand, finger. Perceptible limp, deformities, atrophy, weakness, paralysis, clubbing, edema, hypotonia. Insufficient grasp and prehension in upper limb to maintain steering wheel grip. Insufficient mobility and strength in lower limb to operate pedals properly. | | ✓ |
| 4. Mouth and Throat | Irremediable deformities likely to interfere with breathing or swallowing. | | ✓ | | | | |
| 5. Heart | Murmurs, extra sounds, enlarged heart, pacemaker, implantable defibrillator. | | ✓ | 11. Spine, other musculoskeletal | Previous surgery, deformities, limitation of motion, tenderness. | | ✓ |
| 6. Lungs and chest, not including breast examination. | Abnormal chest wall expansion, abnormal respiratory rate, abnormal breath sounds including wheezes or alveolar rales, impaired respiratory function, cyanosis. Abnormal findings on physical exam may require further testing such as pulmonary tests and/or x-ray of chest. | | ✓ | 12. Neurological | Impaired equilibrium, coordination or speech pattern; asymmetric deep tendon reflexes, sensory or positional abnormalities, abnormal patellar and Babinski's reflexes, ataxia. | | ✓ |

*COMMENTS:* _____

Note certification status here. See Instructions to the Medical Examiner for guidance.

☐ Meets standards in 49 CFR 391.41; qualifies for 2 year certificate
☐ Does not meet standards
☑ Meets standards, but periodic monitoring required due to __HTN__

   Driver qualified only for: ☐ 3 months ☐ 6 months ☑ 1 year ☐ Other

☐ Temporarily disqualified due to (condition or medication): _____
   Return to medical examiner's office for follow up on _____

Expires
JUL 1 4 2005

☐ Wearing corrective lenses
☐ Wearing hearing aid
☐ Accompanied by a _____ waiver/exemption. Driver must present exemption at time of certification.
☐ Skill Performance Evaluation (SPE) Certificate
☐ Driving within an exempt intracity zone (See 49 CFR 391.62)
☐ Qualified by operation of 49 CFR 391.64

Medical Examiner's Signature _____

Medical Examiner's Name ___ROLF NIEMAN, MD___
   BUCKLEY'S RENEWAL CENTER
   637 INDIANA AVENUE, NW
   WASHINGTON, DC 20004

Address _____

Telephone Number __(202) 628-0000__

If meets standards, complete a Medical Examiner's Certificate as stated in 49 CFR 391.43(h). (Driver must carry certificate when operating a commercial vehicle).

AU 0118

# 49 CFR 391.41 Physical Qualifications for Drivers

## THE DRIVER'S ROLE

Responsibilities, work schedules, physical and emotional demands, and lifestyles among commercial drivers vary by the type of driving that they do.  Some of the main types of drivers include the following:  turn around or short relay (drivers return to their home base each evening); long relay (drivers share the driving by alternating their 5-hour driving periods and 5-hour rest periods); straight through haul (cross country drivers); and team drivers (drivers share the driving in a driver's performance of duties: abrupt schedule changes and rotating work schedules, which may result in irregular sleep patterns and a driver beginning a trip in a fatigued condition, long hours; extended time away from family and friends, which may result in lack of social support; tight pickup and delivery schedules, with irregularity in work, rest, and eating patterns, adverse road, weather and traffic conditions, which may cause delays and lead to hurriedly loading or unloading cargo in order to compensate for the lost time; and environmental conditions such as excessive vibration, noise, and extremes in temperature. Transporting passengers or hazardous materials may add to the demands on the commercial driver.

There may be duties in addition to the driving task for which a driver is responsible and needs to be fit.  Some of these responsibilities are:  coupling and uncoupling trailer(s) from the tractor, loading and unloading trailer(s) (sometimes a driver may lift a heavy load or unload as much as 50,000 lbs. of freight after sitting for a long period of time without any stretching period); inspecting the operating condition of tractor and/or trailer(s) before, during, and after delivery of cargo; lifting, installing, and removing heavy tire chains; and, lifting heavy tarpaulins to cover open top trailers. The above tasks demand agility, the ability to bend and stoop, the ability to maintain a crouching position to inspect the underside of the vehicle, frequent entering and exiting of the cab, and the ability to climb ladders on the tractor and/or trailer(s).

In addition, a driver must have the perceptual skills to monitor a sometimes complex driving situation, the judgment skills to make quick decisions, when necessary, and the manipulative skills to control an oversize steering wheel, shift gears using a manual transmission, and maneuver a vehicle in crowded areas.

## §391.41 PHYSICAL QUALIFICATIONS FOR DRIVERS

(a) A person shall not drive a commercial motor vehicle unless he is physically qualified to do so and, except as provided in §391.67, has on his person the original, or a photographic copy, of a medical examiner's certificate that he is physically qualified to drive a commercial motor vehicle.

(b) A person is physically qualified to drive a motor vehicle if that person:

(1) Has no loss of a foot, a leg, a hand, or an arm, or has been granted a Skill Performance Evaluation (SPE) Certificate (formerly Limb Waiver Program) pursuant to §391.49.

(2) Has no impairment of:  (i) A hand or finger which interferes with prehension or power grasping; or (ii) An arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or has been granted a SPE Certificate pursuant to §391.49.

(3) Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control;

(4) Has no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure.

(5) Has no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his ability to control and drive a commercial motor vehicle safely.

(6) Has no current clinical diagnosis of high blood pressure likely to interfere with his ability to operate a commercial motor vehicle safely.

(7) Has no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease which interferes with his ability to control and operate a commercial motor vehicle safely.

(8) Has no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle;

(9) Has no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his ability to drive a commercial motor vehicle safely.

(10) Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70 degrees in the horizontal meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber;

(11) First perceives a forced whispered voice in the better ear not less than 5 feet with or without the use of a hearing aid, or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz and 2,000 Hz with or without a hearing device when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5-1951;

(12) (i) Does not use a controlled substance identified in 21 CFR 1308.11 Schedule I, an amphetamine, a narcotic, or any other habit-forming drug. (ii) Exception:  A driver may use such a substance or drug, if the substance or drug is prescribed by a licensed medical practitioner who: (A) Is familiar with the driver's medical history and assigned duties;

and (B) Has advised the driver that the prescribed substance or drug will not adversely affect the driver's ability to safely operate a commercial motor vehicle; and

(13) Has no current clinical diagnosis of alcoholism.

## INSTRUCTIONS TO THE MEDICAL EXAMINER

### General Information

The purpose of this examination is to determine a driver's physical qualification to operate a commercial motor vehicle (CMV) in interstate commerce according to the requirements in 49 CFR 391.41-49. Therefore, the medical examiner must be knowledgeable of these requirements and guidelines developed by the FMCSA to assist the medical examiner in making the qualification determination. The medical examiner should be familiar with the driver's responsibilities and work environment and is referred to the section on the form, **The Driver's Role.**

In addition to reviewing the **Health History** section with the driver and conducting the physical examination, the medical examiner should discuss common prescriptions and over-the-counter medications relative to the side effects and hazards of these medications while driving. Educate the driver to read warning labels on all medications. History of certain conditions may be cause for rejection, particularly if required by regulation, or may indicate the need for additional laboratory tests or more stringent examination perhaps by a medical specialist. These decisions are usually made by the medical examiner in light of the driver's job responsibilities, work schedule and potential for the conditions to render the driver unsafe.

Medical conditions should be recorded even if they are not cause for denial, and they should be discussed with the driver to encourage appropriate remedial care. This advice is especially needed when a condition, if neglected, could develop into a serious illness that could affect driving.

If the medical examiner determines that the driver is fit to drive and is also able to perform non-driving responsibilities as may be required, the medical examiner signs the medical certificate which the driver must carry with his/her license. The certificate must be dated. **Under current regulations, the certificate is valid for two years, unless the driver has a medical condition that does not prohibit driving but does require more frequent monitoring.** In such situations, the medical certificate should be issued for a shorter length of time. The physical examination should be done carefully and at least as complete as is indicated by the attached form. Contact the FMCSA at (202) 366-1790 for further information (a vision exemption, qualifying drivers under 49 CFR 391.64, etc.).

### Interpretation of Medical Standards

Since the issuance of the regulations for physical qualifications of commercial drivers, the Federal Motor Carrier Safety Administration (FMCSA) has published recommendations called Advisory Criteria to help medical examiners in determining whether a driver meets the physical qualifications for commercial driving. These recommendations have been condensed to provide information to medical examiners that (1) is directly relevant to the physical examination and (2) is not already included in the medical examination form. The specific regulation is printed in italics and its reference by section is highlighted.

## Federal Motor Carrier Safety Regulations
### -Advisory Criteria-

### Loss of Limb:
#### §391.41(b)(1)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has no loss of a foot, leg, hand or an arm, or has been granted a Skill Performance Evaluation (SPE) Certificate pursuant to Section 391.49.*

### Limb Impairment:
#### §391.41(b)(2)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has no impairment of: (i) A hand or finger which interferes with prehension or power grasping; or (ii) An arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or (iii) Any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle.) (4) Has been granted a Skill Performance Evaluation (SPE) Certificate pursuant to Section 391.49.*

A person who suffers loss of a foot, leg, hand or arm or whose limb impairment in any way interferes with the safe performance of normal tasks associated with operating a commercial motor vehicle is subject to the Skill Performance Evaluation Certification Program pursuant to section 391.49, assuming the person is otherwise qualified.

With the advancement of technology, medical aids and equipment modifications have been developed to compensate for certain disabilities. The SPE Certification Program (formerly the Limb Waiver Program) was designed to allow persons with the loss of a foot or limb or with functional impairment to qualify under the Federal Motor Carrier Safety Regulations (FMCSRs) by use of prosthetic devices or equipment modifications which enable them to safely operate a commercial motor vehicle. Since there are no medical aids equivalent to the original body or limb, certain risks are still present, and thus restrictions may be included on individual SPE certificates when a State Director for the FMCSA determines they are necessary to be consistent with safety and public interest.

If the driver is found otherwise medically qualified (391.41(b)(3) through (13)), the medical examiner must check on the medical certificate that the driver is qualified only if accompanied by a SPE certificate. The driver and the employing motor carrier are subject to appropriate penalty if the driver operates a motor vehicle in interstate or foreign commerce without a current SPE certificate for his/her physical disability.

### Diabetes
#### §391.41(b)(3)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control.*

Diabetes mellitus is a disease which, on occasion, can result in a loss of consciousness or disorientation in time and space. Individuals who require insulin for control have conditions which can get out of control by the use of too much or too little insulin, or food intake not consistent with the insulin dosage. Incapacitation may occur from symptoms of hyperglycemic or hypoglycemic reactions (drowsiness, semiconsciousness, diabetic coma or insulin shock).

The administration of insulin is, within itself, a complicated process requiring insulin, syringe, needle, alcohol sponge and a sterile technique. Factors related to long-haul commercial motor vehicle operations, such as fatigue, lack of sleep, poor diet, emotional conditions, stress, and concomitant illness, compound the dangers, the FMCSA has consistently held that a diabetic who uses insulin for control does not meet the minimum physical requirements of the FMCSRs.

Hypoglycemic drugs, taken orally, are sometimes prescribed for diabetic individuals to help stimulate natural body production of insulin. If the condition can be controlled by the use of oral medication and diet, then an individual may be qualified under the present rule. CMV drivers who do not meet the Federal diabetes standard may call (202) 366-1790 for an application for a diabetes exemption.
(See Conference Report on Diabetic Disorders and Commercial Drivers and Insulin-Using Commercial Motor Vehicle Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

### Cardiovascular Condition
#### §391.41(b)(4)
**A person is physically qualified to drive a commercial motor vehicle if that person:**
*Has no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse or congestive cardiac failure.*

The term "has no current clinical diagnosis of" is specifically designed to encompass: "a clinical diagnosis of" (1) a current cardiovascular condition, or (2) a cardiovascular condition which has not fully stabilized regardless of the time limit. The term "known to be accompanied by" is defined to

include: a clinical diagnosis of a cardiovascular disease (1) which is accompanied by symptoms of syncope, dyspnea, collapse or congestive cardiac failure; and/or (2) which is likely to cause syncope, dyspnea, collapse or congestive cardiac failure.

It is the intent of the FMCSRs to render unqualified, a driver who has a current cardiovascular disease which is accompanied by and/or likely to cause symptoms of syncope, dyspnea, collapse, or congestive cardiac failure. However, the subjective decision of whether the nature and severity of an individual's condition will likely cause symptoms of cardiovascular insufficiency as an individual basis and qualification rests with the medical examiner and the motor carrier. In those cases where there is an occurrence of cardiovascular insufficiency (myocardial infarction, thrombosis, etc.), it is suggested before a driver is certified that he or she have a normal resting and stress electrocardiogram (ECG), no residual complications and no physical limitations, and is taking no medication likely to interfere with safe driving.

Coronary artery bypass surgery and pacemaker implantation are remedial procedures and thus, not unqualifying. Implantable cardioverter defibrillators are disqualifying due to risk of syncope. Coumadin is a medical treatment which can improve the health and safety of the driver and should not, by its use, medically disqualify the commercial driver. The emphasis should be on the underlying medical condition(s) which require treatment and the general health of the driver. The FMCSA should be contacted at (202) 366-1790 for additional recommendations regarding the physical qualification of drivers on coumadin.
(See Cardiovascular Advisory Panel Guidelines for the Medical Examination of Commercial Motor Vehicle Drivers at: http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Respiratory Dysfunction
### §391.41(b)(5)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with ability to control and drive a commercial motor vehicle safely.*

Since a driver must be alert at all times, any change in his or her mental state is in direct conflict with highway safety. Even the slightest impairment in respiratory function under emergency conditions (when greater oxygen supply is necessary for performance) may be detrimental to safe driving.

There are many conditions that interfere with oxygen exchange and may result in incapacitation, including emphysema, chronic asthma, carcinoma, tuberculosis, chronic bronchitis and sleep apnea. If the medical examiner detects a respiratory dysfunction, that in any way is likely to interfere with the driver's ability to safely control and drive a commercial motor vehicle, the driver must be referred to a specialist for further evaluation and therapy. Anticoagulation therapy for deep vein thrombosis and/or pulmonary

thromboembolism is not unqualifying once optimum dose is achieved, provided lower extremity venous examinations remain normal and the treating physician gives a favorable recommendation.
(See Conference on Pulmonary/Respiratory Disorders and Commercial Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Hypertension
### §391.41(b)(6)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has no current clinical diagnosis of high blood pressure likely to interfere with ability to operate a commercial motor vehicle safely.*

Hypertension alone is unlikely to cause sudden collapse; however, the likelihood increases when target organ damage, particularly cerebral vascular disease, is present. This regulatory criteria is based on FMCSA's Cardiovascular Advisory Guidelines for the Examination of CMV Drivers, which raised the Sixth Report of the Joint National Committee on Detection, Evaluation, and Treatment of High Blood Pressure (1997).

Stage 1 hypertension corresponds to a systolic BP of 140/159 mmHg and/or a diastolic BP of 90-99 mmHg. The driver with a BP in this range is at low risk for hypertension-related acute incapacitation and may be medically certified to drive for a one-year period. Certification examinations should be done annually thereafter and should be at or less than 140/90. If less than 160/100, certification may be extended one time for 3 months.

A blood pressure of 160-179 systolic and/or 100-109 diastolic is considered Stage 2 hypertension, and the driver is not necessarily unqualified during evaluation and institution of treatment. The driver is given a one time certification of three months to reduce his or her blood pressure to less than or equal to 140/90. A blood pressure in this range is an absolute indication for anti-hypertensive drug therapy.
Provided treatment is well tolerated and the driver demonstrates a BP value of 140/90 or less, he or she may be certified for one year from date of the initial exam. The driver is certified annually thereafter.

A blood pressure at or greater than 180 (systolic) and 110 (diastolic) is considered Stage 3, high risk for an acute BP-related event. The driver may not be qualified, even temporarily, until reduced to 140/90 or less and treatment is well tolerated. The driver may be certified for 6 months and biannually (every 6 months) thereafter if at recheck BP is 140/90 or less.

Annual recertification is recommended if the medical examiner does not know the severity of hypertension prior to treatment.

An elevated blood pressure finding should be confirmed by at least two subsequent measurements on different days.
Treatment includes nonpharmacologic and pharmacologic modalities as well as counseling to reduce other risk factors. Most antihypertensive medications also have side effects, the

importance of which must be judged on an individual basis. Individuals must be alerted to the hazards of these medications while driving. Side effects of somnolence or syncope are particularly undesirable in commercial drivers. Secondary hypertension is based on the above stages. Evaluation is warranted if patient is persistently hypertensive on maximal or near-maximal doses of 2-3 pharmacologic agents. Some causes of secondary hypertension may be amenable to surgical intervention or specific pharmacologic disease.
(See Cardiovascular Advisory Panel Guidelines for the Medical Examination of Commercial Motor Vehicle Drivers at: http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Rheumatic, Arthritic, Orthopedic, Muscular, Neuromuscular or Vascular Disease
### §391.41(b)(7)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular or vascular disease which interferes with ability to control and operate a commercial motor vehicle safely.*

Certain diseases are known to have acute episodes of transient muscle weakness, poor muscular coordination (ataxia), abnormal sensations (paresthesia), decreased muscular tone (hypotonia), visual disturbances and pain which may be suddenly incapacitating. With each recurring episode, these symptoms may become more pronounced and remain for longer periods of time. Other diseases have more insidious onsets and display symptoms of muscle wasting (atrophy), swelling and paresthesia which may not suddenly incapacitate a person but may restrict his/her movements and eventually interfere with the ability to safely operate a motor vehicle. In many instances these diseases are degenerative in nature or may result in deterioration of the involved area.

Once the individual has been diagnosed as having a rheumatic, arthritic, orthopedic, muscular, neuromuscular or vascular disease, then he/she has an established history of that disease. The physician, when examining an individual, should consider the following: (1) the nature and severity of the individual's condition (such as sensory loss or loss of strength); (2) the degree of limitation present (such as range of motion); (3) the likelihood of progressive limitation (not always present initially but may manifest itself over time); and (4) the likelihood of sudden incapacitation. If severe functional impairment exists, the driver does not qualify. In cases where more frequent monitoring is required, a certificate for a shorter time period may be issued.
(See Conference on Neurological Disorders and Commercial Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Epilepsy
### §391.41(b)(8)
A person is physically qualified to drive a commercial motor

vehicle if that person:
*Has no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a motor vehicle.*

Epilepsy is a chronic functional disease characterized by seizures or episodes that occur without warning, resulting in loss of voluntary control which may lead to loss of consciousness and/or seizures. Therefore, the following drivers cannot be qualified: (1) a driver who has a medical history of epilepsy; (2) a driver who has a current clinical diagnosis of epilepsy; or (3) a driver who is taking antiseizure medication.

If an individual has had a sudden episode of a nonepileptic seizure or loss of consciousness of unknown cause which did not require antiseizure medication, the decision as to whether that person's condition will likely cause loss of consciousness or loss of ability to control a motor vehicle is made on an individual basis by the medical examiner in consultation with the treating physician. Before certification is considered, it is suggested that a 6 month waiting period elapse from the time of the episode. Following the waiting period, a driver may be qualified if the results of the examination are negative and antiseizure medication is not required, then the driver may be qualified.

In those individual cases where a driver has a seizure or an episode of loss of consciousness that resulted from a known medical condition (e.g., drug reaction, high temperature, acute infectious disease, dehydration or acute metabolic disturbance), certification should be deferred until the driver has fully recovered from that condition and has no existing residual complications, and not taking antiseizure medication.

Drivers with a history of epilepsy/seizures off antiseizure medication and seizure-free for 10 years may be qualified to drive a CMV in interstate commerce. Interstate drivers with a history of a single unprovoked seizure may be qualified to drive a CMV in interstate commerce if seizure-free and off antiseizure medication for a 5-year period or more.
(See Conference on Neurological Disorders and Commercial Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Mental Disorders
### §391.41(b)(9)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has no mental, nervous, organic or functional disease or psychiatric disorder likely to interfere with ability to drive a motor vehicle safely.*

Emotional or adjustment problems contribute directly to an individual's level of memory, reasoning, attention, and judgment. These problems often underlie physical disorders. A variety of functional disorders can cause drowsiness, dizziness, confusion, weakness or paralysis that may lead to incoordination, inattention, loss of functional control and susceptibility to accidents while driving. Physical fatigue, headache, impaired coordination, recurring physical ailments and chronic "nagging" pain may be present to such a degree that certification for commercial driving is inadvisable. Somatic and psychosomatic complaints should be thoroughly examined when determining an individual's overall fitness to drive. Disorders of a periodically incapacitating nature, even in the early stages of development, may warrant disqualification.

Many bus and truck drivers have documented that "nervous trouble" related to neurotic, personality, emotional or adjustment disorders is responsible for a significant fraction of their preventable accidents. The degree to which an individual is able to appreciate, evaluate and adequately respond to environmental strain and emotional stress is critical when assessing an individual's mental alertness and flexibility to cope with the stresses of commercial motor vehicle driving.

When examining the driver, it should be kept in mind that individuals who live under chronic emotional upsets may have deeply ingrained maladaptive or erratic behavior patterns. Excessively antagonistic, instinctive, impulsive, openly aggressive, paranoid or severely depressed behavior greatly interfere with the driver's ability to drive safely. Those individuals who are highly susceptible to frequent states of emotional instability (schizophrenia, affective psychoses, paranoia, anxiety or depressive neuroses) may warrant disqualification. Careful consideration should be given to the side effects and interactions of medications in the overall qualification determination. See Psychiatric Conference Report for specific recommendations on the use of medications and potential hazards for driving.
(See Conference on Psychiatric Disorders and Commercial Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Vision
### §391.41(b)(10)
A person is physically qualified to drive a commercial motor vehicle if that person:
*Has distant visual acuity of at least 20/40 (Snellen) in each eye with or without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70 degrees in the horizontal meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber.*

The term "ability to recognize the colors of" is interpreted to mean if a person can recognize and distinguish among green, and amber, he or she meets the minimum standard, even though he or she may have some type of color perception deficiency. If certain color perception tests are administered, (such as Ishihara, Pseudoisochromatic, Yarn) and doubtful findings are discovered, a controlled test using signal red, green, and amber may be employed to determine the driver's ability to recognize these colors.

Contact lenses are permissible if there is sufficient evidence to indicate that the driver has good tolerance and is well adapted to their use. Use of a contact lens in one eye for distance visual acuity and another lens in the other eye for near vision is not acceptable, nor telescopic lenses acceptable for the driving of commercial motor vehicles.

If an individual meets the criteria by the use of glasses or contact lenses, the following statement shall appear on the Medical Examiner's Certificate: "Qualified only if wearing corrective lenses."

CMV drivers who do not meet the Federal vision standard may call (202) 366-1790 for an application for a vision exemption.
(See Visual Disorders and Commercial Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Hearing
### §391.41(b)(11)
A person is physically qualified to drive a commercial motor vehicle if that person:
*First perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid, or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5-1951.*

Since the prescribed standard under the FMCSRs is the American Standards Association (ANSI), it may be necessary to convert the audiometric results from the ISO standard to the ANSI standard. Instructions are included on the Medical Examination report form.

If an individual meets the criteria by using a hearing aid, the driver must wear that hearing aid and have it in operation at all times while driving. Also, the driver must be in possession of a spare power source for the hearing aid.

For the whispered voice test, the individual should be stationed at least 5 feet from the examiner with the ear being tested turned toward the examiner. The other ear is covered. Using the breath which remains after a normal expiration, the

examiner whispers words or random numbers such as 66, 18, 23, etc. The examiner should not use only sibilants (s-sounding materials). The opposite ear should be tested in the same manner. If the individual fails the whispered voice test, the audiometric test should be administered.

If an individual meets the criteria by the use of a hearing aid, the following statement must appear on the Medical Examiner's Certificate "Qualified only when wearing a hearing aid."

(See Hearing Disorders and Commercial Motor Vehicle Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Drug Use
### §391.41(b)(12)
A person is physically qualified to drive a commercial motor vehicle if that person:

*Does not use a controlled substance identified in 21 CFR 1308.II.. Schedule I, an amphetamine, a narcotic, or any other habit-forming drug. Exception: A driver may use such a substance or drug, if the substance or drug is prescribed by a licensed medical practitioner who is familiar with the driver's medical history and assigned duties; and has advised the driver that the prescribed substance or drug will not adversely affect the driver's ability to safely operate a commercial motor vehicle.*

This exception does not apply to methadone. The intent of the medical certification process is to medically evaluate a driver to ensure that the driver has no medical condition which interferes with the safe performance of driving tasks on a public road. If a driver uses a Schedule I drug or other substance, an amphetamine, a narcotic, or any other habit-forming drug, it may be cause for the driver to be found medically unqualified. Motor carriers are encouraged to obtain a practitioner's written statement about the effects on transportation safety of the use of a particular drug.

A test for controlled substances is not required as part of this biennial certification process. The FMCSA or the driver's employer should be contacted directly for information on controlled substances and alcohol testing under Part 382 of the FMCSRs.

The term "uses" is designed to encompass instances of prohibited drug use determined by a physician through established medical means. This may or may not involve body fluid testing. If body fluid testing takes place, positive test results should be confirmed by a second test of greater specificity. The term "habit-forming" is intended to include any drug or medication generally recognized as capable of becoming habitual, and which may impair the user's ability to operate a commercial motor vehicle safely.

The driver is medically unqualified for the duration of the prohibited drug(s) use and until a second examination shows the driver is free from the prohibited drug(s) use.

Recertification may involve a substance abuse evaluation, the successful completion of a drug rehabilitation program, and a negative drug test result. Additionally, given that the certification period is normally two years, the examiner has the option to certify for a period of less than 2 years if this examiner determines more frequent monitoring is required. (See Conference on Neurological Disorders and Commercial Drivers and Conference on Psychiatric Disorders and Commercial Drivers at:
http://www.fmcsa.dot.gov/rulesregs/medreports.htm)

## Alcoholism
### §391.41(b)(13)
A person is physically qualified to drive a commercial motor vehicle if that person:

*Has no current clinical diagnosis of alcoholism.*

The term "current clinical diagnosis of" is specifically designed to encompass a current alcoholic illness or those instances where the individual's physical condition has not fully stabilized, regardless of the time element. If an individual shows signs of having an alcohol-use problem, he or she should be referred to a specialist. After counseling and/or treatment, he or she may be considered for certification.



Printed by J.J. KELLER & ASSOCIATES, INC., Neenah, WI • USA
(800) 327-6868 • www.jjkeller.com • Printed in the United States
649-F (Rev. 10/03) (6045)

ATI 0123

# STAFF PERSONNEL POLICIES AND BENEFITS MANUAL ACKNOWLEDGEMENT

By my signature below, I acknowledge the following:

I, _Reginald Calvin Green_

(Social Security Number _5 79-76-1479_ ) have received and will

keep in my possession American University's Staff Personnel Policies and Benefits

Manual. I understand electronic versions with the most up-to-date information are posted

on the my.american.edu portal. I agree as a condition of employment to follow the

policies contained in the Staff Personnel Policies Manual. I understand that these Staff

Personnel and Benefits policies may be revised periodically to reflect changes in the law

and university policy. I understand these revisions will be announced in Today@AU to

all faculty and staff with revised Staff Personnel or Benefits Policies manuals posted on

the my.american.edu portal. If I have any questions about any personnel or benefits

policies, I agree to consult with Human Resources. I further understand that this signed

statement will be permanent record in my personnel file.

Signature _____    Date _8/16/04_



EXHIBIT
Green #8
T.H.  8-27-07

AU 0082

# EMERGENCY INFORMATION

Name        Reginald C. Green

Address     9108 Lela Ct

            Ft Washington MD 20744

Phone       301-265-1901

Date Completed  8/16/04

## EMERGENCY CONTACT

Contact Name          Meadean McCaskil Green

Relationship to Employee  Wife

Phone        301-265-1901 WK 301-594-9920 Cell 202-277 6704

Contact Name          

Relationship to Employee  

Phone        

American University Human Resources 5/02

AU 0083

# TABLE OF CONTENTS

PREFACE ................................................................................................. 4

SECTION ONE: FOREWORD ................................................................. 5

   1. Mission of the University ...................................................................5

   2. Purpose of the Manual......................................................................5

   3. Affirmative Action .............................................................................5

   4. Changes/Revisions ..........................................................................6

SECTION TWO: EMPLOYMENT POLICIES ............................................ 7

   1. Definition of Full-time Employment ...................................................7

   2. Definition of Part-time Employment...................................................7

   3. Immigration and Naturalization Service Requirements .....................7

   4. Affirmative Action Report ..................................................................7

   5. Employment of Family Members........................................................8

   6. Employment of Students...................................................................8

   7. Categories of Positions .....................................................................9

   8. Job Posting .....................................................................................10

   9. Promotions, Transfers, and Demotions............................................10

   10. University-Initiated Transfer and Demotions ..................................12

   11. Terms of Service ...........................................................................13

   12. Payment of Salaries......................................................................13

   13. EEO Policies .................................................................................13

   14. Equal Employment Opportunity Policy...........................................13

   15. Affirmative Action Program Policy .................................................14

   16. Equal Employment Opportunity Complaint Procedures ..................14

   17. Sexual Harassment Policy – *Revised July 1999*...........................15

   18. Discrimination and Discriminatory Harassment Policy – *Revised March 1999* ......................18

   19. Americans with Disabilities Act Policy – *Adopted December 2002* ...............23

SECTION THREE: PERSONNEL RECORDS ....................................... 25

   1. Records Management......................................................................25

   2. References .....................................................................................25

SECTION FOUR: HOURS OF WORK................................................... 26

   1. University Schedule ........................................................................26



STAFF MANUAL OF PERSONNEL POLICIES
Includes Updates as of December 2003

AU 000207

22) an employee's service is not satisfactory. If a promoted staff member does not meet departmental standards in the higher classification or new position, he or she may be demoted without prejudice to a position with the same classification band as the position held before promotion, if such a vacancy exists. If an appropriate vacancy does not exist, the services of the staff member will be terminated and his or her name will be placed on a priority re-employment list;

23) an employee voluntarily requests demotion. When a demotion is being considered because of inadequate performance, the affected staff member must receive adequate notice as to the reasons why such action might become necessary. Sufficient advice must be given to provide the staff member with reasonable opportunity to meet the performance standards. This advice should be in writing, with a copy to the staff member's personnel file in Human Resources.

Demotion actions, like any other personnel action thought to be adverse by the staff member, may be appealed through the university's staff complaint procedure.

## 11. TERMS OF SERVICE

### Probationary Status

Staff members serve a probationary period of four months. During the probationary period, a staff member may be removed from his or her position at any time for any reason without prior notice.

At the end of the probationary period, or at any time after three weeks of employment, an initial performance review conference between the staff member and his or her supervisor should be held. As a result of this conference, one of three actions will be taken:

24) probation is concluded and regular status in the position is granted;

25) probation is extended for four months (only one extension may be granted);

26) the staff member is removed from the position.

A completed Probation Form must be sent to Human Resources at the end of probation in order for the appropriate action to be taken. If this form is not received by the probation expiration date, the employee's probation is automatically completed.

During an extended probationary period, a staff member removed from a position is entitled to two weeks notice of termination (or pay in lieu of notice).

AU 000218

Records of formal complaints will be maintained in accordance with the hearing/grievance process under which the complaint was heard. In addition, the university official who handled the complaint in the formal process will send all documentation concerning the complaint to the official listed above.

Complaints against staff or faculty that result in a personnel action will also be part of the respondent's personnel record. Complaints against students that result in a disciplinary record will be part of the respondent's disciplinary record.

All records are confidential with access only to individuals with a legitimate need to know.

## 19. AMERICANS WITH DISABILITIES ACT POLICY — ADOPTED DECEMBER 2002

American University supports the policies of the Americans with Disabilities Act and is completely committed to treating all applicants and employees with disabilities in accordance with the requirements of that statute. The university judges individuals by their abilities, not their disabilities, and seeks to give full and equal employment opportunities to all persons capable of performing successfully in the university's positions. American University will provide reasonable accommodations to any qualified persons with disabilities who require them, and urges employees and applicants who may be disabled and require accommodation to advise the university of their particular needs. Information concerning individuals' disabilities is considered confidential and their need for accommodation will be handled with the utmost discretion.

When considering a requested accommodation, American University will require medical certification or information from a health care professional concerning the requested accommodation. Medical certification or other information may be requested at the time of the initial request or at any time thereafter, for the purpose of determining whether the individual still meets the definition of a disabled person or whether an accommodation is still necessary.

Employees and applicants who want to request a reasonable accommodation should contact human resources employee relations, extension 2607. Any staff employee or applicant who believes that they may have been discriminated against based on their disability should refer to the staff EEO complaint procedures or contact the executive director of human resources.

American University is firmly committed to the principle of equal employment opportunity. The university recognizes that the implementation of such a policy requires

AU 000229

constant effort and supervision. Every necessary step will be taken to guarantee that this commitment is honored in principle and in practice.

AU 000230

Driver's Duties and Responsibilities

1.  30% of time:  Provide driving services for the University President, other university officials and anyone the president designates, including but not limited to his wife and family members.

    a.  All driving must be provided in a safe and efficient manner by obtaining detailed information in order to properly plan driving routes and schedules.  Care must be taken to know direct route and alternate routes as may be necessary.

    b.  All driving must be provided with the utmost care and consideration for the passengers safety and comfort.

    c.  An extensive understanding of Washington, DC and the surrounding suburbs with respect to roads, traffic patterns and rush hours must be maintained at all times.

    d.  Consistently remain informed with up-to-date traffic information in and around Washington, DC. (Most notably on planned routes.)

    e.  Extensive knowledge of Reagan National Airport and Dulles International Airport for both arrivals and departures.  Additional requirement to  track arrival or departure flight information as appropriate.

    f.  When needed for clarity, pre-driving to a destination is required to ensure efficient transport.

    g.  As punctuality is an absolute requirement to successful accomplishment of the driver's tasks, he/she is expected to be in place at a pick-up point at least 15 minutes prior to the scheduled pick-up time.  There are times when this is simply not possible because of other scheduling commitments and the driver's calendar will reflect such if a problem is to occur.  This "15-minute rule" (for lack of a better name) is <u>required</u>.

    h.  Driver may be required to drive out of town.  This may include but is not limited to Philadelphia and New York.  Maintaining a working knowledge of these two cities is required – but acceptable at a lesser extent than Washington, DC.

    i.  Driver must become functionally proficient in the GPS system installed in the vehicles.  The GPS is to be used effectively when needed to ensure accurate arrival at a specific destination – particularly if that destination is out of the Washington Metropolitan area.

    j.  Driver may be regularly required to transport the President or others that he designates to and from the President's personal, private residence located in Maryland.

    k.  Knowledge and consistent application of the appropriate protocol when transporting VIP's.  Including, but not limited to, opening car doors, use of umbrellas and handling of luggage.  Timely and diligent response in these areas is required.

    l.  Driver is also expected to load and unload luggage at the President's Residence including retrieving and returning it to their 2nd floor private quarters.

2.  30% of time:  Responsible for the care and maintenance of any vehicles used for transporting the University President or anyone he designates. This includes any car owned/leased by the university primarily designated to transport the president as well



AU 0130

as any personal vehicles owned/leased by the president.

a. Care of vehicles includes detailed cleaning inside and out to <u>always</u> maintain a highly professional and polished appearance. The driver is expected to <u>personally</u> perform this cleaning with few exceptions made during inclement weather and/or very tight time schedules and by seeking prior approval of the supervisor. Vehicle cleaning is performed at the President's Residence.

b. Cars are to remain fragrance free at all times including but not limited to the driver's personal hygiene and choice of vehicle cleaning products. No air freshners are to be used in the vehicles.

c. Maintain full fuel and fluid levels at all times. When the cars are parked for the night, the fuel tank is expected to be full (totally topped off). Driver may <u>not</u> routinely put this task off until the next morning as the President's schedule changes quickly therefore limiting access to the vehicles the next day.

d. Perform routine safety inspections of the vehicles.

e. Responsible for tracking and keeping current inspection and governmental registrations and/or permits.

f. Responsible for tracking and keeping current all routine vehicle maintenance.

g. Responsible for any other vehicle maintenance as noticed by the driver or requested by the president or his designee.

3. 20% of time: Various administrative responsibilities including but not limited to:

a. Run errands as requested by the President, his office and residence staff. Use personal vehicle when president's vehicle is not available. When personal vehicle is used, maintain accurate mileage records appropriate for reimbursement. (Reimbursement for personal mileage is made on a routine basis normally through petty cash. Reimbursement is paid at the same per mile rate as used by the US Government in Washington, DC)

b. Regularly reconcile all cash and charge expenses, keeping complete and accurate records all expenditures.

c. Monitor driver's schedule/calendar currently maintained in Lotus Notes software. Make additional entries throughout the day to ensure calendar actually reflects the tasks encountered and/or completed daily.

d. Functioning effectively and efficiently in the Lotus Notes system for email and calendar is required.

e. Driver is required to use an AU cell phone for the purpose of maintaining close contact with the office and making him/herself available should the Ladner's need to call. A Blackberry has been made available for this purpose. In incorporates wireless access to calendar and email as well as cell phone abilities. Driver must become proficient in its operation to ensure complete and accurate information transmittal.

f. Driver is <u>required to report immediately</u> any automobile accidents, tickets or problems of any sort, encountered in the course of performing his/her duties to Meg Clemmer, Assistant to the President. Consideration does not need to be given for time of day or day of week. Cell phone is the vehicle to accomplish this notification after normal work hours. Leaving a voice mail at the office in lieu of cell phone notification is <u>not</u> an acceptable option.

4. 10% of time: Other duties as assigned.

For Conversation with Reggie –

These are various problems that have presented themselves in the past with
former drivers and resulted in counseling type conversations. Quickly they
become performance issues if not dealt with quickly and professionally. They are
offered here simply for your information.

- Be honest about mistakes – own your responsibility
- Smoking – The cars are to be kept totally fragrance free – no smoking, no air
  freshener, no cologne – also, be careful about strong smelling cleaners
- Cleaning – the cleaning of the cars must be on-going and kept in tip-top shape
- Car is to be cleaned by the driver personally not a cleaning service.
- Top-off the gas tanks at the end of the day – not the start of the next day
- Pre-driving to various locations that aren't totally familiar
- Talking out loud to other drivers
- Driving is not a group exercise
- Never told him to only use "main roads" and not side streets – other than
  crossing to River on 46th
- Don't tell BL where to find you – It's your responsibility to find him
- Get in the car and get on the way – this isn't the time for captured
  conversation
- No personal chit/chat
- No tail-gating – and no anxious driving
- Don't pay attention to conversations in the car when you are not being
  spoken to. And, don't remark or laugh at things said or done in the back seat.
- No jerky driving – remember you are transporting people not cargo – and
  bumps, swerves and the like are felt more in the back seat than by the driver.
- Don't <u>do</u> distracting things while driving or be distracted by things going on
  elsewhere. No personal phone calls or text messaging while driving. And, no
  playing around with the GPS while driving.
- Minimize bathroom stops on long trips – such as to New York. (In the past
  there have been as many as 4 stops for bathroom in the 4 hour trip.) One is
  acceptable – zero is preferable.
- When problems occur let meg know – this is a requirement not an option.
- If you are asked by someone other than meg - to make a repair on the car –
  be sure to tell meg and then proceed to get it done. In other words, keep meg
  in the loop and informed. If something can not be fixed/repaired quickly, be
  sure to let meg know so BL can be kept up to date.



EXHIBIT
Green #11
T.H. 8-27-07

AU 0129

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

| PE.  .i FILING CHARGE |
| --- |
| Green, Reginald C |

| THIS PERSON (check one) |
| --- |
| [X] CLAIMS TO BE AGGRIEVED |
| [ ] IS FILING ON BEHALF OF ANOTHER |

Mr. Benjamin Ladner
President
American University
4400 Massachusetts Avenue, N.W

Washington, DC 20016

| DATE OF ALLEGED VIOLATION | |
| --- | --- |
| *Earliest* | *Most Recent* |
| 09/16/2004 | 12/03/2004 |

| PLACE OF ALLEGED VIOLATION |
| --- |
| Washington, DC |

| EEOC CHARGE NUMBER |
| --- |
| 10CA500080 |

| FEPA CHARGE NUMBER |
| --- |
| 05-105-P(CN) |

# NOTICE OF CHARGE OF DISCRIMINATION   IN JURISDICTIONS WHERE A FEP AGENCY WILL INITIALLY PROCESS
*(See attached information sheet for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

- [ ] Title VII of the Civil Rights Act of 1964
- [ ] The Age Discrimination in Employment Act of 1967 (ADEA)
- [X] The Americans with Disabilities Act

HAS BEEN RECEIVED BY

- [ ] The EEOC and sent for initial processing to _____ .
  *(FEP Agency)*

- [X] The D.C. Office Of Human Rights _____ and sent to the EEOC for dual filing purposes.
  *(FEP Agency)*

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

- [X] As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained in the "EEOC Rules and Regulations" apply.

For further correspondence on this matter, please use the charge number(s) shown.

- [ ] An Equal Pay Act investigation (29 U.S.C. 206(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.
- [X] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[ ] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NAT. ORIGIN   [ ] AGE   [X] DISABILITY   [ ] RETALIATION   [ ] OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

See enclosed Form 5, Charge of Discrimination.

EXHIBIT
Green #15
T.H. 8-27-07

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
| --- | --- | --- |
| 12/21/2004 | Tulio L Diaz<br>Director | |

EEOC FORM 131-A (Rev. 06/92)

FILE COPY

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

☒ FEPA  85 - 105 - P(CN)
☐ EEOC  10CA500080

D.C. Office Of Human Rights _____ and EEOC
State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Reginald C. Green | (301) 265-1901 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 9108 Lela Court, Fort Washington, MD 20744 | | 02/05/1958 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| American University | Cat C (201-500) | (202) 885-2121 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 4400 Massachusetts Avenue, N.W., Washington, DC 20016 | | 001 |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 09/16/2004 | 12/03/2004 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I believe I have been discriminated against and subjected to disparate treatment and a hostile work environment on the basis of my disability in the involuntary termination of my employment because:

I was hired as a Chauffeur/Office Assistant on August 16, 2004, and I performed my duties satisfactorily.

When I was hired in August 2004, I informed Respondent that I had medical problems which would require certain accommodations, such as having to use the bathroom on long trips, and being allowed not to move as fast as possible on a fractured ankle. In September 2004, Respondent gave me my job description which indicated that one bathroom stop is acceptable-zero is preferable during a four hour trip. Respondent constantly complained about the cast on my leg and gave me assignments which exacerbated my pre-existing conditions. This created a hostile work environment for me.

On December 1, 2004, Respondent inofrmed me that I had to learn the Global Positioning System (GPS)-navigational system on Respondent's President's car by December 16, 2004, or I would be terminated. I had repeatedly requested to be sent to a class to learn the system, but to no avail.

Finally, on December 3, 2004, Respondent terminated my employment upon

** Text is Continued on Attached Sheet(s) **

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) Haydn Demas I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. Notary Public, District of Columbia My Commission Expires 11-14-2008 |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) 12/21/04 |
| Date      Charging Party (signature) | |

EEOC FORM 5 (Rev. 07/99)

FILE COPY

Dec 21 12:32 2004 CP Initials  Chg # , Attachment Page 1

----------------------------------------------------------------------

Equal Employment Opportunity Commission
Form 5 - Charge of Discrimination, Additional Text

----------------------------------------------------------------------

our return from a trip to Philadelphia because I had stopped to use the
bathroom.  Respondent's reason for my termination was that I had not
been able to meet the expectations for the position.

I charge Respondent with an unlawful discriminatory practice on the
basis of my disability in violation of the D.C. Human Rights Act of
1977, as amended, and the Americans with Disabilities Act.  I have not
commenced any action, civil, criminal or administrative, based on the
above allegations; other than the following: CROSS FILED WITH THE EEOC.

# EXHIBIT 2

## Capital Reporting Company

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

REGINALD GREEN,                    :

               Plaintiff, :

          v          : CASE NO:

AMERICAN UNIVERSITY and    : 07-52(RBW)

BENJAMIN LADNER,            :

            Defendant.:

Washington, D.C.

Friday, September 28, 2007

Deposition of:


DR. ROLF NEIMAN

called for oral examination by counsel for

Plaintiff, pursuant to Notice, at the Law Offices

of Pillsbury, Winthrop, Shaw, Pittman, 2300 North

Street, Northwest, Washington, D.C., before Mary

E. Warner of Capital Reporting, sworn by a Notary

Public in and for the District of Columbia,

beginning at 10:00 a.m.

## Capital Reporting Company

| Page 10 | Page 12 |
|---|---|
| 1    A  Everything except the Green, Reginald,<br>2  Calvin on the top line and expires July 14, 2005.<br>3  The date actually is a stamp that the office uses.<br>4    Q  Okay.  All right.  So let's go to the<br>5  first page of the report, where you have written<br>6  in onset 2003.  Sitting here today, Doctor, do you<br>7  know what those words refer to?<br>8    A  It answers the question for yes answer<br>9  indicate onset diagnosis, onset date, diagnosis,<br>10  treating physician's name, any current limitations<br>11  and lists all medications.<br>12    Q  Okay.  So in this case it appears that<br>13  the driver response to that question wrote<br>14  oxycodone, pardon me, I'm not particularly<br>15  medical.  He wrote everything on the first line.<br>16  He wrote everything on the second line.  And then<br>17  you wrote onset 2003 to indicate when the anal<br>18  fissure occurred?<br>19    A  Correct.<br>20    Q  Sitting here today, do you remember<br>21  discussing the date, the onset occurred with the<br>22  patient? | 1  are the words you wrote in?<br>2    A  Correct.<br>3    Q  I'm sorry, that was very ugly the way I<br>4  just said that.  Did you write the letters HTN?<br>5    A  Correct.<br>6    Q  Does that stand for hypertension?<br>7    A  Correct.<br>8    Q  And you checked one year after the phrase<br>9  driver qualified for only.  That was in connection<br>10  with his hypertension?<br>11    A  Correct.<br>12    Q  Okay.  When you complete the form, the<br>13  medical examination report for commercial driver<br>14  fitness determination, in the course of your work,<br>15  do you provide it to the potential employer or<br>16  does someone do that on your behalf?<br>17    A  I hand it to him.<br>18    Q  You hand it to the driver?<br>19    A  Correct.<br>20    Q  And what is the driver to do with it?<br>21    A  He takes it to the receptionist and they<br>22  will often do a hearing test afterward, which is |
| **Page 11** | **Page 13** |
| 1    A  Yes.<br>2    Q  Okay.  And what do you recall about that<br>3  conversation?<br>4    A  I simply asked what year the illness<br>5  occurred and I write it down.<br>6    Q  Okay.  And then you wrote the words "no<br>7  limitation"?<br>8    A  Correct.<br>9    Q  What did you mean by that?<br>10    A  That is answering the, again the question<br>11  for any answer yes, indicate onset date,<br>12  diagnosis, treating physician's name and address<br>13  and any current limitations.<br>14    Q  Okay.  Do you recall sitting here today<br>15  what led you to conclude there were no limitations<br>16  related to the anal fissure?<br>17    A  That's what he told me.  I asked him if<br>18  the doctor gave him any restrictions.<br>19    Q  Okay.  Then if you look at the third page<br>20  with me, under note certification status here, you<br>21  have checked meet standards but periodic<br>22  monitoring required due to HTN.  Is that your -- | 1  checked on the second page and then they process<br>2  the form otherwise.<br>3    Q  And who retains your services, Doctor, in<br>4  connection with a medical examination report for<br>5  commercial driver fitness determination?<br>6    A  Buckley's Renewal Center.<br>7    Q  And who retains Buckley's, the driver or<br>8  the potential employer?<br>9    A  I am guessing that it would be the<br>10  driver.<br>11    Q  Okay.  So the driver finds you?<br>12    A  Correct.<br>13    Q  Okay.  All right.  When the process is<br>14  complete at Buckley's Renewal Center, does the<br>15  driver take possession of the report?<br>16    A  In my opinion, yes, but I do not<br>17  physically see what happens to the papers.<br>18    Q  Okay.  All right.  Okay.<br>19      MS. KEARNS:  And I have no further<br>20  questions.<br>21      THE WITNESS:  I have one question.<br>22  BY MS. KEARNS: |

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REGINALD GREEN,           ) <br>                      ) <br>           Plaintiff,   ) <br>                      ) <br>            v.          ) <br>                      ) <br> AMERICAN UNIVERSITY, et al.,  ) <br>                      ) <br>           Defendants.  ) <br>                      ) | Case No.  1:07-cv-0052 (RBW) |

## <u>DECLARATION OF MARGARET CLEMMER</u>

I declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

1.      My name is Margaret Clemmer.  I am over eighteen (18) years old and competent to testify to the matters set forth in this declaration.

2.      I was the Assistant to the President of American University (the "University") during Reginald Green's employment at the University and remain in that position today.  I was Mr. Green's direct supervisor.

3.      The University's Staff Personnel Policies Manual states that new staff members at the University serve a probationary period of four months.  A staff member may be terminated at any time for any reason without prior notice during this probationary period.  This probationary period allows the University to determine whether a new staff member will be able to appropriately carry out all aspects of his or her duties.

4.      On July 21, 2004, Mary Hentschel, then a Human Resources Generalist at American University, sent me an email stating that she had "just received the results from Reggie Green's drug screening and physical. Nothing came out in the drug screening and the physical that would keep us from hiring Reggie." The July 21, 2004 email is attached hereto as Exhibit A. The "the physical" that Ms. Hentschel referred to was the Medical Examination Report for Commercial Driver Fitness Determination ("Medical Examination Report"), dated July 14, 2004, which is attached to the Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment.

I declare under penalty of perjury that the foregoing is true and correct.

_Margaret Clemmer_

Margaret Clemmer

Date: _1·18·08_

2

# EXHIBIT A

Mary
Hentschel/maryh/AmericanU
07/21/2004 01:33 PM

To   Meg
Hawthorne/megh/Staff/President/AmericanU@AmericanU

cc

bcc

Subject   Results are in

History:          🖾 This message has been forwarded.

Hello Meg,

I just received the results from Reggie Green's drug screening and physical.  Nothing came out in the drug screening and physical that would keep us from hiring Reggie.  And, as you know, his driving record and criminal check came back clean.  I will call Reggie to let him know that all is clear.  Shall I let him know that you will be calling to arrange for some driving for him prior to his FT start date?  Perhaps we should discuss the logistics of him working PT prior to his FT start date (hiring form, completion of I9, etc...).  I will wait for your response before I call Reggie.

Mary

---

Mary Hentschel
Human Resources Generalist
American University
4400 Massachusetts Avenue NW
Washington, DC 20016-8054
phone:  202.885.3732
fax:  202.885.2558

AU 000289

# EXHIBIT 4

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

Civil Division

REGINALD GREEN,

      Plaintiff,          Case No.:

      v.                1:07-cv-0052 (RBW)

AMERICAN UNIVERSITY, et al.,

      Defendants.


Deposition of:


MARGARET HAWTHORNE CLEMMER,

Taken on behalf of the Plaintiff, at the Law

Offices of Pillsbury, Winthrop, 2300 N Street,

N.W., Washington, D.C., commencing at

10:20 a.m., Tuesday, September 25, 2007, before

Toni R. DeSenze.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 26

1  of the knowledge of D.C.?
2      MS. KEARNS: I'm sorry. I object to the
3  form of that question. Are you asking if it's her
4  memory that that's what the document says?
5      MR. GNATT: I'm asking her if she
6  acknowledges what the document says.
7      MS. KEARNS: Shouldn't we put the document
8  in front of her?
9      MR. GNATT: We could. I'd like her to
10  answer the question first.
11  BY MR. GNATT:
12     Q  Are you familiar with those parts of the
13  document?
14     A  I'm not sure. I don't recall.
15     Q  Do you know yourself whether Mr. Green, when
16  he was hired, had a working knowledge of Philadelphia?
17     A  Yes.
18     Q  Did he?
19     A  Yes.
20     Q  Has anything that you learned during the
21  time he was employed for the university given you an
22  impression otherwise?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 28

1      Q  Am I correct in assuming that, during the
2  interviewing process, you made some judgment about his
3  knowledge of VIP protocol?
4      A  Yes.
5      Q  Did you discuss specifics about VIP protocol
6  during the interviewing process?
7      A  I don't recall.
8      Q  Specifically, did you discuss, as mentioned
9  in the responsibilities of the driver document,
10  opening car doors?
11     A  Yes.
12     Q  Did you discuss the use of umbrellas?
13     A  Yes.
14     Q  Did you discuss the handling of luggage?
15     A  Yes.
16     Q  And, overall, what assessment did you make
17  about Mr. Green's knowledge of VIP protocol?
18     A  He had the knowledge.
19     Q  Were there issues relating to any of those
20  three VIP protocols that arose during Mr. Green's
21  employment, to your knowledge?
22     A  And the three are?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 27

1      A  Yes.
2      Q  What is your impression otherwise?
3      A  That he didn't know Philadelphia very well.
4      Q  Did it become your impression that Mr. Green
5  had no working knowledge of Philadelphia?
6      A  No.
7      Q  Was your impression that he had some working
8  knowledge of Philadelphia?
9      A  When?
10     Q  At any point that you formed an impression
11  while he worked for American University.
12     A  Yes.
13     Q  Was it your impression that he had some
14  working knowledge, albeit less than his working
15  knowledge of D.C.?
16     A  Yes.
17     Q  During the interviewing process, am I
18  correct in assuming you assessed Mr. Green's
19  interpersonal and communication skills?
20     A  Yes.
21     Q  And what was your assessment?
22     A  They were fine.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 29

1      Q  Opening car doors, use of umbrellas, and
2  handling of luggage?
3      A  I don't recall an issue.
4      Q  Were there issues relating to any other VIP
5  protocols not specifically listed that arose during
6  Mr. Green's employment, to your knowledge?
7      A  Yes.
8      Q  What were those?
9      A  I was told that he approached Mrs. Ladner in
10  an airport greeting her similarly to a family member,
11  hugging her and telling her that he missed her.
12     Q  By whom were you told that?
13     A  By Dr. Ladner and later by Nancy Ladner.
14     Q  Did Dr. Ladner tell you how he had become
15  aware of it?
16     A  Mrs. Ladner had told him.
17     Q  What, if anything, do you know about the
18  context in which that came up between Nancy and
19  Benjamin Ladner?
20     A  No idea.
21     Q  In what context did it come up between
22  Benjamin Ladner and you?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 30

1    A   Either face to face or on the phone -- face
2   to face, I think.
3        Q   When I say context, I mean what else was
4   going on? Did it come up as a standalone item? Was
5   it in the context of a broader discussion, and, if so,
6   about what?
7        MS. KEARNS:  Object to the form of the
8   question. You can answer that.
9        THE WITNESS:  It was -- the conversation was
10  about Reggie and performance issues as they had
11  accrued at that point.
12  BY MR. GNATT:
13       Q   So this hugging greeting issue was not
14  raised by Dr. Ladner with you as a standalone?
15       A   No.
16       Q   To the best of your memory, how did
17  Dr. Ladner describe the conduct that you're bringing
18  up?
19       A   He said it was inappropriate.
20       Q   But how did he describe the conduct itself?
21  What did he say happened?
22       A   Specifically, I certainly couldn't answer

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 31

1   what the words were exactly.  The basic message was
2   the driver has no reason to treat him or his wife as a
3   family member and hug them upon arrival at an airport,
4   that it was unprofessional demeanor.
5        Q   Did you ever ride in a vehicle driven by
6   Mr. Green on the job?
7        A   I don't recall.
8        Q   Do you believe that you have any first-hand
9   observations about his driving?
10       A   My observations?
11       Q   Yes.
12       A   No.
13       Q   Did you make any first-hand observations
14  about the care taken by Mr. Green of the president's
15  vehicle?
16       A   Yes.
17       Q   What were those observations?
18       A   He kept the car meticulously clean.
19       Q   You observed the car in that meticulously
20  clean condition? That's your first-hand observation;
21  is that correct?
22       A   That's correct.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 32

1        Q   You didn't observe him actually engaged in
2   the details and the cleaning process?
3        A   Not that I recall.
4        Q   That was normally supposed to take place at
5   the residence?
6        A   That's correct, it may have been wiped down
7   in the parking lot at work.  That was a common
8   occurrence.
9        Q   You're familiar with the document that's
10  titled "For conversation with Reggie"?
11       A   I think.
12       MR. GNATT:  Mark this, please.
13       (Plaintiff's Deposition Exhibit No. 2 was
14  marked for identification by the reporter and is
15  attached.)
16  BY MR. GNATT:
17       Q   That was Plaintiff, Reggie Green's,
18  Deposition Exhibit 11.  Now, when was this prepared,
19  if you know?
20       A   Around the time -- just before the time that
21  Reggie was hired.
22       Q   Was it prepared after the previous driver

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 33

1   was gone?
2        A   Yes.
3        MR. GNATT:  Let's go off the record for just
4   a second.
5        (Mr. Green leaves the deposition.)
6        MR. GNATT:  Back on the record.
7        Mr. Green had to leave, so he has now
8   departed from the room.
9   BY MR. GNATT:
10       Q   By whom was that document prepared?
11       A   Me.
12       Q   Whose idea was it to prepare such a
13  document?
14       A   Dr. Ladner.
15       Q   What did he say to you about that idea of
16  preparing such a document?
17       A   He wanted to gather the mistakes made by
18  previous drivers as just a guideline of things that
19  had gotten previous drivers into problems so to avoid
20  the pitfalls sort of thing.
21       Q   What did he want that document to be used
22  for?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 34

1     A    Just in conversation as we oriented Reggie
2    to his job.
3     Q    After he was on board?
4     A    Yes.
5     Q    Were Dr. Ladner's ideas expressed after
6    selection had been made, the offer had been made, to
7    Reggie Green?
8     A    I don't remember.
9     Q    Because it says "For Conversation with
10    Reggie." It doesn't say For Conversation with Driver
11    to be Hired or anything more generic like that, so can
12    you recall if, at the inception, Reggie was already
13    hired?
14     A    That's not correct. The document was
15    prepared, minus the descriptor, for conversation with
16    Reggie. When that conversation was over, he asked for
17    a copy of it, and I made a point once again, as I had
18    done in the conversation of reminding him, that these
19    were not any grievances about him or problems. They
20    were -- well, they were problems that had occurred in
21    the past, so it was given to him for informational
22    purposes, and when he asked for a copy of it, it

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 36

1    a driver?
2     A    Yes.
3     Q    Who was the next person employed by the
4    university to provide a driver, slash, staff assistant
5    services to the president after Mr. Green?
6     A    I don't recall the two parts to the title,
7    but it was Steven Price, was the next driver.
8     Q    Approximately when was he hired, and when
9    did he start?
10     A    Somewhere in the spring of '05.
11     Q    In the interim, between December of '04 and
12    the spring of '05, how were these driver services
13    provided to Dr. Ladner?
14     A    Carey Limousine, for the most part.
15     Q    Were you or was the university actively
16    trying to fill the position during those several
17    months?
18     A    Yes.
19     Q    Was a document of the same type as this
20    Exhibit 2 shared with or provided to Steven Price?
21     A    I don't recall. Probably, but I don't
22    recall.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 35

1    concerned me, that without putting a description on
2    it, so I typed the top version of the cover and title
3    and the first paragraph at that point, before I gave
4    it to him.
5     Q    So it was prepared without that on it, but
6    it was prepared with Reggie Green in mind?
7     A    No. It was prepared with a driver in mind.
8     Q    After Reggie Green had been hired or before
9    Reggie Green had been hired?
10     A    Before.
11     Q    Who wrote or composed the actual written
12    words that go with each bullet?
13     A    It was a combination of Dr. Ladner and I.
14    He had the final edit.
15     Q    Did you have the first shot at it?
16     A    Yes.
17     Q    Did you refer to any source documents for
18    any of the words that were used, any written
19    documents?
20     A    Sure, my notes.
21     Q    To your knowledge, was this the first time
22    any such document had been put together and used with

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 37

1     Q    Were any items added to that form of
2    document to reflect issues that had arisen with
3    Mr. Green during his tenure which were not already
4    added?
5     A    I'll need to read it.
6         No, I don't recall anything being added to
7    it.
8     Q    Are there any issues or items that you feel
9    should be added because they're not reflected in there
10    and because they were issues that arose with
11    Mr. Green, assuming that you were engaged in that
12    process?
13         MR. RYAN: I have to object to the form of
14    the question, but you can answer.
15         THE WITNESS: Please ask it to me again.
16    I'm not quite sure I understand.
17    BY MR. GNATT:
18     Q    Based on your knowledge of the issues that
19    arose during Mr. Green's employment with the
20    university, are those issues covered by the existing
21    bullets on that document, or are there issues that
22    arose that are not covered?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 38

1    A   I'm not certain.
2    Q   Is that because you're not personally
3  familiar with each and every issue that arose during
4  his employ?
5    A   Yes.
6    Q   There's a bullet on there that says "no
7  tailgating." Do you see that?
8    A   Yes.
9    Q   Can you describe what prompted the inclusion
10  of that item?
11    A   That item came from Dr. Ladner.
12    Q   Beyond that, do you have any insight into
13  where it came from, meaning what was it about it that
14  was an issue for Dr. Ladner?
15    A   It's the kind of thing that Dr. Ladner would
16  not want a driver to demonstrate, so it was -- I
17  wasn't in the car. It was articulated, and that had
18  been articulated about previous drivers, the style of
19  driving too close.
20    Q   Dr. Ladner verbally articulated that issue
21  or concern to you about prior drivers?
22    A   Yes.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 40

1    A   That's Dr. Ladner's wording, that he said to
2  me I never told him to only use the main roads.
3    Q   What do you recall about that whole
4  situation with Jeff Madden and main roads versus side
5  streets?
6    A   The main roads versus side streets was just
7  quickness of getting from one point to another and not
8  sort of touring the countryside.
9    Q   So there's a preference on the part of
10  Dr. Ladner for getting there as soon as possible; is
11  that correct?
12    A   Yes.
13    Q   And, in general, he would expect that that
14  would be best accomplished by using main roads, but
15  not to the exclusion of side streets; is that a fair
16  way of characterizing it?
17    A   That's correct.
18    Q   Did Jeff Madden at some point protest and
19  say he told me only to use main roads?
20    A   Yes.
21    Q   Can you describe that situation?
22    A   That came from a conversation that I had

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 39

1    Q   But you yourself didn't include it in your
2  first cut at this document?
3    A   Oh, I did.
4    Q   So you included it based on prior
5  articulations by Dr. Ladner?
6    A   Yes.
7    Q   What more do you remember about how
8  Dr. Ladner articulated that concern to you that led
9  you to include it?
10    A   I don't remember a specific example.
11    Q   There's also one that says "never told him
12  to only use main roads and not side streets." Do you
13  see that one?
14    A   Yes.
15    Q   Who is "him"?
16    A   Jeff Madden.
17    Q   Who composed that bullet or included it in
18  the document in the first instance?
19    A   Me.
20    Q   And the language sounds like it's taken from
21  some written memo of some sort; is that correct? Can
22  you explain the wording of that bullet?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 41

1  with Dr. Ladner about Jeff Madden's performance, and
2  Jeff's response -- Jeff was sometimes accused of not
3  knowing where he was going and getting lost on side
4  streets, so Jeff's response to me was, Meg, Dr. Ladner
5  told me not to take side streets. That's why I stayed
6  on the main roads.
7    Q   So he was saying Dr. Ladner can't be right
8  about accusing me of getting lost on side streets; I
9  didn't even take side streets; he told me I should
10  only take main roads?
11    A   Right.
12    Q   Dr. Ladner said that's not true; I never
13  tell him to use main roads; so when he says that,
14  that's false?
15    A   Correct.
16    Q   How long did Jeff Madden work in that
17  position?
18    A   I don't recall. Over a year. I'm sure
19  more. I don't recall.
20    Q   Can you trace for me who held the position
21  from the time you became executive assistant to the
22  present?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 42

1      A   Uh-huh.  Val Gidda, V-A-L, G-I-D-D-A.

2      Q   If you can put some approximate dates, a

3   date range on it, years even would be good enough?

4      A   I'm really not sure.

5      Q   Or even an estimate or guesstimate of how

6   many years?

7          MS. KEARNS:  Object to the form of the

8   question.  You're not supposed to guess, but what's

9   your best memory?

10         THE WITNESS:  Less than a year.

11         Next was James Person, and I think he was

12  there over three years.  After James was Jeff Madden,

13  and after Jeff Madden was Reggie.

14  BY MR. GNATT:

15     Q   You said that after Reggie was Steven Price?

16     A   Right.

17     Q   As of approximately the spring of 2005, was

18  there anybody else since?

19     A   That held the position of driver?

20     Q   Yes.

21     A   No.

22     Q   Does Steven Price currently hold the

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 44

1      A   Several.  The crowning event was missing --

2   getting Dr. Ladner -- missing getting Dr. Ladner and

3   Mrs. Ladner to an evening event by not knowing where

4   he was going, not having the address, driving as if he

5   did have the address, and getting lost.

6      Q   As a result, they missed the event entirely?

7      A   No.  I think they were way late.

8          MS. KEARNS:  Do you want to take a break?

9          THE WITNESS:  Yes.

10         (Brief recess.)

11         MR. GNATT:  Back on the record, please.

12  BY MR. GNATT:

13     Q   When you interviewed Reggie Green, did you

14  ask him if he was a smoker?

15     A   I think so.

16     Q   What was his response?

17     A   No.

18     Q   Approximately how long had Mr. Green been on

19  the job when you had this discussion with him about

20  the items on Exhibit 2?

21     A   I prepared a pretty detailed chronology at

22  the time that the EEOC complaint was filed, so dates

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 43

1   position?

2      A   No.

3      Q   Does anybody?

4      A   Steven Price is now a transportation

5   specialist who drives for the president upon request.

6      Q   Do you know the circumstances surrounding

7   the separation of Val Gidda from his job?

8      A   Yes.

9      Q   What were they?

10     A   Apparently, he threw a barrage of profanity

11  at a woman who worked in the residence.

12     Q   The same question for James Person?

13     A   James Person retired.

14     Q   How about Jeff Madden?

15     A   Jeff Madden was terminated.

16     Q   During his probationary period or after?

17     A   After.

18     Q   About how long did he work there?

19     A   I think, three years.  You said Jeff Madden,

20  correct?

21     Q   Right.  What were the reasons for his

22  involuntary termination?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 45

1   and things are in that.  I have not committed them to

2   memory.  I don't know.

3      Q   What do you remember about the discussion,

4   if any, with Mr. Green about the bulleted item that

5   has a handwritten asterisk near it about bathroom

6   stops?

7      A   When I reviewed this list of items with

8   Reggie, when we got to that particular item, I told

9   him that Dr. Ladner had reacted strongly to Jeff

10  Madden, who was a smoker, for taking multiple stops on

11  a return trip from New York so that he could smoke.

12  Mrs. Ladner was acutely allergic to smoke, so coming

13  back in the car wreaking of cigarettes attacked her

14  allergies, and Jeff was using I need to go to the

15  bathroom for the excuse to smoke I was told.

16     Q   You were told by whom?

17     A   Dr. Ladner.

18     Q   When were you told that?

19     A   About Jeff?

20     Q   Yes.

21     A   After several -- I was told it several times

22  after several trips.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 54

```
1     Q   The first floor being the floor you
2   diagrammed for us?
3     A   Yes.
4     Q   Were there any bathrooms on the ground
5   floor?
6     A   There were not.
7     Q   You say there was one on the first floor?
8     A   Correct.
9     Q   And that's the one in your diagram?
10    A   Correct.
11    Q   And two additional ones, one up from your
12  floor?
13    A   That's correct.
14    Q   Two flights up from where his office was?
15    A   That's correct.
16    Q   Was there an elevator?
17    A   No.
18    Q   This is a converted residence?
19    A   Correct.
20    Q   So do you recall any discussion about any
21  difficulty that Reggie Green had, given his cast, in
22  negotiating the stairs to use the bathroom that's up a
```

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 56

```
1   and Mr. Green's concern about being able to stop to
2   use the bathroom, did Dr. Ladner ask anything about,
3   well, what's his problem, what's the need, or what's
4   the issue?
5     A   No.  I articulated the conversation.  It was
6   very brief.  Reggie's concerned about this; Dr. Ladner
7   said, Meg, that related to Jeff Madden; if Reggie
8   needs to go to the bathroom, he needs to go to the
9   bathroom; of course, he can stop.  That was the whole
10  question and response.
11       MR. GNATT:  Mark this, please.
12       (Plaintiff's Deposition Exhibit No. 3 was
13  marked for identification by the reporter and is
14  attached.)
15  BY MR. GNATT:
16    Q   Did you ever see this Exhibit 3 prior to any
17  EEOC or D.C. Human Rights filings or lawsuit filing?
18    A   I've never seen it until right this minute.
19    Q   I gather, in your testimony.  That the
20  driver position into which Mr. Green was hired was
21  vacant as of June, July, or around August of 2004?
22    A   Yes.  I don't remember exactly when Jeff
```

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 55

```
1   flight of stairs?
2     A   No.  There was -- I offered Reggie the
3   opportunity on several occasions to locate on the same
4   floor as me so that he would not have to traverse the
5   stairs.
6     Q   For any reason?
7     A   Right.  And that's also in my chronology.  I
8   was concerned.  Dr. Ladner was concerned.  He walked
9   in the first day with a cast on.  Of course, you feel
10  sorry for that, and I am an extremely accommodating
11  person.
12    Q   Is it your testimony that none of the
13  discussion about relocating to the first floor ever
14  took place in the context of access to or use of a
15  bathroom?
16    A   If it was said, it was minor.  I don't
17  recall anything related to that.  If it was said, it
18  might have been something like you'd be -- you
19  wouldn't have to come upstairs to go to the bathroom,
20  but I don't recall specifically saying anything.
21    Q   When you went to Dr. Ladner on behalf of
22  Mr. Green in anticipation of the trip to Philadelphia
```

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 57

```
1   Madden left, but after Jeff Madden left until Reggie
2   was hired, we didn't have a driver.
3     Q   And you were actively recruiting and trying
4   to hire someone into the position during that period
5   of vacancy?
6     A   As I recall, yes.
7     Q   Do you agree or disagree with this
8   statement:  "Reggie Green received no written document
9   expressing concerns about his driving style while
10  employed by American University"?
11       MS. KEARNS:  I object to the form of the
12  question, but you can answer that.
13       THE WITNESS:  Not that I recall.
14  BY MR. GNATT:
15    Q   Do you agree that, while Reggie Green was
16  employed by American University, he received no
17  written document expressing concerns about his job
18  performance?
19    A   No written.
20    Q   Did you have any conversation or discussion
21  with Dr. Ladner in which Dr. Ladner described for you
22  any aspect of the return trip to Washington from
```

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 58

1  **Philadelphia on December 2, 2004?**
2      A   Do I recall -- I need the first part of the
3  question again.  I remember the last, but not the
4  first.
5      MS. KEARNS:  Did Dr. Ladner tell you about
6  the return trip from Philadelphia?  Is that the gist
7  of it?
8      THE WITNESS:  Yes.
9  BY MR. GNATT:
10     **Q   What did he tell you?**
11     A   He described the incident where Reggie had
12 dropped off he and Al Checcio at the restaurant --
13     **Q   Time out.  I'm sorry to interrupt you, but I**
14 **want to be sure you're clear on what I'm asking.  I'm**
15 **only talking about the return trip, when they're done**
16 **in Philadelphia, they're on their way back to**
17 **Washington, just that piece.**
18     A   He talked about Reggie not maintaining a
19 single speed, speeding up and slowing down a lot,
20 rocking back and forth as he was driving, muttering to
21 other drivers.  That's what I remember.
22     **Q   When did you have this conversation in**

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 60

1      A   Well, that was the point where he had made
2  the determination to let him go.
3      **Q   Well, what did he say, is that I'm asking?**
4      A   I want to fire him, I believe was his word,
5  and he was concerned -- actually, there was a
6  follow-up statement.  He was concerned about safety.
7  He said I think it's an issue of safety.
8      **Q   Tell me anything else you remember that he**
9  **said and that you said at that point in the**
10 **conversation?**
11     A   I don't recall anything in my memory.  I
12 know I probably have extensive notes in the
13 chronology, but I don't remember off the top of my
14 head exactly what transpired in the conversation we
15 had.
16     **Q   In that conversation, did Dr. Ladner say**
17 **anything about whether they had made a stop for**
18 **Mr. Green to use the bathroom?**
19     A   No.
20     **Q   The hotel that Dr. Ladner stayed at in**
21 **Philadelphia was the Four Seasons Hotel; is that**
22 **correct?**

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 59

1  relation to the return?  They got back from the trip
2  December 27th.  Do you know approximately what time
3  they arrived back?
4      A   I don't, and I don't remember if the
5  conversation happened that day or the next morning
6  with Dr. Ladner.
7      **Q   You think it was no later than the next day?**
8      A   Correct.
9      **Q   Tell me everything else you can remember**
10 **about that conversation with Dr. Ladner either before**
11 **the things you just mentioned or after or both.**
12     A   So in totality?
13     **Q   Yes.**
14     A   I started to describe Reggie getting lost on
15 the way into Philadelphia.  Reggie was unaware where
16 to pick Dr. Ladner and Al Checcio up at the restaurant
17 that he dropped them off at, not using the GPS system
18 in the car, which was to ensure that he didn't get
19 lost.
20     **Q   So those are the things on the list that**
21 **were discussed.  Then, what was the rest of the**
22 **conversation, if anything?**

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 61

1      A   Yes.
2      **Q   Did there come a time when you faxed**
3  **directions to that hotel to be used by Mr. Green?**
4      A   I don't recall.
5      **Q   Do you have any first-hand knowledge as to**
6  **whether or not Mr. Green used the GPS system during**
7  **the trip to Philadelphia and back?**
8      A   No firsthand knowledge.
9      **Q   Do you have any first-hand knowledge as to**
10 **whether he used that system before departing on the**
11 **trip to Philadelphia?**
12     A   No.
13     **Q   What was your response to Dr. Ladner when he**
14 **said words to the effect of I want to fire him and**
15 **went on to say that he thinks it's become an issue of**
16 **safety?  What was your response?**
17     A   I think I must have said yes or okay.
18     **Q   Was there any discussion between the two of**
19 **you about whether this would be a termination that**
20 **occurred during Mr. Green's probationary period?**
21     A   Yes.
22     **Q   You think you had that discussion with**

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 66

1   that Roberta Goldstein is the one that sent me the
2   draft, so I don't know at what point Beth spoke to her
3   or anything. I don't recall.
4       Q   You believe that your telephone conversation
5   was with Beth?
6       A   I think so.
7       Q   And what did you tell Beth about Mr. Green's
8   shortcomings, failures, and not meeting expectations?
9       A   I told her about the Philadelphia trip and
10  the items that I had already mentioned to you, and
11  there were other times fairly recent to the
12  Philadelphia trip where Reggie had made serious errors
13  with respect to being timely and picking up Dr. Ladner
14  and taking him places, not showing up at all, showing
15  up in an office to pick him up in a motorcycle outfit,
16  those things, and I'm sure that there were others, but
17  I just don't remember.
18      Q   When you talked to Dr. Ladner the day of
19  their run from Philadelphia, did you and he talk about
20  all those other things, or did you only talk about the
21  Philadelphia trip-related things?
22      A   I really don't know.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 67

1       (Plaintiff's Deposition Exhibit No. 6 was
2   marked for identification by the reporter and is
3   attached.)
4   BY MR. GNATT:
5       Q   Looking at Exhibit 6, is this the detailed
6   chronology that you were referring to earlier?
7       A   It is.
8       Q   What source material did you utilize in
9   preparing this document?
10      A   My notes.
11      Q   Describe these notes, please.
12      A   I take notes throughout the day of things
13  that happen, things I need to remember, things I need
14  to fix. I make notes of things are problems or things
15  that don't stick in my head.
16      Q   These are handwritten notes?
17      A   Yes.
18      Q   In a notebook?
19      A   Yes.
20      Q   Like a steno pad-type notebook, or what kind
21  of notebook?
22      A   A spiral thing so thick (indicating).

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 68

1       Q   Do you keep these notebooks forever?
2       A   No.
3       Q   What is your policy in terms of retaining
4   these notebooks?
5       A   I really don't. Once I open a new book,
6   maybe a few weeks, but I don't keep it -- I keep it
7   for forward reasons, not for looking back.
8       Q   This is a compilation of notes on any
9   subject that comes up in a day? It's a chronological
10  set of notes that's not separated by subject; is that
11  correct?
12      A   Absolutely.
13      Q   So in order to compile this chronology, you
14  would have had to pick out those notes relating to
15  Reggie Green from notes related to all kinds of other
16  subjects?
17      A   Exactly.
18      Q   When did you begin the task of creating this
19  chronology?
20      A   When I was asked to make a chronology in
21  response to the EEOC complaint.
22      Q   Asked by university counsel; is that

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 69

1   correct?
2       MS. KEARNS:  You can answer that.
3       THE WITNESS:  Yes.
4   BY MR. GNATT:
5       Q   And do you have a sense of the date you
6   began the process?
7       A   Not precisely, no.
8       Q   But you had the spiral notebooks in which
9   all of this information was contained?
10      A   I change spiral notebooks maybe twice a
11  year, so, yes, it was all in one.
12      Q   You hadn't discarded that one at the time
13  you were asked?
14      A   Correct.
15      Q   Have you since discarded it?
16      A   Yes.
17      Q   Even though the information was extracted
18  and put into a chronology which related to a
19  legal-type claim?
20      A   Once I did this and once it was resolved
21  with the EEOC, I thought we were done. This
22  represented everything I had written anyway.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 70

1   Q   Did you ask anyone is it safe to discard all
2   these source notes at this time?
3      A   No, I didn't ask anybody.
4   Q   What specific instruction did Mr. Green
5   receive about coordinating between the need to drive
6   Dr. Ladner's places and the need to drive Mrs. Ladner
7   places?
8      A   Reggie's job was to drive, so if Dr. Ladner
9   took priority, if he needed Reggie, that would be a
10  priority over Mrs. Ladner needing Reggie; however,
11  they often worked out the details -- I often worked
12  out the details with the driver to have it combined in
13  some way that it still -- they were able to
14  accommodate both people fairly often.
15     Q   In working out the details, did you
16  typically also coordinate everything with Sally
17  Ekfelt?
18     A   Yes.
19     Q   Prior to Mr. Green's employment, were there
20  ever issues where there was a mix up in terms of the
21  driver meeting the needs of Mrs. Ladner and Dr. Ladner
22  and somebody getting left behind or a lack of

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 71

1   coordination?
2      A   Perhaps.  I don't remember a specific
3   incident.
4      Q   The responsibility for the coordination
5   rested with you and Sally Ekfelt; is that correct?
6      A   And the driver.
7      Q   The driver would have to implement the
8   arrangements that you and Sally had worked out?
9      A   Yes.  He also would be looking at his
10  calendar and his own notes and helping to identify
11  when there was a problem or a contradiction or
12  something like that.
13     Q   Did you determine that Reginald Green had
14  failed in some way in this regard during his employ?
15     A   Yes.
16     Q   What was the basis or that determination?
17     A   The use of the Blackberry and how Reggie
18  reacted to some of the entries on his calendar.
19     Q   Can you explain that?
20     A   There were entries on Reggie's calendar in a
21  category at 9:00 a.m. that were general, and they were
22  put there to sort of mark a place, at some time on

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 72

1   that particular day, something like this might happen,
2   whatever it was, and there were, I think, two
3   different times that Reggie responded to that as an
4   actual call for him to drive without even looking into
5   the inside of it, where it was say see notes and read
6   what the notes are, and without asking questions about
7   what he's to do.
8      Q   So these were more of a putting a hold on a
9   block of time --
10     A   It was entered in the 9:00 a.m. timeframe,
11  and address it was informational.
12     Q   What kind of notes would be entered that
13  were informational?
14     A   Inside the calendar record would be maybe a
15  flight itinerary, maybe e-mails back and forth between
16  Sally and I, maybe just my notes saying we may need
17  this, we may not need that, whatever the specific
18  things were that I knew or to say I don't know much
19  now; ask me later.
20     Q   So this was like a way of sending Mr. Green
21  a memo?
22     A   Sure.

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 73

1      Q   You found a place to put it on the calendar,
2   and the place you put it was 9:00 a.m., but it was not
3   an appointment.  It was a location within the
4   Blackberry for him to read notes, and he mistook that?
5      MS. KEARNS:  I'll object to the form of the
6   question.
7      THE WITNESS:  It was clearly articulated and
8   understood that the 9:00 a.m. timeframe on the
9   calendar was used to put a general hold or mark a
10  place where the driver would have to act or react.  It
11  often had, after the description of what it was, a set
12  of words saying see notes, and those notes would be
13  inside that particular entry on the calendar.
14     If he was to actually do something as a
15  result of that place being held, then, there was an
16  entry on the calendar for the specific time with the
17  details for what he needed to do.  For example, Board
18  of Trustees is going to be in town for Thursday and
19  Friday of whatever dates.  The time that would be put
20  on the driver's calendar, we would have no idea what
21  we would expect of the driver, but he would know we
22  would expect things from him.  These are the same

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 90

1       MR. GNATT:  No.

2       MS. KEARNS:  Yes, the letter in addition to

3    this.

4       THE WITNESS:  Is that what you're saying?

5    BY MR. GNATT:

6    Q    Whether or not it's in there, wasn't that

7    something that was discussed at that meeting?

8    A    I would say, if it was discussed in the

9    meeting, I would expect it to be in my notes.

10   Q    Do you know whether the GPS system can be

11   checked to see when it was on and when it was off?

12   A    I have no idea.

13      MR. GNATT:  That's something else that I'll

14   mention on the record for us to look into, which is

15   whether or not there is that kind of data available

16   that would document whether the GPS was in use or not,

17   in use on or off during the time he worked there.

18   BY MR. GNATT:

19   Q    Do you know whether at the time Mr. Green

20   was hired if he was asked to sign a medical release or

21   authorization?

22   A    An authorization for what?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 91

1    Q    For the release of his medical records from

2    any doctors that he --

3    A    No.  I certainly never saw that.

4    Q    Is that a procedure that is familiar to you

5    or unfamiliar to you?

6    A    Unfamiliar to me.

7    Q    Are you aware of Mrs. Ladner having said to

8    Mr. Green during his employment in the presence of

9    Dr. Ladner you'll work for us forever?

10   A    I have no knowledge of that.

11      MR. GNATT:  Let's go off the record for a

12   minute.

13      (Brief recess.)

14      THE WITNESS:  I want to make a

15   clarification.  I have to find it first.  As I read

16   these notes over a little bit ago, I did know that it

17   was a colon problem.  I don't remember where exactly I

18   read it, but it is in here, so it refreshed my memory

19   that he said it was a colon problem.  It's a paragraph

20   just above December 1, 2004 -- November 30, 2004,

21   Page 11, the second paragraph.

22

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 92

1    BY MR. GNATT:

2    Q    And you understood what the colon is and

3    that that's related to the digestive system and moving

4    one's bowels and that sort of thing?

5    A    Yeah, I know about the colon.

6    Q    You're aware of a concept of urgency to move

7    one's bowels?

8    A    With respect to Reggie, no.

9    Q    But you're familiar with the concept in

10   general?

11   A    Sure.

12   Q    An urgent need to use the bathroom, move

13   your bowels, that sort of thing?

14   A    Right.

15   Q    Did Sally Ekfelt ever express to you

16   concerns or complaints about Mr. Green's performance?

17   A    Probably.

18   Q    Well, what, if any, such concerns or

19   complaints did she express to you?

20   A    I don't recall them specifically.  Sally and

21   I talked many times a day about many things.

22   Q    Because you had Dr. Ladner and she had Nancy

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 93

1    Ladner, and there was lots to coordinate about them?

2    A    About them, but, also, events at the

3    residence and other things related not specifically to

4    them, but to the building itself.

5    Q    But you can't recall any specific concerns

6    or complaints expressed to you by Sally Ekfelt about

7    Mr. Green?

8    A    Not specifically, no, I don't.

9    Q    How about concerns or complaints expressed

10   to you by Nancy Ladner?

11   A    Well, Nancy did tell me about the hugging

12   business at the airport.  She did say that he did

13   that.

14   Q    How did that come about that you were

15   talking to her about that?  I understand that, first,

16   you heard of it from Dr. Ladner.

17   A    And, then, I spoke to Reggie about it on the

18   phone, and, then, I spoke to Reggie about it face to

19   face.

20   Q    How did it come about that you were talking

21   to Nancy Ladner about it?

22   A    I wish I could tell you that I know, but I

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 94

1   don't.  I don't know the context of that conversation
2   at all.  I also talked to Nancy Ladner fairly often.
3       Q   Do you recall whether you brought it up or
4   she brought it up?
5       A   It wouldn't have been me.
6       Q   Do you remember what she expressed, how she
7   expressed it?
8       A   I'm afraid I don't.
9       Q   Do you recall whether she seemed perturbed,
10  put out, or distressed by it at the time you talked to
11  her or something less serious than that?
12      A   I think she was upset about it.  I would
13  characterize her reaction as being upset about it.
14      Q   I'm just talking about, as you recall her
15  expressing it to you, not from Dr. Ladner, not through
16  Dr. Ladner.  When she told you about it, how was
17  she --
18      A   She was upset.
19      Q   What did she say?
20      A   She had indicated -- well, she told me what
21  he did.  She told me that it was very inappropriate.
22  She felt like he was looking like a family member

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 95

1   coming to get her and not using the proper decorum to
2   receive her.  That's really about all I remember.
3       Q   Did she say whether she had been drinking
4   alcohol at the time or prior to the time?
5       A   No.
6       Q   Were you ever aware of her drinking alcohol?
7       A   Yes.
8       Q   Were you ever aware of her drinking alcohol
9   in the daytime?
10      A   I have no first-hand knowledge of that, no.
11      Q   Did you ever get an impression in talking to
12  her during the business day that she had been drinking
13  alcohol?
14      A   I don't think so.
15      Q   When it came time to inform Mr. Green that
16  he was being terminated, to whom fell that
17  responsibility?
18      A   The words "you're terminated," me.
19      Q   You informed him?
20      A   Right.
21      Q   How did that go?  Tell me about that.
22      A   He had a lot of questions about why he was

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 96

1   being terminated, and the answer was you're being
2   terminated in the probationary period, and he asked
3   many, many questions that I couldn't answer.
4       Q   So the response was limited to pointing out
5   to him that it's a probationary period termination;
6   therefore, there is no more detail to give?
7       A   Right.  And I think I did say we've been
8   talking about problems up to now, but I did not get
9   into the A, B, C thing at all.
10      Q   Did he seem upset?
11      A   Yeah.  He was disappointed.  I think he said
12  something to me like this is hard to take.
13      Q   Did you respond to that?
14      A   My message was the same throughout, which is
15  I'm sorry, but it's during the probationary period,
16  and this is the end of the line.
17      Q   Were you upset about the situation at the
18  time?
19      A   I don't think I've ever fired an employee
20  when I wasn't upset about having to do it.  It's
21  appropriate that I did it, but it's a very difficult
22  thing for me to do, and I don't do it without a lot of

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 97

1   thought.
2       Q   On a personal level, how did you feel
3   towards Reggie Green as of the time you fired him?
4       A   I felt that he deserved to be fired.
5       Q   Well, that's not what I meant by on a
6   personal level.  I mean person to person, putting
7   aside your job, putting aside his job, just in the way
8   the two of you had related over those several months.
9   On a personal level, how did you feel towards him?
10      A   Mr. Gnatt, I didn't have any kind of
11  personal relationship with Reggie.  I think I've said
12  all I can.  I don't like having to fire someone.  I
13  know what that must feel like.  I don't know what it
14  feels like.  I would hate for that to happen to me,
15  and I didn't have a personal relationship with Reggie.
16  We didn't do lunch or whatever.  I did what I had to
17  do.  I didn't like having to do it, but that was
18  because of what it meant.
19      MR. GNATT:  I have no other questions.
20  Thank you.
21      (Examination concluded at 1:05 p.m.)
22      (Signature not waived.)

## THE CHRONOLOGY OF EVENTS AND DISCUSSIONS FOR REGGIE GREEN

JUL 7, 2004
: Offer extended for employment at AU, effective August 16, 2004. In a phone conversation just prior to this offer letter being sent out, Reggie told Mary Hentschel he had broken his leg in a motor cycle accident. He kind of made a joke about it to her saying the good news is... it's not his driving foot. Then said he should be out of the cast in 6-8weeks.

AUG 16, 2004
: Reported to work wearing a short cast on his leg. (I was on vacation for that week.) During that first week he did all his basic orientation. Met with Mary Hentschel, received his ID card, parking sticker... etc. BL/NL were both on vacation also. He had no driving assignments nor access to either of the cars for cleaning/maintenance etc.

AUG 23, 2004
: I returned to work as did the Ladners. In this first week with me in the office, I asked Reggie if having his office in the basement was any problem for him because of his leg. He said no, he was managing the stairs just fine and the cast would be off real soon. He said laughing, "trust me this thing's coming off soon."

Week of AUG 24
: BL and Reggie met in the POB hallway. BL expressed concern over Reggie's leg and said he was sorry as it must be uncomfortable for him. Reggie laughed and said no problem it was mostly healed and that it was not bothering him. Reggie thanked BL for asking about it. BL responded saying he appreciated his efforts.

AUG 26, 2004
: Reggie was given his Blackberry/Cell Phone. (Reggie had specifically asked for this item during the interview. Said he was very comfortable using it and would like to use it at AU.)

AUG 27, 2004
: I reviewed a comprehensive list of Reggie's duties and responsibilities as well as a listing of items that have been problematic for employees in this position. Both documents were given to him for his information. (They are attached)

Early SEP
: About Reggie's leg... Reggie had indicated his cast was due to come off of his leg sometime in early September. I don't remember the date, but sometime in September he came into work on a Monday without the cast on and indicated he had cut the cast off himself over the weekend. He was laughing and joking about it. Said he knew the doctor would not be pleased but he was happy to have it off... and said he'd get to the doctor sometime during the week and get it checked out. I would characterize his attitude as bragging about taking matters into his own hands. Early in the week he said he felt "great"... as the week wore on the ankle swelled and he was limping. It was later in the week that he went to the doctor.



Clemmer No. 6
9-25-07 ㅁ기

AU 0132

As I recall, when he went to the doctor he came back to the office with a soft cast on his leg and said he needed to wear it several more weeks. I cautioned Reggie that he needed to be more careful in following the Doctor's instructions most specifically to be sure his insurance would honor his claim. I told him it was my understanding that if you don't follow the doctor's instructions the insurance company may not honor your claim. I told him this several times in the three months - he would always laugh and say no problem... everything's under control.

Many times in September, October and November Reggie would come into work without the soft cast on his leg. He would always laugh and brag that he was happy to be free of it... dancing around while he said it. Throughout this period, Sally Ekfelt, at the residence, admonished him several times for not following the doctor's instructions and expressed concern that he wasn't taking proper care of himself.

Later, and I don't remember exactly when – but I'm pretty sure it was after mid-October, Reggie asked me if he could use the side basement door when leaving the building. (This eliminated his need to climb the stairs.) I said sure and asked if there was anything else we needed to do to help him. He said no, that was just a small thing he thought would be helpful although he probably wouldn't do it all the time.

Some time in November, after Reggie returned from a Doctor's visit he told me the doctor thought there might be some kind of permanent damage to his leg. I told him I was sorry to hear that and reminded him I had suggested he really ought to have been following the doctor's instructions. He said, yes I know, I never thought there would be any permanent damage. He was obviously concerned and said he'd be sure to keep his cast on. After that visit to the doctor, I don't recall seeing him without his cast.

My attitude throughout Reggie's employment with us was that of concern over his leg. I never once made a reference to it being a problem and he never asked for any special consideration other than the use of the side basement door. I never asked for, nor was I ever presented with any kind of medical documentation of any sort.

Week of SEP 6    Sally and I met with Reggie at the residence for about an hour and a half going over every detail of how business is to be conducted in the residence, on errands and when driving the Ladners or their guests. We were very clear that problems encountered during the course of Reggie doing his job are to be aired with either Sally or me immediately. He was clearly told if something happened after normal business hours he was to call me immediately no matter what time it is. I carry a cell phone and can be called anytime, 24/7. We talked about the need for a straight-up honest working relationship... problems are to be aired and discussed not "discovered.". We stressed that the Ladners were not his problem solvers. We spoke at length about attention to detail and being meticulous in the care of the cars. We addressed issues of keeping conversations with passengers to a minimum. Always being professional; appropriate

3

attire; maintaining a fragrance free environment; follow up, etc. We discussed at length the various problems that have occurred with previous drivers. Sally and I both wanted Reggie to be aware of these types of problems so he would be sure to avoid the pitfalls of the past. Reggie said he was very grateful to have the benefit of this information. He said he certainly wanted to keep things positive. We also talked with him about not repeating his own mistakes... and seriously learning from them. Being corrected once is certainly acceptable... being repeatedly told the same correction is seriously problematic. Lastly, we spoke about the importance of being in place 15 minutes prior to the appointed time whenever possible. I told Reggie this "15 minute rule" had proven itself over time to be extremely helpful and prudent.

SEP 9, 2004        I spoke with Reggie expressing BL's concerns about how the car is left at the end of Reggie's work day.
1. Put the driver's seat back in the #1 memory position.
2. Leave the headlights in the "auto" position - specifically do not leave them in the "off" position.
3. Put passenger seat back in the normal position.
4. Remove all personal items.
5. Top off with fuel.
6. Be sure to complete these steps each day before leaving the car at the end of the day.

SEP 14, 2004       Reggie was given the day off for a personal matter. (This was a planned absence. BL used a Carey driver for an event in the afternoon.)

SEP 20, 2004       At 3:30 pm NL was to be picked up at the residence for a 3:45 appointment on Wisconsin Avenue. Reggie was here in the POB basement when she called at 3:30 to see where he was. He left immediately.
The problem seemed to be with the Blackberry - both how Reggie used it... and how the information was entered. A test entry was made and reviewed and further instructions given on the use of the Blackberry. Reggie clearly indicated he knew how the calendar function worked in this instrument and that I shouldn't be concerned – as this would never happen again. Additionally I reminded Reggie of our standard "15 minute rule" which says the driver is to be in place 15 minutes before the scheduled pick-up. Had this happened in this instance, Reggie would have actually been at the residence at 3:30 pm as he thought he was to be there at 3:45 pm. In the end of this discussion his instructions were clear and he said he understood both the 15 minute rule as well as the function of the Blackberry.

SEP 22-23, 2004    Reggie personally detailed BL's car.

SEP 27, 2004       I spoke to Reggie expressing BL's concerns about his driving style.
1. Drive at a normal rate of speed. Apparently he is driving excessively slow.

AU 0134

2. Keeping 5-car lengths distance between cars is too much. Keep normal distance between cars.
3. At a stop light or stop sign - keep reasonable distance between cars - not an excessive amount.
4. Be sure to get into the right-hand lane if you want to turn right - don't do it from the left-hand lane.

OCT 1, 2004    BL spoke to Reggie expressing his concerns directly. I took notes. Conversation lasted about 20 minutes.

1. First BL expressed these were course corrections to make so that bad habits don't get formed. He said he knew I had already talked with him about most of the items, and that he wanted Reggie to know first hand they are his concerns. And, he thanked him in advance as BL was sure Reggie would want to make the necessary improvements and that he was sure Reggie was capable of making them.
2. Do not leave personal items in the cars at the end of the day. i.e. cleaning rags, food, etc. (Reggie had left items in the front seat previously)
3. Stressed Reggie's need to keep an eye on the service department Rosenthaul. They are notorious for solving a problem and creating others; not solving the problem they say they solved; resetting various personalized settings in the car and not telling anyone. And then the famous door locking problem which has just resurfaced again.
4. It is a must to learn the GPS system in the car and the XM Radio. At this point Reggie told BL he was generally familiar with both but would work with Rosenthaul to ramp up the rest of the way on the GPS. Reggie also indicated he had the manuals to refer to as well. His response to BL's request on both of these items was "no problem."
5. Drive at a normal rate of speed - keep up with traffic.
6. Five car lengths between cars is too much. Reggie said he does that for safety. BL said he understood that, but thought it would be prudent to close the distance quite bit and that they would still be safe. BL suggested leaving too much space was problematic also.
7. Cross speed bumps and construction work at a reasonable rate of speed. It is not necessary to stop and then crawl over the bump.
8. He reminded Reggie to always be mindful of NL's comfort in the car, especially with she is sitting behind him. He also thanked Reggie for the manner in which he handled her up to now.
9. Don't make right-hand turns from the left-hand lane. Be sure to move into the right lane.
10. Attention to detail is of paramount importance. BL said he expects a very high level of attention to detail from all of his staff members and the driver position was clearly a highly focused position with a lot of details.
11. He also mentioned that the transmission in his car tends to "jump a bit" when it starts. BL wanted Reggie to be aware of it as a characteristic of the

car and not to worry that something is wrong. Reggie said he had already noticed it and didn't see it presenting a problem.

Reggie went into this meeting very nervous. When it was over he was visibly relieved. He said being called into the boss' office scared him a bit, but he was glad these were the only things on his mind. He said, this is absolutely no problem.

OCT 2-17, 2004    I was out of the office due to the death of my father.

OCT 15, 2004    BL asked to be taken to the Metropolitan Club after he finished with the Golden Eagles Luncheon. Reggie drove him there - when BL got out of the car as usual - he told Reggie he would be ready to be picked up around 2:15 PM. Reggie told him that would not be possible because he had a run to make with NL. This presented BL with a dilemma he was totally unaware of. BL then had to work out the situation with NL rather than Reggie working it out with Gerri and Sally in my absence. Reggie knew when BL left the office that he had a conflict. BL made me aware this happened when I returned to the office the week of October 18th.

Week of October 18, 2004  I spoke with Reggie about the conflicting situation he put BL in the week before. I explained that he held a position of responsibility as BL's driver. BL is not the one who should be called to solve these types of problems... and that Reggie himself should have handled it. This is not a totally reactionary position, where you only do exactly what you are told and that's it. The job requires thinking, attention to detail and very good judgment.

OCT 28, 2004    I entered the Philadelphia trip on Reggie's calendar for December 1 and 2. I also instructed him to make his own hotel arrangements. He asked where BL would be staying and I told him I did not yet know -- but would make that arrangement in the next few days and let him know. I also reminded Reggie that he needed to be sure he was up to speed with the GPS system prior to the trip. His response was... no problem. He said, "Meg I've basically got it," then he said he just needed to spend a little more time with the person at Rosenthaul that is helping him with it.

I made BL's hotel reservation at the Four Seasons and noted Reggie's calendar with the information directly, including the address and made him aware of it.

At this same time, there was also a trip to New York entered on Reggie's calendar for December 5-7, 2004. Using Reggie for this trip was ultimately aborted as BL decided to use the shuttle to LaGuardia. He made the decision not to use Reggie for New York on 11/29.

OCT 29, 2004    BL was out of the office today and called me concerning several items that had happened with Reggie recently. I spoke with Reggie about these items this day over the phone then on November 2nd I talked with him about them again face-to-face.

ıte OCT

It was also around this time that Reggie mentioned he would like to go to some sort of training seminar on the GPS system. Even though he had learned the basics he wanted to become an expert on the system. I encouraged him to explore this and let me know if he found a class that would benefit him. I suggested that Rosenthaul might know of something. As far as I can remember this is the only time he mentioned this.

NOV 2, 2004

I talked with Reggie about the same items I addressed on the phone on 10/29; this time the conversation was face-to-face.

1. When greeting Mrs. Ladner, in any scenario, it is not appropriate to hug her. - Reggie offered no explanation for this behavior. He just said, "understood" and "it will never happen again."
(BL had made me aware that when Reggie had picked NL up at Dulles on 10/28, he approached her as if she were a close friend or family member, hugging her and telling her that he had missed her.)

2. As a driver for the President of AU you are expected to maintain professional demeanor at all times.

3. I reminded Reggie once again not to leave personal items in BL's car at the end of the day.

4. Asked that he be sure the cars were left in the unlock position when parked in the garage for the night. This was brought up because of a concern about the car door locking problem resurfacing. This had nothing to do with a performance issue with Reggie - other than a request for him to be sure he is leaving the cars in the unlocked position. That way we could determine if the car is actually locking itself - which it was.

5. Also a reminder to be sure the car driver's seat is left in the #1 position, passenger seat is returned to the normal position and lights are left in the "auto" mode.

6. I talked with Reggie specifically about attention to detail - reminding him that is one of the significant keys to his success in this position. It is not just "ok" to miss these simple details time after time.

NOV 4 - 5, 2004

These were AU Board days. Reggie, however was slated to drive NL on Thursday, the 4th. She had a luncheon and then needed to go to National Airport to pick up family members at 2:28 PM. After returning from lunch, NL told Reggie she had decided to go to the airport and pick up her family members herself (alone) because there was not enough room in the car for both she and Reggie with the children's car seats and other adults. Sally had indicated first thing this morning that this was likely. She, Sally told me Reggie would be used only if they thought the family had too much luggage to fit in the car with all the people. I made Reggie aware of the tentative nature of this particular booking.

7

There were board related drives on Friday that Reggie handled fine. My only concern was a conversation he chose to engage in with one of our Trustees (Leslie Baines, Vice Chair) about how long it took for us to hire him. She told me he didn't complain actually just made a point about it. I asked what brought about the comment from him. She told me he was just basically chatty in nature and that he brought it up. The following Monday, November 8th I had a brief conversation with Reggie, emphasizing he was to keep conversations with his passengers to a bare minimum.. I also said it was not appropriate to discuss personal matters with his passengers. I asked if he had a problem with the time it took to hire him and he said no and that he understood what I meant.

**NOV 7 - 8, 2004**

There was an entry on Reggie's November 7, 2004 calendar in the 9:00 AM time slot stating: "RETURN NL'S FAMILY TO AIRPORT - SEE NOTES." The notes stated: "US AIRWAYS FLT # 2429 - DEPARTING FOR GREENVILLE, SC AT 4:30 PM - WILL NEED CAR SEATS." Based on this calendar entry, Reggie reported to the residence at 8:30 AM and prepared to make the airport run. The following happened.

1. After waiting until 10:00 AM, Reggie called me on my cell phone and asked if I would find out what was going on as the Ladners had not come out of the residence to go to the airport. I called the residence and asked BL what had happened, he said there must be some mistake the family was being taken care of by the Ladners themselves. I relayed this message to Reggie and he left for home.

2. Reggie should have remembered the situation from Thursday when he was told not to plan to make the airport run because of space in the car. He should have at least asked the question if he was needed.

3. Reggie did not read the entire set of instructions on his calendar. In the "see notes" part of this calendar entry it clearly said the airport run was 4:30 PM. So it was wrong of him to be there at 8:30 AM in the first place.

   It is important to know, we use the 9:00 AM entry slot on the driver's calendar to make the driver "generically" aware of things that may happen that day. This particular entry was originally put on his calendar in the 9:00 AM slot to make Reggie aware there would be an airport run. When Sally got the actual info it should have been moved to the 4:30 PM slot and then eventually it should have been cancelled.

4. Sally should have made Reggie clearly aware he was not needed, which she apologized for when it was brought to her attention on Monday, November 8th. This also resulted in a further clarifying discussion between the two of them about items entered in the 9:00 AM time slot that are meant to be generic. It also pointed out the fact that he did not look into the body of the calendar entry to "see notes" to discover the actual flight time.

   As a point of clarification, Sally and Reggie decided together that she would use the "To remind" function in the calendar to enter generic information that might

8

happen as opposed to entering it into the 9:00 AM slot. It was decided this would eliminate any further confusion.

I additionally spoke with Reggie about all of this following Sally's conversation. I pointed out the following.

1. Read your calendar entries carefully and thoroughly. If the entry says see notes... be sure you do it. Ask questions, if the entry is in a 9:00 AM slot and the notes say the pick up is at 4:30 PM. Get clarification.

2. Clarify all weekend driving commitments before departing the office at the end of the work week. Be sure entries are confirmed. If it is an event for NL confirm it with Sally; if for BL confirm with me. If there are any problems, concerns, conflicts etc. talk to me and get clarification before the weekend gets underway.

3. I also praised Reggie for calling me when he wasn't sure what to do. I stressed the importance of calling me every time a problem arises – and when ever it happens. I made very sure Reggie understood that calling me was not optional, but required. If there is a problem, I can't possibly do my job if I don't know what's going on. He was also very, very clear my cell phone is a 24 hour number and he must call me any time a problem arises... day, night, weekend, whatever. I really made a very strong point on this.

4. Reggie did admit to me that he had not read the notes for this calendar entry. He basically blamed it on the Blackberry – which actually meant he either did not know how to use it properly; or he simply did not open the notes. I was able to open the notes without a problem or any troubleshooting. Following that, I reviewed this Blackberry function with him and also reminded him that Filemon is available if he needed more instruction. I brought up the fact that he had told me in the interview he was very familiar with the Blackberry and that he specifically asked to use one. He said yes he had said that and thought this must have been some sort of glitch. I had him open the notes himself a few times to demonstrate that he knew how to. He did so and said he understood and that everything was fine.

5. I raised again the issue of attention to detail; reminding Reggie this is a key characteristic to being successful in this position. I reiterated that keeping up with all of the details in an assignment is required. I also reminded Reggie that BL is a very detail oriented person and that he (Reggie) needed to realize there was going to be no pardon, time and time again, if the same details are continually missed.

I felt that Reggie thought he had been the victim of Sally's mistake and that was that. I wanted to be sure he understood the various questions that he should have raised to get clarification ahead of time... and most specifically, how that would have kept the problem from happening in the first place. I pointed out that Sally had made a mistake, absolutely, but so had he... because we must work as a team to ensure all things are done completely and accurately. He was very clear and positive about this at the end of our discussion.

AU 0139

Both Sally's conversation with Reggie and mine happened on November 8th. The conversation I had with him on the phone on the 7th did not begin to approach any of the problems stated above. In fact I did not uncover the entire situation until I came to work on the 8th and looked into the matter.

**NOV 8th on...**   From this point on things began to unravel with Reggie. One of the most obvious problems was Reggie appearing extremely tired and basically not focused almost every day. I asked him if he was feeling alright and he said yes, fine. His demeanor though was tired and disconnected. He would ask me questions about information missing from his calendar that wasn't missing... it was right there. I would point the information out to him and he would say oh... ok, look puzzled and walk away.

It was also during the week of November 8th that BL mentioned the cars were not being kept as clean as they had been. When I spoke to Reggie about this, he said he was doing exactly the same thing as always. He said that he was trying really hard. I strongly encouraged him to pay attention to the details and really focus on his job in totality.

**Week of NOV 15**   Things continued to decline. Reggie just couldn't seem to get it together. He continued to lack focus. I would have to remind him of what time it was to get him in place for many of his drives. At some point late in this week Reggie told me he was just trying to get through. I asked through what? He said his probationary period. I told him he needed to focus on the details of his job.

**Week of NOV 22**   Sometime this week (I think – it could have been a week earlier) Reggie was late for work because of a "shredded" tire on his van. He complained he had to come up with $200 for a new tire, etc. As far as I knew he corrected his tire problem. I heard nothing more about it.

**NOV 23, 2004**   Reggie had another "possible" Ladner family pick up noted on his calendar. During the day, Sally had made him aware that the Ladners were taking care of the airport run this time – both arrival and departure. (The family members were also to depart on Sunday of Thanksgiving weekend.) Sally was not going to be at the office on Wednesday, 11/24, so she made a specific point of reviewing the weekend with Reggie on Tuesday, and clearly told him that he was not needed on Sunday and that he was clear for the holiday weekend as far as she knew. If plans were to change and he was needed, Reggie would be told specifically.

**NOV 28, 2004**   Once again, Reggie reported to the residence at 8:30 AM responding to a "to remind" calendar entry, "SOME TIME TODAY, DAVID LADNER, WIFE, & TWO CHILDREN PLAN TO FLY BACK TO ATLANTA - TIME & AIRPORT UNKNOWN - YOU <u>MIGHT</u> BE ASKED TO PICK THEM UP - PLANS TBD." This is the very entry Sally had spoken with Reggie about and made it perfectly clear he did not have an airport run to make unless plans changed. It was also entered on the calendar in the "to remind" format they had discussed and agreed upon so it would not be confusing.

Reggie told me he waited until 11:30 AM and when no one came out of the residence to go to the airport he left and went back home.

AU 0140

| | |
|---|---|
| NOV 29, 2004 | Reggie had a 7:00 AM pick up of BL at the residence to take him to National Airport. He asked BL what had happened and why no one came out to go to the airport the day before. BL told him he did not know what he was talking about as they had taken care of their family members themselves. He told Reggie to talk to me and to get it figured out. |

Later in the morning when Reggie came into the office he asked me what happened and complained bitterly that he shouldn't be expected to come into work on a holiday weekend based on a maybe.

I counseled him on the following:

1. Sally said she had told him he did not have a drive on Sunday – Reggie claimed this is not true.

2. The entry on his calendar was put there in the "to remind" category so he would not be confused that it was only informational. The wording of the entry was also obviously only pointing out a possibility.

3. I pointed out the obvious, he didn't get complete information before the weekend began as I had clearly instructed; he didn't call me when he encountered a problem doing his job; he made it BL's problem by telling him about it without first bringing it to my attention.

He could give me no explanation. He said he didn't want to bother me, that's why he didn't call. I told him this was serious. I instructed, you must pay attention to the details, the information on the calendar is meant to be interactive. He has a responsibility to make completely sure he knows every detail. Again he said he understood.

I asked if he was ready for his trip to Philadelphia. He said yes. I asked about the GPS, he said he would use it. I reminded him that BL was expecting him to. He said, understood.

| | |
|---|---|
| NOV 30, 2004 | Reggie was 10 minutes late for a 9:00 AM NL pick up at the residence. NL called Saker at 9:10 and asked where Reggie was. Saker called Reggie on his cell and he said he was already in place at the residence. Saker relayed that to NL. When NL went out a second time, Reggie was just pulling up. (When I spoke with NL about this later, she said, Reggie clearly had not told Saker the truth.) |

Reggie later told me a fireman had chased him down for passing a fire truck displaying flashing lights. He stated that was why he was late.

At 12:30 PM when BL walked out of the front door of the POB to go downtown, Reggie was sound asleep in the driver's seat sitting at the front steps of the President's Office Building. BL had to tap on the window to wake him up.

When Reggie returned BL to the POB after lunch I spoke with him about this. I asked if he thought it was professional demeanor to sleep in the president's car parked in front of the office. I told him that sleeping on the job was not acceptable

and that it could result in him loosing his job. He told he was just trying to get through his probationary period — but offered no explanation why he was asleep. At the end of our conversation I told Reggie, "all I can say is, you look tired to me and more importantly than that, you are acting tired." I then suggested he go home and get some extra rest to be ready for his trip to Philadelphia the next day especially since the day was to begin with a 7:15 AM pick up of BL at the residence for a dental appointment.

Just before Reggie left for the day he came to me and expressed concern that he may have to use the bathroom while driving to or from Philadelphia, because of a medical problem he had in the past regarding his colon. I told him I would explain to BL and that he should not worry about it. I told Reggie the problem we had encountered in the past with a driver needing many bathroom breaks on a road trip, was due to the driver smoking. He was using the need to use the toilet as an opportunity to smoke. I said in fact his smoking was really the problem much more than the bathroom stops. Reggie seemed relieved and then went home for the rest of the day.

I did tell BL that Reggie had a past colon problem and it may cause a need for him to use the restroom during the trip. BL said fine and that he appreciated knowing that. He also said Reggie should not worry about it. I told BL I had already expressed that to Reggie and that when I saw him the next day I would inform him that BL and I had talked about it. Which I did. Reggie said thank you — he was glad not to have to worry about it.

DEC 1, 2004    At 7:40 AM I called Reggie, just to see how things were going. Since he had a 7:15 AM pick up at the residence I expected him to be parked and waiting for BL at his dental appointment which was scheduled for 7:30 AM. Reggie was frantic. He said he went out to get in his van that morning and his tire was flat. He said he had come to work on his motorcycle (in the rain) because of the flat on his van. He had totally missed the pick up of BL. He said BL's car was gone from the residence and it was not at the office. I told him to go to the office and that I would be there around 8:00 AM. He called me back in about 10 minutes and said he had found BL and would be driving him to the office after his dental appointment.

Dressed in his motor cycle riding attire, Reggie had gone into the dentist office and told the receptionist to tell Dr. Ladner his driver is here and ready to drive. From the dental chair, BL asked the receptionist if she would simply tell Reggie to report to work and he would catch up with him at the office. When she returned to her work station Reggie was gone.

When BL left the dentist office he encountered Reggie waiting in the garage. He was standing there in his motor cycle attire with helmet. Reggie said he was here to drive. BL told him to go to the office and that he would drive himself to the office.

When I saw Reggie at the office my first question was, why didn't you call me on my cell phone and let me know you were having a problem and would be late. He said

he didn't think of it. The morning was really hectic and there was not time for a prolonged conversation as Reggie had asked if he could go home so he could leave a key for his van to be picked up and the tire repaired. He also said all of his clothes were wet and he needed to get dry ones for the trip. There were only a few hours left to the morning before they were due to depart for Philadelphia and I expressed my concern. Reggie said he'd be back in time.

He did return in a timely fashion and he and BL left for Philadelphia as planned. Reggie called me once they arrived at BL's hotel and told me the trip went extremely well. No problems. Said he went right to the Four Seasons.

DEC 2, 2004

I spoke with Reggie a couple of times during the day and he told me everything was going well and there were no problems. Reggie and BL returned to Washington later that evening.

DEC 3, 2004

Reggie reported to work very happy and said they had a wonderful trip to Philadelphia. BL called me into his office and told me of the following problems:

1. Reggie got lost getting to the Four Seasons. Said he even went down an alley where a truck was unloading produce. Said he never turned on the GPS.

2. Reggie had dropped BL and Al Checcio at a restaurant for dinner. As they exited the car, BL told Reggie they would probably be about 90 minutes. When BL and Al came out of the restaurant (in about 90 minutes) they did not see Reggie. BL did the standard thing in that circumstance which was to call him on his cell and tell him they were finished and ready to be picked up. Reggie said, "from where." BL said at the restaurant where you dropped us off for dinner. Reggie said, "where is that." It became necessary for Al to get on the phone and direct Reggie back to the restaurant to pick them up. He did not know where they were.

3. On Tuesday, Al Checcio was helping to direct Reggie from the back seat – since he had already gotten lost getting to the Four Seasons and because of the restaurant problem the evening before. Several times Al would warn Reggie that he would be making a right hand turn shortly. Instead of moving into the right lane to accomplish the turn – several times he remained in the next lane over and attempted to make the right turn from the wrong lane.

4. On the return trip, Reggie started talking to himself out loud while he was driving the car.

5. There were several stretches of time when BL would realize the car was going slowly and noticed they were going about 40 miles an hour. Traffic was not the problem, it just seemed Reggie was not paying attention. Perhaps like he was day dreaming. Then he would speed back up again only to drop speed again a few minutes later. This happened many times on the entire drive back to DC.

6. Reggie also rocked back and forth in the seat through most of the return trip to Washington while he was talking out loud to himself.

13

BL told me he had made the decision to terminate Reggie during his probationary period. He said he just did not feel safe in the car with Reggie and he had demonstrated many instances of both unprofessional behavior and extremely poor judgment. He had also lied to me about his ability to operate the GPS and lied about his whereabouts when he was late picking up NL earlier in the week.

I terminated his employment that same day in the mid-afternoon.

AU 0144

# EXHIBIT 5

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

Civil Division

REGINALD GREEN,

      Plaintiff,          Case No.

      v.               1:07-cv-0052 (RBW)

AMERICAN UNIVERSITY, et al.,

      Defendants.

Deposition of:

BENJAMIN LADNER,

Taken on behalf of the Plaintiff, at the Law

Offices of Pillsbury, Winthrop, 2300 N Street,

N.W., Washington, D.C., commencing at

10:20 a.m., Wednesday, September 26, 2007,

before Toni R. DeSenze.

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 18

1  successor to Mr. Green?
2      A   I'm trying to think who the successor was.
3  I think there was only one, very late, in fact, only a
4  few weeks before I left.
5      Q   Well, if I may assist you, the name that I
6  understand is Steven Price?
7      A   Steven Price, right.  I don't know whether
8  such a document was presented to him.
9      Q   So, then, you probably also don't know
10  whether any additional items were added based on the
11  experiences with Mr. Green?
12      A   I do know that, over the seven or eight
13  years Meg was there, she made it a point to collect
14  all of the observations about various staff members
15  and their performance, so it would be typical to say
16  to the next driver these are issues that we have faced
17  before, and we want to make you aware of and the same
18  thing that she did with Reggie.
19      Q   During Mr. Green's employment, did you make
20  any first-hand observations about the care taken by
21  him of the president's vehicle?
22      A   Yes.

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 20

1  outside of the car to her standards.  Other than that,
2  I think generally it was okay.
3      Q   If you would look at Exhibit 1, one of the
4  bullets refers to "no tailgating."  Do you see that on
5  there?
6      A   Yes.
7      Q   What prompted that one for inclusion, if you
8  know?
9      A   I do know.  The previous driver had actually
10  had an accident due to tailgating.
11      Q   Do you know the name of that driver?
12      A   Jeff Madden, M-A-D-D-E-N, I believe.
13      Q   So what was your prescription for avoiding
14  accidents like that?  Rather than no tailgating, how
15  would you express it in a prescriptive positive way?
16      MS. KEARNS:  I want to object to the form of
17  that question.  If you can answer, go ahead.
18      THE WITNESS:  I can't answer because that's
19  how I would express it:  No tailgating.  It seems to
20  be commonsense.
21  BY MR. GNATT:
22      Q   Instead of tailgating, what is it that you

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 19

1      Q   What were those observations?
2      A   Well, there were several.  I knew he had
3  been briefed on the protocols of the care of the
4  vehicle, and he seemed not to be able to follow
5  through on some of those.  He would leave rags and
6  food in the car.  He would fail to leave the car
7  unlocked, which was an issue because the car would
8  self-lock, and we were trying to discover if there was
9  a problem.  He would forget to turn the lights on to
10  auto, which could be problematic because we were used
11  to them turning on by themselves, and they may not be
12  on at dusk, for example, if we were driving, so there
13  were a number of issues just in terms of care of the
14  vehicle that he seemed not to be able to follow
15  through on.
16      Q   How about the detailing and cleaning of the
17  car?  You've already mentioned that he left personal
18  items, rags and food in the car.  That aside, how well
19  did he take care of the car in terms of cleaning it
20  and detailing it?
21      A   I can think of only one occasion in which I
22  think Meg mentioned to me he had not cleaned the

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 21

1  wanted the driver to do?
2      A   Instead of tailgating?
3      Q   Yes.
4      A   To drive normally without tailgating.
5      Q   And what is normally in this context?
6      A   Obviously, it depends on the situation.  If
7  you're highway driving or driving in the city,
8  et cetera, but if you're at high speeds, three car
9  lengths in the city and one car length for something.
10  I don't know.
11      Q   You don't have a prescribed formula for
12  that?
13      A   Of course not, no.
14      Q   Did you ever discuss with Mr. Green the
15  question of whether he was a smoker?
16      A   No, I don't recall that I did.
17      Q   Were you ever aware of him smoking during
18  work hours?
19      A   No.
20      Q   There's an item on Exhibit 1 relating to
21  bathroom stops, and there's a handwritten asterisk
22  near it.  From my review of documents that have been

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 26

1    Q   Did you see the written report of his
2  physical or medical examination that was done at the
3  time he was being hired?
4    A   No.
5    Q   Did there come a time prior to departing for
6  Philadelphia that you became aware of a concern of
7  Mr. Green's about being able to stop to use the
8  bathroom on that trip?
9    A   My only recollection is that Meg mentioned
10 something that I took to be a fairly low level --
11 either he had been sick or had a cold.  It was not
12 something that I was concerned about, and as I recall,
13 I said that's no problem; certainly, we can stop if he
14 needs to stop.
15    Q   What do you recall Meg saying to you about
16 this?
17    A   About what?
18    Q   About Mr. Green's concern about being able
19 to stop to use the bathroom on the trip to
20 Philadelphia?
21    A   I recall very little, because it was not a
22 major item for me or her.  She just wanted to alert

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 28

1    Q   Several precipitating?
2    A   Right.
3    Q   And several ongoing before the
4  precipitating?
5    A   I don't understand the distinction.
6    Q   Several ongoing problems and concerns about
7  his performance before the precipitating events?
8       MS. KEARNS:  I'd object to the form.  He's
9  just asking if that's the straw that broke the camel's
10 back, I think.
11      THE WITNESS:  I think it was the
12 accumulation of a number of issues that kept
13 reoccurring that seemed not to be able to resolve.
14 I don't recall a single incident.
15 BY MR. GNATT:
16    Q   Describe what those recurring problems were
17 with Jeff Madden?
18    A   I would have to go back and see Meg's notes,
19 which I haven't thought about in quite a while.
20       One was obviously smoking.  He had indicated
21 that he was not a smoker and would not be smoking; two
22 was he was a bad tailgater and ended up having a wreck

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 27

1  me, as I recall, but I don't recall the content of the
2  conversation at all.
3    Q   Did she mention the underlying reason for
4  the request or concern of Mr. Green's?
5    A   I don't recall that she did.
6    Q   Did you understand whether the concern and
7  request was related to stopping for purposes of
8  urination or for purposes of a bowel movement?
9    A   I have no knowledge of that.
10    Q   So your recollection is that she mentioned
11 it, it wasn't a major item, and your response was, in
12 keeping with that, it's not a problem?
13    A   Right.
14    Q   Approximately how long had Jeff Madden held
15 the position of driver to the president?
16    A   I don't recall exactly, a year or two.  I
17 don't have the dates.
18    Q   It seems like a year or two?
19    A   I really don't recall the exact timeframe.
20    Q   Was there a precipitating reason for his
21 termination?
22    A   There were several.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 29

1  in New York as a result of that; three was he did not
2  know the city very well and would get lost on the way
3  to various appointments.
4    Q   By city, you mean D.C.?
5    A   D.C., yeah, primarily.  According to Meg, in
6  her dealings with him, he routinely misrepresented the
7  facts and was not truthful, and he missed several
8  pickups, was late, et cetera.  Those are some of the
9  things that I remember.  There may be more.  I don't
10 know.
11    Q   Even though it may not have been treated as
12 the straw that broke the camel's back, do you remember
13 what the later occurring problem was with him
14 immediately prior to his termination?
15    A   At the moment, I do not.
16    Q   If the records were to reflect that he was
17 employed in that position for approximately three
18 years, would you have any reason to disagree with
19 that?
20    A   No.  Whatever the facts are on his personnel
21 records would be the facts.
22    Q   Would you say that his inability to get

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 34

1  equivocate in the following way: The residence was
2  right on campus. It was not a matter of being
3  downtown and having to coordinate it. That was a very
4  simple coordination, and there was not a lot of
5  complicated things that had to be worked out. It was
6  simply a matter every day of talking to each other and
7  knowing schedules and things that had to be done and
8  so forth.
9      Q  Are you aware of times when there were some
10  problems that arose where there was a conflict between
11  your need to be driven somewhere and your wife's need
12  to be driven somewhere and that the arrangements had
13  not been made to resolve that conflict?
14      A  I'm not aware that the arrangements had not
15  been made. I'm aware that Mr. Green failed to follow
16  the arrangements that had been made.
17      Q  Is that on one occasion that you're thinking
18  of or more than one?
19      A  More than one.
20      Q  Can you be specific about any of them?
21      A  Yes. I can remember an occasion -- I think
22  it was a Sunday morning or Saturday morning -- when he

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 35

1  was sitting in the driveway early in the day, and it
2  was discovered that he had not read his arrangements
3  that had been put on his Blackberry by Meg, which said
4  there was to be no pickup.
5          I can recall him letting me out at the
6  Metropolitan Club and telling me as I was getting out
7  of the car that he would not be picking me up because
8  he had to pick up Mrs. Ladner, leaving me to find my
9  own way home.
10         Those are two that come to mind, but, in
11  general, he seemed not to be able to follow
12  directions, to check his daily schedule, and so it was
13  not that the arrangements were problematic. It was
14  that the he was unable to follow the arrangements.
15         MR. GNATT: Mr. Green, as yesterday, needs
16  to leave, and he hopes to come back while we're still
17  in progress, but at this point I would also like to go
18  off the record, so as he's leaving, he can mention
19  something to me that I will follow up on after he's
20  gone. We're off the record.
21         (Mr. Green leaves the deposition and brief
22  recess.)

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 36

1          MR. GNATT: Back on the record.
2  BY MR. GNATT:
3      Q  Dr. Ladner, the incident at the Metropolitan
4  Club and your understanding as to how that problem
5  became a problem is based on information you received
6  from Meg and/or Sally?
7      A  Probably Meg, yeah, because in that
8  situation, I would have called her immediately.
9      Q  So the notion that it was Mr. Green who was
10  responsible for the problem is based on information
11  furnished to you by Meg?
12      A  That's right.
13     Q  As of the time that you were getting ready
14  to embark on the trip to Philadelphia, was Mr. Green
15  being considered for termination of his employment?
16     A  I don't recall that there was a discussion
17  about termination at all. I think both Meg and I were
18  concerned about an accumulation of issues that seemed
19  not to be resolved by Mr. Green, and we were
20  concerned, but it was not a moment in which we said
21  we're now considering him for termination.
22     Q  And just to be clear with my question, I

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 37

1  don't mean to ask was that particular moment a moment
2  when you had that discussion? What I mean is: Up to
3  that point, was he under consideration for
4  termination?
5      A  That is the meaning of probation, as a
6  matter of fact. We always assume employees have to
7  measure up. As I said, there's no moment which we
8  said, now, we're considering termination. We simply
9  said you have four months; some employees make it;
10  some don't, and he was in that process.
11     Q  But, as you say, there had been no
12  discussion about terminating him?
13     A  I don't recall one.
14     Q  You were aware of the beginning and ending
15  dates approximately of that four-month probationary
16  period?
17     A  At the time, yes.
18     Q  So you knew even before leaving for the
19  Philadelphia trip that his probationary period was due
20  by sometime in mid-December --
21     A  I knew at the time, yes. I don't know now.
22     Q  I gather that you are asserting at this

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 46

1    Q   When did he say that to you?
2    A   I don't recall if it was at the end of the
3  day or during the day.
4    Q   Did he provide further detail as to what he
5  was basing that on, or was the context something that
6  made it obvious?
7    A   The context was obvious.
8    Q   And the context was what?
9    A   We had spent a day or two -- I don't
10  remember the length of the visit with Mr. Green
11  totally unable to perform his duties adequately.
12    Q   Specifically what?
13    A   Being lost, being unable to find us, being
14  unable to get from Point A to Point B to be on time,
15  driving, if not recklessly, at least turning right out
16  of the left-hand lane, et cetera.
17    Q   Did you and Mr. Checcio talk in any specific
18  terms about these various things you just ticked off?
19    A   I don't recall. The context was so obvious,
20  and it was such a bad driving experience that there
21  was no need for extensive conversation.
22    Q   Mr. Checcio remains an employee of the

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 48

1  agree that "Plaintiff, Reggie Green, received no
2  written document expressing concerns about his job
3  performance"?
4    A   I don't know.
5    Q   On the return trip to Washington from
6  Philadelphia on December 2, 2004, Mr. Green informed
7  you that it was urgent that he stop to use the
8  bathroom. Do you agree with that statement?
9    A   No.
10    Q   What did he inform you?
11    A   My recollection is that he asked if he could
12  stop to go to the bathroom.
13    Q   What was your response?
14    A   Sure.
15    Q   Did he then stop to use the bathroom?
16    A   That's my recollection.
17    Q   Do you know approximately how much time
18  passed between his request, your answer, and, then,
19  the stop itself?
20    A   No. I assume it was the next exit where
21  there was a facility.
22    Q   Do you recall approximately how long the

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 47

1  university?
2    A   No.
3    Q   What was his title?
4    A   Vice president, University Relations, I
5  believe.
6    Q   Did he have an office in Washington?
7    A   Yes.
8    Q   Do you know where he currently resides?
9    A   New York City.
10    Q   Do you agree with this statement that
11  "Plaintiff, Reggie Green, received no written document
12  expressing concerns about his driving style while he
13  was employed with the university"?
14    A   Well, in light of this document, I don't
15  know whether this was presented to him as a written
16  document or whether it was simply Meg's own briefing
17  paper for a discussion, so I don't know.
18        MS. KEARNS: Just so the record is clear,
19  the Witness is pointing to Ladner Exhibit No. 1 as he
20  was speaking.
21  BY MR. GNATT:
22    Q   Similar but different question: Do you

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 49

1  stop lasted?
2    A   No. I would --
3        MS. KEARNS: It sounds like you're about to
4  guess.
5        THE WITNESS: No. I was about to say it was
6  unexceptional. I have no recollection of it being
7  something to comment on.
8  BY MR. GNATT:
9    Q   You remained in the vehicle during the stop?
10    A   I did.
11    Q   That's your general practice?
12    A   Right.
13    Q   And that goes back to a previous answer that
14  you gave me, which is, on a trip the length of a trip
15  from New York or Philadelphia, you don't typically
16  need a bathroom break?
17    A   Plus I have a sort of mini-office in the
18  back seat, and I was in the middle of working. That's
19  typical.
20    Q   But you don't have a bathroom in the
21  vehicle?
22    A   Is that a serious question?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 50

1    Q   Not totally.  So you deny that you told
2  Mr. Green that you preferred not to have to stop?
3    A   Absolutely.
4    Q   Do you agree or disagree with this
5  statement: "Mr. Green did use the GPS system prior to
6  the trip to Philadelphia"?
7    A   Disagree.
8    Q   It's your contention that he never used it?
9    A   Correct.
10    Q   Is it also your contention that he never
11  used it during the trip to Philadelphia?
12    A   Correct.
13    Q   Who made the decision to terminate
14  Mr. Green's employment?
15    A   I did.
16    Q   Did you have full say in the matter?
17    A   Did I have full say?  I made the decision.
18  I'm not sure what you're asking.
19    Q   You made the decision.  Was that your
20  decision to make and yours alone?
21    A   Yes.  He was my staff member.
22    Q   What, if any, discussions did you have with

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 52

1  termination?
2        MS. KEARNS:  I object to the form of that
3  question, but you can answer it.
4        THE WITNESS:  I wouldn't put it that way,
5  because in making the decision, I reviewed his total
6  performance, and the trip to Philadelphia was
7  certainly a disaster in terms of his performance, and
8  it confirmed tendencies we observed in other contexts.
9  BY MR. GNATT:
10    Q   Do you know the date of his termination?
11    A   I do not.
12    Q   Are you aware you signed a letter
13  terminating him?
14    A   Yes.
15    Q   What, if any, practice did Meg Clemmer
16  follow that you're aware of regarding taking notes of
17  what occurred each day?
18    A   I don't know her exact practice.  I do know
19  that it was her habit to take notes on what was going
20  on every day for her area of responsibility, but I
21  don't know how she did this or with whom she shared
22  them.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 51

1  Meg or anyone else about terminating his employment?
2    A   She and I met and reviewed her observations
3  and compared them with my observations, because I had
4  to make a decision about his going off of probation
5  and continuing or not continuing, so we met and
6  thoroughly reviewed all of his performance.
7    Q   When did that take place?
8    A   Sometime between the first and 15th of
9  December, if December 15th was the termination date
10  for probation.  I'm sure it was during that two-week
11  period.
12    Q   Is it your testimony that the Philadelphia
13  trip was not a straw that broke the camel's back
14  event?
15        MS. KEARNS:  Objection to the form of that
16  question, because his testimony was not -- it's just
17  hard to follow.  You can try.
18        THE WITNESS:  Repeat the question.
19  BY MR. GNATT:
20    Q   Is it your testimony that the trip to
21  Philadelphia was not a, quote, unquote, "straw that
22  broke the camel's back event" triggering his

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 53

1    Q   Did you ever review any of her notes?
2    A   No.
3    Q   What, if any, concerns or complaints did
4  Sally Ekfelt ever express to you on her own
5  initiative, as opposed to any questions or comments
6  from you, about Mr. Green's performance or conduct on
7  the job?
8    A   As you know, Ms. Ekfelt worked in the
9  residence, so she was there every day when I came
10  home, and we saw a great deal of her and the residence
11  staff.  On several occasions, she indicated how odd
12  and even bizarre his behavior seemed to be in relation
13  to the staff and some of the assignments that he
14  misunderstood and so forth.
15    Q   Were those occasions when she initiated
16  those comments, or were those in response to comments
17  or questions from you or Mrs. Ladner?
18    A   My recollection is she's such a nice person
19  that phrase probably around each of the two or three
20  events that I recall began by just wanting to
21  apologize for the mixup of Reggie not following
22  through with his assignment.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 54

1    Q   What, if any, concerns or complaints did
2   your wife express to you on her own initiative, rather
3   than in response to questions or comments from you,
4   about Mr. Green's performance or his conduct on the
5   job?
6       A   One of the outstanding ones was when she
7   returned from a trip at either National or Dulles -- I
8   think it was Dulles -- and he greeted her by hugging
9   and kissing her, and she was so shocked, she came home
10  and said that is the most bizarre thing that I can
11  imagine, and she also expressed concern about his
12  driving and feeling unsafe and what an odd demeanor he
13  seemed to have.
14      Q   What, if any, description of his demeanor
15  did she provide?
16      A   I don't recall specific situations, but, in
17  general, she felt that he related to her and the staff
18  in an unusual and odd way, and the hugs were one
19  example.
20      Q   Any other examples that you know of?
21      A   He seemed not to understand assignments or
22  comprehend the context in which we all operated, for

TOLL FREE: 877-718-1850 – LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 56

1       A   Yes.
2       Q   What words did she use that conveyed to you
3   that she was offended?
4       A   I don't recall the exact words.
5       Q   Did she say that she had initiated the hug?
6       A   Absolutely not.
7       Q   Did she say whether she had anything
8   alcoholic to drink at the time?
9       A   She did not, and it would not be her custom.
10      Q   Would Meg Clemmer have initiated discussion
11  with you about concerns that she had about Mr. Green,
12  or would she only have dealt with those things as you
13  brought them up to her?
14      A   You mean during his entire employment?
15      Q   Yes.
16      A   It would be both.  She would express
17  concerns.  I would express concern.  We would compare
18  notes about performance.
19      Q   What concerns do you recall her bringing up
20  to you on her own initiative?
21      A   Many of the ones listed on Deposition
22  Exhibit No. 1.

TOLL FREE: 877-718-1850 – LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 55

1   example, sitting in the driveway when he didn't have
2   an assignment and similar things.
3       Q   That was one occasion where that occurred?
4       A   There were several occasions.  I think that
5   happened two or three times, but the mixup of her
6   schedule and my schedule was no problem for other
7   drivers.  She just commented that he seemed not to be
8   able to comprehend how to carry out his assignments.
9       Q   When Mrs. Ladner mentioned to you that
10  Mr. Green had greeted her with a hug and, you think, a
11  kiss at the airport, did she express that to you as
12  information or as a complaint or as a criticism or as
13  something else?
14      A   I'm not sure how to parse out those three
15  words.  She was shocked and bewildered.
16      Q   Was she offended?
17      A   Of course.
18      Q   Well, you say "of course."
19      A   Well, you asked me, so I said "of course."
20  I'm the one you asked.
21      Q   Did she express to you that she was
22  offended?

TOLL FREE: 877-718-1850 – LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 57

1       Q   As concerns that she had about Mr. Green's
2   performance on the job to date?
3       A   To date?
4       MS. KEARNS:  I object to the question.  I'm
5   sorry --
6       THE WITNESS:  I don't know what you mean.
7   BY MR. GNATT:
8       Q   Meg Clemmer initiated discussion with you
9   about many of the things that are listed on Exhibit 1
10  as being concerns that she had about Mr. Green's
11  performance on the job?
12      A   Correct.
13      Q   Did Mr. Green keep the vehicle topped off
14  with gas in a satisfactory manner?
15      A   I don't recall that as an issue.
16      Q   Do you know whether Al Checcio ever rode
17  with you when Jeff Madden was the driver?
18      A   Yes.
19      Q   Did Mr. Checcio make any comments about Jeff
20  Madden's performance or comments?
21      A   I don't recall that he did.
22      Q   How would you compare Mr. Green's

TOLL FREE: 877-718-1850 – LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 58

1   performance in the position with that of Jeff Madden?
2      A   I would say that Mr. Green was much worse.
3      Q   Can you be specific on what score you would
4   consider him much worse?
5      A   He was totally unable to deal with the GPS,
6   to enter navigational data, which is a fairly simple
7   thing to do, to navigate, especially when you're out
8   of town.  He was a much worse driver.  He did not know
9   the city of Washington at all and was continually
10  taking wrong turns and delaying my arrival.  He was
11  confused about the assignments, about the schedule.
12  He acted inappropriately with passengers in terms of
13  chitchat, in terms of his response to Mrs. Ladner, to
14  trustees that he picked up at the airport.  He seemed
15  unable to correct the simplest of faults, leaving rags
16  in the car and food in the car, et cetera.  He dressed
17  inappropriately, showed up in his motorcycle uniform
18  and his helmet to drive one day, for example.  He
19  represented to me that his broken foot would be healed
20  in just a matter of a week or two.  It seemed to take
21  months.  He seemed to have that disability for a
22  while.  In general, he was disconnected, I would say,

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 59

1   from the requirements of the job and seemed unable to
2   assimilate the duties that were obvious ones for him
3   to perform.
4      Q   He didn't tailgate, did he?
5      A   Five car lengths back, I don't call
6   tailgating.
7      Q   He didn't have any crashes?
8      A   No.
9      Q   The occasion when he was in a motorcycle
10  suit was a day when you had what appointments to go
11  to?
12     A   I had a dental appointment.
13     Q   Ultimately, you were provided with some
14  explanation of what had happened that led him to
15  showing up in a motorcycle suit; am I right?
16     A   He said something about car trouble or
17  something.  I don't recall the particulars at the
18  time.
19     Q   He offered some explanation?
20     A   Yes, he offered some explanation.
21     Q   Did you give credence to what he said?
22     A   Well, only partially, because it was his

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 60

1   responsibility to call Meg if there was a problem
2   about not being picked up, and when it got to be time
3   for me to be at my appointment, he was not there, and
4   Meg didn't know where he was, and it would have been a
5   simple thing for him to simply check in with me, which
6   were his instructions, so I didn't trust exactly his
7   explanation.
8      Q   Were there advantages that you perceived of
9   having a driver employed by the university, such as
10  Mr. Green, such as Jeff Madden overusing a private
11  limousine company such as Carey?
12     A   Yes.
13     Q   What were those advantages?
14     A   We actually did an experiment, I think, for
15  about six months after Mr. Madden left to see if, from
16  the standpoint of costs, of efficiency, and so forth
17  that we could make that experiment work.  It turned
18  out that the cost was not a factor.  It was not
19  cheaper to use them, but the hassle was much more
20  difficult.  They couldn't always guarantee the best
21  drivers.  There would be people who would show up who
22  just started and didn't know Washington, and when I

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 61

1   would be under a time deadline to get to an
2   appointment, knowing about the quality of the cars,
3   and, often, you would have to call two or three
4   different car providers in order to get a schedule,
5   and my schedule changed during the day a great deal as
6   events happened, and I might have to go someplace that
7   wasn't on my schedule initially and so forth, and they
8   were not good about being able to respond immediately
9   to those kinds of needs, so, on balance, it was both
10  Meg's and my conclusion that it was more efficient
11  from the standpoint of cost and my schedule and so
12  forth to have a driver on staff, and previous
13  presidents had drivers and so forth, and we felt that
14  was the best judgment.
15     Q   Do you know Mr. Saul, S-A-U-L, of Chevy
16  Chase Bank?
17     A   I met him once.
18     Q   Where did that meeting occur?
19     A   In his office.
20     Q   Have you ever spoken with him on the
21  telephone?
22     A   No.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 70

1  BY MR. GNATT:
2    Q   I'm looking at a page that's Bates-stamped
3  AU 0135 at the bottom and 04 at the top and,
4  specifically, an entry that starts with the date of
5  October 1, 2004, and I'm looking at Paragraph 3 at the
6  end, the last sentence that refers to the famous door
7  locking problem, and my question is: Were you aware
8  of any effort made by Mr. Green to fix that problem?
9    A   Not specifically, but I know that Meg had
10  asked him to either take it or call the service
11  department or something, because over a period of
12  months, it would self-lock when you got out of the
13  car, and I'm sure she birddogged that in a way with
14  the drivers that we had to try to see if we could
15  correct it, so I don't have specific knowledge that he
16  did something to correct it, but I know she was
17  working on that.
18    Q   No. 6 refers to the amount of distance
19  between cars. Your feeling was that the amount of
20  distance that Mr. Green was leaving went beyond
21  reasonable defensive driving; is that correct?
22    A   Correct.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 72

1  of you, did that create any specific safety hazards?
2    A   Yes, in my judgment, for the reasons I just
3  cited.
4    Q   The confusion --
5    A   Right.
6    Q   No. 7 talks about it's not necessary to stop
7  and, then, crawl over a speed bump, and I gather it's
8  also your concern that, when he saw a construction
9  zone, he was slowing down more than he needed to?
10    A   No. It was not a construction zone. It was
11  ordinary speed bumps that are built into routine
12  streets that, ordinary drivers in driving, you would
13  simply show down and go over them, which is the intent
14  of a speed bump. He would come to a speed bump and
15  come to a complete stop as if there was a stop sign
16  there and, then, very slowly creep over it.
17    Q   Wouldn't you agree that, by doing that, he
18  would minimize the impact of the bump on the drive, on
19  the trip, on the passenger?
20    A   Not really. If you've ever done that, it
21  actually gives you a heightened sense of going up, and
22  it's also so unnatural and weird that it caused me

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 71

1    Q   Did it also feel like this practice was
2  slowing down the trip?
3    A   Yes. I missed several lights because he was
4  so far back.
5    Q   You missed several green lights?
6    A   Traffic lights, yes.
7    Q   And had to stop?
8    A   That's right.
9    Q   Were there any specific incidents where
10  safety was jeopardized by this practice of his?
11    A   Well, in my judgment, it confused the cars
12  around us, because they would blow their horns.
13  People would try to cut in front of us. They didn't
14  know if we were stalled. I think you have to admit
15  that, driving in Washington, D.C., you rarely see a
16  car five car lengths back, stopped at the stoplight,
17  so I felt it was not a safe practice.
18    Q   Specifically stopping that far back at a
19  stoplight when you're fully stopped?
20    A   That's right.
21    Q   How about, as you're driving along, keeping
22  this extra distance between you and the car in front

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 73

1  each time to stop what I was doing in the back,
2  whether I was reading or working on my computer and so
3  forth, so I wouldn't agree with that.
4    Q   Well, No. 7 seems to combine the speed bump
5  issue with also a construction work issue. Do you
6  remember that being an issue that, upon entering a
7  construction zone, he slowed down more than you
8  thought he needed to?
9    A   I don't remember a specific site. Let me
10  just say, in general, that he drove so slowly that it
11  was in, my judgment, a safety issue. He would drive
12  45 miles an hour on the interstate, for example, and,
13  then, he would speed up and, then, drop down to 35.
14  He would drive the speed limit going downtown to
15  Washington, and, then, he'd drop down to 15 miles an
16  hour for no reason, and then stop for speed bumps, and
17  it was a bizarre driving pattern, so I don't remember
18  a specific construction site, but I can easily imagine
19  he did the same thing if we came to one.
20    Q   What is the meaning of No. 8, especially
21  about the part when Mrs. Ladner is sitting behind him,
22  to be mindful of her comfort?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 74

1      A   The particular car that we had, the model of
2   the car was an Infinity, which had a unique design
3   compared to other cars that would give a very narrow
4   leg space in the back, and it was simply to remind him
5   not to push too far back because she would have to sit
6   sideways, or her knees would go into the back of the
7   front seat.
8      Q   It says that you thanked him for the manner
9   in which he handled Mrs. Ladner up to now. What were
10   you aware of as to the manner in which he had handled
11   her up until then?
12      A   I take that to mean in relation to the seat
13   and adjusting for her comfort in the car.
14      Q   Just that?
15      A   Just that.
16      Q   As to Paragraph 9, as of October 1st, can
17   you estimate how many occasions you had observed
18   Mr. Green make a right-hand turn from the left lane?
19      A   I don't recall any occasions in which he did
20   not do that. Coming to the president's office and
21   hitting Ward Circle, which is the main circle there,
22   he would be in the left lane and refuse to get into

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 75

1   the right lane until it was time to turn and, then,
2   cut in front of other cars. He always did that.
3      Q   So is that the basis for this item of
4   concern, the way he handled Ward Circle?
5      A   No. He would do it in other -- it was
6   typical of him not to be able to judge when he was
7   going to turn appropriately, and sometimes he would
8   straddle a line of two lanes, and sometimes he would
9   be in the left lane and turn right and sometimes in
10   the right lane and turn left.
11      Q   The October 15, 2004, entry appears to be
12   one that you've talked about already. Do you know
13   when Mr. Green was first advised that there was a need
14   to take Mrs. Ladner somewhere?
15      A   No.
16      Q   Do you remember how ultimately your pickup
17   was handled that day?
18      A   No, I don't.
19      Q   If Mr. Green were to testify that he came
20   back and got you after taking Mrs. Ladner where she
21   needed to be, would you have any reason to negate that
22   or to dispute that?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 76

1      A   No. I don't remember. Meg worked out a
2   solution. I just don't remember what it was.
3      Q   Prior to today, had Meg or anyone else
4   suggested to you -- not suggested it to you, but told
5   you that Reggie Green in response to being told about
6   the hugging incident at the airport was contending
7   that Mrs. Ladner had initiated the hug?
8         MS. KEARNS:  I would object to the extent
9   you're asking him to reveal information he may have
10   learned from counsel, but aside from that, you can
11   answer the question.
12         THE WITNESS:  No.
13   BY MR. GNATT:
14      Q   On Page 6, AU 0137, the entry for
15   November 4th to the 5th, 2004, how familiar are you
16   with the situation that was described in there?
17      A   I'm familiar that Meg reported to me that
18   she had this discussion with him and made these
19   points. Is that what you're asking?
20      Q   I'm really asking how familiar were you with
21   the situation that is described here and Mr. Green's
22   culpability, if you will, for what happened?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 77

1      A   Well, as I've testified earlier, these were
2   all issues that kept coming up, so Meg and I discussed
3   them. I was certainly aware of them, and we compared
4   notes and our evaluation of his performance, so I was
5   certainly aware of them.
6      Q   This is now at the top of Page 7. Did
7   Trustee Leslie Baines, vice chair, bring this issue up
8   as a complaint?
9         MS. KEARNS:  I just need to object to the
10   form of the question, because it assumes he had a
11   conversation with Leslie Baines about this. Bring it
12   up to whom?
13   BY MR. GNATT:
14      Q   What is your knowledge about how Leslie
15   Baines addressed this issue, to whom and what did she
16   say?
17      A   I don't know other than what you've -- what
18   Meg has written here.
19      Q   So you don't know whether Leslie Baines was
20   expressing dismay or a complaint or anything like
21   that?
22      A   No.

# EXHIBIT 6

**KAISER PERMANENTE** ®

Mid-Atlantic Permanente Medical Group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

## CERTIFICATION OF MEDICAL RECORDS

As custodian of medical records at the North Capitol Medical Facility of Kaiser

Permanente, I hereby certify that the attached photocopies consisting of _128_ pages are

true photocopies of the medical record pertaining to:

Reginald . C . Green                          68 12 03 72 9
**Patient Name**                              **Medical Record Number**

The original of said medical records are maintained at the facility named above.

Subsequent re-disclosure of this patient's medical record is prohibited by law.


Allison Prim - James                          4/23/07
**Health Information Correspondence Technician**     **Date**

Medical Center North Capitol
1011 North Capitol Street
Washington, D.C. 20002-4236
202.898.5100



**KAISER PERMANENTE**.

---

**Reginald C Green**
6/9/2003 8:47 AM Office Visit-Legacy
MRN: 681203729

Encounter #: **28779209**
Center: **None**

Description: **49 year old male**
Provider: **SALLIE K DAVIS MD**

Department: **Gen Surgery**

---

**After Visit Summary**    After Visit Summary

| Visit Summary |
|---|

**Reason for Visit**    DX                    p/o

---

**Progress Notes**    EVENT DATE: 06/09/2003
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: DAVIS,SALLIE K MD
SPECIALTY: GENERAL SURGERY
NOTE TYPE: FOLLOW-UP VISIT
DIAGNOSIS: p/o

[INITIAL ENTRY: DAVIS,SALLIE K MD]
p/o lat int sph for anal fissure; altho 1st 3d same pain, now minimal-can sit!!!&
drive
says he's weaning off meds-did not ask for script
not exam today per his req; rtc 1mo

---

**Completed by:**
**Charting**    **Name**                                **Date and Time**

---

There are no scans attached to this encounter.

---

**Encounter Status**    Closed by HERNANDEZ, BING on 8/25/04 at 8:47 AM

---



**KAISER PERMANENTE**®

---

**Reginald C Green**
**6/9/2003 8:47 AM Office Visit-Legacy**
MRN: 681203729

Encounter #: **28779216**
Center: **None**

Description: **49 year old male**
Provider: **CANDACE LOVE NP**

Department: **Internal Med**

| After Visit Summary | After Visit Summary |
|---|---|

**Visit Summary**

| Reason for Visit | DX | Medication Refill | Percocet Medication Withdra |
|---|---|---|---|

**Progress Notes**

```
EVENT DATE: 06/09/2003
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: LOVE,CANDACE NP
SPECIALTY: INTERNAL MEDICINE
NOTE TYPE: FOLLOW-UP VISIT
DIAGNOSIS: Medication Refill    Percocet Medication Withdra

[INITIAL ENTRY: LOVE,CANDACE NP]
S: Pain med request /Stated has been 3 days without Percocet/ Rectal pain is much
better/Pt has agreed to go thru withdrawal Percocet/Takes 4 Percocet tabs a
day/Declines to be on Methadone


NKDA                                          Meds:Percocet 5- 325 mgm po q
6hr

142/90     Wt 160     T 98.2   P 72    R 20


O: No exam


A: Medication Refill
Percocet Medication Withdrawal

P: Discussed plan of care Renee Benzel,PharmD
Percocet 5-325 mgm po #40 No refills
Oramorph 30 mgm po bid #  80 No refills
Will schedule follow up appt 2 weeks


Candace Love,CRNP
Provider # 782
```

| Completed by: Charting | **Name** | | **Date and Time** |
|---|---|---|---|

There are no scans attached to this encounter.

**Encounter Status**    Closed by HERNANDEZ, BING on 8/25/04 at 8:47 AM

---

Green, Reginald C (MR # 681203729) Printed at 4/18/07 12:43 PM                    Page 1 of 2



**KAISER PERMANENTE®**

| | | |
|---|---|---|
| **Reginald C Green** | Encounter #: **28779255** | Description: **49 year old male** |
| **1/20/2004 8:47 AM Office Visit-** | Center: **None** | Provider: **JUSTIN G ROSEMORE** |
| **Legacy** | | **MD** |
| **MRN: 681203729** | | Department: **Gastro** |

| After Visit Summary | After Visit Summary |
|---|---|

| | | Visit Summary |
|---|---|---|

| **Reason for Visit** | DX | Constipation and Anal Fissure |
|---|---|---|

**Progress Notes**

```
EVENT DATE: 01/20/2004
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: ROSEMORE,JUSTIN G MD
SPECIALTY: GASTROENTEROLOGY
NOTE TYPE: FOLLOW-UP VISIT
DIAGNOSIS: Constipation and Anal Fissure

[INITIAL ENTRY: ROSEMORE,JUSTIN G MD(PASS)LN]
Patient with resolution of anal fissure and constipation, s\p surgery and bowel
regimen. No issues to address at this time. Denies pain, nausea, vomiting,
constipation, diarrhea, blood, melena.

F\U as
needed
```

| **Completed by: Charting** | **Name** | **Date and Time** |
|---|---|---|

There are no scans attached to this encounter.

| **Encounter Status** | Closed by HERNANDEZ, BING on 8/25/04 at 8:47 AM |
|---|---|


**KAISER PERMANENTE**®

---

**Reginald C Green**
**10/19/2004 6:41 PM Office Visit-Legacy**
MRN: **681203729**

Encounter #: **32271901**
Center: **None**

Description: **49 year old male**
Provider: **CANDACE LOVE NP**

Department: **Internal Med**

---

| After Visit Summary | After Visit Summary |
|---|---|

| **Visit Summary** | | |
|---|---|---|
| **Reason for Visit** | DX | Left ankle Fx |

| **Completed by: Charting** | **Name** | **Date and Time** |
|---|---|---|

**Transcription**

| **Type** | **ID** | **Author** |
|---|---|---|
| PACE Follow-up visit | PN13630032 | LOVE, CANDACE (N.P.) |

**Authenticated by LOVE, CANDACE (N.P.) NURSE PRACTITIONER on 10/19/2004 at 6:19 PM**

**Document Text**
EVENT DATE: 10/19/2004
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: LOVE,CANDACE NP
SPECIALTY: INTERNAL MEDICINE
NOTE TYPE: FOLLOW-UP VISIT
DIAGNOSIS: Left ankle Fx

Chief complaint: SWOLLEN LT ANKLE
VITAL SIGNS:
Sex: M Age:46 yrs. Wt: 176 lbs. (80. kg) Temp: 97.9 F BP: 140/90 HR: 88 RR: 20
Informant: patient
Known drug allergies: none
- Smokes? no
- Diabetes? no
- Hypertension? no
- Hearing impaired? no
Patricia Mickens CA
=================================================================
S: 1.Stated fx left ankle  2 months ago /Removed the cast himself/ Did not go to follow up appt
    Has not seen Orthopedics before he removed the cast / Now complain of pain and swelling
    in the left ankle /Rx: Tylenol # 3
    2.Requesting to see Dr Clamp re: Addiction
PMH:
Allergies: NKDA
Meds: Tylenol # 3
        Viagra
O: Left ankle (+) Pain  (+) swelling
A: Left ankle Fx /Left ankle swelling
P: Cont Tylenol # 3 as presribed for pain
    Urgent Ortho Referral
    Left ankle xray
    F/Uappt prn pain

Display transcription (PN13630032) by LOVE, CANDACE (N.P.) only

---

There are no scans attached to this encounter.

| **Encounter Status** | Closed by MAS IF, IN PACE TRANS on 10/19/04 at 6:41 PM |

# EXHIBIT 7

# MEDICAL FACULTY ASSOCIATES

## ·THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Apr 14 2004  9:15AM

Pt presents because he has a lot of body pains.   He believes that this has to do with his PTSD which has been acting up.  He is no longer seeing a therapist and would like to get back into group.

Pt states that he has rectal pain and fecal urgency which has been bothering him, the nitroglycerin has been helping.

Pt also had severe epigastric pain - states it feels as if his insides are twisting.  NO nausea or vomiting.

Headaches occur about 3 times a day and last anywhere from 3-15 minutes and per patient are so severe he wants to cry.  They are located on right side of his head and are throbbing.

## PMH:
1.  HTN
2.  GERD, s/p Nissen fundoplication 1978
3.  Anal Fissures, s/p sx repair in Summer 2003
4.  Migraine HA
5.  Chronic constipation
6.  Fecal urgency

## MEDS:
1.    HCTZ 25 mg po qd
2.    Atenolol 50 mg po qd
3.    Protonix 40 mg po qd
4.    Lactulose prn
5.    Elavil
6.    Viagra prn
7.    Prilosec OTC
8.    nitroglycerin cream PR

## PE:

BP 150/100

WNWD male in NAD
Fundi - WNL
no facial pain

GREEN, REGINALD CALVIN

heart - RRR, no m,s3,s4
lungs - CTA bilaterally
abd - soft, +tenderness in RUQ, NABS, liver is from
Ext - no edema

**A/P**

HA - will refer to neurology for evaluation

Anal fissure and fecal urgency - refer to colorectal surgeon, continue with fiber, water and
nitroglycerin prn

Abdominal pain - will check CBC, CMP, H. pylori and lipase, refer to Gastro, refill given for
Protonix

Referral given for psychiatry for PTSD.

pt given utracet for prn pain.

HTN - stopped HCTZ and started lisinopril 10/12.5 - RTC in a few weeks.

Electronically signed by:AMY  STONE MD  Apr 14 2004 10:10AM EST

# George Washington University Medical Faculty Associates

2150 Pennsylvania Ave NW
Washington,DC 20037
(202) 741-3000

| | | | |
|---|---|---|---|
| **Patient:** | GREEN, REGINALD CALVIN | **Age/DOB** | 49 yrs        05-Feb-1958 |
| | 9108 LELA COURT | **EMRN:** | 2214650 |
| | FORT WASHINGTON, MD 20744-9999 | **OMRN:** | 2214650 |
| | | **Home:** | 0 |
| | | **Work:** | (202) 744-3508 |

## Results

| | | | |
|---|---|---|---|
| **Lab Accession #** | 071504047214650 | **Collected:** | 7/15/2004 12:43:00AM |
| **Ordering Provider:** | SIKKA,NEAL | **Resulted:** | 7/15/2004 12:43:00AM |
| **Performing Location:** | | **Verified By:** | <Verification Not Required> |
| | | **Auto Verify:** | Y |

**XR ANKLE MIN 3V LTr**                                        **Stage:**        **Final**

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| XR ANKLE MIN 3V LTr | | | | |

Patient: **GREEN, REGINALD CALVIN**                    EMRN: **2214650**

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|

```
***** AUTOVERIFIED *****
FINAL RESULT THE GEORGE WASHINGTON UNIVERSITY HOSPITAL
DEPARTMENT OF MEDICAL IMAGING
DIAGNOSTIC REPORT

PATIENT:  REGINALD GREEN
07/15/04 047
MED REC#:  2214650  53219754  XR ANKLE MIN 3V LT

VT:  ER
ROOM:
D.O.S:  07/15/04
D.O.B:  02/05/1958NEAL SIKKA, M.D.
EMERGENCY MEDICINE
2150 PENN AVE NW
WASINGTON, DC 20037

EMR
---
--
EXAMINATION:  AP, LATERAL, AND OBLIQUE VIEWS OF THE LEFT ANKLE WERE
PERFORMED ON 07/15/04 AT 1:01 WITH NO PRIOR STUDIES AVAILABLE FOR
COMPARISON

CLINICAL HISTORY:  Left ankle pain.  Evaluate for fracture.

FINDINGS:  There is a comminuted fracture involving the distal left
fibula.  There is no extension into the ankle joint.  Additionally, there
is a nondisplaced intra-articular posterior distal left tibia fracture.
No bony lesions were seen.  The visualized soft tissues demonstrate soft
tissue swelling at the left ankle joint, worse on the medial aspect.

A bony fragment is seen, adjacent to the medial malleolus, and just
medial to the talar dome.

IMPRESSION:  Findings compatible with a left ankle trimalleolar fracture.

Randy M. Becker, M.D.

I attest to the fact that I have reviewed the above images and agree
with the above.

Kathleen A. Brindle, M.D.
J#701199

---
--
07/15/04 047

07/16/04  TYPED
DW 07/15/04  10:20    S/KATHLEEN A BRINDLE, M.D.
KAB/DW
PATIENT:  REGINALD GREEN
MED REC#: 2214650
PAGE # 1
```

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Jul 16 2004 10:00AM

## Department of Orthopaedic Surgery

**PATIENT VISIT**

**PRIMARY DIAGNOSIS:** Fractured left lateral malleolus. ICD-9: 824.2.

**SUMMARY:** Ms. Green is a 46-year-old 5' 7", 165 pounds, translator at the White House, who fell off his motorcycle on July 14, 2004 sustaining a hyper-dorsiflexion injury and medial lateral crush of his left ankle. He had immediate onset of pain and was unable to walk. He was seen in the emergency room where he was placed nonweightbearing in a splint. He comes in today for followup. He has no history of previous injuries to this ankle.

**PAST MEDICAL HISTORY:**  Significant for reflux disease for which he takes Prilosec.

**ALLERGIES:** He is not allergic to any medications.

**SOCIAL HISTORY:** He does not smoke and drinks some wine.  Currently, he has significant moderate to severe pain and is ambulating only on crutches.

**PHYSICAL EXAMINATION:** Physical examination today shows vascular exam to be intact in left lower extremity.  Skin is intact.  It is impossible to test range of motion of the ankles, subtalar, and midfoot joints because of pain.  Likewise, motor testing is not possible due to pain.  Overall alignment of the ankle appears to be satisfactory.  His midfoot and forefoot examinations are unremarkable with no tenderness that could be localized.  Examination of left ankle shows large amount of swelling with tenderness both medially and laterally.  Sensation to light touch is intact.  Radiographs from July 14, 2004 show a distal fibular fracture Weber-type D with no talar shift.  Radiographs are taken today, nonweightbearing left foot and left ankle.  Left foot films are negative for any fracture or dislocation. Left ankle films show fibular fracture unchanged with very slight widening perhaps 1 mm of the talar laterally with increased medial greater webspace.

**PLAN:**   I have gone over the radiographs in some detail with Mr. Green and discussed with him the risk and benefits of surgery versus nonoperative treatment.  At this point, he chooses to pursue nonoperative treatment given the minimal talar shift.  Accordingly, we will plan to see him back in four days' time, and we will obtain x-rays of the ankle nonweightbearing.

GREEN, REGINALD CALVIN

James Michelson, M.D.

CC:    Amy Stone, M.D.
        General Internal Medicine
        GW Medical Faculty Associates
        2150 Pennsylvania Avenue, NW
        Washington DC 20037

Electronically signed by:JAMES MICHELSON M.D. Aug 6 2004 8:06AM EST

# George Washington University Medical Faculty Associates

2150 Pennsylvania Ave NW
Washington,DC 20037
(202) 741-3000

Patient:  GREEN, REGINALD CALVIN
9108 LELA COURT
FORT WASHINGTON, MD 20744-9999

Age/DOB    49 yrs            05-Feb-1958
EMRN:      2214650
OMRN:      2214650
Home:      0
Work:      (202) 744-3508

## Results

Lab Accession #      071604348214650
Ordering Provider:   MICHELSON,JAMES
Performing Location:

Collected:   7/16/2004  12:15:00PM
Resulted:    7/16/2004  12:15:00PM
Verified By:  MICHELSON, JAMES
Auto Verify:  N

**XR ANKLE MIN 3V LTr**                              Stage:      **Final**

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|
| XR ANKLE MIN 3V LTr | | | | |

Patient: **GREEN, REGINALD CALVIN**                    EMRN: 2214650

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|

FINAL RESULT THE GEORGE WASHINGTON UNIVERSITY HOSPITAL
DEPARTMENT OF MEDICAL IMAGING
DIAGNOSTIC REPORT

PATIENT: REGINALD GREEN
07/16/04 348
MED REC#: 2214650  53219754  XR ANKLE MIN 3V LT

VT: ACO
ROOM: ACO
D.O.S: 07/16/04
D.O.B: 02/05/1958 JAMES MICHELSON, M.D.
ORTHOPAEDIC SURGERY
MFA 6B


ACO
---
--
EXAMINATION: AP, lateral and oblique views of the left ankle and AP,
lateral and oblique views of the left foot.

CLINICAL HISTORY: 46-year-old male for evaluation of unstable foot
fracture.

COMPARISON: AP, lateral and oblique views of the left ankle from
07/15/04.

FINDINGS: Again seen is a trimalleolar fracture of the left ankle with
widening of the medial aspect of the ankle joint.

Additionally within the foot, there is dorsal dislocation of the 5th toe
at the metatarsophalangeal joint.

The bony mineralization is normal.

IMPRESSION:

1. Stable appearing trimalleolar fracture with widening of the medial
aspect of the ankle joint as described above.

2. Dorsal dislocation of the 5th toe as described above.

Edward A. Daly, M.D.

I attest to the fact that I have reviewed the above images and agree with
the above.

Kathleen A. Brindle, M.D.
J# 703031


---
--
07/16/04 348

07/21/04  TYPED
SB 07/21/04 11:49    S/KATHLEEN A BRINDLE, M.D.
KAB/SB
PATIENT: REGINALD GREEN
MED REC#: 2214650
PAGE # 1

# George Washington University Medical Faculty Associates

2150 Pennsylvania Ave NW
Washington, DC 20037
(202) 741-3000

| | | | |
|---|---|---|---|
| **Patient:** | GREEN, REGINALD CALVIN | **Age/DOB** | 49 yrs        05-Feb-1958 |
| | 9108 LELA COURT | **EMRN:** | 2214650 |
| | FORT WASHINGTON, MD 20744-9999 | **OMRN:** | 2214650 |
| | | **Home:** | 0 |
| | | **Work:** | (202) 744-3508 |

## Results

| | | | |
|---|---|---|---|
| **Lab Accession #** | 071604346214650 | **Collected:** | 7/16/2004 12:14:00PM |
| **Ordering Provider:** | MICHELSON,JAMES | **Resulted:** | 7/16/2004 12:14:00PM |
| **Performing Location:** | | **Verified By:** | MICHELSON, JAMES |
| | | **Auto Verify:** | N |

**XR FOOT 3V LTr**                                                 **Stage:**     **Final**

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| XR FOOT 3V LTr | | | | |

Patient:  **GREEN, REGINALD CALVIN**                               EMRN:  **2214650**

| <u>Test</u> | <u>Result</u> | <u>Units</u> | <u>Flag</u> | <u>Reference Range</u> |
|---|---|---|---|---|

```
FINAL RESULT THE GEORGE WASHINGTON UNIVERSITY HOSPITAL
DEPARTMENT OF MEDICAL IMAGING
DIAGNOSTIC REPORT

PATIENT:  REGINALD GREEN
07/16/04 346
MED REC#:  2214650  53220059  XR FOOT 3V LT

VT:  ACO
ROOM:  ACO
D.O.S:  07/16/04
D.O.B:  02/05/1958JAMES MICHELSON, M.D.
ORTHOPAEDIC SURGERY
MFA 6B


ACO
---
--
EXAMINATION:  Left foot.

Please refer to:  Left ankle study dated 07/16/04 which was dictated in
conjunction with this examination.

Edward A. Daly, M.D.

I attest to the fact that I have reviewed the above images and agree with
the above.

Kathleen A. Brindle, M.D.
J# 703032
link-346


---
--
07/16/04 346

07/21/04  TYPED
SB 07/21/04  11:49    S/KATHLEEN A BRINDLE, M.D.
KAB/SB
PATIENT:  REGINALD GREEN
MED REC#: 2214650
PAGE # 1
```

# George Washington University Medical Faculty Associates

### 2150 Pennsylvania Ave NW
### Washington,DC 20037
### (202) 741-3000

| | | | |
|---|---|---|---|
| **Patient:** | GREEN, REGINALD CALVIN | **Age/DOB** | 49 yrs | 05-Feb-1958 |

Patient: GREEN, REGINALD CALVIN
9108 LELA COURT
FORT WASHINGTON, MD 20744-9999

Age/DOB  49 yrs   05-Feb-1958
EMRN:    2214650
OMRN:    2214650
Home:    0
Work:    (202) 744-3508

## Results

Lab Accession #     072004423214650
Ordering Provider:  MICHELSON,JAMES
Performing Location:

Collected:  7/20/2004  2:42:00PM
Resulted:   7/20/2004  2:42:00PM
Verified By:  MICHELSON, JAMES
Auto Verify: N

**XR ANKLE MIN 3V LTr**                              Stage:        Final

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|
| XR ANKLE MIN 3V LTr | | | | |

Patient: **GREEN, REGINALD CALVIN**                    EMRN: 2214650

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|

FINAL RESULT THE GEORGE WASHINGTON UNIVERSITY HOSPITAL
DEPARTMENT OF MEDICAL IMAGING
DIAGNOSTIC REPORT

PATIENT: REGINALD GREEN
07/20/04 423
MED REC#: 2214650  53219754  XR ANKLE MIN 3V LT

VT: ACO
ROOM: ACO
D.O.S: 07/20/04
D.O.B: 02/05/1958JAMES MICHELSON, M.D.
ORTHOPAEDIC SURGERY
MFA 6B


ACO
---
--
EXAMINATION: AP, LATERAL, AND OBLIQUE VIEWS OF THE LEFT ANKLE

CLINICAL HISTORY: A 46-year-old male with an ankle fracture.

COMPARISON: AP, lateral, and oblique views of the left ankle from
07/16/04.

FINDINGS: Again seen is a stable trimalleolar fracture involving the
distal fibula, posterior tibia, and distal tibia.

Again seen and unchanged is widening of the medial aspect of the ankle
mortise.

The bony mineralization is normal.

There is stable minimal soft tissue swelling at the left ankle.

IMPRESSION: Stable left trimalleolar ankle fracture with stable widening
of the medial aspect of the ankle mortise, as described above.

Edward A. Daly, M.D.

I attest to the fact that I have reviewed the above images and agree with
the above.

Kathleen A. Brindle, M.D.
J#703256




---
--
07/20/04 423

07/22/04  TYPED
DW  07/21/04  17:06     S/KATHLEEN A BRINDLE, M.D.
KAB/DW
PATIENT: REGINALD GREEN
MED REC#: 2214650
PAGE # 1

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:  REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Jul 20 2004  2:15PM

## Department of Orthopaedic Surgery

**PATIENT VISIT**

**PRIMARY DIAGNOSIS:**  Left ankle fracture.

**SUMMARY:**  Mr. Green comes in today.  He is now one week out from his injury.  I saw him four days ago, at which point he was placed into a splint and kept nonweightbearing.  He discontinued the splint this morning.  He is complaining of significant pain.  He has been nonweightbearing.

**PHYSICAL EXAMINATION:**  Physical examination today shows his skin exam is intact.  Neurovascular exam is intact.  He has unchanged swelling which is 2+, and alignment overall appears to be satisfactory externally.  Radiographs are taken today of the ankle.  They are nonweightbearing.  They show no evidence of lateral talar shift or shift in the fibula fracture compared to previous films.

**PLAN:**  At this point, we will place Mr. Green into short-leg nonweightbearing cast.  We will switch him from Percocet to Ultracet for medication and I have given him a work slip to allow him to work as long as he is not weightbearing.  We will see him back in one week's time with the new x-rays of the ankle in the cast.

James Michelson, M.D.

Electronically signed by:JAMES  MICHELSON M.D.  Aug  6 2004  8:15AM EST

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Jul 27 2004  1:00PM

## Department of Orthopaedic Surgery

**PATIENT VISIT**

**PRIMARY DIAGNOSIS:** Left ankle fracture. ICD-9: 824.2.

**SUMMARY:** Mr. Green is now two weeks out from his injury. Since I last saw him he came in again to get a cast change and to have a cast bivalve. Yesterday, the cast was repositioned with the ankle 15 degrees of plantar flexion and since then he has had essentially no pain.

**PHYSICAL EXAMINATION:** Physical examination today the cast is left intact. Neurovascular examination is intact. The swelling is markedly diminished distally.

**ASSESSMENT:** Review of his radiographs taken today are nonweightbearing in the ankle and show an intact mortis. The fibular fracture is unchanged.

**PLAN:** At this point, we will continue Mr. Green in his current bivalve cast since he is comfortable. He will come back in two weeks' time to dorsiflex the ankle to neutral but he will stay in nonweightbearing cast. Two weeks following that he will be changed to short-leg walking cast.

James Michelson, M.D.

CC:    Amy Stone,, M.D.
       General Internal Medicine
       GW Medical Faculty Associates
       2150 Pennsylvania Ave., NW
       Washington, DC 20037

Electronically signed by:JAMES  MICHELSON M.D.  Aug  6 2004  8:13AM EST

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Aug 10 2004 2:30PM

## Department of Orthopaedic Surgery

**PATIENT VISIT**

**PRIMARY DIAGNOSIS:** Left ankle fracture.  ICD-9:  824.2.

**SUMMARY:** Mr. Green is now four weeks out from his injury.  He has been nonweightbearing in a cast, although the ankle has been normal and is bit plantar flexed.  He has had no pain in the cast.  He has been nonweightbearing.

**PHYSICAL EXAMINATION:** Physical examination today, the cast taken off.  Skin and neurovascular is intact.  Overall alignment of the ankle is satisfactory.  We cannot bring the ankle up to neutral without any difficulty, whatsoever.

**PLAN:** We will place Mr. Green back into a nonweightbearing cast but this time at neutral.  He will stay nonweightbearing for another two weeks and then I will see him back a week after that with new x-rays, which we will obtain at WRA prior to his visit.  I have reinforced with him quite strongly that should he start walking on this prematurely that the ankle may have major problems and may require surgery.  I have also given a prescription for Vicodin for pain control as needed.

James Michelson, M.D.

CC:    Amy Stone,, M.D.
         Medicine - General Internal Medicine
         GW Medical Faculty Associates
         2150 Pennsylvania Avenue, NW
         Washington, DC 20037-2396

Electronically signed by:JAMES  MICHELSON M.D.  Sep  3 2004 11:04AM EST



MRN # 221465

**WASHINGTON RADIOLOGY ASSOCIATES, P.C.**
www.washingtonradiology.com

**BOARD CERTIFIED PHYSICIANS SUB-SPECIALIZING IN:**
- MRI & CT
- PET/CT Fusion
- Ultrasound
- Radiography
- Mammography with CAD
- Needle Biopsies
- Neuroradiology
- Bone Densitometry & IVA
- Nuclear Medicine

**PHYSICIAN OWNED & MANAGED:**

MRI
K Street, NW
Suites 111 & 900
Washington, DC 20037
202-785-4MRI (4674)
202-785-2305 Fax

MRI
4445 Willard Avenue
Suite 200
Chevy Chase, Maryland 20815
301-654-4242
301-907-7414 Fax

NUCLEAR MEDICINE & PET
2021 K Street, NW
Suite T-120
Washington, DC 20006
202-466-2033
202-463-0700 Fax

2141 K Street, NW
Suites 200 & 900
Washington, DC 20037
202-223-9722
202-659-2819 Fax

Williams Drive
Suites 200 & 204
Fairfax, Virginia 22031
703-698-8800
703-573-2318 Fax

21351 Ridgetop Circle
Suite 100
Sterling, Virginia 20166
571-434-0140
571-434-0144 Fax

10215 Fernwood Road
Suites 50 & 103
Bethesda, Maryland 20817
301-564-1053
301-493-8522 Fax

4445 Willard Avenue
Suite 200
Chevy Chase, Maryland 20815
301-654-4242
301-907-7414 Fax

Business Office
3015 Williams Drive
Suite 200
Fairfax, Virginia 22031
703-641-9133
703-280-5098 Fax

PATIENT:  GREEN REGINALD C                                    527938-02

DOB: 02/05/1958            AGE: 46                            8/31/2004

REFERRING PHYSICIAN:        JAMES MICHAELSON MD
                            601 N CAROLINA ST

                            BALTIMORE    @MD 21287

SERVICES PERFORMED AT:      WRA 2141 K ST NW WASH DC

**08/31/2004: ANKLE 3 OR MORE VIEWS**

Left ankle

Clinical History: Left ankle fracture

The examination is being compared to the patient's prior study on 7/26/2004. The films were obtained through the cast which obscures much of the detail. There is a comminuted fracture of the left distal fibula. The appearance of the fragments is not dramatically changed since the study on 7/26/2004.

Impression: Left ankle fracture viewed through the overlying cast as described above.

*Mark E. Klein, MD*

MARK E. KLEIN, M.D.

CC:     KALPANA JAIN MD

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Sep 10 2004  2:45PM

## Department of Orthopaedic Surgery

**PRIMARY DIAGNOSIS:**   Left ankle fracture, ICD-9: 84.2.

**SUMMARY:**   Mr. Green comes back today and is now eight weeks out from his injury.  He comes in today without his cast and says that he took it off about three days ago because it had gotten wet.  He has been ambulating using a cane.  He has pain both medially and laterally about the ankle and thinks that he is doing pretty well.

**PHYSICAL EXAMINATION:**   Physical examination today shows skin and neurovascular exams to be intact.  He has moderate swelling about the ankle both medially and laterally as well as tenderness medially and laterally.  His range of motion of the ankle is without pain and is about 75% normal.  Subtalar joint motion is normal without pain.

**PLAN:**   Mr. Green obtained some x-rays in the last day or so, but forgot to bring them in today.  So, he will bring them back later and I will review them.  In the meantime, we will put him into a short-leg walking boot and he will stay on his cane.  I will give him a call once I have had an opportunity to see the x-rays.  We will plan to see him back in four weeks' time for a reevaluation.

James Michelson, M.D.

CC:    Amy Stone,, M.D.
       Medicine - General Internal Medicine
       GW Medical Faculty Associates
       2150 Pennsylvania Avenue, NW
       Washington, DC 20037

Electronically signed by:JAMES  MICHELSON M.D.  Sep 17 2004 10:30AM EST

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Dec 14 2004  2:00PM

## Department of Orthopaedic Surgery

**PRIMARY DIAGNOSIS:** Left ankle fracture. ICD-9: 824.2.

**SUMMARY:** Mr. Green comes in today for his first follow-up in about three months. He is not using his boot and has been working. However, he has continued pain over the lateral aspect of the ankle. There is no pain medially.

**PHYSICAL EXAMINATION:** Physical examination today shows tenderness over the distal aspect of the fibular region of fracture. He has no tenderness medially about the ankle. He has no swelling about the ankle. Radiographs, which he brings with him from October 2004, show incomplete healing of fibular fracture. The mortise, however, appears to be intact.

**PLAN:** At this point, Mr. Green cannot stay today for x-rays. I have written him a prescription to get x-rays, and I will make a return appointment for the x-rays and reevaluation.

James Michelson, M.D.

CC:   Amy Stone, M.D.
      Department of General Internal Medicine
      GW Medical Faculty Associates
      2150 Pennsylvania Avenue, NW
      Washington, DC 20037

Electronically signed by:JAMES  MICHELSON M.D.  Dec 23 2004 11:42AM EST



## WASHINGTON RADIOLOGY ASSOCIATES, P.C.
www.washingtonradiology.com

**BOARD CERTIFIED PHYSICIANS SUB-SPECIALIZING IN:**

- MRI & CT
- PET/CT FUSION
- ULTRASOUND
- RADIOGRAPHY
- MAMMOGRAPHY WITH CAD
- NEEDLE BIOPSIES
- NEURORADIOLOGY
- BONE DENSITOMETRY & IVA
- NUCLEAR MEDICINE

**PHYSICIAN OWNED & MANAGED:**

MRI
K Street, NW
Suites 111 & 900
Washington, DC 20037
202-785-4MRI (4674)
202-785-2305 Fax

MRI
4445 Willard Avenue
Suite 200
Chevy Chase, Maryland 20815
301-654-4242
301-907-7414 Fax

NUCLEAR MEDICINE & PET
2021 K Street, NW
Suite T-120
Washington, DC 20006
202-466-2033
202-463-0700 Fax

2141 K Street, NW
Suites 200 & 900
Washington, DC 20037
202-223-9722
202-659-2819 Fax

3022 Williams Drive
Suites 200 & 204
Fairfax, Virginia 22031
703-698-8800
703-573-2318 Fax

21351 Ridgetop Circle
Suite 100
Sterling, Virginia 20166
571-434-0140
571-434-0144 Fax

10215 Fernwood Road
Suites 50 & 103
Bethesda, Maryland 20817
301-564-1053
301-493-8522 Fax

4445 Willard Avenue
Suite 200
Chevy Chase, Maryland 20815
301-654-4242
301-907-7414 Fax

Business Office
3015 Williams Drive
Suite 200
Fairfax, Virginia 22031
703-641-9133
703-280-5098 Fax

MRN 2214650

PATIENT: GREEN REGINALD C          527938-02

DOB: 02/05/1958      AGE: 46         12/27/2004

REFERRING PHYSICIAN:      JAMES D MICHELSON MD
                                 2150 PENN AVENUE NW

                                 WASHINGTON      DC 20037

SERVICES PERFORMED AT:      WRA 2141 K ST NW WASH DC

**12/27/2004: ANKLE 3 OR MORE VIEWS**
12/27/2004: AMENDED REPORT- wvw

Clinical History: Fracture followup.

Left ankle: AP, lateral and oblique views of the left ankle are reviewed and compared to prior study of 8/31/2004

Oblique comminuted fracture of the left distal fibula demonstrates significant interval bridging callus formation. There is good fracture alignment. Ankle mortise is intact and relatively symmetric. **There is** a 4 mm calcific density adjacent to the lower pole of the medial malleolus which may represent an old fracture **fragment** but unchanged in interim. Soft tissues are normal.

Impression:
1. Healing distal fibular fracture.
2. Question of chip avulsion fracture the medial malleolus.

RAMIN ABRAHIM, M.D.

CC:      KALPANA JAIN MD

Page 1 of 1

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Dec 29 2004  8:50AM

## Department of Orthopaedic Surgery

**DATE OF INJURY:** 07/01/2004

**HISTORY OF PRESENT ILLNESS:** This is a follow-up of Dr. Michelson's patient who had a left lateral malleolus fracture in December of this past year. He still has pain and is having difficulty at work driving and climbing stairs.

**PHYSICAL EXAMINATION:** On physical examination today, he has some swelling of the lateral malleolus.

**DIAGNOSTIC STUDIES:** X-ray show that there is a healed fracture which is in about three parts of the lateral malleolus.

**IMPRESSION:** Healed lateral malleolus fracture.

**PLAN:** The plan for him is to continue his activities and perhaps have some physical therapy to get him going with this. I think at this point that this is probably arthrosis secondary to the fracture and will have a difficult time returning him to the state that he wants to be. He is going to follow up with Dr. Michelson.

Kathleen A. McHale, M.D, FACS
COL(R) MC USA

Received for:Kathleen  Mchale M.D.  Jan 10 2005 12:13PM Eastern Standard Time

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Sep 6 2005  1:00PM

Amy Stone, M.D.
Frederick Brody, M.D.
2150 Pennsylvania Avenue NW
Washington, DC 20037

Dear Dr. Stone and Dr. Brody,

As a result of your kind referral, I had the pleasure of seeing Mr. Green for a consultation in the GI clinic. The details of the encounter are summarized below:

## HISTORY OF PRESENT ILLNESS
The patient is a  47 year-old man who presents for evaluation of abdominal pain, heartburn and regurgitation. He underwent a Nissen fundoplication in 1977, after which he did well for over 10 years. In the late 1980's, he began experiencing recurrent refractory heartburn, with regurgitation, nausea and RUQ and LUQ pain. These symptoms have increased recently. He had an ultrasound which demonstrated gallstones, and will be undergoing a laparoscopic cholecystectomy with Dr. Abell later this month. He is also being evaluated for a possible re-do of his fundoplication by Dr. Brody. Prilosec and Prevacid 30mg twice daily have decreased, but not resolved, his symptoms.
He has seen bright red blood in his stool once 3 weeks ago. He has a history of an anal fissure, and had a colonoscopy 3 years ago. He has experienced no recent weight loss, and has noted no change in bowel habits. There is no family history of colon cancer.

## PAST MEDICAL HISTORY
Post traumatic stress disorder
GERD status post Nissen 1977
HTN
Migraines

## MEDICATIONS
Lisinopril 10mg qd
Atenolol 50 mg po qd
Protonix 40 mg po qd
Elavil 25 mg qHS
Viagra prn
Prilosec OTC

## ALLERGIES
No Known Drug Allergies

## SOCIAL HISTORY
The patient does not smoke cigerettes, drinks alcohol socially, and works as a Korean translator.

GREEN, REGINALD CALVIN

**REVIEW OF SYSTEMS:**
HEENT: Pt has migraines
CV: No shortness of breath, orthopnea or exertional dyspnea
Pulmonary: No cough, hemoptysis or dyspnea
GI: As per HPI
GU: No dysuria
Musculoskeletal: No joint or muscle pain
Skin: No rashes or pruritus
Neurological: No focal weakness, no history of seizures or stroke
Endocrine: No history of diabetes or thyroid disease

**PHYSICAL EXAMINATION:**
Weight:  165  lbs            Blood Pressure:  131/72            Pulse: 82
**HEENT:** Pupils equally round and reactive to light bilaterally; Extraocular movements intact bilaterally;
Moist mucus membranes with no oral ulcers
**Neck:** Supple, with no masses, bruits, JVD, or lymphadenopathy
**CV:** RRR; Normal S1 and S2
**Lungs:** Clear to auscultation bilaterally
**Abdomen:** Soft, nondistended, nontender, with normal bowel sounds
**Extremities:** No clubbing, cyanosis or edema
**Skin:** No rashes
**Neurological:** Grossly normal
**Psychiatric:** Normal affect and mood.

**ASSESSMENT**
The patient presents for evaluation of abdominal pain, persistent reflux and regurgitation. He is being
evaluated for a possible revision of his fundoplication. I will perform an EGD to evaluate the integrity of
the fundoplication, and 48-hour pH testing to determine whether he has persistent acid reflux. In
addition, an esophageal manometry will be done to determine whether his esophageal motility is
adequate to tolerate a full fundoplication, if necessary.

**PLAN**
The indications, risks, benefits and alternatives of EGD were discussed with the patient in detail. The
patient agrees to proceeding with EGD.


Thank you once again for allowing me to participate in the care of your patient. Please do not hesitate to
contact me if you wish to discuss the case further.

                                        Sincerely,


                                        Aamir Ali, M.D.

Electronically signed by:Mohammed Aamir Ali M.D.  Sep  6 2005  4:02PM EST

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REGINALD GREEN,                    )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )
                                   )    Case No.  1:07-cv-0052 (RBW)
AMERICAN UNIVERSITY, et al.,       )
                                   )
                    Defendants.    )
                                   )

## ORDER

UPON CONSIDERATION of the Defendants' Motion for Summary Judgment and Statement of

Undisputed Material Facts, Plaintiff's opposition thereto, and the entire record in this case, it is

this ___ day of _____, 2008, by the United States District Court for the District of

Columbia,

        ORDERED, that Defendants' Motion is granted, and the Complaint dismissed in its

entirety.

_____
The Honorable Reggie B. Walton

Copies to:

Christine N. Kearns, Esq.
Rebecca M. Carr, Esq.
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037

Andrew W. Nussbaum, Esq.
Sheldon L. Gnatt, Esq.
Knight, Manzi, Nussbaum & LaPlaca, P.A.
14440 Old Mill Road
Upper Marlboro, MD  20772

400705814v1