**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| REGINALD GREEN | * | |
| | * | |
| *Plaintiff* | * | |
| | * | |
| v. | * | Civil Action No.: 1:07-cv-0052 (RBW) |
| | * | |
| AMERICAN UNIVERSITY | * | |
| | * | |
| and | * | |
| | * | |
| BENJAMIN LADNER | * | |
| | * | |
| *Defendants* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,


*Sheldon L. Gnatt*

_____
Sheldon L. Gnatt (D. C. Bar No. 362405)


*Andrew W. Nussbaum*

_____
Andrew W. Nussbaum
*Attorneys for Plaintiff*


Knight, Manzi, Nussbaum & LaPlaca, P.A.
14440 Old Mill Road
Upper Marlboro, MD  20772-3088
(301)952-0100
Fax No. (301) 952-0221

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**REGINALD GREEN,**                                 )
                                                    )
            **Plaintiff,**                          )
                                                    )
      **v.**                                        )          **Case No.: 1:07-cv-0052 (RBW)**
                                                    )
**AMERICAN UNIVERSITY, et al.,**                    )
                                                    )
            **Defendants**                          )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff, Reginald Green ("Green") submits this memorandum in opposition to Defendants' Motion for Summary Judgment.

Plaintiff's employment by Defendant American University (the "University") as the driver for its then President, Benjamin Ladner ("Ladner"), during which he was told that he was doing a good job, was abruptly cut short after approximately three and one-half (31/2) months when, on a return trip from Philadelphia to Washington, D. C., the first and only long-distance trip during Green's tenure, Green, due to his medical condition of fecal urgency, against the wishes of Ladner, made a stop because of Green's urgent need to use the bathroom for a bowel movement.

Plaintiff is a person with a covered disability under both the Americans with Disabilities Act ("ADA") and the D. C. Human Rights Act ("DCHRA"). Before, during and after his employment with the University, Green was substantially limited in the major life activity of the ability to control one's elimination of waste (also referred to in the case law as the ability to eat and control one's bowels). His condition of fecal urgency produces symptoms similar in nature to that of Irritable Bowel Syndrome (IBS). He will experience profuse rectal bleeding and spasms of his colon producing diarrhea and the feeling of an urgent need to defecate. While employed by the University, Green would have such urgent feelings ten to fifteen times a day. Because of the difficulty controlling this urgent need to use the bathroom, Green actually soiled himself while at

work.   Green informed his employer of this condition and requested, as an accommodation, that he have ready access to a bathroom in the President's office and that he be permitted to make bathroom stops, as needed, while driving.

The University and Ladner have asserted, in defense of Green's termination, that his work performance was unsatisfactory, citing examples such as driving the car excessively slowly, keeping too much distance between the President's car and the car in front of him and not knowing his way around the City of Philadelphia.   Yet, other drivers employed by Ladner and the University before Green, were retained for longer periods of time despite, among other things, misrepresenting that they were a non-smoker, tailgating and not knowing well Washington, D. C.   Moreover, Green had an extensive successful career as a professional driver before he began his employment with the University and his driving was not criticized in these ways.   Pretext can also be found in the fact that Ladner, who was described by his Executive Assistant as strong-willed, arrogant and easily annoyed, someone who displayed (to her) anger and impatience and someone who was thoughtless who spoke without regard to how his statement might be perceived and someone who needed a speedy response, had a preference not to make stops on trips, in part, because it took additional travel time.   Ladner, who, himself, did not need bathroom stops on a trip to Philadelphia or New York, directed that his preference for "zero" stops be included on a written list of expectations for the Driver position.   Ladner's decision to terminate Green was made the very next day after Green, against Ladner's stated wishes, stopped to use the bathroom during the return trip from Philadelphia.   A jury could reasonably conclude that Green was a covered individual with a disability, that his employer was unwilling to accommodate him, that Ladner objected to him stopping to use the bathroom on the return trip from Philadelphia, that Green, the driver, because of his urgent need to defecate, stopped anyway, and that his termination the next day was in response to his stopping.   Therefore, in light of factual disputes, including disputes based on credibility of witnesses, concerning the degree of Green's impairment, his job performance and the motivation behind the no-stops preference and Green's termination, summary judgment is not appropriate in this case.

**STANDARD OF REVIEW**

"Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." Bolden v. Ashcroft, 515 F.Supp.2d 127, 129 (D.D.C. 2007). "[A] genuine issue of material fact is a fact that is determinative of a claim or defense, and therefore, affects the outcome of the case." Steere v. The George Washington University, 368 F.Supp.2d 52, 54 (D.D.C. 2005). It is the moving party that bears the initial burden of demonstrating that there is no genuine issue of material fact, and upon such a showing, the burden shifts to the non-moving party. Id. "Courts must construe the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Bugg-Barber v. Randstad US, L.P., 271 F.Supp.2d 120, 126 (D.D.C. 2003) (*See also*, Steere, 368 F.Supp.2d at 54, "The Court is precluded from weighing evidence or finding disputed facts and must draw all inferences and resolve all doubts in favor of the non-moving party"). Moreover, "courts should not weigh the evidence or make credibility determinations when reviewing a motion for summary judgment." Id. In the present matter, the Defendants are not entitled to summary judgment as a matter of law as to any claims, as genuine disputes of material fact certainly exist.

**ARGUMENT**

I.  Summary Judgment as to Plaintiff's claim under the Americans with Disabilities Act is improper where there is a factual dispute as to whether Mr. Green's fecal urgency substantially limits a major life activity and whether Mr. Green was denied reasonable accommodation.

   A.  There is no dispute that Mr. Green exhausted his administrative remedies prior to filing the present action.

3

Defendants do not dispute the fact that Mr. Green properly exhausted his administrative remedies prior to filing the present suit. As Defendants concede, on December 21, 2004, Mr. Green filed a timely complaint for discrimination with the District of Columbia Human Rights Commission, alleging that he had informed the Defendants of his medical condition and that he was denied the accommodation of "having to use the bathroom on long trips". (See, pages 3 and 5 of Defendants' Motion for Summary Judgment). He also alleged in his Charge that he was terminated because he stopped to use the bathroom during a trip to and from Philadelphia. (See, page 3 of Defendants' Motion for Summary Judgment). After the Commission dismissed the claim with a no-probable cause determination, the U.S. Equal Employment Opportunity Commission (EEOC) issued a Dismissal and Notice of Rights to file suit.

As Defendants note, the allowable scope of the present lawsuit is limited to "the [scope of the] administrative investigation that can reasonably be expected to follow the charge of discrimination." Buggs-Barber, 271 F.Supp.2d at 131. In their motion, Defendants also cite to cases where summary judgment has been granted in favor of the defendants for the plaintiff's failure to sufficiently exhaust the administrative remedies. For example, Defendants note that in Carter v. Washington Post, No. 05-1712 (RMC), 2006 U.S. Dist. LEXIS 29424 (D.D.C. May 15, 2006), the court dismissed the claim for the plaintiff's failure to mention in his EEOC charge his request for accommodation or that his request had been denied. (See, pages 4-5 of Defendants' Motion for Summary Judgment). They also note Buggs-Barber, *supra*, in which the court granted summary judgment for the plaintiff's failure to properly exhaust her remedies when she did not mention that she had requested an accommodation. (See, page 5 of Defendants' Motion for Summary Judgment). Finally, Defendants refer to Marshall v. Federal Express

4

Corporation, 130 F.3d 1095 (D.D.C. Cir. 1997), in which the court granted summary judgment against a plaintiff who failed to mention her termination or the defendant's failure to accommodate. (See, page 5 of Defendants' Motion for Summary Judgment). These cases, however, are inapposite to the present case.  Unlike the cases above, Mr. Green clearly alleged before the DCHRC and the EEOC that he had a medical condition, that the medical condition required him to use the bathroom frequently, that he had requested certain accommodations, such as bathroom breaks on long trips, that his request had been denied and that he had been terminated as a result of this disability, as indicated in Defendants' motion. (See, pages 3-5 of Defendants' Motion for Summary Judgment).  Therefore, it is undisputable that Mr. Green exhausted the administrative remedies before the Commission and can pursue the present suit, which addresses the same issues that had been before the DCHRC and the EEOC.

B. There is evidence that Plaintiff's disability, specifically fecal urgency, substantially limited his ability to eat and control the elimination of waste.

The Americans with Disabilities Act ("ADA") prohibits a covered employer from discriminating against a qualified individual because of a disability. Bugg-Barber, supra. Under the ADA, "it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question would impose an undue hardship." Id. at 127.  To establish a prima facie case under the ADA, Mr. Green must show: (1) that he was an individual with a disability within the meaning of the ADA, (2) that his employer had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of his position, and (4) that the employer refused to make the accommodation.  Id.  As the court explained in Toyota Motor Manufacturing Kentucky, Inc. v. Williams, 534 U.S. 184, 195-96, 122 S. Ct. 681, 690 (2002):

> "Merely having an impairment does not make one disabled for purposes of the ADA. Claimants do also need to demonstrate that the impairment limits a major life activity …
>
> To qualify as disabled, a claimant must further show that the limitation on the major life activity is 'substantial.' … According to the EEOC regulations, 'substantially limited' means 'unable to perform a major life activity that the average person in the general population can perform'; or 'significantly restricted as to the condition, manner or duration under which an individual can perform  a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity … In determining whether an individual is substantially limited in a major life activity, the regulations instruct that the following factors should be considered: 'the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.'"

(Internal citations omitted).  Moreover, the determination of whether an individual is substantially disabled must be made on a case-by-case basis.  Id.  As the court explained in Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 679 (8th Cir. 2001), a case in which the Plaintiff suffered from Irritable Bowel Syndrome, "[t]he determination of a disability is a highly fact-intensive one, and thus, a conclusion that a certain condition, or a particular manifestation of a condition, does not substantially limit a particular plaintiff does not foreclose a determination that another individual with the same or analogous condition may be disabled within the meaning of the ADA."  (internal citations omitted).

    1.  Plaintiff's fecal urgency constitutes a physical impairment.

Before addressing whether Mr. Green's condition affects a major life activity, Defendants erroneously argue that there is no evidence that Mr. Green had any impairment. (See, page 8 of Defendants' Motion for Summary Judgment.)  In support of their contention, Defendants point to the lack of medical records regarding complaints of fecal urgency during the brief (less than four-month) period that Mr. Green was employed by the University.  However, as stated (buried) in footnote 8 of Defendants'

Motion, there was also evidence that Mr. Green made doctors' appointments to address his rectal bleeding, which appointments were rescheduled at the request of his supervisors. (See, page 9 of Defendants' Motion for Summary Judgment, which notes that these facts are accepted as true for the purpose of summary judgment). Defendants also refer to the evidence showing that Mr. Green had some improvement from his prior surgery on May 21, 2003 to alleviate the symptoms associated with anal fissure. However, as acknowledged in footnote 7 of Defendants' Motion, at p. 9, there was evidence that, as of April 14, 2004 (just four months before Mr. Green commenced employment with the University), Mr. Green still had symptoms of fecal urgency that were being treated with medication. Id. Moreover, Defendants also note that Mr. Green testified that, while employed by the University, he felt like he needed to use the bathroom ten to fifteen times a day, he had three to four bowel movements a day, he had an accident in which he soiled himself, and he had bleeding. Id.

2. Mr. Green's ability to perform a major life activity, such as eat and remove waste, has been substantially limited by virtue of his fecal urgency.

Defendants also argue that Mr. Green did not have a disability, as defined under the ADA, at the time that an accommodation was requested. As stated above, a disability under the ADA requires not only a physical or mental impairment, but it also requires that the impairment substantially limit one or more major life activities of an individual. See, Brown v. Snow, 407 F.Supp.2d 61 (D.D.C. 2005). Although the issue is fact specific and must be determined on a case-by-case basis, as discussed below, it appears that Mr. Green's condition did, in fact, substantially limit major life activities of eating and controlling the removal of waste.

In Bugg-Barber, supra, the United States District Court for the District of Columbia concluded that the issue of whether the Plaintiff's diabetes constituted a

disability under the ADA would be an issue of fact.  There, the evidence showed that the plaintiff tested her own blood sugar, injected insulin, took glucose tablets and controlled her diet as needed.  Nonetheless, she still experienced significant fluctuations in her blood sugar levels.  There was also evidence that when her diabetes was out of control, it substantially affected the plaintiff's ability to perform manual tasks.  Based on these facts, the court determined that, for the purposes of summary judgment, there was a genuine issue of material fact as to whether the plaintiff had a disability within the meaning of the ADA when she experiences wide fluctuations in her blood sugar.[1]  In Otting v. J.C. Penney Co., 223 F.3d 704 (8th Cir. 2000), the court concluded that summary judgment was improper and upheld a jury verdict where a plaintiff had seizures that were not under control at the time of her termination despite surgery and medication.

Specifically with respect to the issue of one's ability to remove waste, courts have recognized moving one's bowel and eating as a major life activity.  In EEOC v. Browning-Ferris, 262 F.Supp.2d 577 (D.Md. 2002), for example, the court denied summary judgment where the plaintiff was diagnosed with Crohn's Disease, suffered from severe diarrhea, loss of appetite and weight, several surgeries to drain abscesses in her intestines, and took medication for her condition.  Based on those facts, the court concluded that "a reasonable jury could conclude that [plaintiff] is significantly restricted as to the condition, manner or duration under which she can move her bowels or eat as compared to the condition, manner, or duration under which the average person in the general population can perform those same major life activities."  Id. at 585.  In Boles v. Polyloom Corporation of America, 459 F.Supp.2d 647 (E.D. Tn. 2006), the court denied

---

[1] Summary Judgment was ultimately granted against the plaintiff not on the issue of whether plaintiff had a disability, but due to the plaintiff's failure to articulate to her employer what accommodation would be reasonable or necessary for her disability, though she was, nonetheless, reasonably accommodated by her employer, and due to her failure to exhaust her administrative remedies.

summary judgment where a plaintiff, who was diagnosed with Crohn's disease, manifested his condition at work principally by taking frequent bathroom breaks and took time off from work for a series of treatments for his condition.  In <u>Maziarka v. Mills Fleet Farm, Inc.</u>, 245 F.3d 675 (8th Cir. 2001), the court concluded that the plaintiff with irritable bowel syndrome presented sufficient evidence that would allow a trier of fact to find the plaintiff disabled.  There, while the plaintiff only suffered from flare-ups a few times a month on average, he may also be incapacitated for longer periods of time due to substantial pain and intestinal discomfort.[2]  Likewise, in <u>Workman v. Frito-Lay, Inc.</u>, 165 F.3d 460 (6th Cir. 1999), the court refused to hold as a matter of law that a plaintiff with irritable bowel syndrome was not disabled under the ADA where the evidence showed that the Plaintiff took medication for the condition, underwent surgery, and had to use the restroom one to four times a day at the time she returned to work. (*See also*, <u>Nesser v. Trans World Airlines</u>, 160 F.3d 442 (8th Cir. 1998), where the court found that a plaintiff suffering from Crohn's disease was disabled under the ADA when plaintiff had medical leaves of absence for treatment; <u>Mazza v. Bratton</u>, 108 F.Supp.2d 167 (E.D.NY 2000), where the court concluded that a plaintiff with severe ulcerative colitis introduced sufficient evidence to create a triable issue by showing that he had been hospitalized for the condition and had diarrhea, loose and bloody stool, cramps, etc., although his condition improved with medication and he only had flare-ups around the time of termination; and <u>Hodge v. Henry County Medical Center</u>, 341 F.Supp.2d 968 (W.D. Tn. 2003), where the court found that there was sufficient evidence to allow a jury to conclude that the plaintiff suffered from a disability under the ADA based on the evidence that the plaintiff went to the bathroom five to six times per day, that during

---

[2] Summary judgment was ultimately granted because plaintiff failed to present evidence that he could perform essential functions of his position with reasonable accommodation.

9

flare-ups he has to use the bathroom up to forty times a day, that he had been hospitalized for his bowel obstructions and that he had surgery to correct his condition.)

In the present matter, Mr. Green has introduced evidence that, notwithstanding anal fissure surgery, he continues to have problems with bleeding, accidents and feeling the urgent need to have a bowel movement. Plaintiff testified that, as of the Summer of 2004, he would have the urge to go to the bathroom and feel like he had to go about 10 to 15 times in a day. He also testified that he bleeds from his rectum on a regular basis; that that was true between August and December of 2004; and that the bleeding symptoms come and go throughout the years in question, from 2004 to the present. Plaintiff testified that, while at the University, he bled regularly. (Statement of Genuinely Disputed Issues of Material Facts (hereinafter "Statement"), ¶46.)

Defendants seek to attach significance to the "No Limitations" words written by Dr. Rolf Neiman on the Medical Examination Report for Commercial Driver Fitness Determination ("Medical Examination Report") filled out at Mr. Green's pre-hiring Fitness Determination on July 14, 2004. As noted, this entry was the result of Dr. Neiman asking Mr. Green simply whether his doctor had given him "any restrictions" related to his anal fissure and Mr. Green responded in the negative. Dr. Neiman testified that he did not explain to Mr. Green precisely what he meant by the words in his question. Statement ¶4. The question did not relate to limitations on Plaintiff's major life activities and it did not relate to a need for work place accommodations. The mere fact that a doctor has not recommended work restrictions due to a medical condition (such as no heavy lifting, no bending, no sitting for long periods) does not negate the existence of that medical condition or a need for accommodations in the work place that will enable the employee to perform all of the essential functions of the job.

In support of their motion, Defendants cite to numerous cases in which summary judgment was granted against plaintiffs for their failure to prove a disability under the ADA. The conditions in these cases, however, are more controlled and affect the plaintiffs to a lesser degree than in the present case. For example, in Brunke v. The Goodyear Tire and Rubber Company, 344 F.3d 819 (8th Cir. 2003), the plaintiff's seizures were under control and, in a period of four years, he suffered only one seizure at work. In EEOC v. Sara Lee Corp., 237 F.3d 349 (4th Cir. 2001), the court held that a plaintiff, whose primary effects of epilepsy were only that she would sometimes wake up with a bruise on her body and sporadically zoned out during the day, did not have symptoms that rose to the level of substantially limiting her major life activities. In Ryan v. Grae & Rybicki, P.C., 135 F.3d 867 (2nd Cir. 1998), the plaintiff suffered symptoms of colitis only during the summer months and could go for years without significant symptoms. In Rivera v. Orange County School Board, 2000 U.S. Dist. Lexis 14304 (M.D.Fl. 2000), and in Carpenter v. Hampton Roads Shipping Association, 2005 U.S. Dist. Lexis 34186 (E.D. Va. 2005), there was evidence that the plaintiffs had regular or controlled bowel movements. In Rivera, while the plaintiff testified that she needed to use the bathroom fifteen times a day, the only accommodation she sought was a fifteen-minute break in the morning and in the afternoon and a lunch break, which was consistent with restroom breaks of a normal person who did not suffer from an impairment and showed that plaintiff was able to control the timing of her use of a restroom to a significant degree. In Carpenter, the plaintiff took supplements to maintain regular bowel movements and submitted no other evidence of negative symptoms or side effects. Finally, in Crawford v. New York Life Insurance, 2006 U.S. Dist. Lexis 69585 (E.D. NY 2006), the court found that a plaintiff with irritable bowel syndrome was not limited in

her ability to eliminate waste where the evidence showed that the plaintiff took no medication for the IBS, suffered from diarrhea once a month, constipation and stomach cramps several times a month and daily flatulence. There was no evidence that the IBS caused the plaintiff to run to the bathroom without notice or soil herself.

Unlike these cases, however, Mr. Green's fecal urgency affected him to a higher degree, as he was unable substantially to control his bowel movements and the urgent feeling of needing to defecate. A letter from Adrienne J. Clamp, MD, Department of Integrative Medicine at Kaiser, dated June 27, 2002, reports that Mr. Green had explained to her

"that the reason for his frequent early morning tardiness to work is his problem with fecal urgency. This is a problem in which there is overwhelming urgency to have a bowel movement. It is not under voluntary control. People who suffer with this malady have to stop what they are doing and evacuate the large bowel or risk the embarrassing situation of soiled clothing, furniture and the offense of family and coworkers." Statement ¶37.

A Progress Note from Plaintiff's doctor at George Washington University/Medical Faculty Assocites dated November 9, 2005, states that Mr. Green had complained of "20 trips to bathroom w/ 10 defecations." Id.

As Defendants note, Mr. Green must have been disabled at the time that he made the request for the accommodation. (See, Heasley v. General Hospital, 180 F.Supp.2d 158 (D.D.C. 2002). Defendants contend that Mr. Green was not disabled during the time of his employment with American University, as he did not attend medical appointments during that time. However, courts have found that a disability can exist even at a time when the plaintiff is capable of working and is not hospitalized. In other words, having a disability under the ADA does not necessarily mean that a person is completely incapable of working. For instance, in Banks v. CBOCS West, Inc., 2005 U.S. Dist. Lexis 9503 (N.D. Ill. 2005), the plaintiff suffered from Crohn's disease. He suffered daily from the symptoms of his disease, which included pain and diarrhea that required him to go to the bathroom up to twelve times a day. When he had flare-

ups, his symptoms worsened and he was unable to work.  When he was not experiencing flare-ups, he suffered from pain, discomfort and diarrhea, but was still capable of working.  There, the court found that the plaintiff's symptoms of pain and diarrhea, which necessitated up to a dozen trips to the restroom on any given day, were sufficient to establish that the plaintiff had a disability, whether or not he was experiencing a flare-up.  More recently, in <u>Duncan v. Quality Steel Products, Inc.</u>, 2007 U.S. Dist. Lexis 53626 (E.D. Mi. 2007), the plaintiff, who was diagnosed with Crohn's disease, would be minimally symptomatic for periods of several months to a year before she would have flare-ups, which required hospitalization.  When the plaintiff was able to work, she required frequent bathroom breaks.  Based on those facts, the court denied summary judgment on the basis that a jury could conclude that plaintiff's condition substantially limited her life activities.  Likewise, in <u>Carrasco v. Spectrum Health Hospitals</u>, 2008 U.S. Dist. Lexis 8666 (W.D. Mi. 2008), the court denied summary judgment where a plaintiff with irritable bowel syndrome presented evidence that she needed to be able to go to the bathroom whenever she feels the urge and that she had frequent and sometimes uncontrollable bowel movements.

As in these cases, Mr. Green's condition and the symptoms related thereto can reasonably be viewed by a jury to substantially limit his major life activities before, during and after his employment with the University.  In addition to the medical records cited above, Plaintiff's records reflect the following:

On January 17, 2002, a Provider Note from Kaiser Permanente ("Kaiser") indicates that Mr. Green stated that he was "flowing w/ blood."

A Provider Note from Kaiser dated March 29, 2002 indicates that Mr. Green "was seen in GI for rectal bleeding."

A Provider Note from Kaiser dated April 15, 2002, describes how Mr. Green "admits to being late often due to having pull over to use the bathroom when he has the urge.  At times he may pull off (gas station, etc) & not have a BM, even though he had the urge."

A Provider Note from Kaiser dated February 6, 2003, indicates that Mr. Green experienced "flare-ups of colon pain – Describes this pain as burning sensation approx 20 minutes after having BM."

A Provider Note from Kaiser dated February 11, 2003, reads: "45 y.o. male with known rectal pain he states from Post-Traumatic Stress Syndrome."

A report from George Washington University/ Medical Faculty Associates (GWU/MFA) dated April 14, 2004 (included in Defendants' Statement Exhibit 7) reads: Pt presents because he has a lot of body pains.  He believes that this has to do with his PTSD which has been acting up. . . . Pt states that he has rectal pain and fecal urgency which has been bothering him, the nitroglycerin [suppositories] has been helping."

A letter report from GWU/MFA, by Aamir Ali, M.D. dated September 6, 2005 (included in Defendants' Statement Exhibit 7) notes that Mr. Green "has seen bright red blood in his stool once 3 weeks ago."

A letter report from GWU/MFA dated August 16, 2006, from Allen L. Ginsberg, M.D., a gastroenterologist, states that Mr. Green complained of rectal bleeding.  It also states that the patient has posttraumatic stress syndrome.  Statement at ¶37.

Moreover, the cases above seem to suggest that the issue of whether Mr. Green suffers a disability under the ADA depends on the degree of control he has over his bowel movements or, given the sensation of urgency, the feeling that he needs to visit the bathroom to move his bowels.  At the very least, the evidence introduced by Mr. Green and accepted for purposes of summary judgment by the Defendants creates a genuine issue of material fact as to whether he is significantly restricted as to the condition, manner or duration under which he can eliminate waste as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

C.    There is evidence that Mr. Green's request for a reasonable accommodation, namely to take frequent bathroom breaks, was denied by Dr. Ladner.

The ADA requires an employer to be willing to consider making changes in its ordinary work rules in order to enable a disabled individual to work.  Bugg-Barber, *supra*.  "The Disabilities Act does not provide a comprehensive definition of a 'reasonable accommodation', but gives examples of what the term may include, … such as providing a 'modified work

schedule' for an employee or adjusting the circumstances under which the employee performs his job responsibilities." Taylor v. Rice, 371 U.S. App. D.C. 383, 451 F.3d 898, 908 (2006) (Internal citations omitted).

In the present matter, Defendants cannot argue that the request for reasonable accommodation was not made by Mr. Green, as it is their argument that they provided the requested accommodation.  (See, pages 13-14 of Defendants' Motion for Summary Judgment). Although Mr. Green may not have directly provided medical certification from a health care professional concerning his requested accommodation, based on the facts as presented by Defendants, Mr. Green requested the accommodation in his interview and during his employment.  (See, pages 13-14 of Defendants' Motion for Summary Judgment).  Plaintiff testified that, at his initial interview, Clemmer had read a newspaper article he provided from the Washington Times that described his previous medical condition and she asked him how he was doing.  Plaintiff also discussed his colon surgery and his condition that caused urgency to use the bathroom.  He also talked about his PTSD and needing to be close to a bathroom, as it related to the fecal urgency problem.  Plaintiff, in response to hearing about having to drive Dr. Ladner to Philadelphia and New York, related his concerns about having to stop to use the restroom and explained that he has irritable bowel syndrome.  Plaintiff  testified that, during a subsequent interview with Ladner, they got into detail about Plaintiff's colon issues, they talked about how long Mr. Green had been disabled, what he had been doing while he was disabled, and Ladner asked if he was ready to come back to work and Plaintiff said he was.  Statement at ¶2.

Additionally, although it is disputed, Mr. Green testified that he signed an authorization and release of medical records when he began his employment with the University, which such records, when obtained pursuant to the release, would inform the University about his condition for which an accommodation was needed.  Id.

As to Defendants' claim that the accommodation was provided, Mr. Green has testified that he was given a sheet of discussion points related to his position as Driver to the President (titled "For Conversation with Reggie"), which such points included that stops should be kept to a minimum and that zero was preferable.  Mr. Green testified that, on the return trip from Philadelphia, Ladner was adamant in his opposition to making the stop requested by Mr. Green. Plaintiff further testified that, when he told Ladner that he must use the restroom and that, if he did not stop, he was going to soil the seat in Ladner's car, Ladner "kind of turned blue and pink in the face and mumbled some words".  Ladner expressed concern that he was in a hurry to get back to D. C.  When Plaintiff got back in the car, Ladner did not say one word to him; he looked like he was very perturbed at what Plaintiff had just done.  Statement at ¶25.

As stated above, courts cannot make credibility determinations on summary judgment determinations.  *See*, <u>Bugg-Barber</u>, *supra.*  Consequently, the Defendants' Motion for Summary Judgment must be denied.

D.    <u>Summary Judgment as to Plaintiff's claim under the Americans with Disabilities Act is also improper where there is evidence that Mr. Green was terminated because of his disability, which required him to make bathroom stops while driving.</u>

The Court must evaluate Mr. Green's discrimination claim under the framework established in <u>McDonnell-Douglas Corporation v. Green</u>, 411 U.S. 792 (1973).  <u>Taylor</u>, *supra.* Under that test,

"[t]he initial burden is on the plaintiff to produce evidence making out a prima facie case of discrimination.  If the plaintiff does so, the employer has the burden of presenting evidence supporting its claim that it had a non-discriminatory reason for the personnel action.  If the employer carries this burden, it is up to the plaintiff to prove to the trier of fact that the employer's reason was pretextual and that intentional discrimination occurred."

<u>Taylor</u>, 451 F.3d at 911.   "Pretext may be established directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  <u>Singleton v. Potter</u>, 402 F.Supp.2d

12, 27 (D.D.C. 2005).  The jury can infer discrimination from the combination of "(1) the plaintiff's *prima facie case*; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment.)" Id.  "[I]in suits charging … disability discrimination, summary judgment often has been denied because of the presence of material fact questions involving motive or intent." Taylor, 451 F.3d at 912 (*citing* 10B Charles Allen Wright et al., Federal Practice and Procedure §2732.2 at 198-205 (3d ed. 1998)).

The facts show not only that Mr. Green's request to stop to use the bathroom was opposed, but also that his employment was terminated immediately after he stopped to use the bathroom over Ladner's objection.  Clemmer testified that it was during the same conversation in which Ladner described the events of the Philadelphia trip, either the day they got back or, at the latest, the next day (December 1 or 2, 2004), that Ladner told her that he had made the determination to let Mr. Green go.  Plaintiff's termination letter was dated December 3, 2004.  Plaintiff testified that when he came to work the morning following the return from Philadelphia, he was told by Clemmer that he was fired.  Statement at ¶28.

While Defendants contend that they had a legitimate reason for terminating Mr. Green, based on his unsatisfactory job performance, that explanation is pretextual.  The issues cited by Defendants as performance problems warranting Mr. Green's termination during his probationary period pale by comparison to the performance issues experienced with the previous Driver, Jeff Madden, who, despite recurrences of serious problems, was retained well past his probationary period, for a period of as much as three years.  Madden was accused of not knowing where he was going and getting lost on side streets.  Ladner had reacted strongly to

Madden, who was a smoker, for taking multiple stops on a return trip from New York to smoke. Ladner's wife was acutely allergic to smoke; when Jeff Madden returned to the car after a "bathroom" stop wreaking of smoke, it attacked Mrs. Ladner's allergies. Ladner, himself, did not like being exposed to smoke. Ladner felt that Jeff Madden was using stops to use the bathroom as an excuse to smoke. Ladner related this information to Clemmer several times after several trips, while Jeff Madden was still employed by the University. According to Ladner, one of the reasons for Madden's termination, among an "accumulation of a number of issues that kept reoccurring that [Jeff Madden] seemed not to be able to resolve" was smoking. Madden had indicated that he was not a smoker and would not be smoking. Another reason for his eventual termination was that he was "a bad tailgater and ended up having a wreck in New York as a result of that". During his employment, Madden was faulted for "tailgating", a problem so significant that Ladner included "No tailgating" on the list of problems to discuss with whomever was hired as the Driver to replace Madden. A third reason for Madden's termination, according to Ladner, was that "he did not know the city [Washington, D. C.] very well and would get lost on the way to various appointments." According to Ladner, Clemmer, in her dealings with Madden, found that Madden "routinely misrepresented the facts and was not truthful, and he missed several pickups, was late, et cetera." Madden's inability to get around Washington and the fact that he would get lost, and being a bad tailgater were recurring problems. He was spoken to about tailgating, about being late for pickups, about misrepresenting facts to Ms. Clemmer and about the disingenuous description of himself as a nonsmoker, and he did not demonstrate adequate improvement in these areas as time went by. According to Clemmer, the "crowning event" leading to Madden's termination was missing getting Ladner and his wife to an evening event by not knowing where he was going, driving as if he did have the address and getting lost. (For all, see Statement at ¶7.) The fact that Ladner

18

and the University tolerated such serious performance problems for up to three years and did not terminate Madden until a "crowning event" occurred calls into serious question Defendants' assertion that Plaintiff's performance, as evaluated over a period of less than four months, and not his insistence on stopping on the trip from Philadelphia, militated his termination.

This is especially true when one looks closely at the performance "issues" on which Defendants so heavily rely. Plaintiff disputes that a number of the problematic issues relating to his performance, that he drove too slowly, that he should keep a normal (shorter) distance between cars, that he should turn right from the right-hand lane rather than the left, that he must learn to use the GPS system, that he should cross speed bumps at a normal rate of speed and that he should not leave personal items in the car at the end of the day, were even discussed with him. As to a discussion on October 1, 2004, Clemmer acknowledged in her testimony that the entire meeting was positive, stating that they had a couple of issues that they did not want to become a big deal. Statement at ¶17.

As to the issue of the GPS system, Plaintiff testified that, as instructed, he attended a course at the Rosenthal dealership and that he felt he learned how to use the GPS system and did not have problems using it after he took the course. Id.

As to the alleged issue of keeping too much distance between his car and the vehicle in front of him, Plaintiff testified that he keeps a distance between cars for a safety factor, being that he is a defensive driver and in case he is ever rammed in the back of the car he won't hit the car in front of him. He testified this was something that is taught to drivers in security-related positions. Ladner acknowledged that a concern he had about this driving practice was that his trip was slowed down because he was so far back, he missed several green lights. Ladner also acknowledged that there is no prescribed formula for how many car lengths to keep in front of you and that it depended on the situation. Id.

As to other purported performance issues during Plaintiff's employment, Plaintiff's response/explanation reveals them as not worthy of credence. Mrs. Ladner, apparently, complained that Mr. Green had hugged her at the airport upon her arrival. Mr. Green testified that Mrs. Ladner had greeted him with a hug getting off the airplane and that she was drunk, and that he had only returned a hug to her. Statement at ¶19.

Plaintiff testified that there was a misunderstanding between Clemmer and Mrs. Ladner that left him sitting in the garage for two hours and the Ladners never did come outside because Mrs. Ladner and Clemmer were not communicating. He denied that there was a note on his Blackberry about that assignment. Id. Plaintiff also testified that, on an occasion when Ladner claims he was asleep while waiting in the car at the residence, Clemmer had told him to go outside and stay out there and wait for Ladner and, if he was tired, to take a nap. Ladner walked up an hour later and tapped on the window and Mr. Green was not asleep. Plaintiff had nodded his head when Ladner tapped on the window. Id. Finally, Plaintiff testified that he was late to pick up Ladner at the dentist because of a flat tire in the rain. He got his motorcycle and rode it to the University in the rain. He tried to call Ladner several times but he did not answer. Clemmer testified that she did not disbelieve Mr. Green's explanation of his conduct.

The alleged deficiencies in Mr. Green's performance during the Philadelphia trip are also lacking in foundation and not credible. Plaintiff is not merely stating an opinion about his performance; he is categorically denying the events and the facts as set forth by Defendants. Plaintiff testified that he had no difficulty finding the Four Seasons Hotel in Philadelphia and had been in Philadelphia many times and to the Four Seasons Hotel. He explained that, upon arriving in Philadelphia, the first exit for the Hotel was blocked off; they were doing road work. He immediately went to the next exit, dropped down the ramp and there was a warehouse area. He rode along the road until he entered the circle and the Four Seasons Hotel is right around that

circle.  He went directly to the hotel without stopping to ask anybody; the GPS was pointing out to go that way anyway.  Plaintiff further testified that, that evening, he took Ladner and Al Checcio to a restaurant, dropped them off in front of the restaurant and parked the car on the same street.  He received a call on his cell phone asking where he was; he said he would be right there; he pulled the car in front of the restaurant and picked them up.  He never left from view of the front door of the restaurant.  Statement at ¶26.

Ladner's contention that his decision to terminate Mr. Green was based on his less-than-satisfactory performance is belied by other evidence in the record.  The "Driver's Duties and Responsibilities" document (Plaintiff's Deposition Exhibit 10) includes, at ¶1.h., a requirement to maintain a working knowledge of Philadelphia and New York, but acceptable at a lesser extent than the level of knowledge of Washington, D. C.  Clemmer testified that her impression, even after hearing about the Philadelphia trip, was that Mr. Green had some working knowledge of Philadelphia, albeit less than his working knowledge of Washington, D. C.  Clemmer testified that, consistent with the "Driver's Duties and Responsibilities" document, Mr. Green's interpersonal and communication skills were fine based on her interview of him and that there were no issues during his employment with his knowledge of VIP protocol (also as set forth in the "Driver's Duties and Responsibilities" document); specifically, opening car doors, use of umbrellas and the handling of luggage.  She testified that she observed that Mr. Green kept the President's car "meticulously clean" and was successful in meeting the University's expectations in that regard.  Statement at ¶40.  Clemmer testified that, during Plaintiff's employment with the University, he received no written documents expressing concerns about his driving style or about his job performance.  Statement at ¶41.  Ladner, when he interviewed Mr. Green, took a short drive in the car, with Mr. Green driving.  He did not notice any issues of concern about Plaintiff's driving (Statement at ¶42); yet, he claims that Mr. Green, during his employment,

drove too slowly and left too much room between him and the cars in front of him. As of the time Ladner and Mr. Green embarked on the trip to Philadelphia, Ladner, despite his purported concerns about Mr. Green's driving style and conduct, and Clemmer had not discussed terminating Mr. Green's employment. Statement at ¶43. Plaintiff had extensive experience as a professional driver prior to coming to work at the University. He had been doing professional driving since 1975. Statement at ¶44. It seems highly unlikely and suspect that, all of a sudden, for this one employer, Benjamin Ladner, Mr. Green was truly unprofessional and incompetent. Defendants have presented to evidence that Mr. Green's performance at any of his previous jobs was found lacking.

Defendants' assertion that Ladner was more than willing to give approval to Mr. Green's request to stop to use the bathroom on the return trip from Philadelphia is wholly lacking in credence in the face of the bulleted item on the "For Conversation with Reggie" document that reads: "Minimize bathroom stops on long trips – such as to New York. (In the past there have been as many as 4 stops for bathroom in the 4 hour trip.) One is acceptable – zero is preferable." Pretext can clearly be seen in the Defendants' attempt to explain away that bulleted item. Defendants assert that this item was only included because of concerns Ladner had with the previous driver, Jeff Madden, who would make frequent stops, claiming to need to go to the bathroom when, in reality, he wanted to take a smoking break, and that this had no relevance to Mr. Green, a non-smoker. The evidence shows that Ladner had a broader concern about making stops on trips, which such concern did affect Mr. Green. Margaret Clemmer testified that part of the consideration for the entry on the "For Conversation with Reggie" document was Ladner's preference for no stops on trips because of the time it took out of the travel time and Ladner's preference to get there as soon as possible, and that this was a concern of Dr. Ladner's irrespective of who is the driver, even a nonsmoking driver. When possible, he preferred zero

stops on trips.  Ladner confirmed that his preference was that stops be kept to a minimum, due primarily to his schedule and the time stops would add to his travel time.  Ladner, himself, did not need bathroom stops on trips to Philadelphia or New York; he had no medical condition such as an enlarged prostate or fecal urgency and he never asked for a stop for himself on such trips. (For all, see Statement, ¶15.)

This hostility toward stops on trips, when combined with the personality of Ladner, as described by  Clemmer (strong-willed, arrogant and easily annoyed, someone who displayed (to her) anger and impatience and someone who was thoughtless who spoke without regard to how his statement might be perceived and someone who needed a speedy response) (Statement at ¶39 )makes it so unlikely that Ladner was willing, let alone glad to accommodate Mr. Green.

## <u>CONCLUSON</u>

For the foregoing reasons, Plaintiff respectfully submits that the Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

*Sheldon L. Gnatt*

_____

Sheldon L. Gnatt (D. C. Bar No. 362405)

*Andrew W. Nussbaum*

_____

Andrew W. Nussbaum
*Attorneys for Plaintiff, Reginald Green*

KNIGHT, MANZI, NUSSBAUM & LAPLACA
14440 Old Mill Road
Upper Marlboro, MD  20772
(301) 952-0100
sgnatt@kmnl-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of February, 2008, a true copy of the

foregoing Opposition to Motion for Summary Judgment was served via the Court's

Electronic Case Filing system to:

> Christine N. Kearns, Esq.
> Rebecca M. Carr, Esq.
> Pillsbury Winthrop Shaw Pittman, LLP
> 2300 N Street, NW
> Washington, DC  20037-1122
> *Attorneys for Defendants*

*Sheldon L. Gnatt*

_____
Sheldon L. Gnatt, Esquire
*Attorney for Plaintiff, Reginald Green*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| REGINALD GREEN | * | |
| | * | |
| *Plaintiff* | * | |
| | * | |
| v. | * | Civil Action No.: 1:07-cv-0052 (RBW) |
| | * | |
| AMERICAN UNIVERSITY | * | |
| | * | |
| and | * | |
| | * | |
| BENJAMIN LADNER | * | |
| | * | |
| *Defendants* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>ORDER</u>

Upon consideration of the Defendants' Motion for Summary Judgment and Statement of Undisputed Material Facts, Plaintiff's Opposition thereto and Statement of Genuinely Disputed Material Facts, and the entire record in this case, it is this _____ day of _____, 2008, by the United States District Court for the District of Columbia,

ORDERED, that Defendants' Motion be DENIED.

_____
JUDGE

Copies to:

     Christine N. Kearns (D.C. Bar No. 416339)
     Rebecca M. Carr (D.C. Bar No. 488274)
     PILLSBURY WINTHROP SHAW PITTMAN
     2300 N Street, NW
     Washington, DC  20037-1128
     (202) 663-8000
     *Attorneys for Defendants, American University
      and Benjamin Ladner*

Sheldon L. Gnatt (D. C. Bar No. 362405)
KNIGHT, MANZI, NUSSBAUM & LaPLACA, P.A.
14440 Old Mill Road
Upper Marlboro, MD  20772
(301) 952-0100
*Attorneys for Plaintiff, Reginald Green*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|   |   |   |
|---|---|---|
| **REGINALD GREEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:07-cv-0052 (RBW)** |
| | ) | |
| **AMERICAN UNIVERSITY, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

_____)

**STATEMENT OF GENUINELY DISPUTED ISSUES OF MATERIAL FACTS IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Pursuant to LCvR 7(h), Plaintiff, Reginald Green ("Green"), respectfully submits the following statement of material facts in dispute in support of his opposition to Defendants' Motion for Summary Judgment. The numbered paragraphs correspond to the same numbered paragraphs in Defendants' Statement of Undisputed Material Facts.

**A.    Mr. Green's Application for Employment at American University**

1.      Undisputed.

2.      Undisputed.  Plaintiff testified that, at the interview, Clemmer had read a newspaper article he provided from the <u>Washington Times</u> that described his previous medical condition and she asked him how he was doing and he told her he felt like he was ready to come back to work, that his health had improved somewhat, but he still had some small problems that he felt he could conquer at this point. Depo. of Plaintiff at 57. Plaintiff also discussed his colon surgery and his condition that caused urgency to use the bathroom. <u>Id.</u> He also talked about his PTSD and needing to be close to a bathroom, as it related to the fecal urgency problem. <u>Id.</u> at 83-84. Plaintiff, in response to hearing about having to drive Dr. Ladner to Philadelphia and New York, related his concerns about having to stop to use the restroom and  explained that he has irritable bowel syndrome. <u>Id.</u> at 84. Plaintiff  testified that, during a subsequent interview

with Ladner, they got into detail about Plaintiff's colon issues, they talked about how long Mr. Green had been disabled, what he had been doing while he was disabled, and Ladner asked if he was ready to come back to work and Plaintiff said he was.  Id. at 65.

Plaintiff testified that, before receiving his offer of employment, he signed a medical release so that the University could obtain his medical records.  Id. at 80-81.

3.      Undisputed, but see paragraph 4.

4.      At Mr. Green's pre-hiring Fitness Determination on July 14, 2004, on the Medical Examination Report for Commercial Driver Fitness Determination ("Medical Examination Report") filled out, in part, by Mr. Green and given to Dr. Rolf Neiman, on which Mr. Green noted "anal fissure", Dr. Neiman asked Mr. Green if his doctor had given him "any restrictions" because of his anal fissure.  Mr. Green responded in the negative and Dr. Neiman wrote, "No Limitations."  Dr. Neiman did not explain to the patient, Mr. Green, precisely what he meant by those words.  Deposition of Dr. Neiman, at 17 (attached as Exhibit 2 to Defendants' Motion; supplemented as Exhibit 2 to this Opposition Memorandum/Statement of Disputed Facts).  A dispute exists as to the interpretation to be given to Mr. Green's response.

5.      Undisputed.

**B.      Mr. Green's Employment at American University**

6.      Undisputed.

7.      The University had terminated two of the three previous drivers for performance-related issues.  One such former driver, Jeff Madden, who directly preceded Mr. Green, was sometimes accused of not knowing where he was going and getting lost on side streets.  Depo. of Margaret Clemmer at 41 (attached as Exhibit 4 to Defendants' Motion; supplemented as Exhibit 3 to this Opposition Memorandum/Statement of Disputed Facts).  According to Margaret Clemmer, Ladner's Executive Assistant, Ladner had reacted strongly to Jeff Madden, who was a smoker, for taking multiple stops on a return trip from New York to smoke.  Ladner's wife was

acutely allergic to smoke; when Jeff Madden returned to the car wreaking of smoke, it attacked Mrs. Ladner's allergies. Ladner, himself, did not like being exposed to smoke. Depo. of Benjamin Ladner at 22 (attached as Exhibit 5 to Defendants' Motion; supplemented as Exhibit 4 to this Opposition Memorandum/Statement of Disputed Facts). Ladner felt that Jeff Madden was using stops to use the bathroom as an excuse to smoke. Id.; Clemmer Depo. at 45. Ladner related this information to Ms. Clemmer several times after several trips, while Jeff Madden was still employed by the University. Clemmer Depo. at 46. Jeff Madden held the position for over a year or more and, thus, was terminated after his probationary period. Id. at 41; Ladner Depo. at 31-32. He may have worked as long as three years. Clemmer Depo. at 43; Ladner Depo. at 29. There were several reasons for the involuntary termination of Jeff Madden. According to Clemmer, the "crowning event" was missing getting Dr. Ladner and Mrs. Ladner to an evening event by not knowing where he was going, driving as if he did have the address and getting lost. Clemmer Depo. at 44. According to Ladner, one of the reasons for termination, among an "accumulation of a number of issues that kept reoccurring that [Jeff Madden] seemed not to be able to resolve" was smoking. Ladner Depo. at 28. Madden had indicated that he was not a smoker and would not be smoking. Id. Another reason was that he was "a bad tailgater and ended up having a wreck in New York as a result of that". Id. at 28-29. During his employment, Jeff Madden was faulted for "tailgating", a problem so significant that Ladner included "No tailgating" on the list of problems to discuss with whomever was hired as the Driver to replace Jeff Madden. Clemmer Depo. at 38. A third reason for Madden's termination, according to Ladner, was that "he did not know the city [Washington, D. C.] very well and would get lost on the way to various appointments." Ladner Depo. at 29. According to Ladner, Clemmer, in her dealings with Madden, found that Madden "routinely misrepresented the facts and was not truthful, and he missed several pickups, was late, et cetera." Id. Jeff Madden's inability to get around Washington and the fact that he would get lost, and being a bad tailgater

were recurring problems.  He was spoken to about tailgating, about being late for pickups, about misrepresenting facts to Ms. Clemmer and about the disingenuous description of himself as a nonsmoker, and he did not demonstrate adequate improvement in these areas as time went by. Id. at 29-31.

Before Jeff Madden, James Person held the position, for over three years.  He retired. Clemmer Depo. at 42.

Before James Person, Val Gidda was the Driver.  He held the job for less than a year.  Id. He was terminated for throwing a barrage of profanity at a woman who worked in the residence. Id. at 43.

8.    Undisputed.

9.    Undisputed.  However, Mr. Green testified that when he was hired, during orientation, he was told that the probationary period was ninety (90) days.  Depo. of Plaintiff Reginald Green at 99-100 (attached as Exhibit 1 to Defendants' Motion).

10.    Undisputed.

11.    Undisputed.

12.    Undisputed.

13.    Undisputed.

14.    Undisputed.

15.    Margaret Clemmer testified that part of the consideration for the entry on the "For Conversation with Reggie" document was Ladner's preference for no stops on trips because of the time it took out of the travel time and Ladner's preference to get there as soon as possible, and that this was a concern of Dr. Ladner's irrespective of who is the driver, even a nonsmoking driver.  When possible, he preferred zero stops on trips.  Clemmer Depo. at 40, 46, 47, 48. Ladner confirmed that his preference was that stops be kept to a minimum, due primarily to his schedule and the time stops would add to his travel time.  Ladner Depo. at 23, 24.  Ladner,

himself, did not need bathroom stops on trips to Philadelphia or New York; he had no medical condition such as an enlarged prostate or fecal urgency and he never asked for a stop for himself on such trips. Id. at 24.

16.     Undisputed.

17.     Plaintiff disputes that the problematic issues relating to his performance, that he drove too slowly, that he should keep a normal (shorter) distance between cars, that he should turn right from the right-hand lane rather than the left, that he must learn to use the GPS system, that he should cross speed bumps at a normal rate of speed and that he should not leave personal items in the car at the end of the day, described in Defendants' Statement, ¶17, were discussed with him. Depo. of Plaintiff Reginald Green at 150-151 (attached as Exhibit 1 to Defendants' Motion; supplemented as Exhibit 1 to this Opposition Memorandum/Statement of Disputed Facts). Plaintiff recalls that the first meeting he had with Clemmer and Ladner was for them "to inform [him] . . . how good things were going." Id. at 143. The second meeting was for Clemmer "to let [him] know that don't greet Dr. Ladner's wife with a hug even though she had hugged [him] getting off the airplane." Id. at 143-144. See also Plaintiff's Response to Request for Admissions, attached as Exhibit 5, at ¶2 (denying that, on September 27, 2004, Meg Clemmer spoke to Plaintiff regarding Dr. Ladner's concerns about his driving style); ¶3 (denying that, on October 1, 2004, Benjamin Ladner spoke to Plaintiff regarding his concerns about Plaintiff's driving style, in the presence of Ms. Clemmer); ¶5 (denying that, on October 29, 2004, Meg Clemmer spoke to Plaintiff on the phone regarding Dr. Ladner's concerns about his job performance); ¶6 (denying that, on November 2, 2004, Meg Clemmer spoke to Plaintiff in person regarding Dr. Ladner's concerns about Plaintiff's job performance). As to the October 1, 2004, discussion, Clemmer acknowledged in her testimony that the entire meeting was positive, stating that they had a couple of issues that they did not want to become a big deal. Clemmer Depo. at 89.

As to the issue of the GPS system, Plaintiff testified that, as instructed, he attended a course at the Rosenthal dealership and that he felt he learned how to use the GPS system and did not have problems using it after he took the course.  Depo. of Plaintiff at 153-155.

As to the issue of keeping too much distance between his car and the vehicle in front of him, Plaintiff testified that he keeps a distance between cars for a safety factor, being that he is a defensive driver and in case he is ever rammed in the back of the car he won't hit the car in front of him.  He testified this was something that is taught to drivers in security-related positions.  Depo. of Plaintiff at 151.  Plaintiff testified that no one at the University had talked to him about this concern.  Id. at 152.  Ladner acknowledged that an effect of this driving practice was that his trip was slowed down because he was so far back, he missed several green lights.  Ladner Depo. at 71.  Ladner also acknowledged that there is no prescribed formula for how many car lengths to keep in front of you and that it depended on the situation.  Id. at 21.

18.    Undisputed.

19.    Plaintiff disputes that he continued to have performance issues.  As to the specific issues recited in Defendants' Statement, Plaintiff has presented evidence to controvert Defendants' assertions:

- Mrs. Ladner complained that Mr. Green had hugged her at the airport. Mr. Green testified that Mrs. Ladner had hugged him getting off the airplane. Depo. of Plaintiff at 143-144.  He further stated that Mrs. Ladner greeted him with a hug and that she was drunk,  Id. at 146, and that he had only returned a hug to her.  Id. at 147.

- Plaintiff testified that there was a misunderstanding between Clemmer and Mrs. Ladner that left him sitting in the garage for two hours and the Ladners never did come outside because Mrs. Ladner and Clemmer were not communicating.

He denied that there was a note on his Blackberry about that assignment.  Depo. of Plaintiff at 156-157.

- Plaintiff testified that, on this occasion at the residence, Clemmer told him to go outside and stay out there and wait for Ladner and, if he was tired, to take a nap.  Ladner walked up an hour later and tapped on the window and Mr. Green was not asleep.  Plaintiff had nodded his head when Ladner tapped on the window.  Id. at 150.

- Plaintiff testified that he was late to pick up Ladner at the dentist because of a flat tire in the rain.  Depo. of Plaintiff at 149.  He got his motorcycle and rode it to the University in the rain.  He tried to call Ladner several times but he did not answer.  Id. at 150.  Clemmer testified that she did not disbelieve Mr. Green's explanation of his conduct.  Clemmer Depo. at 88.

20.    Undisputed.

21.    Undisputed.

22.    Undisputed.

23.    Undisputed.  Whereas Ladner denied (or did not recall) that Clemmer told him that Mr. Green's need to use the bathroom on the Philadelphia trip was due to a problem he had in the past regarding his colon, Clemmer, with the benefit of her chronology (page 11, 2nd paragraph), stated that she was aware of that being the reason and told Ladner that specific information.  Clemmer Depo. at 91.

24.    Undisputed.

25.    It is undisputed that Mr. Green, as the driver of the President's car, did drive off the highway and stopped to use the bathroom.  There is a genuine dispute of material facts, as demonstrated by Defendants' Statement, at ¶25, concerning  Ladner's response to Plaintiff's request to stop for that purpose.  As cited, Plaintiff testified that Ladner "was adamant about continuing on to D. C." (Depo. of Plaintiff at 162) while Ladner testified that he responded by

saying, "Sure." (citations omitted here). Plaintiff further testified that, when he told Ladner that he must use the restroom and that, if he did not stop, he was going to soil the seat in Ladner's car, Ladner "kind of turned blue and pink in the face and mumbled some words". Id. Ladner expressed concern that he was in a hurry to get back to D. C. Id. at 165. When Plaintiff got back in the car, Ladner did not say one word to him; he looked like he was very perturbed at what Plaintiff had just done. Id.

### C.    Mr. Green's Termination

26.    Plaintiff was not present during the discussion between Ladner and Clemmer referenced in Defendants' Statement, at ¶26. Whereas Ladner characterized the discussion about terminating Plaintiff as having taken place some time during the first two weeks of December (and did not relate the timing of the discussion to the Philadelphia trip) (Ladner Depo. at 51), Clemmer testified that it was during the same conversation in which Ladner described the events of the Philadelphia trip, either the day they got back or, at the latest, the next day (December 2 or 3, 2004), that Ladner told her that he had made the determination to let Mr. Green go. Clemmer Depo. at 58-60. Clemmer's testimony is more credible given that Plaintiff's termination letter was dated December 3, 2004.

Plaintiff disputes the validity of the substantive performance issues cited in that paragraph. See Plaintiff's Response to Request for Admissions (Exhibit 5), ¶11 (denying that Plaintiff got lost trying to find the Four Seasons Hotel in Philadelphia on December 1, 2004); ¶12 (denying that Al Checcio had to direct Plaintiff back to the restaurant where he had dropped Dr. Ladner off in order to pick Dr. Ladner up after his dinner on December 1, 2004); ¶10 (denying that Plaintiff never turned on the GPS system during his drive to Philadelphia on December 1, 2004). Defendants have presented no testimony from Al Checcio who, at the time, was a Vice-President of the University, to corroborate Ladner's criticisms of Mr. Green's performance.

Plaintiff testified that he had no difficulty finding the Four Seasons Hotel in Philadelphia and had been in Philadelphia many times and to the Four Seasons Hotel.  Depo. of Plaintiff at 158.  He explained that, upon arriving in Philadelphia, the first exit for the Hotel was blocked off, they were doing road work.  He immediately went to the next exit, dropped down in the ramp and there was a warehouse area.  He rode along the road until he entered the circle and the Four Seasons Hotel is right around that circle.  He went directly to the hotel without stopping to ask anybody; the GPS was pointing out to go that way anyway.  Dr. Ladner asked him why he did not take the other exit, and he explained that the exit was blocked because they were doing work and they had to take the next upcoming exit.  Id. at 158-159.

Plaintiff further testified that, that evening, he took Ladner and Al Checcio to a restaurant, dropped them off in front of the restaurant and parked the car on the same street.  He received a call on his cell phone asking where he was; he said he would be right there; he pulled the car in front of the restaurant and picked them up.  He never left from view of the front door of the restaurant.  Depo. of Plaintiff at 159-160.

27.    Plaintiff was not present during the discussion between Ladner and Clemmer referenced in Defendants' Statement, at ¶27.

28.    Plaintiff was not present during the discussion between Ladner and Clemmer referenced in Defendants' Statement, at ¶28.  As stated above, however, whereas Ladner characterized the discussion about terminating Plaintiff as having taken place some time during the first two weeks of December (and did not relate the timing of the discussion to the Philadelphia trip) (Ladner Depo. at 51), Clemmer testified that it was during the same conversation in which Ladner described the events of the Philadelphia trip, either the day they got back or, at the latest, the next day (December 1 or 2, 2004), that Ladner told her that he had made the determination to let Mr. Green go.  Clemmer Depo. at 58-60.  Clemmer's testimony is more credible given that Plaintiff's termination letter was dated December 3, 2004.  Plaintiff

testified that when he came to work the morning following the return from Philadelphia, he was told by Clemmer that he was fired.  Depo. of Plaintiff at 163.

29.     Plaintiff does not dispute that Ladner testified as recited in Defendants' Statement at ¶29, but disputes the credibility of Ladner's testimony.

30.     Undisputed.

**D.     Mr. Green's Alleged Disability**

31.     Undisputed.

32.     Undisputed.

33.     Undisputed.

34.     Undisputed.

35.     Undisputed reference to medical records.  Plaintiff points out that, of the eleven medical provider visits noted, only three (3) occurred during the period Plaintiff was employed by the University, August 16 to December 3, 2004.  One of those visits, on August 31, 2004, involved only the taking of an x-ray of Plaintiff's left ankle fracture.

36.     Undisputed.  However, the medical records, themselves, reflect the dates, during Plaintiff's employment with the University, of his medical appointments.  One such record, dated January 24, 2005, but relating to an Office Visit of October 20, 2004 (during Plaintiff's employment with the University) with Candace Love, NP, contains an admonishment to Mr. Green "to make and keep his appointments in order to continue monitoring progress [relating to his ankle fracture]."  Nurse Love states, "Mr. Green missed several scheduled appointments, which he claimed was due to not being able to leave his employment during the day."  Exhibit 6 – Kaiser records.

**Plaintiff submits the following additional genuinely disputed issues of material facts:**

37.     Plaintiff's medical history, as reflected in records dating from January 2002 to August 2006, and, thereby, encompassing the period during which Plaintiff worked for the

University, reflects a continuing and ongoing problem with fecal urgency and rectal bleeding.
See Exhibits 6 and 7.

On January 17, 2002, a Provider Note from Kaiser Permanente ("Kaiser") indicates that
Mr. Green stated that he was "flowing w/ blood."

A Provider Note from Kaiser dated March 29, 2002 indicates that Mr. Green "was seen in
GI for rectal bleeding."

A Provider Note from Kaiser dated April 15, 2002, describes how Mr. Green "admits to
being late often due to having pull over to use the bathroom when he has the urge. At times he
may pull off (gas station, etc) & not have a BM, even though he had the urge."

A letter from Adrienne J. Clamp, MD, Department of Integrative Medicine at Kaiser,
dated June 27, 2002, reports that Mr. Green had explained to her "that the reason for his frequent
early morning tardiness to work is his problem with fecal urgency. This is a problem in which
there is overwhelming urgency to have a bowel movement. It is not under voluntary control.
People who suffer with this malady have to stop what they are doing and evacuate the large
bowel or risk the embarrassing situation of soiled clothing, furniture and the offense of family
and coworkers."

A Provider Note from Kaiser dated February 6, 2003, indicates that Mr. Green
experienced "flare-ups of colon pain – Describes this pain as burning sensation approx 20
minutes after having BM."

A Provider Note from Kaiser dated February 11, 2003, reads: "45 y.o. male with known
rectal pain he states from Post-Traumatic Stress Syndrome."

A report from George Washington University/ Medical Faculty Associates (GWU/MFA)
dated April 14, 2004 (included in Defendants' Statement Exhibit 7) reads: Pt presents because
he has a lot of body pains. He believes that this has to do with his PTSD which has been acting

up. . . . Pt states that he has rectal pain and fecal urgency which has been bothering him, the nitroglycerin [suppositories] has been helping."

A letter report from GWU/MFA, by Aamir Ali, M.D. dated September 6, 2005 (included in Defendants' Statement Exhibit 7) notes that Mr. Green "has seen bright red blood in his stool once 3 weeks ago."

A Progress Note from GWU/MFA dated November 9, 2005, states that Mr. Green had complained of "20 trips to bathroom w/ 10 defecations."

A letter report from GWU/MFA dated August 16, 2006, from Allen L. Ginsberg, M.D., a gastroenterologist, states that Mr. Green complained of rectal bleeding.  It also states that the patient has posttraumatic stress syndrome.

38.    Defendants refer to Mr. Green's anal fissure surgery in May 2003 and suggest, if not argue, that this procedure was intended to, and did, resolve Plaintiff's fecal urgency condition.  They present no medical evidence to support the argument.  Plaintiff testified that the anal fissure and his fecal urgency condition are "two different things."  Depo. of Plaintiff at 174. Plaintiff asserts that the medical records cited above, as well as a letter dated July 14, 2005, from Ralph W. Wadeson, Jr., M.D., psychiatrist (see Exhibit 8), report that Mr. Green's Post Traumatic Stress Disorder (PTSD) contributes to his ongoing, chronic fecal urgency/rectal bleeding condition.  Dr. Wadeson, after mentioning Mr. Green's anal "fission[sic]" surgery, states, "His current symptoms include insomnia, rectal bleeding, suicidal thoughts, nightmares, headaches and stomach pains due to the PTSD. . ."

39.    Clemmer described Ladner as strong-willed, arrogant and easily annoyed, someone who displayed (to her) anger and impatience and someone who was thoughtless who spoke without regard to how his statement might be perceived and someone who needed a speedy response.  Clemmer Depo. at 14-17.

40.    The testimony of Clemmer conflicts with that of Ladner on issues related to Plaintiff's competency and performance.  The "Driver's Duties and Responsibilities" document (Plaintiff's Deposition Exhibit 10) includes, at ¶1.h., a requirement to maintain a working knowledge of Philadelphia and New York, but acceptable at a lesser extent than the level of knowledge of Washington, D. C.  Clemmer Depo. at 25.  Clemmer testified that her impression, even after hearing about the Philadelphia trip, was that Mr. Green had some working knowledge of Philadelphia, albeit less than his working knowledge of Washington, D. C.  Id. at 26, 27.  Clemmer testified that, consistent with the "Driver's Duties and Responsibilities" document, Mr. Green's interpersonal and communication skills were fine based on her interview of him and that there were no issues during his employment with his knowledge of VIP protocol (also as set forth in the "Driver's Duties and Responsibilities" document); specifically, opening car doors, use of umbrellas and the handling of luggage.  She testified that she observed that Mr. Green kept the President's car "meticulously clean" and was successful in meeting the University's expectations in that regard.  Id. at  27-31; 82.

41.    Clemmer testified that, during Plaintiff's employment with the University, he received no written documents expressing concerns about his driving style or about his job performance.  Clemmer Depo. at 57.

42.    Ladner, when he interviewed Mr. Green, took a short drive in the car, with Mr. Green driving.  He did not notice any issues of concern about Plaintiff's driving.  Ladner Depo. at 10-11.

43.    As of the time Ladner and Mr. Green embarked on the trip to Philadelphia, Ladner and Clemmer had not discussed terminating Mr. Green's employment.  Ladner Depo. at 36-37.

44.    Plaintiff had extensive experience as a professional driver prior to coming to work at the University.  He had been doing professional driving since 1975.  Depo. of Plaintiff at 46-49; 58.

45.    Prior to being fired, Plaintiff was told by Ladner's wife, whom Plaintiff also drove, that he was doing a good job.  Depo. of Plaintiff at 126.

46.    As noted by Defendants' in their Statement, Plaintiff testified that, as of the Summer of 2004, he would have the urge to go to the bathroom  and feel like he had to go about 10 to 15 times in a day.  Depo. of Plaintiff at 130.  He also testified that he bleeds from his rectum on a regular basis; that that was true between August and December of 2004; and that the bleeding symptoms come and go throughout the years in question, from 2004 to the present.  Id. at 174-177.  Plaintiff testified that, while at the University, he bled regularly.  Id. at 196.  He testified that he told Clemmer about his bleeding problem and that he had to go to the hospital and he tried to go to the doctor but he could not because Dr. Ladner had overlapping schedules and Clemmer told him to try to re-book the appointments because Dr. Ladner had things going on and he wanted Mr. Green to drive.  Id. at 196-197.

Respectfully submitted,


*Sheldon L. Gnatt*
_____
Sheldon L. Gnatt (D. C. Bar No. 362405)


*Andrew W. Nussbaum*
_____
Andrew W. Nussbaum
*Attorneys for Plaintiff, Reginald Green*

KNIGHT, MANZI, NUSSBAUM & LAPLACA
14440 Old Mill Road
Upper Marlboro, MD  20772
(301) 952-0100
Fax No. (301) 952-0221
sgnatt@kmnl-law.com

**STATEMENT OF GENUINELY DISPUTED ISSUES OF MATERIAL FACTS IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**Table of Exhibits**

1.      Deposition of Plaintiff Reginald Green (Excerpts)

2.      Deposition of Dr. Rolf Neiman (Excerpts)

3.      Deposition of Margaret Hawthorne Clemmer

4.      Deposition of Benjamin Ladner

5.      Plaintiff Reginald Green's Response to Defendant, American University's First Request for Admissions of Fact

6.      Kaiser Permanente Medical Records (Selected)

7.      George Washington University Medical Records (Selected)

8.      Dr. Ralph W. Wadeson, Jr., M.D., letter dated 07/14/05

# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

----------------------------------:

REGINALD GREEN,                    :

       Plaintiff,              :

    vs.                            : No.:

AMERICAN UNIVERSITY,               : 07-52

       Defendant.              :

----------------------------------:

               Washington, D.C.

           Monday, August 27, 2007

Deposition of:

        REGINALD GREEN

called for oral examination by counsel for

Defendant, pursuant to notice, at Pillsbury,

Winthrop, Shaw, Pittman, L.L.P., 2300 N Street,

Northwest, Washington, D.C., before Terri L.

Hamilton of Capital Reporting Company, a Notary

Public in and for the District of Columbia,

beginning at 10:17 a.m., when were present on behalf

of the respective parties:

| Page 2 | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | On behalf of Plaintiff: |
| 4 | SHELDON L. GNATT, ESQUIRE |
| 5 | Knight, Manzi, Nussbaum & Laplaca |
| 6 | 14440 Old Mill Road |
| 7 | Upper Marlboro, Maryland 20772 |
| 8 | (301) 952-0100 |
| 9 | |
| 10 | On behalf of Defendant: |
| 11 | CHRISTINE KEARNS, ESQUIRE |
| 12 | Pillsbury, Winthrop, Shaw & Pittman, L.L.P. |
| 13 | 2300 N Street, Northwest |
| 14 | Washington, D.C. 20037 |
| 15 | (202) 663-8000 |
| 16 | |
| 17 | ALSO PRESENT: |
| 18 | Rebecca Carr, Pillsbury, Winthrop, Shaw & |
| 19 | Pittman, L.L.P. |
| 20 | |
| 21 | |
| 22 | |

**Page 4**

1  C O N T E N T S (CONT.)
2  17  Letter of Determination, 6/15/05        101
3  18  Letter dated 12/27/05        101
4  19  Determination on Complainant's Request for   101
5  Reconsideration
6  20  Medical Faculty Associates        195
7
8
9
10
11
12
13
14  (*Exhibits attached to transcript.)
15
16
17
18
19
20
21
22

**Page 3**

1  C O N T E N T S
2  EXAMINATION BY:        PAGE
3  Counsel for Defendant        5
4
5  GREEN DEPOSITION EXHIBITS    *    PAGE
6  1  Answers to Interrogatories        11
7  2  Individual Tax Declaration, 2004        17
8  3  Individual Tax Declaration, 2005        18
9  4  Individual Tax Declaration, 2006        18
10  5  Department of Veterans Affairs, 7/18/05    20
11  6  Letter to Mary Hentschel, 5/3/04        34
12  7  Medical Examination Report        67
13  8  Staff Policies Acknowledgement        77
14  9  Staff Manual of Personnel Policies        78
15  10  Driver's Duties and Responsibilities      91
16  11  AU 0129        93
17  12  American University, 12/3/04        96
18  13  Intake Questions Disability        101
19  13A  Intake Questions Discharge        107
20  14  Complaint Form        101
21  15  Notice of Charge of Discrimination        101
22  16  Affidavit        101

**Page 14**

1
2  Chase Bank?
3     A  I was brought on on a trial basis for a
4  week and I guess when this gentleman found out that
5  I had relations to Dr. Ladner, he fired me.
6     Q  Who was the gentleman?
7     A  Mr. Solz, a close friend of Dr. Ladner.
8     Q  And how do you know that he fired you for
9  that reason?
10     A  When I put down on my application that --
11  he asked me some questions and I had to answer the
12  questions and I believe that that's the reason I
13  was fired.
14     Q  Did he or anyone else at Chevy Chase Bank
15  tell you why you were fired?
16     A  No, ma'am.
17     Q  How did you learn that your employment
18  was terminated at Chevy Chase Bank?
19     A  How did I learn that it was terminated?
20     Q  Yes.
21     A  Because I was informed by the personnel
22  office.

**Capital Reporting Company**

3 (Pages 15 to 18)

Page 15

1  Q  Who was that?
2  A  The HR people in Chevy Chase Bank.
3  Q  Can you identify the person you spoke to
4  about your termination?
5  A  I don't have the name on me, but I could
6  find out what the lady's name was.
7  Q  What did she say to you?
8  A  She kind of speculated that due to the
9  fact that you were involved in this incident here,
10  Mr. Solz would like to terminate you at this time.
11  Q  Someone from Chevy Chase Bank said that
12  to you?
13  A  Yes, ma'am.
14  Q  What dates did you work for Chevy Chase
15  Bank?
16  A  Ma'am, I don't have that information.
17  Q  Was it in 2007?
18  A  Yes, it was.
19  Q  So sometime since January 1, 2007 you
20  worked for Chevy Chase Bank for one week?
21  A  Yes, ma'am.
22  Q  When you say you could get me the

Page 16

1  information of who the woman was who made that
2  statement to you, how would you obtain that
3  information?
4  A  I believe I have her card somewhere in my
5  home.
6  MS. KEARNS:  We would make a formal
7  request for a copy of that card.
8  THE WITNESS:  I'll do my best to find it.
9  BY MS. KEARNS:
10  Q  I believe this morning you talked about
11  working for U.S. Sedan Service and then it says
12  Intercontinental Commerce Corp., chauffeur,
13  obtained.  Did you work for Intercontinental
14  Commerce Corp. since December 3rd, 2004?
15  A  Yes, ma'am.
16  Q  For what period of time?
17  A  I would think for maybe two months.
18  Q  Which two months?
19  A  It was probably sometime in 2 -- early
20  2007.  I don't know exactly what month.  I just
21  simply don't remember.
22  Q  Why did your employment end?

Page 17

1  A  It was kind of too far from my home and
2  having a child to go to school it was conflicting
3  with trying to get my child back and forth to
4  school.
5  Q  So you quit that position?
6  A  Yes, ma'am.
7  Q  They did not terminate you?
8  A  No, ma'am.
9  Q  You can put that to the side for a second
10  although we'll be coming back to it.  While we're
11  talking about your employment, let's just mark the
12  next exhibit.
13  (Green Exhibit Number 2
14  was marked for identification.)
15  BY MS. KEARNS:
16  Q  Mr. Green, Exhibit Number 2 is a document
17  that your counsel produced on your behalf in this
18  litigation which is a 2004 U.S. tax return e-filed.
19  Can you look at that document and tell me whether
20  that's a tax return that was filed by you or on
21  your behalf --
22  A  Yes, it is.

Page 18

1  Q  -- for the year 2004?  Sir, you must let
2  me finish my questions before you answer.  Do you
3  understand?
4  A  Yes.
5  Q  Just to be clear, is this a tax return
6  filed by you or on your behalf for the tax year of
7  2004?
8  A  Yes, it is.
9  MS. KEARNS:  Let's mark the next exhibit.
10  (Green Exhibit Number 3
11  was marked for identification.)
12  BY MS. KEARNS:
13  Q  Mr. Green, the document you have in front
14  of you, which the court reporter has marked as
15  Exhibit 3, is a U.S. tax return for the year 2005.
16  Is this a tax return that you filed or was filed on
17  your behalf for the tax year 2005?
18  A  Yes, it is.
19  Q  Did you file any amendments to the 2005
20  tax return?
21  A  I don't believe I did.
22  MS. KEARNS:  This is the next exhibit.

**Capital Reporting Company**

4 (Pages 19 to 22)

| Page 19 |
|---|

1    (Green Exhibit Number 4
2    was marked for identification.)
3    BY MS. KEARNS:
4        Q    We've put in front of you Exhibit Number
5    4, which is a tax return for 2006.  Is this a tax
6    return filed by you or on your behalf for 2006?
7        A    Yes, it is.
8        Q    Is your wife employed?
9        A    Yes, ma'am.
10       Q    Where is she employed?
11       A    She works for the federal government, NIH
12   Institute.
13       Q    Do you currently receive disability
14   compensation from the Department of Veterans
15   Affairs?
16       A    Yes, I do.
17       Q    Are those payments indicated on your tax
18   return?
19       A    Yes, they are -- well, I don't have to
20   claim that because it's nontaxable.
21       Q    How much do you receive on an annual
22   basis?

| Page 20 |
|---|

1        A    Maybe $6,000.
2        Q    And did you receive $6,000 from the
3    Department of Veterans Affairs in 2006?
4        A    I believe I did.
5        Q    Did you receive it in 2005?
6        A    I'm not sure because the exact time I
7    started receiving those payments I don't have a
8    clear recollection of when they actually started,
9    but I do receive 30 percent from the VA.
10       Q    30 percent of what?
11       A    Of disability, which is stated probably
12   on that statement that you have there.
13       Q    I think you're referring to a document I
14   have in front of me which you produced, July 18th,
15   2005 a letter to you from the Department of
16   Veterans Affairs.
17       A    Yes, ma'am.
18            MS. KEARNS:  We should probably mark that
19   as an exhibit.
20            (Green Exhibit Number 5
21            was marked for identification.)
22   BY MS. KEARNS:

| Page 21 |
|---|

1        Q    Mr. Green, we've marked as Exhibit 5 the
2    July 18th letter that you were just referring to.
3    It says "This is to certify that the records of the
4    Department of Veterans Affairs disclose that
5    Reginald C. Green is in receipt of disability
6    compensation due to service-connected disability
7    rated at 30 percent or more.  This payment is made
8    in accordance with public laws administered by the
9    Department of Veterans Affairs."  And if I
10   understand your testimony correctly, you receive
11   approximately $6,000 a year in disability benefits?
12       A    Possibly, yes.
13       Q    Is it possibly more than that?
14       A    No, ma'am.
15       Q    And is it your testimony you cannot
16   recall when those payments commenced?
17       A    The exact date I -- I can't recollect.
18       Q    Was it since 2000?
19       A    No, they started say maybe two months
20   after this date.
21       Q    When you say this date, you're pointing
22   to the --

| Page 22 |
|---|

1        A    July 18th.
2        Q    -- July 18th, 2005 date on the letter?
3        A    Yes, ma'am.
4        Q    Other than the employers that we've
5    identified that you've had since December 3rd, 2004
6    and your disability benefits, have you had any
7    sources of income since December 3rd, 2004?
8        A    I -- I detail cars maybe once in awhile
9    for friends that I know.  I mean it's not a lot of
10   income, but I guess one car is 150 bucks.
11       Q    Do you have your own company that does
12   that?
13       A    No, ma'am, it's just something I do on
14   the side.  It's not a full fledged business that I
15   do.
16       Q    And how long have you been doing that?
17       A    Just on and off.  It's nothing like
18   consecutively like a business, no.
19       Q    Any other sources of income other than
20   your employers that you've identified and the
21   disability benefits since December 3rd, 2004?
22       A    I just received a payment from Social

9e5544ca-29dc-40d4-80d2-47d7d8739d8a

# Capital Reporting Company

Page 23

1  Security for when I couldn't work from the time
2  that I -- I was on disability disabled list before
3  I came back to work.  I just received payment for
4  that.
5      Q    What period of time was that?
6      A    From 2004.  Of November 2004 up until I
7  went back -- I went to work for America's Pride in
8  the White House for the two and-a-half years that I
9  was disabled.
10     Q    So, I'm sorry, I didn't understand your
11 answer.  What was the period in which you were
12 disabled and unable to work?
13     A    From 2004, November.  Exact date in
14 November maybe the 14th -- I'm not sure, I'm
15 guessing -- until May the 4th when I went to work
16 in the White House.
17     Q    Of 2005?
18     A    If that's when I went back -- if that's
19 when I went to work in the White House, yes.
20     Q    On November 14th, 2004 you were employed
21 by American University; isn't that right?
22     A    Excuse me, 2003.

Page 24

1      Q    Okay.  That's what I needed some help
2  with, sir.
3      A    2003.
4      Q    So let's start over.  What is the period
5  in which you couldn't work due to your disability?
6      A    From November of 2003, maybe the 14th of
7  November, until May of -- was it 2005 or 2004 I
8  went back to work?  I don't know exactly.  It was
9  two and-a-half years.
10     Q    Two and-a-half years commencing in
11 November of --
12     A    November, yes, ma'am.
13     Q    November of 2003?
14     A    Yes, ma'am.
15     Q    And was there an event that caused your
16 disability in November of 2003?
17     A    Yes.
18     Q    What was that?
19     A    I had irritable bowl syndrome, esophageal
20 reflux, post-traumatic stress disorder pretty
21 severe, I bled constantly from my colon, the pain
22 of frequent migraine headaches, insomnia, fecal

Page 25

1  urgency.  Quite a severe condition.
2      Q    I'm not trying to test your memory --
3  well, I am trying to test your memory, but it's not
4  really a quiz, but I'm trying to understand how
5  that could have been November of 2003 if it's two
6  and-a-half years if you started work at American
7  University in August of 2004.
8      A    I left OPIC I remember -- I believe in
9  2003, November, and I believe I went back to work
10 in 2005, May the 4th, so maybe two years.
11     Q    Well, we'll look at some documents that I
12 think will pin that down a little more precisely.
13     A    I have documentation to show the exact
14 periods of date, ma'am, to make it clearer for you.
15     Q    Well, I do too so I'll show them to you.
16     A    Okay.
17     Q    Could you just look -- I'm sorry, do you
18 need something?
19     A    I'll just drink some of this water.
20     Q    Could you look back at the
21 interrogatories, which were Exhibit Number 1,
22 please.  I'm looking at interrogatory number three

Page 26

1  which is on the bottom of page three.  And your
2  answer is with respect to your compensation at
3  America's Pride.  My question is is the information
4  in answer number three accurate?
5      A    You're speaking of the $68,510?
6      Q    I'm speaking of the entire answer.  I'm
7  asking you whether your answer is accurate.
8      A    I believe so.
9      Q    If you could look at interrogatory number
10 four followed by your answer.  My question is is
11 your answer accurate?
12     A    Yes, ma'am.
13     Q    And you signed this document in April of
14 2007.  Is it correct that since that time that
15 you've resigned your position at U.S. Sedan
16 Services?
17     A    Will you repeat that question, please.
18     Q    Sure, it's two questions.  Didn't you
19 sign this document in April of 2007?
20     A    Yes, ma'am.
21     Q    Since that time you quit your job at U.S.
22 Sedan Services?

**Capital Reporting Company**

6 (Pages 27 to 102)

Page 27

1    A   Yes.
2    Q   Do you know the total amount of
3  compensation you've received from Lemay Limousine
4  Services since you commenced your employment there?
5    A   Maybe perhaps no more than $4,000.
6    Q   What records do you have that would show
7  the compensation you've received since you quit
8  your job at U.S. Sedan Services?
9    A   Okay, are you speaking of from Lemay or
10  from the Sedan Service?
11    Q   I'm sorry. I want to know what
12  information you have that will show what
13  compensation you've received since you quit your
14  job at U.S. Sedan Services?
15    A   I have records from that. As a matter of
16  fact, I may have them on me.
17    Q   Great. Maybe at a break I could see
18  those.
19    A   Sure.
20    Q   I want records of all your compensation
21  since you quit your job at U.S. Sedan Services.
22    A   Okay.

Page 28

1    Q   Did you receive any compensation from
2  Chevy Chase Bank?
3    A   Yes, ma'am.
4    Q   How much?
5    A   Maybe $8,000.
6    Q   Do you have any records that would
7  indicate the amount of compensation you received
8  from Chevy Chase Bank?
9    A   I believe so.
10    Q   Okay, I'd like those as well. Did you
11  receive any compensation from Intercontinental
12  Commerce Corp.?
13    A   Yes, I do, ma'am.
14    Q   How much?
15    A   I don't know the exact dollar amount.
16    Q   Do you have any records that would
17  indicate that?
18    A   I believe my tax records is the only
19  thing I could produce from that. They paid me by
20  check and gave me a W-2 form.
21    Q   Okay. So you have the W-2 from them?
22    A   I believe so.

Page 29

1    Q   Okay, I'd like a copy of that as well.
2    MR. GNATT:  Before we move past that, if
3  I may speak. I believe there is a W-2 from
4  Intercontinental in one of the tax return exhibits
5  that we've already identified, Exhibit 3 for 2005.
6    MS. KEARNS:  I believe his testimony was
7  that he worked there after that, so I just wanted
8  to make sure.
9  BY MS. KEARNS:
10    Q   Is that the only time you worked for
11  Intercontinental?
12    A   That's it, ma'am.
13    Q   And if you could look at the document
14  you're counsel is showing you and confirm that
15  that's the W-2 you referred to in your testimony a
16  moment ago.
17    A   Yes, ma'am.
18    Q   That's your only W-2 from
19  Intercontinental?
20    A   That's it.
21    MR. GNATT:  2005, right?
22    THE WITNESS:  That's the only time I

Page 102

1    A F T E R N O O N   S E S S I O N
2    (12:56 p.m.)
3  Whereupon,
4    REGINALD GREEN
5  was called for continued examination, and having
6  been previously duly sworn was examined and
7  testified further as follows:
8    EXAMINATION BY COUNSEL FOR DEFENDANT
9    CONTINUED
10  BY MS. KEARNS:
11    Q   We're back on the record. Mr. Green,
12  just as we were back on the record I noticed that
13  you took medication. I wanted to ask you is there
14  any medication that you're taking that affects your
15  memory in any way?
16    A   No, no, ma'am.
17    Q   While we were off the record we went
18  ahead and marked a number of exhibits. I'm going
19  to show you what we marked as Exhibit 13 and ask
20  you to take a look at that. My question,
21  Mr. Green, do you recognize that document?
22    A   I -- it's not my handwriting.

# Capital Reporting Company

7 (Pages 103 to 106)

| Page 103 | Page 105 |
|---|---|
| 1   Q  That is not your handwriting? | 1   (The reporter read the record as |
| 2   A  This is not my handwriting. | 2   requested.) |
| 3   Q  Okay.  Let me back up for a moment. | 3   THE WITNESS: Yes, I was. |
| 4  After you were terminated from American University | 4  BY MS. KEARNS: |
| 5  did you contact the D.C. Office of Human Rights to | 5   Q  And do you know why she completed the |
| 6  file a charge of discrimination? | 6  form? |
| 7   A  Yes. | 7   A  I wasn't feeling good.  Ms. Pollard was |
| 8   Q  And did you meet with anyone in person? | 8  sitting in a chair over here.  She completed the |
| 9   A  I met with someone over at the D.C. | 9  form and handed them to the examiner for me. |
| 10  Office of Human Rights. | 10   Q  Ms. Pollard accompanied you to see the |
| 11   Q  And did you complete the document we've | 11  examiner at the D.C. Office of Human Rights? |
| 12  marked as Exhibit 13 in connection with your | 12   A  Yes, she did. |
| 13  communications with the D.C. Office of Human | 13   Q  And did you provide Ms. Pollard with the |
| 14  Rights? | 14  information that she completed on the intake |
| 15   A  Jeanette Pollard completed this. | 15  questions under disability? |
| 16   Q  Who is Jeanette Pollard? | 16   A  I -- my recollection of this number nine |
| 17   A  My -- was my psychiatrist. | 17  I can't recollect of telling her this right her. |
| 18   Q  For what period of time was Ms. Pollard | 18   Q  Item number nine.  What about items one |
| 19  your psychiatrist? | 19  through eight, did you provide her with any |
| 20   A  From 2002 to 2004 or 5 she assisted me | 20  information for one through eight? |
| 21  with different things. | 21   A  Yes.  Okay, yes. |
| 22   Q  And was she your psychiatrist at the time | 22   Q  And did you authorize her to complete |

| Page 104 | Page 106 |
|---|---|
| 1  of your termination from American University? | 1  this document on your behalf? |
| 2   A  Yes. | 2   A  Yes, I did. |
| 3   Q  And were you in Ms. Pollard's presence | 3   Q  And you understood she was providing it |
| 4  when she completed this form? | 4  to the D.C. Office of Human Rights in connection |
| 5   A  If you give me a second and let me read | 5  with your complaint of discrimination? |
| 6  this for a second, please. | 6   A  To the best of her knowledge. |
| 7   Q  Sure. | 7   Q  Did you review the document before she |
| 8   MR. GNATT:  May I say something without | 8  gave it to the D.C. Office of Human Rights? |
| 9  doing any harm to your line of questions?  When you | 9   A  No, ma'am, I kind of verbally told her. |
| 10  started asking him about D.C. Human Rights, were | 10  I didn't physically go over documents and read the |
| 11  you about to put this in more of a context than you | 11  entire thing. |
| 12  have so far? | 12   Q  So she would ask you what the answers |
| 13   MS. KEARNS:  Yes. | 13  were to particular questions and then she would |
| 14   MR. GNATT:  And it might help him if you | 14  write them down? |
| 15  continue to do that.  I think it might help him if | 15   A  Yes, ma'am. |
| 16  you were to put it in more of a context since just | 16   Q  And were you present when she provided |
| 17  before the lunch break we were talking about things | 17  the intake questions and answers to the examiner? |
| 18  that are in his American University file and now | 18   A  Yes, I -- I was there. |
| 19  we've sort of taken a leap into another arena.  I | 19   Q  What did you think the purpose was of the |
| 20  think it might help him. | 20  intake questions? |
| 21   MS. KEARNS:  Okay.  What was my pending | 21   A  Was to give them the -- best idea of |
| 22  question? | 22  what transpired. |

Page 107

1    Q   In connection with your employment and
2    termination at AU?
3    A   Yes, ma'am, yes.
4        MS. KEARNS:  Could we mark as 13A the
5    second page of that.
6        (Green Exhibit Number 13A
7        was marked for identification.)
8    BY MS. KEARNS:
9    Q   Thank you.  Before we turn to 13A, Mr.
10   Green, I wanted to ask you a couple more questions
11   about Ms. Pollard.  Why did she cease providing you
12   with psychiatric services?
13   A   Number one, she's no longer working with
14   Kaiser and number two, I'm seeing a different
15   hair -- healthcare provider.
16   Q   Did you discharge her?
17   A   She's not my psychiatrist anymore.
18   Q   Whose decision was that, hers or yours?
19   A   Mine.
20   Q   Yours, okay.  Do you know what her
21   current address is?
22   A   I don't.  I've been trying to locate her.

Page 108

1    Q   If you could look at the document the
2    court reporter marked as 13A, intake questions
3    discharge.  My question to you is did Ms. Pollard
4    complete this document --
5    A   Yes.
6    Q   -- at your request?
7        MR. GNATT:  Make sure she finishes her
8    question before you answer.
9        THE WITNESS:  Yes, ma'am.
10   BY MS. KEARNS:
11   Q   And did you provide her with the
12   information with which to answer these questions?
13   A   If you give me a second I want to read
14   over this.
15   Q   Sure.
16   A   Okay.
17       MS. KEARNS:  Would you read my question
18   back?
19       (The reporter read the record as
20       requested.)
21       THE WITNESS:  To the best of my
22   knowledge, yes.

Page 109

1    BY MS. KEARNS:
2    Q   And were you present when she provided it
3    to the examiner at the D.C. Office of Human Rights?
4    A   Yes, ma'am.
5    Q   And did you understand it was for the
6    same purpose as the intake questions on disability?
7    A   Yes.
8    Q   Let's look at the next exhibit which is
9    Exhibit 14.  If you could look at Exhibit 14, which
10   is entitled complaint form, and go, if you will, to
11   page eight of that document and let me know if
12   that's your signature?
13   A   Yes, ma'am.
14   Q   On the prior two pages is handwriting
15   starting with, if you could look at the prior page
16   to the one you're looking at, not to be looking
17   over your shoulder here.  At the top of the page it
18   says witnesses and then there's handwriting.  Do
19   you see that?
20   A   Yes, ma'am.
21   Q   Meg Hawthorne, Ms. Saker, Ms. Jeri Rice
22   Mr. Phil Taylor.  Whose handwriting is that?

Page 110

1    A   Ms. Pollard.
2    Q   And did you provide her with the
3    information to complete that section of the form?
4    A   To the best of my knowledge, yes.
5    Q   And whose handwriting is in the section
6    of the form titled your complaint?
7    A   Ms. Pollard.
8    Q   And did you provide her with the
9    information to complete that section of the form?
10   A   She didn't complete it properly, but I
11   gave her I guess most of the information.
12   Q   And how did she complete it improperly?
13   A   Because I guess I was hired the 8 -- in
14   the month of 8/2004 and it says 9/16.
15   Q   Yes.
16   A   Yes, ma'am.
17   Q   And did you read that portion of the form
18   before you executed it?
19   A   This portion that she had written down
20   here no, I didn't.  I just -- when she completed it
21   and told me it was finished, I signed it.
22   Q   You didn't read it first?

| Page 111 | Page 113 |
|---|---|
| 1  A  No, ma'am. | 1  Q  Did you prepare this affidavit or did |
| 2  Q  Is there any portion of the complaint | 2  someone else prepare it? |
| 3  form other than your signature on page eight which | 3  A  I didn't prepare this. |
| 4  is your handwriting? | 4  Q  You did or did not? |
| 5  A  Repeat that question. | 5  A  I did not. |
| 6  Q  Is there any handwriting within this | 6  Q  Someone else prepared it and then you |
| 7  exhibit that is your handwriting other than your | 7  read it and signed it? |
| 8  signature on page eight? | 8  A  Yes, ma'am, I believe the Office of D.C. |
| 9  A  This is all Ms. Pollard's writing except | 9  Human Rights had prepared this. |
| 10  for my handwriting. | 10  Q  Okay. Here's number 17. This Exhibit 17 |
| 11  Q  Except for your signature -- | 11  is a letter from the Government of The District of |
| 12  A  My signature, I'm sorry. | 12  Columbia addressed to you at 9108 Lela Court, Fort |
| 13  Q  -- on page eight? Okay. Here's Exhibit | 13  Washington, Maryland 20744. That's the address you |
| 14  15. You have in front of you what's been marked as | 14  said at the beginning of the day was your home |
| 15  Exhibit 15. Have you seen this document before? | 15  address, right? |
| 16  A  Yes, ma'am. | 16  A  Yes, ma'am. |
| 17  Q  If you could look on the second page of | 17  Q  Did you receive a copy of this letter? |
| 18  Exhibit 15 and let me know if that's your signature | 18  A  Yes, I believe I did. |
| 19  at the bottom right hand of the page? | 19  Q  And in response to the letter you asked |
| 20  A  Yes, it is. | 20  for reconsideration of the decision; is that |
| 21  Q  Did you read the document before you | 21  correct? |
| 22  signed it? | 22  A  Yes. |

| Page 112 | Page 114 |
|---|---|
| 1  A  I believe I did. | 1  Q  And you filed a letter with the D.C. |
| 2  Q  On the top of the third page of the | 2  Office of Human Rights -- |
| 3  document it says CP initials. Are those your | 3  A  Yes. |
| 4  initials? | 4  Q  -- to reconsider? Let's look at Exhibit |
| 5  A  On the last page? | 5  18. First, Mr. Green, on Exhibit 18, which is a |
| 6  Q  Yes. | 6  December 27, 2005 letter from you to Kenneth |
| 7  A  Yes, ma'am. | 7  Saunders, director, D.C. Office of Human Rights. |
| 8  Q  And did you read the third page before | 8  Is this a letter that you prepared and signed on or |
| 9  you initialled that page? | 9  around that date? |
| 10  A  I believe I did. | 10  A  Yes, it is, ma'am. |
| 11  Q  Did you ever provide the D.C. Office of | 11  Q  Could you turn with me to one attachment. |
| 12  Human Rights or the EEOC with any supplemental | 12  First, did you have attachments to your letter? |
| 13  charge of discrimination? | 13  A  I can't recollect. It's been so long. |
| 14  A  Supplemental charge? I'm not sure if I | 14  Possibly I did. I -- I just clearly don't |
| 15  understand what you're saying. | 15  remember. |
| 16  Q  Never mind. We'll skip that. Look at | 16  Q  Well, there's a letter attached |
| 17  the next exhibit. If you could look at Exhibit 16, | 17  purporting to be from you to Ms. Lynne A. Griffin, |
| 18  I believe that's what this is, and it's entitled | 18  case manager, workers comp unit, St. Paul. It's |
| 19  affidavit and specifically I'd like you to look at | 19  about two-thirds of the way through the package. |
| 20  the second page and tell me if that's your | 20  A  Would you be speaking of -- |
| 21  signature. | 21  Q  No, I'm looking at a January 5th, 2005 |
| 22  A  Yes, it is my signature. | 22  letter. |

Page 115

1    A    Yes, ma'am.
2    Q    Is this a letter you prepared?
3    A    Yes.
4    Q    Is that your signature on the left hand
5    side of the first page of the letter?
6    A    Yes.
7    Q    At the bottom of the letter there's a
8    reference to line 19.  Do you see that?  The last
9    paragraph on the first page of the letter.
10    A    Yes.
11    Q    The words line 19 appear?
12    A    Yes.
13    Q    And look at any portion of the paragraph
14    that you want, but you state "The employer was
15    aware before I was hired that I had two permanent
16    disabilities and one temporary disability."
17    A    Yes.
18    Q    Was the temporary disability your broken
19    foot --
20    A    Yes, ma'am.
21    Q    -- due to the motorcycle accident?
22    A    Yes.

Page 116

1    Q    Were the permanent disabilities your
2    post-traumatic stress disorder and your anal
3    fissure?
4    A    Yes.
5    Q    Could you turn with me a few pages
6    earlier and I apologize this isn't paginated.  I
7    believe it's four pages earlier to a newspaper
8    article.
9    A    Yes, ma'am.
10    Q    Is this the Washington Times article that
11    you said that you provided to American University
12    prior to your employment?
13    A    Yes, it is.
14    Q    And this is the article which you believe
15    revealed your disability to American University?
16    A    Yes, ma'am.
17    Q    And could you point me to the portion of
18    the article that identifies your disability, and
19    feel free to read any aspect if you want, but I'm
20    wondering whether you weren't thinking of the
21    bottom of the second column going on to the top of
22    the third.

Page 117

1    A    "Where it says Reggie Green, 46, suffered
2    a stress-related injury during his service in the
3    Army.  When his condition worsened, the retired
4    sergeant and Korean linguist had to leave his job.
5    After undergoing colon surgery, he had trouble
6    finding another job."
7    Q    Yes.
8    A    Yes, ma'am.
9    Q    And just so I'm clear the reference to
10    having to leave his job is the disability leave you
11    described this morning --
12    A    That is correct.
13    Q    -- while you were working for, was it
14    OPIC?
15    A    Yes, ma'am.
16    Q    And the colon surgery that's referred to
17    here, is that the May 21st, 2003 colon surgery that
18    we talked about this morning with Dr. Davis?
19    A    That's correct.
20    Q    And it was following that surgery in May
21    of 2003 that you met up with America's Pride and
22    started your security work at the White House?

Page 118

1    A    Yes, ma'am.
2    Q    Could you turn with me to the letter
3    that's I think four pages from the back of this
4    exhibit, July 14th, 2005.  Dr. Watson Psychiatric
5    Center.
6        MR. GNATT:  Wadeson.
7        THE WITNESS:  Wadeson.
8    BY MS. KEARNS:
9    Q    Wadeson Psychiatric Center.  Do you see
10    that.
11    A    Yes.
12    Q    Did you provide this letter to the D.C.
13    Office of Human Rights in connection with your
14    reconsideration?
15    A    Yes, ma'am.
16    Q    And were you evaluated by Dr. Wadeson on
17    April 26, 2005?
18    A    Yes, ma'am.
19    Q    What was your purpose in having that
20    evaluation done?
21    A    I was directed to go see a doctor.
22    Q    By who?

Page 119

1    A   By my current physician.
2    Q   Which doctor?
3    A   Dr. Jain.
4    Q   And on how many occasions did you see
5  Dr. Wadeson?
6    A   I can't remember.  Several.
7    Q   And did you find him to be competent?
8        MR. GNATT:  I'll object to the form of
9  the question, but you may answer.
10       THE WITNESS:  Actually I found him going
11 to sleep sometime while I -- during the session,
12 and I kind of felt uncomfortable with him.
13 BY MS. KEARNS:
14   Q   And why did you provide this letter to
15 the D.C. Office of Human Rights?
16   A   It was one of the letters that I had in
17 my file that was available to me at the time in
18 reference to my condition.
19   Q   And you believed this was a useful piece
20 of information to assess the credibility of your
21 claim against AU?
22   A   Yes.

Page 120

1    Q   Is that a yes?
2    A   Yes.
3    Q   On the next page is a letter from
4  Jeanette Pollard, to whom it may concern.  Did you
5  ask Dr. Pollard to prepare this letter?
6    A   I may have.  I'm not sure.  I know with
7  me -- with her counseling me I figured that I
8  needed something for the record.  Each time I went
9  to a counseling session with her I wanted it to be
10 noted.
11   Q   Did you provide this to the D.C. Office
12 of Human Rights, this letter?
13   A   I believe I did, ma'am.
14   Q   I know she accompanied you on
15 December 21st to the D.C. Office of Human Rights,
16 we've looked at those documents just a minute ago;
17 isn't that right?
18   A   Yes.
19   Q   And did you see her on a professional
20 basis after you left AU for an evaluation or
21 treatment?
22   A   I think I did.

Page 121

1    Q   Did you believe that Jeanette Pollard was
2  a competent caregiver?
3        MR. GNATT:  Objection.  Go ahead.
4  BY MS. KEARNS:
5    Q   Yes?
6    A   Yes.
7    Q   Just to be complete if you could look at
8  this last document, Exhibit 19.  Mr. Green, do you
9  recognize this document from the government of the
10 District of Columbia addressed to you on
11 January 24th, 2006?
12   A   Yes, ma'am.
13   Q   Did you receive it on or about that time?
14   A   Yes, ma'am.
15   Q   Did you also provide the D.C. Office of
16 Human Rights with logs from your work at American
17 University?
18   A   Yes, ma'am.
19   Q   And what was your purpose in doing that?
20   A   In providing the log?
21   Q   Yes.
22   A   I was asked for the logbook.

Page 122

1    Q   Who asked you?
2    A   Okay.  Repeat that question, please.
3    Q   Did you provide any type of driver's log
4  book to the D.C. Office of Human Rights?
5    A   Yes, ma'am.
6    Q   Why did you do that?
7    A   To show that the allegations that I had
8  made were forthcoming and that I could prove that
9  what I was saying was true.  I was asked about
10 certain dates.  They asked me did I have any form
11 of record of that.
12   Q   And the logs, in your view, provided
13 support for your contention?
14   A   Yes, ma'am.
15   Q   Did you maintain copies of the logs after
16 you left American University?
17   A   No, I didn't.
18   Q   How did you get them?
19   A   I was contacted by some type of
20 accounting firm that was assisting in the
21 investigation of Ben Ladner and I asked for -- I
22 requested a copy of the log and they were willing

**Capital Reporting Company**

12 (Pages 123 to 126)

| Page 123 |
|---|

1  to give it to me.
2      Q   What was the accounting firm?
3      A   Ma'am, I don't remember the name of it.
4  It was something involving -- they were doing
5  accountability of Dr. Ben Ladner's spending
6  practices.
7      Q   How many times did you talk to the
8  accounting firm?
9      A   Maybe three or four times.
10     Q   Did they provide you with anything other
11  than the driver's logs?
12     A   That's it.
13     Q   I guess while we're on that topic it is
14  correct that after you were fired you wrote an
15  anonymous letter accusing Dr. Ladner of certain
16  conduct while he was the President of American
17  University?
18     A   That is correct.
19     Q   And you wrote that in anonymous fashion?
20     A   Yes.
21     Q   But then at some point you were
22  identified as the writer?

| Page 124 |
|---|

1      A   Yes.
2      Q   Did you self-identify or did someone
3  figure it out?
4      A   Someone figured it out.
5      Q   Who was that?
6      A   I think someone along the board of
7  directors.  I really don't know, ma'am, exactly who
8  the finger pointer was at me, but someone had an
9  idea that it was Reggie Green.
10     Q   And then you admitted it?
11     A   I admitted it.
12     Q   Did you believe that your termination had
13  anything to do with Dr. Ladner's conduct as the
14  President in terms of his spending?
15     A   I think that Reggie was kind of learning
16  too much and kind of heard a lot of things he had
17  no business.
18     Q   When you say Reggie, you're referring to
19  yourself?
20     A   Myself, yes.
21     Q   Are you saying that you were terminated
22  because you knew too much information about

| Page 125 |
|---|

1  Dr. Ladner?
2      A   No, I -- that may have had something to
3  do with it.  That's just what I think.  Speculation
4  that -- I mean I personally believe it was because
5  I requested to use the restroom in the way I did
6  and he wasn't happy with that especially when he
7  wanted to go straight to D.C. from Philadelphia.
8      Q   But my question is do you believe you
9  were terminated because, as you said, Reggie knew
10  too much about Dr. Ladner's spending?
11         MR. GNATT:  Objection.  Asked and
12  answered, but go ahead.
13         THE WITNESS:  To be honest I don't,
14  ma'am.  In reference to that -- that question that
15  you're asking I kind of -- that may have had
16  something to do with it.  Personally, I don't know.
17  BY MS. KEARNS:
18     Q   But you said you speculated that might be
19  part of the reason?
20     A   It may have had something to do with it.
21     Q   And you speculated it may have been going
22  to the bathroom?

| Page 126 |
|---|

1      A   I personally believe it had to do with
2  going to the bathroom.
3      Q   And other than knowing about spending and
4  going to the bathroom do you think there was any
5  other reason you were fired?
6      A   It couldn't have been for my job
7  performance because I -- I was told I was doing a
8  good job from his wife.
9      Q   Other than knowing too much or having to
10  go to the bathroom on the trip to Philadelphia do
11  you think there was any other reason you were
12  terminated?
13     A   No, ma'am.
14     Q   While you were employed at AU how often
15  did you meet with Meg Clemmer?
16     A   In reference to?
17     Q   Did you report to Meg Clemmer?
18     A   Yes, ma'am.
19     Q   So in connection with reporting to her
20  how often did you talk to her about your duties and
21  responsibilities?
22     A   About my duties and responsibilities

9e5544ca-29dc-40d4-80d2-47d7d8739d8a

Page 127

1    probably about three times.
2        Q    Well, let's try it a different way.  Did
3    you work in the same building with Meg Clemmer?
4        A    Yes, ma'am.
5        Q    On a weekly basis how often did you see
6    her?
7        A    I saw Meg on a daily basis.
8        Q    How often did you speak with her?
9        A    Every morning when I first walked in the
10   office.
11       Q    Was it pleasantries or was there
12   substantive conversation?
13       A    Pleasantries.
14       Q    Other than that you say you only spoke
15   with her on three occasions while you were employed
16   there?
17       A    I spoke with her more than three.  In
18   reference to your question what you're asking me
19   how many times did I speak with her, I spoke with
20   her on a daily basis, good morning, how are you,
21   anything I can do.  But we kept in communications
22   through Blackberries.

Page 128

1        Q    Well, this morning you testified that you
2    sat down and talked to her about your duties and
3    responsibilities shortly after you arrived and she
4    gave you two documents which we've marked as
5    Exhibits 10 and 11; isn't that right?
6        A    Yes, ma'am.
7        Q    Was anyone else present when she provided
8    that information to you?
9        A    Just her.
10       Q    And she went through the documents with
11   you and you talked about their content?
12       A    We sat down.
13       Q    And you asked questions?
14       A    Yes.
15       Q    And after that meeting did you ever talk
16   with her again about your job duties in your
17   position at AU?
18       A    Subsequent to what was outlined on the
19   paper?
20       Q    Yes.
21       A    I talked about the bathroom.  That was
22   the only other conversation then about -- I mean we

Page 129

1    had spoken before about anything I can -- I asked
2    her anything I can do to make this a much more
3    pleasurable transition.  That's -- that's it.
4        Q    When you say you talked about the
5    bathroom, are you referring to asking her about
6    stopping on the way to Philadelphia when you drove
7    Dr. Ladner?
8        A    I spoke to her in the bathroom -- in
9    reference to the bathroom that one occasion and we
10   spoke again about being close to a bathroom inside
11   of the building.
12       Q    When did you have that conversation?
13       A    Exact date I don't know, ma'am, but
14   shortly after I spoke with Meg -- Meg several times
15   in reference to that.
16       Q    And what did you say to the best of your
17   knowledge?
18       A    I said it would help facilitate in me
19   having to hop up and run up and down the top third
20   floor steps being closer to a bathroom and we even
21   talked about moving and she never said anything
22   else about it.  We talked about me having to run up

Page 150

1
2    motorcycle and ride to the university in the rain.
3    I tried to call Dr. Ladner several times.  He did
4    not answer his telephone.
5        Q    Was this to pick him up to take him to
6    the dentist?
7        A    To the dentist, yes.
8        Q    Were you ever late any other time?
9        A    That is it, ma'am.
10       Q    Did you ever fall asleep in the car in
11   front of the residence?
12       A    I was directed by Meg to go outside and
13   stay out there and wait for Dr. Ladner and if
14   you're tired, take a nap.  And Dr. Ladner walked up
15   an hour later and tapped on the window and I wasn't
16   asleep.  I had nodded my head and he tapped on the
17   window.
18       Q    And you had been directed by your
19   supervisor to take a nap?
20       A    Yes, I was.
21       Q    And did anyone ever talk to you about the
22   fact that you seemed to drive slowly?

**Capital Reporting Company**

14 (Pages 151 to 166)

| Page 151 |
|---|
| 1    A   I was never told I drive slowly. |
| 2    Q   No one ever addressed with you the issue |
| 3   of driving at the speed limit? |
| 4    A   I was directed to break the law by |
| 5   Dr. Ladner, but not too slow. |
| 6    Q   No one ever talked to you about driving |
| 7   too slowly? |
| 8    A   No, ma'am, I don't -- I'm not a slow |
| 9   driver. |
| 10    Q   Did anyone ever talk to you about the |
| 11   distance between cars that you were maintaining? |
| 12    A   I keep a distance between cars for a |
| 13   safety factor being that I'm a defensive driver for |
| 14   safety precautions in case I'm ever rammed in the |
| 15   back of the car how I won't hit the car in front of |
| 16   me.  It's something they teach defensive drivers, |
| 17   security drivers. |
| 18    Q   My question was did anyone at AU ever |
| 19   discuss with you the space you maintained between |
| 20   vehicles? |
| 21    A   Never. |
| 22    Q   No one ever talked to you about that. |

| Page 153 |
|---|
| 1    A   Yes, I did, and I addressed it with Meg |
| 2   also. |
| 3    Q   And you had a Blackberry issued to you by |
| 4   AU? |
| 5    A   Yes. |
| 6    Q   And that's where you kept your schedule? |
| 7    A   Yes. |
| 8    Q   Now, at some point you learned that you |
| 9   would be taking Dr. Ladner to Philadelphia; is that |
| 10   right? |
| 11    A   Yes, ma'am. |
| 12    Q   Do you know when that was that you |
| 13   learned you'd be taking that trip? |
| 14    A   December the 1st. |
| 15    Q   The trip was December 1st? |
| 16    A   Yes. |
| 17    Q   Now, prior to that time had you used the |
| 18   GPS system in the car? |
| 19    A   Yes, ma'am. |
| 20    Q   And had you had any issues or problems |
| 21   with it? |
| 22    A   In the beginning, being that I hadn't |

| Page 152 |
|---|
| 1   Did you ever have a problem while you were working |
| 2   at AU where you had to be in two places at one |
| 3   time; that is, picking up Dr. Ladner and |
| 4   Mrs. Ladner? |
| 5    A   Yes, ma'am. |
| 6    Q   And in those circumstances did you ever |
| 7   feel any conflict about what to do? |
| 8    A   Did I feel any conflict from having to |
| 9   pick up Mrs. Ladner and Mr. Ladner at the same |
| 10   time? |
| 11    Q   Yes. |
| 12    A   Did I personally feel any conflict? |
| 13    Q   Yeah. |
| 14    A   Yes, I did. |
| 15    Q   How did you resolve that? |
| 16    A   I had spoken to Dr. Ladner to give him |
| 17   heads up that I could possibly run into a problem |
| 18   in trying to pick him back up while I'm with Mrs. |
| 19   Ladner at the same time due to the fact she has to |
| 20   be picked up and be somewhere and then he needed to |
| 21   be picked up five minutes later. |
| 22    Q   So you addressed that with Dr. Ladner? |

| Page 166 |
|---|
| 1     MS. KEARNS:  I think that was corrected |
| 2   earlier and my time frame I was just talking about |
| 3   was post AU so that would include 2005. |
| 4     MR. GNATT:  You're right.  I'm sorry. |
| 5   BY MS. KEARNS: |
| 6    Q   At U.S. Sedan did you request any |
| 7   accommodation for your disability, and when I'm |
| 8   referring to disability, I'm referring to your anal |
| 9   fissure? |
| 10    A   They know because I kind of -- I |
| 11   mentioned it them something about it. |
| 12    Q   Who did you mention it to? |
| 13    A   Ahmed.  He knows that -- plus the |
| 14   dispatchers know that because I would hear them say |
| 15   something about it, the dispatchers. |
| 16    Q   Did you request from U.S. Sedan an |
| 17   accommodation for your disability? |
| 18    A   Yes. |
| 19    Q   Who did you make that request to? |
| 20    A   Kensey.  It's Kensey and she's a |
| 21   dispatcher. |
| 22    Q   When did you do that? |

**Capital Reporting Company**

15 (Pages 167 to 170)

| Page 167 |
| --- |

1    A    When I first went to work for them I
2    mentioned about my disabilities up front.
3    Q    What accommodation did you request?
4    A    To be able to stop to use the bathroom if
5    I'm driving a client. They said it's fine, you can
6    do that. And on several occasions I did have to do
7    that.
8    Q    So they said essentially what Ms. Clemmer
9    said to you?
10    A    Meaning that yes, you can stop to use the
11    bathroom, yes.
12    Q    And at Chevy Chase Bank did you request
13    an accommodation?
14    A    Yes, I did.
15    Q    Who did you make that request to?
16    A    I don't remember the lady's name that was
17    my supervisor, but yes, I did mention it to her.
18    Her and I spoke one on one and I clearly asked for
19    permission.
20    Q    And what did you say?
21    A    That on occasions that I'm going to have
22    to stop to use the bathroom on long trips.

| Page 168 |
| --- |

1    Q    And at U.S. Sedan did you also refer to
2    using the bathroom on long trips?
3    A    Yes, I did.
4    Q    At U.S. Sedan did you talk about using
5    the bathroom any time other than on long trips?
6    A    Are you speaking in the car or in the
7    office?
8    Q    In the car.
9    A    Yes, I did.
10    Q    So at Chevy Chase Bank you only asked for
11    an accommodation when you were going to take a long
12    trip?
13    A    Yes.
14    Q    At U.S. Sedan did you ask for an
15    accommodation for any car trip?
16    A    Yes, I did.
17    Q    And what was the accommodation you asked
18    for at Chevy Chase Bank?
19    A    That I would need to use the bathroom on
20    long trips.
21    Q    And what did Chevy Chase Bank say?
22    A    Chevy Chase allowed me to use the

| Page 169 |
| --- |

1    restroom on long trips because when I came in there
2    first, I told them straight up I need to be able to
3    stop to use the bathroom on long trips and they
4    definitely accommodated me.
5    Q    Did they agree to accommodate you?
6    A    Yes.
7    Q    You didn't take any long trips when you
8    were there?
9    A    Yes, I did.
10    Q    And did you have to stop and use the
11    bathroom?
12    A    Yes, ma'am.
13    Q    And while you have been at Lemay have you
14    requested an accommodation?
15    A    Yes, I have.
16    Q    And what was that accommodation?
17    A    To be able to stop to use the restroom if
18    I have a client from time to time.
19    Q    What did they say?
20    A    You do as -- as needed.
21    Q    Who did you make that request to?
22    A    George Lemay.

| Page 170 |
| --- |

1    Q    And he's the owner of the company?
2    A    Yes, ma'am.
3    Q    And at Intercontinental did you make a
4    request to have an accommodation?
5    A    I don't remember. Most likely I did.
6    Q    Do you remember doing so or not?
7    A    Yes, I did.
8    Q    Who did you make the request to?
9    A    To my office -- the office supervisors.
10    Q    Who is that?
11    A    I don't remember her name, ma'am, that's
12    been awhile.
13    Q    Did you put any of these requests in
14    writing?
15    A    Verbally when I came in during the
16    interview, took the job.
17    Q    Did you put any of these requests in
18    writing?
19    A    No, ma'am.
20    Q    Did you provide any medical certification
21    to any of those four employers regarding your
22    disability?

Page 171

1    A  I wasn't asked to.
2    Q  Did you provide any medical certification
3  to those employers --
4    A  No, ma'am.
5    Q  -- regarding your disability?
6    A  No, ma'am.
7    Q  I'm sorry, I may have asked you this.
8  While you were at AU what were your hours?
9    A  They varied.  Normally from 8 to 5, but
10  there were many occasions that I had to go from 8
11  to 12, 1, 2 o'clock in the morning and be back at 8
12  o'clock the next morning or 9 o'clock.
13    Q  And were those occasions for the most
14  part where there was a lot of extra driving?
15    A  A lot of extra driving.
16    Q  So that wouldn't be long days spent in
17  the office?
18    A  No, ma'am.  On the road.
19    Q  If you can tell me this, in a normal 8 to
20  5 day you said about 45 percent was driving?
21    A  45, 50.  It varied.
22    Q  Sure.  I understand.

Page 172

1    A  There's a lot of overtime, but not paid
2  overtime, just you have to do overtime.
3    Q  Well, during what sounds like about in a
4  nine hour day you'd spend about half driving and
5  half in the office; is that right?
6    A  It varied because I'm driving for two
7  individuals.  You have to figure it out like that.
8    Q  You testified earlier that you actually
9  have a bowel movement three times a day, but you
10  have an urge to have one more frequently?
11    A  Yes.
12    Q  And do you have a practice or habit
13  regarding the times of day that you have your bowel
14  movements?
15    MR. GNATT:  Is there a regularity to
16  that?  Is that what your question is?
17  BY MS. KEARNS:
18    Q  Yes.
19    A  It varies depending on if I end up taking
20  stool softeners.  If I take medication before I go
21  to bed at night to force me to go to the bathroom
22  when I wake up in the morning.

Page 173

1    Q  So is it your goal to go to the bathroom
2  first thing in the morning?
3    A  Yes, it is.
4    Q  And are there any other times of the day
5  that you aim to have a bowel movement?
6    A  Somewhere in the afternoon, but first
7  thing in the morning it takes a lot of pressure off
8  my stomach.
9    Q  In the period you worked at AU what
10  symptoms did you have related to your fecal urgency
11  anal fissure issues?
12    MR. GNATT:  Let me just ask one question.
13  When you ask that, are you also intending to
14  encompass his irritable bowel syndrome and to the
15  extent which that creates fecal urgency as well?
16    MS. KEARNS:  Yes.
17    THE WITNESS:  Okay.  What's the question
18  again?
19  BY MS. KEARNS:
20    Q  What's were your symptoms?  You've
21  contended in this case you had a disability that
22  caused fecal urgency; isn't that right?

Page 174

1    A  Okay.
2    Q  What other symptoms did you have of that
3  disability?
4    A  For the fecal urgency or you talking
5  about the anal fissure?  You're talking about two
6  different things, ma'am.
7    Q  Okay.  Well, let me try it this way.
8  What do you think is your disability that led to
9  your termination at AU?  You're claiming in this
10  case you were fired --
11    A  Say -- say that one more time, please.
12    Q  No, I'll say it a different way.  Are you
13  claiming you were fired because you were disabled?
14    A  Yes, I am.
15    Q  What was the disability about which they
16  fired you?
17    A  Having to run to the bathroom and
18  inconvenience Dr. Ladner.
19    Q  Now, other than having to run to the
20  bathroom does your disability have any other
21  symptoms?
22    A  I bleed from my rectum on a regular

| | Page 175 |
|---|---|
| 1 | basis. |
| 2 | Q   Was that true between August of 2004 and |
| 3 | December of 2004? |
| 4 | A   Yes, it was, ma'am. |
| 5 | Q   And we've established this morning that |
| 6 | as of January 2004 that had stopped, that's what |
| 7 | you testified to? |
| 8 | A   Guess what?  It's back on again. |
| 9 | Q   When did it start again? |
| 10 | A   I'm bleeding as of right now. |
| 11 | Q   Okay.  After January of 2004 when did it |
| 12 | start again? |
| 13 | A   It goes and comes, ma'am. |
| 14 | Q   Can you tell me -- |
| 15 | A   If I get up in morning and have a bowel |
| 16 | movement, have the urge to bowel movement and I |
| 17 | push myself, what they call it like you -- you |
| 18 | fracture a muscle, you -- you -- you -- you |
| 19 | fracture scar tissue. |
| 20 | Q   In January of 2004 the bleeding had |
| 21 | stopped following your surgery.  When did the |
| 22 | bleeding start again, if you know? |

| | Page 176 |
|---|---|
| 1 | A   In this case right now the bleeding |
| 2 | started last week again. |
| 3 | Q   Last week would be the third weekend of |
| 4 | August 2007, right? |
| 5 | A   That's not the first time it just started |
| 6 | back.  I bleed on and off. |
| 7 | Q   When did you start bleeding again after |
| 8 | January of 2004, if you know? |
| 9 | A   I've been bleeding on a regular basis on |
| 10 | and off since January the date that you just spoke |
| 11 | of. |
| 12 | Q   Do you have any medical records that -- |
| 13 | A   Yes, it is, ma'am.  It's in my medical |
| 14 | records. |
| 15 | Q   And which doctor would be able to talk |
| 16 | about that? |
| 17 | A   Dr. Jain Kirkpatrick. |
| 18 | Q   Is she with Kaiser? |
| 19 | A   No, ma'am, she's with GW. |
| 20 | Q   So in January of 2004 you had no symptoms |
| 21 | and is it your testimony that immediately after |
| 22 | that you started bleeding again? |

| | Page 177 |
|---|---|
| 1 | A   The symptoms come and go, ma'am, back and |
| 2 | forth. |
| 3 | Q   So sometimes -- |
| 4 | A   Since January.  Sometimes I don't bleed, |
| 5 | sometimes I do bleed.  I have a constant bleeding |
| 6 | problem as we speak right now. |
| 7 | Q   We'll, we're in August of 2007? |
| 8 | A   Yes, ma'am. |
| 9 | Q   In January of 2004 you had no symptoms |
| 10 | whatsoever.  Those would be in the medical records |
| 11 | that Kaiser had when you applied to AU, so I'm just |
| 12 | wondering where one would go to find medical |
| 13 | records -- |
| 14 | A   GW. |
| 15 | Q   -- to support the contention that you're |
| 16 | bleeding started again before August of 2004? |
| 17 | A   Dr. Jain Kirkpatrick, GW internal |
| 18 | medicine. (202) 741-2222. |
| 19 | Q   And when you are having the periods of |
| 20 | bleeding, what steps do you take to control it? |
| 21 | A   I try to relax myself.  When I go home, I |
| 22 | sit in the hot tub, relax my muscles. |

| | Page 178 |
|---|---|
| 1 | Q   Do you have to wear a pad? |
| 2 | A   I do. |
| 3 | Q   Are you wearing a pad right now? |
| 4 | A   Yes.  Yes. |
| 5 | Q   All right.  Other than rectal bleeding |
| 6 | what other symptoms do you have of your disability |
| 7 | that you believe you were fired? |
| 8 | A   Esophageal reflux.  I don't -- I don't |
| 9 | know if -- I don't think I was fired for esophageal |
| 10 | reflux though.  I have -- |
| 11 | Q   Wait, slow down. |
| 12 | A   Esophageal reflux. |
| 13 | Q   Do you contend in this case you were |
| 14 | fired because you have esophageal reflux? |
| 15 | A   No, ma'am. |
| 16 | Q   Is your esophageal reflux related to |
| 17 | your, as you said, your need to run to the |
| 18 | bathroom? |
| 19 | A   It causes me stomach pain. |
| 20 | Q   The esophageal reflux does? |
| 21 | A   Yes, ma'am. |
| 22 | Q   Do you take medicine to control that? |

9e5544ca-29dc-40d4-80d2-47d7d8739d8a

# Capital Reporting Company

Page 179

1    A    Yes, I do.
2    Q    Are you experiencing stomach pain at the
3    moment from that?
4    A    I'm uncomfortable right now.
5    Q    During the period that you worked at AU
6    did you take medicine for your esophageal reflux?
7    A    Yes, I did.
8    Q    Did you ever need to miss work in
9    connection with that?
10    A    No.
11    Q    You never asked for any accommodation
12    associated with that?
13    A    For my esophageal reflux?
14    Q    Yes.
15    A    If -- if I don't -- if I have a lot of
16    pain in my stomach, I will ask for accommodations.
17    Q    Did you do that while you were at AU?
18    A    I can't recollect.
19    Q    Do you have any other symptoms of your
20    disability that you're alleging in this case that
21    caused your termination from AU?
22    A    No, ma'am, not that I can think of.

Page 180

1    Q    While you were at AU and you would be
2    driving the car with no passenger, if you either
3    needed to have a bowel movement or felt urgency to
4    have one, did you feel free to go into a bathroom
5    and pull the car over and go into a bathroom?
6    A    You said without any passengers?
7    Q    Yes.
8    A    Yes, ma'am.
9    Q    You have brought claims for
10    discrimination against other employers; isn't that
11    right?
12    A    Yes.
13    Q    Which other employers?
14    A    OPIC.
15    Q    That was a claim of race discrimination?
16    A    Yes, and sexual harassment.
17    Q    You were sexually harassed?
18    A    Yes, ma'am.
19    Q    And you were discriminated against based
20    on your race?
21    A    Yes, ma'am.
22    Q    Any other forms of discrimination by OPIC

Page 181

1    that you alleged?
2    A    Sexual harassment and discrimination.
3    Q    Based on race?
4    A    Yes, ma'am.
5    Q    And did you file a lawsuit?
6    A    Yes, ma'am.
7    Q    Did you have a court hearing, a jury
8    trial on that?
9    A    May I speak with my attorney for a
10    minute?
11    Q    Sure.
12       MR. GNATT:  I think I could help even
13    without taking a break to talk to you.  I don't
14    think it was a lawsuit, per se, against OPIC.
15       THE WITNESS:  It wasn't.
16    BY MS. KEARNS:
17    Q    What kind of claim did you file against
18    OPIC?
19    A    It was a grievance.
20    Q    And was it internal at OPIC?
21    A    When you say internal, you mean in -- in?
22    Q    Who did you go to with your complaint?

Page 182

1    A    I went to the EEOC.
2    Q    You filed a charge with EEOC against
3    OPIC?
4    A    Yes.
5    Q    And were you represented by counsel?
6    A    Yes, I was.
7    Q    Who was that?
8    A    Michael Wasserman.
9    Q    And did you reach a settlement with OPIC?
10    A    Yes, I did it on my own.
11    Q    You mean without counsel?
12    A    Yes.
13    Q    And the settlement, did that include an
14    agreement that you would resign?
15    A    I resigned because of the fact that my
16    health condition at that point.
17    Q    The settlement didn't address whether or
18    not you'd remain employed there?
19    A    No.
20    Q    Did OPIC give you money?
21    A    Yes.
22    Q    How much money?

9e5544ca-29dc-40d4-80d2-47d7d8739d8a

Page 183

1      MR. GNATT: I'm not sure, but I think
2  there was a confidentiality --
3      THE WITNESS: There is a confidentiality.
4      MR. GNATT: -- clause in that.
5  BY MS. KEARNS:
6      Q   In your agreement with OPIC?
7      A   Yes.
8      Q   When was the last time you looked at your
9  settlement agreement with OPIC?
10     A   There's a confidentiality agreement that
11  I won't discuss this.
12     Q   But you withdrew your charge from OPIC in
13  exchange for money; isn't that right?
14     A   Yes.
15     Q   Was that before or after you resigned
16  from OPIC?
17     A   Okay. Can I -- if this is a
18  confidentiality agreement, I'm not to discuss this.
19     Q   Well, I can certainly ask whether you
20  reached your settlement before or after you
21  resigned from OPIC.
22     A   I -- okay, I resigned due to the fact

Page 184

1  that I was ill.
2      Q   I understand that's what you're saying.
3  I want to know whether that was before or after you
4  reached your settlement with OPIC?
5      A   After the settlement.
6      Q   How much time passed between reaching a
7  settlement and your resignation?
8      A   Maybe a month.
9      Q   And did you negotiate with Peter Watson
10  about your settlement?
11     A   Didn't have to.
12     Q   Why didn't you have to?
13     A   Because they have lawyers for that.
14     Q   So did you ever talk with Peter Watson
15  about your settlement?
16     A   That was not Peter's involvement.
17     Q   Did you ever talk with Peter Watson about
18  your settlement?
19     A   No, ma'am.
20     Q   Did you receive Peter Watson's
21  recommendation letter as part of your settlement?
22     A   No, ma'am. No way.

Page 185

1      Q   Have you brought a claim of
2  discrimination against any other employer?
3      A   No.
4      Q   Did you allege at any time that you were
5  discriminated against while in the Army?
6      A   I filed a EEOC if that's the question.
7      Q   In connection with the Army?
8      A   Excuse me, ma'am, if you don't mind, when
9  you -- when you bring up this Army thing, you --
10  you cause my post-traumatic disorder to start to
11  take affect on me due to the fact that I was
12  sexually assaulted in the military and I don't want
13  to get into that.
14     Q   Well, a few minutes ago we looked at a
15  letter from a therapist who evaluated you,
16  Dr. Wadeson; do you remember that?
17     A   Yes, I do.
18     Q   You saw him in April of 2005?
19     A   Yeah, but you -- you beginning to seem
20  like you're badgering me about it.
21     Q   I'm trying not to badger you.
22     A   Okay.

Page 186

1      Q   I would be happy to end this line of
2  questioning. Do you remember Dr. Wadeson's letter?
3  You're free to look at it again, you gave it to the
4  EEOC.
5      A   Yes.
6      Q   And he says your post-traumatic stress
7  disorder is caused by the incident that you went
8  through in the Army; do you remember that?
9      A   Yes.
10     Q   Do you agree with that?
11     A   Yes, and I wish that we would -- can we
12  refrain from this? Okay. I need to take a break.
13     MS. KEARNS: Okay.
14     (Brief recess.)
15  BY MS. KEARNS:
16     Q   I just was looking for Exhibit Number 1.
17  Put that in front of you.
18     MR. GNATT: These are in order descending
19  highest number down to the lower number, or atleast
20  the first half of them. Keep them in that order.
21  BY MS. KEARNS:
22     Q   Mr. Green, if you could turn to page

# Capital Reporting Company

20 (Pages 187 to 189)

Page 187

1  eight of the interrogatory answers. We've asked
2  you to identify any doctors, nurses, therapists, or
3  other medical practitioners who have knowledge of
4  your alleged physical and mental impairments
5  described in paragraph 12 of the complaint. Do you
6  see that question?
7      A  Yes, ma'am.
8      Q  Is there some reason that you have
9  omitted Dr. Kirkpatrick from that list?
10     A  I apologize, ma'am. Her name is Dr.
11 Jain, the first one. I said Kirkpatrick. I -- I
12 constantly say Kirkpatrick, but it's Kalpana.
13     Q  Oh, the doctor you're referring to when
14 you said Kirkpatrick is Kalpana, Jain?
15     A  Yes, I'm sorry.
16     Q  At GW University. So just to be clear
17 are there healthcare providers who are omitted from
18 this list?
19     A  No, ma'am.
20     Q  And who is this last person, Benzel? Do
21 you know the first name?
22     A  I don't know her first name, but she was

Page 188

1  a medication specialist.
2      Q  Now, turning to the next page, the
3  doctors, nurses, therapists who have knowledge of
4  your medical conditions for which you're seeking
5  damages. We've talked about Dr. Ralph Wadeson.
6  When was the last time you saw Dr. Wadeson?
7      A  Maybe a year ago or less.
8      Q  Do you believe you've seen him in 2007?
9      A  No, ma'am.
10     Q  No?
11     A  (Shakes head.)
12     Q  Kalpana, Jain, we've now talked about her
13 a bit. When was the last time you saw Dr. Jain?
14     A  Last -- last month.
15     Q  In July of '07?
16     A  Yes.
17     Q  How frequently do you see her?
18     A  About once a month.
19     Q  Candace Love we talked about earlier and
20 I may have asked you. You haven't seen her for
21 quite awhile, right?
22     A  Right.

Page 189

1      Q  Several years?
2      A  Yes, ma'am.
3      Q  And Jeanette Pollard you haven't seen
4  since early 2005?
5      A  No.
6      Q  Now, who is Phillip Taylor?
7      A  He's the maintenance man at AU.
8      Q  And what does he know that relates to
9  your disabilities?
10     A  He heard me say that I wish they would
11 move my -- my office near a bathroom because it'll
12 make life much more easier.
13     Q  Did he respond to your comment or just
14 listen?
15     A  He said something to the effect yeah, you
16 know how they move around here, at Dr. Ladner's
17 speed or something like that.
18     Q  What did you understand he meant by that?
19     A  You need to hope and pray.
20     Q  What else does Mr. Taylor know about your
21 physical and mental impairment?
22     A  Well, Mr. Taylor knows that I worked

9e5544ca-29dc-40d4-80d2-47d7d8739d8a

# Exhibit 2

Capital Reporting Company

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

---

REGINALD GREEN,                          :

                Plaintiff, :

          v            : CASE NO:

AMERICAN UNIVERSITY and       : 07-52(RBW)

BENJAMIN LADNER,                     :

              Defendant.:

---

Washington, D.C.

Friday, September 28, 2007

Deposition of:

DR. ROLF NEIMAN

called for oral examination by counsel for

Plaintiff, pursuant to Notice, at the Law Offices

of Pillsbury, Winthrop, Shaw, Pittman, 2300 North

Street, Northwest, Washington, D.C., before Mary

E. Warner of Capital Reporting, sworn by a Notary

Public in and for the District of Columbia,

beginning at 10:00 a.m.

## Capital Reporting Company

|  | Page 16 |
|---|---|

1    2003. I don't ask when that's -- when he had his
2    first symptom, first doctor visit, when he had his
3    surgery or anything other than that.
4        Q   All right.  And the question that you
5    asked in order to make the notation no
6    limitations, I believe you said was you asked did
7    the doctor give you any restrictions?
8        A   Correct.
9        Q   Can you -- well, would you agree that
10    what you are referring to when you ask about
11    restrictions, is whether or not, for example, the
12    doctor has placed restrictions on lifting,
13    sitting, bending, walking, carrying, things like
14    that?
15        MS. KEARNS:  I just want to object to the
16    question because I believe the word in the box is
17    current limitations and the Doctor's note is no
18    limitations.  So I think you're misspeaking by
19    using the word restrictions.
20        MR. GNATT:  I'm using the Doctor's word.
21    I can't be misspeaking because I'm using the
22    Doctor's word when he asked the applicant, "Did

|  | Page 17 |
|---|---|

1    the doctor give you any restrictions?"
2    BY MR. GNATT:
3        Q   May I continue, Doctor?
4        MS. KEARNS:  I object, you can try to
5    answer.
6        THE WITNESS:  I asked, do you have any
7    current -- did the Doctor give you any limitations
8    or restrictions?  I generally leave it to those
9    three or four words, weather.
10    BY MR. GNATT:
11        Q   You don't explain to the patient
12    applicant precisely what you mean by those three
13    or four words?
14        A   Correct.
15        Q   And in this case based on your notation,
16    the answer you were given was no?
17        A   Correct.
18        Q   Earlier when I gave what I think to be
19    examples of restrictions or limitations, would you
20    agree that those are examples of what you consider
21    restrictions or limitations?
22        MS. KEARNS:  I object to the form of the

|  | Page 18 |
|---|---|

1    question.
2    BY MR. GNATT:
3        Q   Go ahead.
4        MS. KEARNS:  You can answer.  Are they
5    examples of the kind of limitations you're
6    thinking about?
7        MR. GNATT:  I'm sorry, I couldn't hear.
8        MS. KEARNS:  I asked him, go ahead, are
9    those examples of the kind of limitations you
10    thought about, I guess at the time.  I have a
11    problem with your question.  Are you asking him
12    sitting there the day he asked the question, did
13    he have those examples in mind?  It's a difficult
14    question.
15    BY MR. GNATT:
16        Q   I'm referring to at the time this form
17    was completed and that you had some verbal
18    interaction with this candidate, applicant,
19    patient, when you asked the question relating to
20    limitations or restrictions from his doctor, are
21    the examples of -- that I gave examples of what
22    you had in mind or what you considered at the time

|  | Page 19 |
|---|---|

1    to be restrictions or limitations?
2        THE WITNESS:  I only asked the patient
3    whether the doctor gave him any limitations or
4    restrictions.
5    BY MR. GNATT:
6        Q   I think by your answer you're reiterating
7    for me that you did not tell the patient what you
8    had in mind by using those terms?
9        A   Correct.
10        Q   But my question is, are the examples that
11    I mentioned earlier examples of what you
12    considered to be restrictions and limitations that
13    you were asking about?
14        MS. KEARNS:  I object.  Go ahead.
15        THE WITNESS:  That goes into the realm of
16    expert opinion.  And you explained in a letter to
17    Ms. Carr what my fee would be for expert opinion
18    information.
19    BY MR. GNATT:
20        Q   So that goes beyond the scope of the
21    deposition as contemplated, is that what you're
22    saying?

3  (Pages 16 to 19)

Exhibit 3

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

Civil Division



REGINALD GREEN,

     Plaintiff,         Case No.:

     v.            1:07-cv-0052 (RBW)

AMERICAN UNIVERSITY, et al.,

     Defendants.


Deposition of:


MARGARET HAWTHORNE CLEMMER,

Taken on behalf of the Plaintiff, at the Law

Offices of Pillsbury, Winthrop, 2300 N Street,

N.W., Washington, D.C., commencing at

10:20 a.m., Tuesday, September 25, 2007, before

Toni R. DeSenze.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 2

1          A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4
5          SHELDON GNATT, ESQUIRE
6          Knight, Manzi, Nussbaum & LaPlaca, P.A.
7          14440 Old Mill Road
8          Upper Marlboro, Maryland  20772
9          (301) 952-0100.
10
11   FOR THE DEFENDANTS:
12
13         TINA KEARNS, ESQUIRE
14         Pillsbury, Winthrop
15         2300 N Street, N.W.
16         Washington, D.C.  20037
17         (202) 663-9143
18
19   ALSO PRESENT:
20         Reginald Green
21
22

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 4

1          P R O C E E D I N G S
2    WHEREUPON:
3          MARGARET HAWTHORNE CLEMMER,
4          Was called as a witness and, after first
5    being duly sworn by the Notary Public, was examined
6    and testified as follows:
7          EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8    BY MR. GNATT:
9          Q    Good morning.  My name is Sheldon Gnatt, and
10   I represent Reginald Green in his lawsuit that's
11   currently pending in the United States District Court
12   for the District of Columbia.
13         I'm going to ask you a number of questions,
14   and I would ask that you listen to my question, and
15   make sure I have finished asking the question before
16   giving an answer so that we're not both talking at the
17   same time.  The court reporter has difficulty in
18   taking that down.
19         If you don't understand my question, please
20   tell me, and we'll do what we can to ask a question
21   that you do understand, so when you do answer it,
22   we'll both know it's a question that you felt that you

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 3

1          C O N T E N T S
2
3    EXAMINATION OF MARGARET HAWTHORNE CLEMMER    PAGE
4
5    BY MR. GNATT                    4
6    BY MS. KEARNS                   --
7
8          E X H I B I T S
9    MARGARET HAWTHORNE CLEMMER
10   NUMBER                    PAGE
11   1   Drawing by Ms. Clemmer         11
12   2   Problems presented w/other drivers    32
13   3   Article re Veterans get White House    56
14       Work
15   4   Memo to Mr. Green from Dr. Ladner      63
16       dtd 12-3-04 re Termination
17   5   Memo to M. Clemmer from Mr. Goldstein    64
18       dtd 12-3-04 re Termination
19   6   Chronology of Events and Discussions    67
20       for Reggie Green
21
22

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 5

1    understood.  Do you understand that?
2          A    I do.
3          Q    Please give a verbal response to each
4    question so that the court reporter knows whether
5    you're saying yes or no or whatever your verbal
6    response is.  Shaking your head or nodding your head
7    or saying uh-uh or uh-huh will not do the job.
8          If you need a break at any time for any
9    reason, please say so, and we'll certainly try to
10   accommodate that, all right?
11         A    Yes.
12         Q    Please state your full name?
13         A    Margaret Hawthorne Clemmer.
14         Q    Hawthorne was your previous name before
15   getting married?
16         A    Yes.
17         Q    When did you get married?
18         A    July 31, 2004.
19         Q    What is your understanding as to who's being
20   sued in this lawsuit?
21         A    American University.
22         Q    Do you know that Benjamin Ladner is also an

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 6

1   individually-named Defendant in the lawsuit?
2   A   No.
3   Q   Well, I'm telling you that that is the case,
4   that the case is pending against both the university
5   and Dr. Ladner.  I hope you understand that you are
6   not a named party in this lawsuit.  Do you understand
7   that?
8   A   Yes.
9   Q   What is your current position with the
10  university?
11  A   Executive assistant to the president.
12  Q   Have you held that position continuously
13  without interruption since first assuming the position
14  some years ago?
15  A   Yes.
16  Q   When did you first assume the position?
17  A   December 1, of '96.
18  Q   Who was the president of the university at
19  that time?
20  A   Benjamin Ladner.
21  Q   Do you know approximately when he became the
22  president of the university?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 8

1   A   That's correct.
2   Q   Who provided you training and orientation to
3   the requirements of the job working for Dr. Ladner?
4   A   No one.
5   Q   During the time that Reginald Green worked
6   for the university, there was an employee who we've
7   seen references to by the name of Sekar, S-E-K-A-R.
8   Do you know who I'm referring to when I use that name?
9   A   I do.
10  Q   What position did she hold during that time?
11  A   Receptionist in the office of the president.
12  Q   Do you know when she separated from her
13  employment with the university?
14  A   Yes.
15  Q   When?
16  A   In July a year ago, so July of '06.
17  Q   Do you know what the circumstances were
18  surrounding her separating from the university?
19  A   She moved back to India.
20  Q   Do you know why?
21  A   No.
22  Q   During the time Mr. Green worked there, what

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 7

1   A   Nineteen-ninety-four, I think.  I'm not
2   certain of the date.
3   Q   Do you know who was your predecessor as his
4   executive assistant?
5   A   Yes.
6   Q   Who was that?
7   A   Marjorie -- I don't know the last name.
8   Q   How did she become separated from that
9   position, if you know?
10  A   Retired.
11  Q   Did you have any opportunity to overlap with
12  her and be oriented to the job by her?
13  A   No.
14  Q   Did you ever have an opportunity to compare
15  notes or share notes of experiences as the executive
16  assistant to Dr. Ladner?
17  A   No.
18  Q   What was your position immediately prior to
19  becoming executive assistant?
20  A   The assistant to Bill Bradley in the Senate.
21  Q   So you were new to the university at the
22  time?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 9

1   position did Gerri Vines hold?
2   A   Administrative assistant.
3   Q   Were you the immediate or direct supervisor
4   of both Sekar and Ms. Vines?
5   A   I am -- I was.
6   Q   There came a time when Ms. Vines no longer
7   worked in that position as administrative assistant;
8   is that correct?
9   A   That's correct.
10  Q   Do you know what position she assumed after
11  that?
12  A   I do.
13  Q   What was that?
14  A   Assistant to the dean of the Kogod School of
15  Business.
16  Q   Approximately when did that occur, if you
17  know?
18  A   It occurred in September of last year, a
19  year ago.
20  Q   Do you know what were the circumstances
21  leading to that change or surrounding that change?
22  A   With Vines?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 10

1     Q   Yes.
2     A   Yes. We reduced two positions to one,
3  consolidated.
4     Q   Can you first describe and, then, perhaps,
5  sketch the office layout when Mr. Green worked there?
6     MS. KEARNS:  I just want to object to the
7  form of the question, but you can answer that.
8     THE WITNESS:  I guess I'm not understanding
9  what you want me to say.
10    MR. GNATT:  I'd like you to describe the
11 layout of the space where you worked, where Ms. Vines
12 worked, where Sekar worked, where Mr. Green worked,
13 and where Dr. Ladner worked.
14    THE WITNESS:  Square, hallway, receptionist,
15 president, behind the receptionist in another room, my
16 desk, Gerri Vines' desk, behind the receptionist down
17 the stairs, Reggie Green.
18    MR. GNATT:  I'm going to hand you a piece of
19 paper and ask you to please do your best to sketch out
20 what you just described and sketched out with your
21 finger on the table, understanding before you even
22 begin that this will not be to scale, that you're not

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 11

1  an artist, and that you don't claim to be able to do
2  it with expertise, so with those caveats, would you
3  please attempt to do that?
4     A   The Witness draws.
5     Q   While you have the pen, would you put your
6  initials and today's date in the corner, and we'll
7  mark it as an exhibit.
8     (Plaintiff's Deposition Exhibit No. 1 was
9  marked for identification by the reporter and is
10 attached.)
11 BY MR. GNATT:
12    Q   The areas that you've shown for the various
13 employees are separated in some way by partitioned
14 walls or --
15    A   Yes.
16    Q   Describe the separation?
17    A   Dr. Ladner's office was behind the door.
18 Sekar's position was in the main hallway of the
19 president's office building, which is a house. Gerri
20 and I shared the same room, and Reggie's office was
21 down in the basement (indicating).
22    Q   Is there a bathroom within the square that

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 12

1  you've drawn?
2     A   Yes, there is.
3     Q   Can you show that on here, please?
4     A   (The Witness draws.)
5     Q   You've indicated with a little box a "BR"
6  for bathroom; is that correct?
7     A   Right.  That's not anywhere near scale.  I'm
8  just pointing to the area.
9     Q   I understand.  You mentioned a hall.  Can
10 you draw the hallway?
11    A   (The Witness draws.)  This is his door.
12    Q   Is this a solid wall here (pointing)?
13    A   Yes, this here as well (pointing).
14    Q   Would you mind making that a solid wall for
15 us?
16    A   (The Witness draws.)  This is a door here,
17 too, (drawing).
18    Q   Can you clarify for me how one accesses that
19 bathroom given that it appears to be in the middle of
20 the area that you've shown as being Gerri Vines' work
21 area?
22    A   This is a room (drawing), entering here.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 13

1     Q   From the hall?
2     A   Exactly.  There's a wall here (drawing).
3  Beyond that is a door into the restroom; beyond that
4  is a conference room (drawing).
5     Q   "CR" for conference room?
6     A   Yes.
7     Q   So, if someone comes up the stairs and wants
8  to go directly to the bathroom, do the stairs come up
9  in the area where Saker was sitting?
10    A   This is a stairwell (pointing).  Sekar's
11 back is up against the wall here (pointing).  This is
12 a stairway that comes up from the basement, comes up
13 to a hallway here (pointing).  You can go to my
14 office.  You can go out into the hallway of the
15 building of the first floor.
16    Q   Who have you worked for subsequent to
17 Dr. Ladner's departure?
18    A   Neil Kerwin.
19    Q   Describe Benjamin Ladner using as many
20 adjectives as you feel are useful in describing him.
21    MS. KEARNS:  I would object to the form of
22 that question.  If you can answer it, go ahead.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 14

1    THE WITNESS:  Detailed, strong, smart,
2   careful.
3   BY MR. GNATT:
4    **Q**   **Any others?**
5    A   Not at this moment, no.
6    **Q**   **Would you describe him as demanding?**
7    A   Yes.
8    **Q**   **Would you describe him as a perfectionist?**
9    A   Yes.
10    **Q**   **Would you describe him as fussy?**
11    MS. KEARNS:  Objection to the form of that
12   question.  If you know what fussy means.  It really
13   depends on what it means to you.
14    MR. GNATT:  Right.  These are all your
15   perceptions.
16    THE WITNESS:  Yes.
17   BY MR. GNATT:
18    **Q**   **Would you describe him as persnickety?**
19    A   No.
20    **Q**   **Would you describe him as arrogant?**
21    A   Yes.
22    **Q**   **Would you describe him as aloof?**

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 16

1   because I'm sure you have something in mind, and you
2   can ask the question, but how would one answer rank
3   and file?  Does that include the Witness?  Your
4   understanding of rank and file and hers might be at
5   odds, so you're not going to get an answer that works.
6    MR. GNATT:  That's fair enough.
7   BY MR. GNATT:
8    **Q**   **My next question was going to be:  How did**
9   **he treat you?  Why don't we ask you that, and, then,**
10   **we'll back up to the other question.**
11    A   Fairly well.
12    **Q**   **And fairly well is not as well as well or**
13   **great, so what do you mean when you say fairly well?**
14    A   Not always great.
15    **Q**   **How would you describe the ways he treated**
16   **you that you considered to be not always so great?**
17    A   Thoughtless.
18    **Q**   **Would you also use the term inconsiderate?**
19    MS. KEARNS:  I object to the form of the
20   question.  You can answer it if you can.
21    THE WITNESS:  No.
22

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 15

1    A   No.
2    **Q**   **Short tempered?**
3    A   No.
4    **Q**   **Easily annoyed?**
5    A   Yes.
6    **Q**   **Strong willed?**
7    A   Yes.
8    **Q**   **As you observed his treatment of employees,**
9   **who I will describe for the purposes of this question**
10   **as the hired help, did he treat them as hired help?**
11   **The contrast I'm trying to make is:  Did he show an**
12   **interest in them and what was going on in their lives?**
13    MS. KEARNS:  I object to the form of that
14   question.
15    MR. GNATT:  As well you should.
16    THE WITNESS:  I don't understand exactly
17   what you're asking me.
18   BY MR. GNATT:
19    **Q**   **What attitude or approach did he show to the**
20   **rank-and-file employees that worked for him and near**
21   **him and around him?**
22    MS. KEARNS:  I just want to object again,

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 17

1   BY MR. GNATT:
2    **Q**   **What do you mean by thoughtless?**
3    A   Without regard of how the statement he has
4   made might be received.
5    **Q**   **Did he display anger towards you?**
6    A   Yes.
7    **Q**   **Did he display impatience towards you?**
8    A   Yes.
9    **Q**   **What was your reaction on a personal level**
10   **to the investigation of Dr. Ladner and the allegations**
11   **of improprieties in spending and related things?**
12    MS. KEARNS:  I'm going to object both to the
13   form of the question and to the subject matter.  I'm
14   going to give you a very short leash on the issues
15   related to Dr. Ladner's separation unless you can find
16   some relationship to Reggie Green.  I also object to
17   you asking a fact witness for her opinion, but if you
18   can answer that question, you can.
19    THE WITNESS:  What was the question?
20    MR. GNATT:  Would you read it back?
21    (The previous question was read back.)
22    MS. KEARNS:  I restate my objection.  Are

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 18

1  you asking for her feelings?
2      MR. GNATT:  I think her reaction on a
3  personal level covers it for my purposes if she can
4  answer it.
5      MS. KEARNS:  If you can answer that.
6      THE WITNESS:  Dr. Ladner and AU's Board of
7  Trustees seemed to have a different point of view on
8  the proper use of university funds.
9  BY MR. GNATT:
10      Q   How did you feel personally about what was
11  swirling around Dr. Ladner?
12      MS. KEARNS:  I object to the form of the
13  question.  Go ahead.
14      THE WITNESS:  It was not personal.
15  BY MR. GNATT:
16      Q   What were your feelings about the situation
17  as the events unfolded?
18      MS. KEARNS:  Object to the form of the
19  question.
20      THE WITNESS:  Concerned.
21  BY MR. GNATT:
22      Q   Are you able to say whether you felt support

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 20

1      A   Two or three.
2      Q   Was it part of a large group of guests, or
3  were you the guest?
4      A   I wasn't the only person there -- I was the
5  only person there.
6      Q   On all of the occasions, the two or three?
7      A   Yes.
8      Q   Did you observe how Dr. Ladner interacted
9  with and treated the other employees in the office,
10  such as Sekar, Gerri Vines, anybody else within that
11  office?
12      A   I'm sorry.  Would you say it again?
13      Q   Was there anyone else working in the office
14  under your supervision besides the people we just
15  talked about?
16      A   Yes.
17      Q   Who else?
18      A   Filemon Palero.
19      Q   How do you spell his last name?
20      A   P-A-L-E-R-O.
21      Q   How do you spell his first flame?
22      A   F-I-L-E-M-O-N.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 19

1  for him or not?
2      MS. KEARNS:  I object to the form of the
3  question.
4      THE WITNESS:  No.
5  BY MR. GNATT:
6      Q   You're not able to say, or you didn't feel
7  support for him?
8      A   I didn't feel support for him.
9      Q   Have you had any contact with Dr. Ladner
10  since he left the position?
11      MS. KEARNS:  You mean since he was
12  terminated?  When you say left the position --
13      MR. GNATT:  Yes.
14      THE WITNESS:  No.
15  BY MR. GNATT:
16      Q   While the two of you worked together, did
17  you have any occasions for socializing outside of the
18  workplace?
19      A   Yes.
20      Q   Were you a guest at his Gibson Island home?
21      A   Yes.
22      Q   On how many occasions?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 21

1      Q   What was his position?
2      A   Systems administrator.
3      Q   Did he typically go by Phil?
4      A   Yes.
5      Q   By systems administrator, what do you mean
6  generally?
7      A   He managed the computer equipment that was
8  used in the office of the president.
9      Q   Did you have occasion to observe how
10  Dr. Ladner interacted with and treated Phil?
11      A   Yes.
12      Q   How would you describe that?
13      MS. KEARNS:  I want to object to the form of
14  the question, but you can answer it.
15      THE WITNESS:  Needing a speedy response.
16  BY MR. GNATT:
17      Q   Is it accurate to say that you observed
18  certain amounts of impatience in the way that
19  Dr. Ladner interacted with Phil given his need for a
20  speedy response.
21      A   Yes.
22      Q   What, if any, observations did you make

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 22

1  about how Dr. Ladner interacted with and/or treated
2  Sekar?
3      A   Yes.
4      Q   What were those observations?
5      A   Saker was treated in very high regard both
6  for her capabilities and her personality.
7      Q   Same question with respect to Gerri Vines?
8      A   Not as interactive, but not impatient.
9      Q   Do you know the date that you --
10     MS. KEARNS:  Don't ask a question because
11  she wants to ask me a question.
12     (Discussion off the record by Witness and
13  attorney.)
14     MS. KEARNS:  You can say that as a
15  clarification.  She has a clarification.
16     THE WITNESS:  Gerri Vines interacted with
17  Dr. Ladner pretty much only when I wasn't there, so I
18  don't have any real direct knowledge of how he treated
19  her.
20  BY MR. GNATT:
21     Q   Do you know the date when you first
22  interviewed Reggie Green?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 24

1  together, you and Mary Hentschel together?
2      A   Yes.
3      Q   I've seen in the documents reference to the
4  position that Mr. Green was hired into, reporting to
5  you as the executive assistant to the president, along
6  with an administrative assistant, a receptionist, a
7  senior staff assistant, and an E-support analyst.  Is
8  the E-support analyst position the position held by
9  Phil?
10     A   Yes.
11     Q   Was there a senior staff assistant as well?
12     A   I don't understand your question.
13     Q   Are you familiar with a position description
14  that states that Mr. Green's position reported to you
15  as the executive assistant to the president, as well
16  as reporting to you, an administrative assistant, a
17  receptionist, a senior staff, and an E-support
18  analyst?
19     A   Report to?
20     MS. KEARNS:  The question is:  Are you
21  familiar with a document that says that?
22     THE WITNESS:  No.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 23

1      A   No.
2      Q   Did you interview him on one or more than
3  one occasion?
4      A   Two, I think.
5      Q   What was your role in the hiring process,
6  and what was the role of Mary Hentschel?
7      MS. KEARNS:  Object to the compound
8  question, but you can answer it.
9      THE WITNESS:  Mary Hentschel was the human
10  resources hiring person.  I don't know quite what
11  title she had, but -- and I was the first-line
12  supervisor.
13  BY MR. GNATT:
14     Q   As the first line supervisor, what was your
15  role either in its own right or relative to Mary
16  Hentschel?  How did the two of you share that role?
17     A   For hiring?
18     Q   Yes.
19     A   We both had asked questions during an
20  interview process.  She had gathered resumes.
21     Q   The interview process that you're
22  describing, at least on one occasion, occurred

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 25

1  BY MR. GNATT:
2      Q   Was there a senior staff assistant in the
3  office of the president while Mr. Green worked there?
4      A   Yes.
5      Q   Who was that?
6      A   Sally Ekfelt.
7      Q   She was assigned specifically to Nancy
8  Ladner as her assistant; is that correct?
9      A   Partially.
10     Q   Explain Sally Ekfelt's assignment, please.
11     A   She's also responsible for maintaining the
12  president's home and all that goes with that.
13     Q   Are you familiar with a document referred to
14  as the responsibilities of the driver?
15     A   Yes.
16     Q   And are you familiar with a statement in
17  that document that the driver should have a working
18  knowledge of other cities such as Philadelphia and New
19  York, that that's needed?
20     A   Yes.
21     Q   You also acknowledge that it indicates that
22  it is acceptable if that knowledge is lesser than that

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 26

1  of the knowledge of D.C.?
2     MS. KEARNS: I'm sorry. I object to the
3  form of that question. Are you asking if it's her
4  memory that that's what the document says?
5     MR. GNATT: I'm asking her if she
6  acknowledges what the document says.
7     MS. KEARNS: Shouldn't we put the document
8  in front of her?
9     MR. GNATT: We could. I'd like her to
10  answer the question first.
11  BY MR. GNATT:
12     Q   Are you familiar with those parts of the
13  document?
14     A   I'm not sure. I don't recall.
15     Q   Do you know yourself whether Mr. Green, when
16  he was hired, had a working knowledge of Philadelphia?
17     A   Yes.
18     Q   Did he?
19     A   Yes.
20     Q   Has anything that you learned during the
21  time he was employed for the university given you an
22  impression otherwise?

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 28

1     Q   Am I correct in assuming that, during the
2  interviewing process, you made some judgment about his
3  knowledge of VIP protocol?
4     A   Yes.
5     Q   Did you discuss specifics about VIP protocol
6  during the interviewing process?
7     A   I don't recall.
8     Q   Specifically, did you discuss, as mentioned
9  in the responsibilities of the driver document,
10  opening car doors?
11     A   Yes.
12     Q   Did you discuss the use of umbrellas?
13     A   Yes.
14     Q   Did you discuss the handling of luggage?
15     A   Yes.
16     Q   And, overall, what assessment did you make
17  about Mr. Green's knowledge of VIP protocol?
18     A   He had the knowledge.
19     Q   Were there issues relating to any of those
20  three VIP protocols that arose during Mr. Green's
21  employment, to your knowledge?
22     A   And the three are?

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 27

1     A   Yes.
2     Q   What is your impression otherwise?
3     A   That he didn't know Philadelphia very well.
4     Q   Did it become your impression that Mr. Green
5  had no working knowledge of Philadelphia?
6     A   No.
7     Q   Was your impression that he had some working
8  knowledge of Philadelphia?
9     A   When?
10     Q   At any point that you formed an impression
11  while he worked for American University.
12     A   Yes.
13     Q   Was it your impression that he had some
14  working knowledge, albeit less than his working
15  knowledge of D.C.?
16     A   Yes.
17     Q   During the interviewing process, am I
18  correct in assuming you assessed Mr. Green's
19  interpersonal and communication skills?
20     A   Yes.
21     Q   And what was your assessment?
22     A   They were fine.

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 29

1     Q   Opening car doors, use of umbrellas, and
2  handling of luggage?
3     A   I don't recall an issue.
4     Q   Were there issues relating to any other VIP
5  protocols not specifically listed that arose during
6  Mr. Green's employment, to your knowledge?
7     A   Yes.
8     Q   What were those?
9     A   I was told that he approached Mrs. Ladner in
10  an airport greeting her similarly to a family member,
11  hugging her and telling her that he missed her.
12     Q   By whom were you told that?
13     A   By Dr. Ladner and later by Nancy Ladner.
14     Q   Did Dr. Ladner tell you how he had become
15  aware of it?
16     A   Mrs. Ladner had told him.
17     Q   What, if anything, do you know about the
18  context in which that came up between Nancy and
19  Benjamin Ladner?
20     A   No idea.
21     Q   In what context did it come up between
22  Benjamin Ladner and you?

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 30

1    A   Either face to face or on the phone -- face
2  to face, I think.
3    Q   When I say context, I mean what else was
4  going on?  Did it come up as a standalone item?  Was
5  it in the context of a broader discussion, and, if so,
6  about what?
7    MS. KEARNS:  Object to the form of the
8  question.  You can answer that.
9    THE WITNESS:  It was -- the conversation was
10  about Reggie and performance issues as they had
11  accrued at that point.
12  BY MR. GNATT:
13    Q   So this hugging greeting issue was not
14  raised by Dr. Ladner with you as a standalone?
15    A   No.
16    Q   To the best of your memory, how did
17  Dr. Ladner describe the conduct that you're bringing
18  up?
19    A   He said it was inappropriate.
20    Q   But how did he describe the conduct itself?
21  What did he say happened?
22    A   Specifically, I certainly couldn't answer

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 32

1    Q   You didn't observe him actually engaged in
2  the details and the cleaning process?
3    A   Not that I recall.
4    Q   That was normally supposed to take place at
5  the residence?
6    A   That's correct, it may have been wiped down
7  in the parking lot at work.  That was a common
8  occurrence.
9    Q   You're familiar with the document that's
10  titled "For conversation with Reggie"?
11    A   I think.
12    MR. GNATT:  Mark this, please.
13    (Plaintiff's Deposition Exhibit No. 2 was
14  marked for identification by the reporter and is
15  attached.)
16  BY MR. GNATT:
17    Q   That was Plaintiff, Reggie Green's,
18  Deposition Exhibit 11.  Now, when was this prepared,
19  if you know?
20    A   Around the time -- just before the time that
21  Reggie was hired.
22    Q   Was it prepared after the previous driver

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 31

1  what the words were exactly.  The basic message was
2  the driver has no reason to treat him or his wife as a
3  family member and hug them upon arrival at an airport,
4  that it was unprofessional demeanor.
5    Q   Did you ever ride in a vehicle driven by
6  Mr. Green on the job?
7    A   I don't recall.
8    Q   Do you believe that you have any first-hand
9  observations about his driving?
10    A   My observations?
11    Q   Yes.
12    A   No.
13    Q   Did you make any first-hand observations
14  about the care taken by Mr. Green of the president's
15  vehicle?
16    A   Yes.
17    Q   What were those observations?
18    A   He kept the car meticulously clean.
19    Q   You observed the car in that meticulously
20  clean condition?  That's your first-hand observation;
21  is that correct?
22    A   That's correct.

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 33

1  was gone?
2    A   Yes.
3    MR. GNATT:  Let's go off the record for just
4  a second.
5    (Mr. Green leaves the deposition.)
6    MR. GNATT:  Back on the record.
7    Mr. Green had to leave, so he has now
8  departed from the room.
9  BY MR. GNATT:
10    Q   By whom was that document prepared?
11    A   Me.
12    Q   Whose idea was it to prepare such a
13  document?
14    A   Dr. Ladner.
15    Q   What did he say to you about that idea of
16  preparing such a document?
17    A   He wanted to gather the mistakes made by
18  previous drivers as just a guideline of things that
19  had gotten previous drivers into problems so to avoid
20  the pitfalls sort of thing.
21    Q   What did he want that document to be used
22  for?

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 34

1  A  Just in conversation as we oriented Reggie
2  to his job.
3  Q  After he was on board?
4  A  Yes.
5  Q  Were Dr. Ladner's ideas expressed after
6  selection had been made, the offer had been made, to
7  Reggie Green?
8  A  I don't remember.
9  Q  Because it says "For Conversation with
10  Reggie." It doesn't say For Conversation with Driver
11  to be Hired or anything more generic like that, so can
12  you recall if, at the inception, Reggie was already
13  hired?
14  A  That's not correct. The document was
15  prepared, minus the descriptor, for conversation with
16  Reggie. When that conversation was over, he asked for
17  a copy of it, and I made a point once again, as I had
18  done in the conversation of reminding him, that these
19  were not any grievances about him or problems. They
20  were -- well, they were problems that had occurred in
21  the past, so it was given to him for informational
22  purposes, and when he asked for a copy of it, it

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 35

1  concerned me, that without putting a description on
2  it, so I typed the top version of the cover and title
3  and the first paragraph at that point, before I gave
4  it to him.
5  Q  So it was prepared without that on it, but
6  it was prepared with Reggie Green in mind?
7  A  No. It was prepared with a driver in mind.
8  Q  After Reggie Green had been hired or before
9  Reggie Green had been hired?
10  A  Before.
11  Q  Who wrote or composed the actual written
12  words that go with each bullet?
13  A  It was a combination of Dr. Ladner and I.
14  He had the final edit.
15  Q  Did you have the first shot at it?
16  A  Yes.
17  Q  Did you refer to any source documents for
18  any of the words that were used, any written
19  documents?
20  A  Sure, my notes.
21  Q  To your knowledge, was this the first time
22  any such document had been put together and used with

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 36

1  a driver?
2  A  Yes.
3  Q  Who was the next person employed by the
4  university to provide a driver, slash, staff assistant
5  services to the president after Mr. Green?
6  A  I don't recall the two parts to the title,
7  but it was Steven Price, was the next driver.
8  Q  Approximately when was he hired, and when
9  did he start?
10  A  Somewhere in the spring of '05.
11  Q  In the interim, between December of '04 and
12  the spring of '05, how were these driver services
13  provided to Dr. Ladner?
14  A  Carey Limousine, for the most part.
15  Q  Were you or was the university actively
16  trying to fill the position during those several
17  months?
18  A  Yes.
19  Q  Was a document of the same type as this
20  Exhibit 2 shared with or provided to Steven Price?
21  A  I don't recall. Probably, but I don't
22  recall.

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 37

1  Q  Were any items added to that form of
2  document to reflect issues that had arisen with
3  Mr. Green during his tenure which were not already
4  added?
5  A  I'll need to read it.
6      No, I don't recall anything being added to
7  it.
8  Q  Are there any issues or items that you feel
9  should be added because they're not reflected in there
10  and because they were issues that arose with
11  Mr. Green, assuming that you were engaged in that
12  process?
13      MR. RYAN: I have to object to the form of
14  the question, but you can answer.
15      THE WITNESS: Please ask it to me again.
16  I'm not quite sure I understand.
17  BY MR. GNATT:
18  Q  Based on your knowledge of the issues that
19  arose during Mr. Green's employment with the
20  university, are those issues covered by the existing
21  bullets on that document, or are there issues that
22  arose that are not covered?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 38

1    A    I'm not certain.
2    Q    Is that because you're not personally
3  familiar with each and every issue that arose during
4  his employ?
5    A    Yes.
6    Q    There's a bullet on there that says "no
7  tailgating." Do you see that?
8    A    Yes.
9    Q    Can you describe what prompted the inclusion
10  of that item?
11    A    That item came from Dr. Ladner.
12    Q    Beyond that, do you have any insight into
13  where it came from, meaning what was it about it that
14  was an issue for Dr. Ladner?
15    A    It's the kind of thing that Dr. Ladner would
16  not want a driver to demonstrate, so it was -- I
17  wasn't in the car. It was articulated, and that had
18  been articulated about previous drivers, the style of
19  driving too close.
20    Q    Dr. Ladner verbally articulated that issue
21  or concern to you about prior drivers?
22    A    Yes.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 39

1    Q    But you yourself didn't include it in your
2  first cut at this document?
3    A    Oh, I did.
4    Q    So you included it based on prior
5  articulations by Dr. Ladner?
6    A    Yes.
7    Q    What more do you remember about how
8  Dr. Ladner articulated that concern to you that led
9  you to include it?
10    A    I don't remember a specific example.
11    Q    There's also one that says "never told him
12  to only use main roads and not side streets." Do you
13  see that one?
14    A    Yes.
15    Q    Who is "him"?
16    A    Jeff Madden.
17    Q    Who composed that bullet or included it in
18  the document in the first instance?
19    A    Me.
20    Q    And the language sounds like it's taken from
21  some written memo of some sort; is that correct? Can
22  you explain the wording of that bullet?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 40

1    A    That's Dr. Ladner's wording, that he said to
2  me I never told him to only use the main roads.
3    Q    What do you recall about that whole
4  situation with Jeff Madden and main roads versus side
5  streets?
6    A    The main roads versus side streets was just
7  quickness of getting from one point to another and not
8  sort of touring the countryside.
9    Q    So there's a preference on the part of
10  Dr. Ladner for getting there as soon as possible; is
11  that correct?
12    A    Yes.
13    Q    And, in general, he would expect that that
14  would be best accomplished by using main roads, but
15  not to the exclusion of side streets; is that a fair
16  way of characterizing it?
17    A    That's correct.
18    Q    Did Jeff Madden at some point protest and
19  say he told me only to use main roads?
20    A    Yes.
21    Q    Can you describe that situation?
22    A    That came from a conversation that I had

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 41

1  with Dr. Ladner about Jeff Madden's performance, and
2  Jeff's response -- Jeff was sometimes accused of not
3  knowing where he was going and getting lost on side
4  streets, so Jeff's response to me was, Meg, Dr. Ladner
5  told me not to take side streets. That's why I stayed
6  on the main roads.
7    Q    So he was saying Dr. Ladner can't be right
8  about accusing me of getting lost on side streets; I
9  didn't even take side streets; he told me I should
10  only take main roads?
11    A    Right.
12    Q    Dr. Ladner said that's not true; I never
13  tell him to use main roads; so when he says that,
14  that's false?
15    A    Correct.
16    Q    How long did Jeff Madden work in that
17  position?
18    A    I don't recall. Over a year. I'm sure
19  more. I don't recall.
20    Q    Can you trace for me who held the position
21  from the time you became executive assistant to the
22  present?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 42

1    A    Uh-huh.  Val Gidda, V-A-L, G-I-D-D-A.
2    Q    If you can put some approximate dates, a
3    date range on it, years even would be good enough?
4    A    I'm really not sure.
5    Q    Or even an estimate or guesstimate of how
6    many years?
7        MS. KEARNS:  Object to the form of the
8    question.  You're not supposed to guess, but what's
9    your best memory?
10       THE WITNESS:  Less than a year.
11       Next was James Person, and I think he was
12   there over three years.  After James was Jeff Madden,
13   and after Jeff Madden was Reggie.
14   BY MR. GNATT:
15   Q    You said that after Reggie was Steven Price?
16   A    Right.
17   Q    As of approximately the spring of 2005, was
18   there anybody else since?
19   A    That held the position of driver?
20   Q    Yes.
21   A    No.
22   Q    Does Steven Price currently hold the

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 44

1    A    Several.  The crowning event was missing --
2    getting Dr. Ladner -- missing getting Dr. Ladner and
3    Mrs. Ladner to an evening event by not knowing where
4    he was going, not having the address, driving as if he
5    did have the address, and getting lost.
6    Q    As a result, they missed the event entirely?
7    A    No.  I think they were way late.
8        MS. KEARNS:  Do you want to take a break?
9        THE WITNESS:  Yes.
10       (Brief recess.)
11       MR. GNATT:  Back on the record, please.
12   BY MR. GNATT:
13   Q    When you interviewed Reggie Green, did you
14   ask him if he was a smoker?
15   A    I think so.
16   Q    What was his response?
17   A    No.
18   Q    Approximately how long had Mr. Green been on
19   the job when you had this discussion with him about
20   the items on Exhibit 2?
21   A    I prepared a pretty detailed chronology at
22   the time that the EEOC complaint was filed, so dates

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 43

1    position?
2    A    No.
3    Q    Does anybody?
4    A    Steven Price is now a transportation
5    specialist who drives for the president upon request.
6    Q    Do you know the circumstances surrounding
7    the separation of Val Gidda from his job?
8    A    Yes.
9    Q    What were they?
10   A    Apparently, he threw a barrage of profanity
11   at a woman who worked in the residence.
12   Q    The same question for James Person?
13   A    James Person retired.
14   Q    How about Jeff Madden?
15   A    Jeff Madden was terminated.
16   Q    During his probationary period or after?
17   A    After.
18   Q    About how long did he work there?
19   A    I think, three years.  You said Jeff Madden,
20   correct?
21   Q    Right.  What were the reasons for his
22   involuntary termination?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 45

1    and things are in that.  I have not committed them to
2    memory.  I don't know.
3    Q    What do you remember about the discussion,
4    if any, with Mr. Green about the bulleted item that
5    has a handwritten asterisk near it about bathroom
6    stops?
7    A    When I reviewed this list of items with
8    Reggie, when we got to that particular item, I told
9    him that Dr. Ladner had reacted strongly to Jeff
10   Madden, who was a smoker, for taking multiple stops on
11   a return trip from New York so that he could smoke.
12   Mrs. Ladner was acutely allergic to smoke, so coming
13   back in the car wreaking of cigarettes attacked her
14   allergies, and Jeff was using I need to go to the
15   bathroom for the excuse to smoke I was told.
16   Q    You were told by whom?
17   A    Dr. Ladner.
18   Q    When were you told that?
19   A    About Jeff?
20   Q    Yes.
21   A    After several -- I was told it several times
22   after several trips.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 46

1    Q    While Jeff was still employed?
2    A    Yes.
3    Q    What did Dr. Ladner want you to do about it
4    with Jeff?
5    A    Dr. Ladner did not want Jeff smelling of
6    smoke when he got into the car to drive, so that
7    was -- he was not to smell of smoke.
8    Q    So that was the issue for Dr. Ladner about
9    Jeff and the stops that Jeff was making, that
10   Dr. Ladner did not want the car to smell of smoke?
11   A    That's part of it, yes.
12   Q    Well, what is the other part?
13   A    The other part is it took time out of the
14   travel from one point to another.
15   Q    The stopping took time?
16   A    Right.
17   Q    And Dr. Ladner did not like stopping on
18   trips; is that correct?
19   A    No, that's not right.
20   Q    He preferred zero bathroom stops?
21       MR. RYAN:  Object to the form of the
22   question.  I don't think he finished his question.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 47

1    BY MR. GNATT:
2    Q    He preferred zero stops; isn't that correct?
3        MS. KEARNS:  To?
4        MR. GNATT:  I did finish my question.
5        THE WITNESS:  Now, I'm confused.  I'm
6    sorry -- no.
7    BY MR. GNATT:
8    Q    Dr. Ladner preferred zero stops on trips,
9    did he not?
10   A    When possible, yes.
11   Q    That's what it says right there, doesn't it?
12   A    Yes.
13   Q    Because of the time that it took away from
14   the travel?
15   A    With respect to Jeff Madden.
16   Q    I'm not asking with respect to Jeff Madden.
17   A    The whole entry in this list was with
18   respect --
19   Q    That's not my question.  You said there were
20   two concerns with Jeff Madden.  One was Dr. Ladner did
21   not want to smell of smoke in the car?
22   A    Right.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 48

1    Q    And, then, you said that the other concern
2    with Jeff was that the stops took time out of the
3    travel?
4    A    That's correct.
5    Q    And that is a concern of Dr. Ladner's
6    irrespective of who's the driver, even a nonsmoking
7    driver?  That's a concern of Dr. Ladner's, is it not?
8    A    Yes.
9    Q    During the interview process, do you recall
10   either you or Mary Hentschel telling Mr. Green
11   verbally what was the length of time for the
12   probationary period at American University?
13   A    It was articulated by Mary Hentschel in the
14   interview.
15   Q    Verbally?
16   A    Yes.
17   Q    What did you hear her tell Mr. Green about
18   that?
19   A    I don't remember the specifics, but what she
20   told him was there was a four-month probationary
21   period for all new employees.
22   Q    During the interview process, what, if

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 49

1    anything, did you and Mr. Green and Mary Hentschel
2    discuss about any medical conditions of Mr. Green?
3    A    During the interview?
4    Q    Yes.
5    A    Nothing.
6    Q    That's true whether it was one or two
7    interviews?
8    A    That's right.
9    Q    It didn't come up?
10   A    Correct.
11   Q    Mr. Green was required to submit to a
12   medical examination before being officially hired; is
13   that correct?
14   A    Yes.
15   Q    Did you see the written report of his
16   medical examination at or about the time that he was
17   being hired?
18   A    No.
19   Q    Have you ever seen it?
20   A    No.
21   Q    Not even as of today?
22   A    No.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 50

1  **Q   Did there come a time when you became aware**
2  **of a condition of Mr. Green's that I will refer to as**
3  **fecal urgency?**
4  A   I've never heard the term.
5  **Q   Until just now?**
6  A   Right, till the context of this.
7  **Q   So you've heard the term in the context of**
8  **the pending lawsuit?**
9  A   Correct.
10  **Q   And did you hear it in the context of the**
11  **pending earlier complaint filed with the D.C. Human**
12  **Rights Office?**
13  A   Not that I recall.
14  **Q   Or EEOC, if you will?**
15  A   Not that I recall.
16  **Q   As I had worded my question, I indicated I**
17  **would refer to the condition as fecal urgency.**
18  **Putting aside those exact words, by focusing on the**
19  **condition that those words are intended to describe,**
20  **did there come a time when you became aware of**
21  **Mr. Green having such a condition?**
22  A   To be perfectly honest, I don't know what

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 51

1  the definition of the condition is. I don't know what
2  fecal urgency means.
3  **Q   I am referring to a condition in which one**
4  **feels an urgent need to move one's bowels, to use the**
5  **bathroom for defecation, and that the sensation of**
6  **urgency is there and creates the urgent need to move**
7  **your bowels or use the bathroom?**
8  A   I never heard anything about that at all.
9  **Q   So it was never brought up by Mr. Green to**
10  **you --**
11  A   Let me circle back one second. Before the
12  Philadelphia trip, he said to me that he was concerned
13  because he might have to use the bathroom. There was
14  no description of what going to the bathroom meant in
15  any way, and he reiterated this point that you have
16  starred here, and I said, Reggie, as I told you
17  before, that relates to Jeff Madden stopping and
18  having a cigarette, so that really -- if you don't
19  smoke, that's not an issue, so he continued to be
20  concerned, and I didn't want him to worry, so I said,
21  look, if it will make you feel better, I'll talk to
22  Dr. Ladner and make sure, if you need to go to the

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 52

1  bathroom, you can stop, and I did exactly that. I
2  went in and asked Mr. Ladner that, and he said you
3  know that was the problem with Jeff Madden. He said
4  Reggie is not a smoker. If it's an issue for him, of
5  course he can go to the bathroom. There was never any
6  description of what going to the bathroom meant in any
7  form or fashion, and that's the only time the
8  conversation was had.
9  **Q   So, for all you knew, we're talking about an**
10  **enlarged prostate and a need to urinate urgently or**
11  **feeling like one needs to?**
12  A   Yes.
13  **Q   About how long before the departure date for**
14  **Philadelphia did this first come up?**
15  A   It was sometime in that week. I don't
16  remember the exact date, and I'm sure it's noted on
17  the chronology. I'm really not comfortable telling
18  you when things happened when I know the document
19  records my knowledge at the time.
20  **Q   Had you ever heard Reggie Green discussing**
21  **or talking about bathroom issues of any kind with**
22  **Saker or Gerri Vines?**

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 53

1  A   No.
2  **Q   How about with Philmon Palero?**
3  A   No.
4  **Q   And he had not discussed bathroom issues of**
5  **any kind with you?**
6  A   Correct.
7  **Q   Was there ever any discussion prior to the**
8  **week before the Philadelphia trip or thereabouts about**
9  **Reggie Green's need to have access to a bathroom? For**
10  **a period of time while Reggie Green worked there, he**
11  **had a cast on one of his legs; is that correct?**
12  A   Yes.
13  **Q   And his assigned office was in the**
14  **downstairs' area?**
15  A   That's correct.
16  **Q   And what bathroom would he normally be**
17  **expected to use while in the office area?**
18  A   There was no expectation of where he would
19  go to the bathroom. There was one bathroom on the
20  first floor and two bathrooms on the second floor.
21  None were assigned to anyone. They could use anyone
22  that they chose.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 54

1    Q   The first floor being the floor you
2  diagrammed for us?
3    A   Yes.
4    Q   Were there any bathrooms on the ground
5  floor?
6    A   There were not.
7    Q   You say there was one on the first floor?
8    A   Correct.
9    Q   And that's the one in your diagram?
10   A   Correct.
11   Q   And two additional ones, one up from your
12  floor?
13   A   That's correct.
14   Q   Two flights up from where his office was?
15   A   That's correct.
16   Q   Was there an elevator?
17   A   No.
18   Q   This is a converted residence?
19   A   Correct.
20   Q   So do you recall any discussion about any
21  difficulty that Reggie Green had, given his cast, in
22  negotiating the stairs to use the bathroom that's up a

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 55

1  flight of stairs?
2    A   No.  There was -- I offered Reggie the
3  opportunity on several occasions to locate on the same
4  floor as me so that he would not have to traverse the
5  stairs.
6    Q   For any reason?
7    A   Right.  And that's also in my chronology.  I
8  was concerned.  Dr. Ladner was concerned.  He walked
9  in the first day with a cast on.  Of course, you feel
10  sorry for that, and I am an extremely accommodating
11  person.
12   Q   Is it your testimony that none of the
13  discussion about relocating to the first floor ever
14  took place in the context of access to or use of a
15  bathroom?
16   A   If it was said, it was minor.  I don't
17  recall anything related to that.  If it was said, it
18  might have been something like you'd be -- you
19  wouldn't have to come upstairs to go to the bathroom,
20  but I don't recall specifically saying anything.
21   Q   When you went to Dr. Ladner on behalf of
22  Mr. Green in anticipation of the trip to Philadelphia

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 56

1  and Mr. Green's concern about being able to stop to
2  use the bathroom, did Dr. Ladner ask anything about,
3  well, what's his problem, what's the need, or what's
4  the issue?
5    A   No.  I articulated the conversation.  It was
6  very brief.  Reggie's concerned about this; Dr. Ladner
7  said, Meg, that related to Jeff Madden; if Reggie
8  needs to go to the bathroom, he needs to go to the
9  bathroom; of course, we can stop.  That was the whole
10  question and response.
11      MR. GNATT:  Mark this, please.
12      (Plaintiff's Deposition Exhibit No. 3 was
13  marked for identification by the reporter and is
14  attached.)
15  BY MR. GNATT:
16   Q   Did you ever see this Exhibit 3 prior to any
17  EEOC or D.C. Human Rights filings or lawsuit filing?
18   A   I've never seen it until right this minute.
19   Q   I gather, in your testimony.  That the
20  driver position into which Mr. Green was hired was
21  vacant as of June, July, or around August of 2004?
22   A   Yes.  I don't remember exactly when Jeff

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 57

1  Madden left, but after Jeff Madden left until Reggie
2  was hired, we didn't have a driver.
3    Q   And you were actively recruiting and trying
4  to hire someone into the position during that period
5  of vacancy?
6    A   As I recall, yes.
7    Q   Do you agree or disagree with this
8  statement:  "Reggie Green received no written document
9  expressing concerns about his driving style while
10  employed by American University"?
11      MS. KEARNS:  I object to the form of the
12  question, but you can answer that.
13      THE WITNESS:  Not that I recall.
14  BY MR. GNATT:
15   Q   Do you agree that, while Reggie Green was
16  employed by American University, he received no
17  written document expressing concerns about his job
18  performance?
19   A   No written.
20   Q   Did you have any conversation or discussion
21  with Dr. Ladner in which Dr. Ladner described for you
22  any aspect of the return trip to Washington from

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 58

1  Philadelphia on December 2, 2004?
2      A   Do I recall -- I need the first part of the
3  question again.  I remember the last, but not the
4  first.
5          MS. KEARNS:  Did Dr. Ladner tell you about
6  the return trip from Philadelphia?  Is that the gist
7  of it?
8          THE WITNESS:  Yes.
9  BY MR. GNATT:
10     Q   What did he tell you?
11     A   He described the incident where Reggie had
12  dropped off he and Al Checcio at the restaurant --
13     Q   Time out.  I'm sorry to interrupt you, but I
14  want to be sure you're clear on what I'm asking.  I'm
15  only talking about the return trip, when they're done
16  in Philadelphia, they're on their way back to
17  Washington, just that piece.
18     A   He talked about Reggie not maintaining a
19  single speed, speeding up and slowing down a lot,
20  rocking back and forth as he was driving, muttering to
21  other drivers.  That's what I remember.
22     Q   When did you have this conversation in

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 60

1      A   Well, that was the point where he had made
2  the determination to let him go.
3      Q   Well, what did he say, is what I'm asking?
4      A   I want to fire him, I believe was his word,
5  and he was concerned -- actually, there was a
6  follow-up statement.  He was concerned about safety.
7  He said I think it's an issue of safety.
8      Q   Tell me anything else you remember that he
9  said and that you said at that point in the
10  conversation?
11     A   I don't recall anything in my memory.  I
12  know I probably have extensive notes in the
13  chronology, but I don't remember off the top of my
14  head exactly what transpired in the conversation we
15  had.
16     Q   In that conversation, did Dr. Ladner say
17  anything about whether they had made a stop for
18  Mr. Green to use the bathroom?
19     A   No.
20     Q   The hotel that Dr. Ladner stayed at in
21  Philadelphia was the Four Seasons Hotel; is that
22  correct?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 59

1  relation to the return?  They got back from the trip
2  December 27th.  Do you know approximately what time
3  they arrived back?
4      A   I don't, and I don't remember if the
5  conversation happened that day or the next morning
6  with Dr. Ladner.
7      Q   You think it was no later than the next day?
8      A   Correct.
9      Q   Tell me everything else you can remember
10  about that conversation with Dr. Ladner either before
11  the things you just mentioned or after or both.
12     A   So in totality?
13     Q   Yes.
14     A   I started to describe Reggie getting lost on
15  the way into Philadelphia.  Reggie was unaware where
16  to pick Dr. Ladner and Al Checcio up at the restaurant
17  that he dropped them off at, not using the GPS system
18  in the car, which was to ensure that he didn't get
19  lost.
20     Q   So those are the things on the list that
21  were discussed.  Then, what was the rest of the
22  conversation, if anything?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 61

1      A   Yes.
2      Q   Did there come a time when you faxed
3  directions to that hotel to be used by Mr. Green?
4      A   I don't recall.
5      Q   Do you have any first-hand knowledge as to
6  whether or not Mr. Green used the GPS system during
7  the trip to Philadelphia and back?
8      A   No firsthand knowledge.
9      Q   Do you have any first-hand knowledge as to
10  whether he used that system before departing on the
11  trip to Philadelphia?
12     A   No.
13     Q   What was your response to Dr. Ladner when he
14  said words to the effect of I want to fire him and
15  went on to say that he thinks it's become an issue of
16  safety?  What was your response?
17     A   I think I must have said yes or okay.
18     Q   Was there any discussion between the two of
19  you about whether this would be a termination that
20  occurred during Mr. Green's probationary period?
21     A   Yes.
22     Q   You think you had that discussion with

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 62

1  Dr. Ladner?
2      A   I think that -- I think we knew it was the
3  end of his probationary period.  How and why, I'm not
4  certain I knew for sure that it was the end of his
5  probationary period.
6      Q   When you say that it was the end, had you
7  calculated what the ending date was?
8      A   It's four months from the date of hire, so
9  It's obvious when it is.  Calculate wouldn't be an
10 accurate description.  I knew when it was.
11     Q   Were you aware that it was coming soon, the
12 end was soon?
13     A   Yes.
14     Q   As far as you are concerned, who made the
15 decision to terminate Mr. Green's employment?
16     A   Dr. Ladner.
17     Q   Other than what you've already described,
18 did you have any say in the matter?
19     A   No.
20     Q   Other than what you've already described,
21 did you have anymore discussions with Dr. Ladner about
22 it?

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 64

1      Q   Who composed the words that are contained in
2  that exhibit "you have not been able to meet the
3  expectations for this position," if you know?
4      A   I don't know.
5      MR. GNATT:  Mark this.
6      (Plaintiff's Deposition Exhibit No. 5 was
7  marked for identification by the reporter and is
8  attached.)
9  BY MR. GNATT:
10     Q   You're looking at Exhibit 5, which also has
11 a Bates stamp notation at the bottom, AU 0077, and
12 attached, I believe, is 0078.  That's from Roberta
13 Goldstein in Employee Relations attaching the
14 termination memo that Beth asked Roberta to send to
15 you; is that correct?
16     A   Yes.
17     Q   That's the Beth that you were mentioning a
18 moment ago?
19     A   Yes.
20     Q   Does anything about this Exhibit 5 suggest
21 to you that Roberta Goldstein, rather than Beth, may
22 have composed the letter?

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 63

1      A   Not that I recall.
2      MR. GNATT:  Mark this, please.
3      (Plaintiff's Deposition Exhibit No. 4 was
4  marked for identification by the reporter and is
5  attached.)
6  BY MR. GNATT:
7      Q   Looking at Exhibit 4, can you describe what
8  that is?
9      A   It's the termination notice to Reggie Green
10 from Dr. Ladner.
11     Q   Who composed that letter?
12     A   Initially, HR.
13     Q   Do you know who in particular?
14     A   I think Beth Muha, who's the executive
15 director.  I'm not certain.
16     Q   How do you spell her last name?
17     A   M-U-H-A.
18     Q   In the past, when a driver had been
19 terminated such as Jeff, was Human Resources the
20 source of the initial language for the termination
21 letter?
22     A   Yes, as I recall, yes.

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 65

1      A   I have no idea who wrote it.
2      Q   Do you know what the relationship is within
3  that office in terms of who's responsible for what
4  between Roberta Goldstein and Beth?
5      A   I don't know reporting structure or titles
6  or anything.
7      Q   Or responsibilities for that sort of thing?
8      A   Correct.
9      Q   What information was furnished to Employee
10 Relations, Human Resources, Roberta Goldstein, and/or
11 Beth to enable them to compose the letter, if you
12 know?
13     A   Would you ask me again?
14     Q   What information, if any, if you know, was
15 furnished to Human Resources or Employee Relations or
16 Roberta Goldstein or Beth for the purposes of their
17 initially composing a termination letter?
18     A   I think that I called Beth.  I think that's
19 how I initiated it with Human Resources and talked it
20 over with her and told her we wanted to terminate
21 Reggie, talked to her about the things Dr. Ladner
22 talked with me about, and she -- I don't even recall

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 66

1   that Roberta Goldstein is the one that sent me the
2   draft, so I don't know at what point Beth spoke to her
3   or anything. I don't recall.
4       Q   You believe that your telephone conversation
5   was with Beth?
6       A   I think so.
7       Q   And what did you tell Beth about Mr. Green's
8   shortcomings, failures, and not meeting expectations?
9       A   I told her about the Philadelphia trip and
10  the items that I had already mentioned to you, and
11  there were other times fairly recent to the
12  Philadelphia trip where Reggie had made serious errors
13  with respect to being timely and picking up Dr. Ladner
14  and taking him places, not showing up at all, showing
15  up in an office to pick him up in a motorcycle outfit,
16  those things, and I'm sure that there were others, but
17  I just don't remember.
18      Q   When you talked to Dr. Ladner the day of
19  their run from Philadelphia, did you and he talk about
20  all those other things, or did you only talk about the
21  Philadelphia trip-related things?
22      A   I really don't know.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 67

1       (Plaintiff's Deposition Exhibit No. 6 was
2   marked for identification by the reporter and is
3   attached.)
4   BY MR. GNATT:
5       Q   Looking at Exhibit 6, is this the detailed
6   chronology that you were referring to earlier?
7       A   It is.
8       Q   What source material did you utilize in
9   preparing this document?
10      A   My notes.
11      Q   Describe these notes, please.
12      A   I take notes throughout the day of things
13  that happen, things I need to remember, things I need
14  to fix. I make notes of things are problems or things
15  that don't stick in my head.
16      Q   These are handwritten notes?
17      A   Yes.
18      Q   In a notebook?
19      A   Yes.
20      Q   Like a steno pad-type notebook, or what kind
21  of notebook?
22      A   A spiral thing so thick (indicating).

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 68

1       Q   Do you keep these notebooks forever?
2       A   No.
3       Q   What is your policy in terms of retaining
4   these notebooks?
5       A   I really don't. Once I open a new book,
6   maybe a few weeks, but I don't keep it -- I keep it
7   for forward reasons, not for looking back.
8       Q   This is a compilation of notes on any
9   subject that comes up in a day? It's a chronological
10  set of notes that's not separated by subject; is that
11  correct?
12      A   Absolutely.
13      Q   So in order to compile this chronology, you
14  would have had to pick out those notes relating to
15  Reggie Green from notes related to all kinds of other
16  subjects?
17      A   Exactly.
18      Q   When did you begin the task of creating this
19  chronology?
20      A   When I was asked to make a chronology in
21  response to the EEOC complaint.
22      Q   Asked by university counsel; is that

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 69

1   correct?
2       MS. KEARNS: You can answer that.
3       THE WITNESS: Yes.
4   BY MR. GNATT:
5       Q   And do you have a sense of the date you
6   began the process?
7       A   Not precisely, no.
8       Q   But you had the spiral notebooks in which
9   all of this information was contained?
10      A   I change spiral notebooks maybe twice a
11  year, so, yes, it was all in one.
12      Q   You hadn't discarded that one at the time
13  you were asked?
14      A   Correct.
15      Q   Have you since discarded it?
16      A   Yes.
17      Q   Even though the information was extracted
18  and put into a chronology which related to a
19  legal-type claim?
20      A   Once I did this and once it was resolved
21  with the EEOC, I thought we were done. This
22  represented everything I had written anyway.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 70

1     Q   Did you ask anyone is it safe to discard all
2  these source notes at this time?
3     A   No, I didn't ask anybody.
4     Q   What specific instruction did Mr. Green
5  receive about coordinating between the need to drive
6  Dr. Ladner's places and the need to drive Mrs. Ladner
7  places?
8     A   Reggie's job was to drive, so if Dr. Ladner
9  took priority, if he needed Reggie, that would be a
10  priority over Mrs. Ladner needing Reggie; however,
11  they often worked out the details -- I often worked
12  out the details with the driver to have it combined in
13  some way that it still -- they were able to
14  accommodate both people fairly often.
15     Q   In working out the details, did you
16  typically also coordinate everything with Sally
17  Ekfelt?
18     A   Yes.
19     Q   Prior to Mr. Green's employment, were there
20  ever issues where there was a mix up in terms of the
21  driver meeting the needs of Mrs. Ladner and Dr. Ladner
22  and somebody getting left behind or a lack of

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 72

1  that particular day, something like this might happen,
2  whatever it was, and there were, I think, two
3  different times that Reggie responded to that as an
4  actual call for him to drive without even looking into
5  the inside of it, where it was say see notes and read
6  what the notes are, and without asking questions about
7  what he's to do.
8     Q   So these were more of a putting a hold on a
9  block of time --
10     A   It was entered in the 9:00 a.m. timeframe,
11  and address it was informational.
12     Q   What kind of notes would be entered that
13  were informational?
14     A   Inside the calendar record would be maybe a
15  flight itinerary, maybe e-mails back and forth between
16  Sally and I, maybe just my notes saying we may need
17  this, we may not need that, whatever the specific
18  things were that I knew or to say I don't know much
19  now; ask me later.
20     Q   So this was like a way of sending Mr. Green
21  a memo?
22     A   Sure.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 71

1  coordination?
2     A   Perhaps.  I don't remember a specific
3  incident.
4     Q   The responsibility for the coordination
5  rested with you and Sally Ekfelt; is that correct?
6     A   And the driver.
7     Q   The driver would have to implement the
8  arrangements that you and Sally had worked out?
9     A   Yes.  He also would be looking at his
10  calendar and his own notes and helping to identify
11  when there was a problem or a contradiction or
12  something like that.
13     Q   Did you determine that Reginald Green had
14  failed in some way in this regard during his employ?
15     A   Yes.
16     Q   What was the basis or that determination?
17     A   The use of the Blackberry and how Reggie
18  reacted to some of the entries on his calendar.
19     Q   Can you explain that?
20     A   There were entries on Reggie's calendar in a
21  category at 9:00 a.m. that were general, and they were
22  put there to sort of mark a place, at some time on

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 73

1     Q   You found a place to put it on the calendar,
2  and the place you put it was 9:00 a.m., but it was not
3  an appointment.  It was a location within the
4  Blackberry for him to read notes, and he mistook that?
5     MS. KEARNS:  I'll object to the form of the
6  question.
7     THE WITNESS:  It was clearly articulated and
8  understood that the 9:00 a.m. timeframe on the
9  calendar was used to put a general hold or mark a
10  place where the driver would have to act or react.  It
11  often had, after the description of what it was, a set
12  of words saying see notes, and those notes would be
13  inside that particular entry on the calendar.
14     If he was to actually do something as a
15  result of that place being held, then, there was an
16  entry on the calendar for the specific time with the
17  details for what he needed to do.  For example, Board
18  of Trustees is going to be in town for Thursday and
19  Friday of whatever dates.  The time that would be put
20  on the driver's calendar, we would have no idea what
21  we would expect of the driver, but he would know we
22  would expect things from him.  These are the same

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 74

1 sorts of things.

2    Q   I believe your chronology refers to a

3 September 27, 2004, date when you spoke to Mr. Green

4 about Dr. Ladner's concerns about his driving style;

5 is that accurate?

6    A   Yes.

7    Q   At that point in time, Dr. Ladner had spoken

8 to you and conveyed his concerns, and you, in turn,

9 conveyed them to Mr. Green?

10    A   Yes.

11    Q   And specifically what concerns had

12 Dr. Ladner expressed?

13    A   What it says here, driving at a normal rate

14 of speed, keeping a reasonable amount of distance

15 between cars, and normal amount of distance between

16 cars, stopping at lights and stop signs, and not

17 leaving a great distance between you and the car in

18 front of you, and not trying to make a right-hand turn

19 from a lane to the left of a right-hand turn lane.

20    Q   And Dr. Ladner had conveyed all of that

21 information to you before you spoke to Mr. Green?

22    A   Right.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 75

1    Q   Did you question Dr. Ladner at all about the

2 things that Dr. Ladner had presented to you before

3 talking to Mr. Green?

4    A   Other than to understand what he meant, no.

5    Q   At the time, had you already presented or

6 discussed with Mr. Green the "For Conversation"

7 bulleted items that were on another exhibit?

8    MS. KEARNS:  I'm not sure what you're

9 referring to.

10    THE WITNESS:  I'm not either.

11    MS. KEARNS:  The conversation with Reggie,

12 Exhibit --

13    THE WITNESS:  Oh, I know what you're talking

14 about.

15    MS. KEARNS:  Exhibit 2, had she had the

16 conversation where she handed him Exhibit 2?

17    MR. GNATT:  Yes.

18    THE WITNESS:  Say that again, what you want

19 me to --

20 BY MR. GNATT:

21    Q   As of September 27, 2004, had you had that

22 discussion and presentation of Exhibit 2 to Mr. Green?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 76

1    A   I would say, yes, but I would want to --

2    Q   Well, whatever you can do to figure that

3 out, please do so.

4    A   At least one instance is August 27, 2004.

5 "I reviewed a comprehensive list of Reggie's duties

6 and responsibilities, as well as a list of those items

7 that have been problematic to employees in his

8 position.  Both documents were given to him for his

9 information."

10    Q   You knew, on that list, which is Exhibit 2,

11 was something about no tailgating?

12    A   Right.

13    Q   And, here, Dr. Ladner was saying something

14 to you about Mr. Green keeping too much distance

15 between him and the cars in front of him?

16    A   Correct.

17    Q   Did you ask Dr. Ladner to explain or

18 reconcile that concern with the note tailgating?

19    A   No.

20    Q   Your chronology refers to an October 1,

21 2004, conference between Dr. Ladner and Mr. Green.

22 You were present for that; is that correct?

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 77

1    A   Yes.

2    Q   What were the specific concerns that

3 Dr. Ladner spoke to Mr. Green about?

4    A   They're represented here.  Do you want me to

5 pull them out of this?

6    Q   No.  Thank you.  That's okay.  What

7 triggered your telling Mr. Green on October 28, 2004,

8 that he needed to be up to speed with the GPS system

9 prior to the Philadelphia trip?

10    A   You're asking what prompted me to say that?

11    Q   Yes.

12    A   Over time, Reggie was aware of an

13 expectation to be versed in using the GPS system, and

14 there was a time that it could be helpful to him and

15 that Dr. Ladner expected him to use it.

16    Q   That was something that was pervasive

17 throughout his employment, the need to be competent

18 with the GPS system; is that correct?

19    A   Yes.

20    Q   So my question is, really:  What was it

21 about October 28, 2004, if anything, that led you to

22 make that statement or comment to Mr. Green?

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 78

1   A   Dr. Ladner would have -- Dr. Ladner said to
2   me let's make sure he knows how to operate the GPS
3   several times. Did he say it October 28th? I don't
4   know, but I knew that a trip to Philadelphia would be
5   an opportunity where that could certainly help, rather
6   than hinder.
7   **Q   You think, most likely, this was just you**
8   **trying to be out front on this and make sure that all**
9   **bases were covered?**
10   A   Absolutely.
11   **Q   This was over a month before the trip**
12   **itself, right?**
13   A   Right.
14   **Q   And the trip was scheduled way in advance?**
15   **How far in advance was the trip scheduled? Do you**
16   **understand?**
17   A   I don't remember why Dr. Ladner went there,
18   so I don't remember.
19   **Q   Al Checcio did not travel with Dr. Ladner to**
20   **Philadelphia; is that correct?**
21   A   That's correct?
22   **Q   Al Checcio lived somewhere in Pennsylvania?**

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 80

1   **know the source of that confusion or mistaken**
2   **information?**
3   A   I don't. And as I said, I don't think that
4   Al Checcio was with him, but I'm not certain about
5   that. Al Checcio was with him in Philadelphia, and Al
6   met Ladner there.
7   **Q   Did you ever become aware of any**
8   **acquaintance or friendship or relationship between**
9   **Dr. Ladner and a Mr. Saul, S-A-U-L, from Chevy Chase**
10   **Bank?**
11   A   That's totally foreign to me. I don't know
12   -- wait a minute. It's possible that he's the
13   chairman of Chevy Chase Bank. That may be.
14   **Q   So that person is familiar to you in that**
15   **respect?**
16   A   In that Ladner -- if that is who I think it
17   is, Ladner would have made a development call to his
18   office.
19   **Q   But when you say he would have made a**
20   **development call, why do you say that?**
21   A   He would have wanted his responsibility --
22   one of his responsibilities was to raise funds and

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 79

1   A   That's correct.
2   **Q   Even while he was actively employed by the**
3   **university, his residence was in Pennsylvania?**
4   A   That's correct.
5   **Q   What was his position?**
6   A   Vice president of development.
7   **Q   If you know, was that a position that put**
8   **Mr. Checcio out in the field most of the time, or was**
9   **he based in Washington?**
10   A   I don't know his schedule.
11   **Q   Did you know whether he had an office in**
12   **Washington?**
13   A   Absolutely.
14   **Q   Did he commute from his home in Pennsylvania**
15   **to the American University campus every day?**
16   A   No.
17   **Q   And Mr. Checcio also did not accompany**
18   **Dr. Ladner on the return trip; is that correct?**
19   A   As I recall, that's correct.
20   **Q   There was a point at which the discovery**
21   **information that we were provided indicated that**
22   **Mr. Checcio was in the car on the return trip. Do you**

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 81

1   seek donations.
2   **Q   Did you get the impression that Dr. Ladner**
3   **knew Mr. Saul or came to know him at some point other**
4   **than just a cold call?**
5   A   I don't remember anything other than I do
6   know that Dr. Ladner made an office visit to the
7   president of Chevy Chase Bank. I don't remember any
8   other communications specifically.
9   **Q   Do you know whether that visit and/or call**
10   **took place while Mr. Green was still working for**
11   **American University?**
12   A   I don't know.
13   **Q   Did you ever field any requests for**
14   **reference information about Mr. Green after he left?**
15   A   Not that I recall.
16   **Q   Were you aware of any requests for reference**
17   **information, formal or informal, that Dr. Ladner**
18   **received about Mr. Green?**
19   A   Not that I recall.
20   **Q   Your entry for October 29, 2004, talks about**
21   **you speaking to Mr. Green on the telephone regarding**
22   **Dr. Ladner's concerns. Do you recall how it came**

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 82

1  about that this was by telephone rather than in
2  person?
3      A    My recollection is that it was later in the
4  day when I wasn't going to have the opportunity to see
5  Reggie face to face, and it was a kind of a correction
6  that I felt needed to be made immediately.
7      Q    Based on the --
8      A    -- content.
9      Q    And the way it had been described to you by
10 Dr. Ladner?
11     A    Correct.
12     Q    Earlier, you spoke of the manner in which
13 Mr. Green appeared to be taking care of the vehicle in
14 terms of cleaning it, detailing it, and that sort of
15 thing.  On that score, Mr. Green was successful in
16 meeting the expectations of his position?
17     A    In keeping the car clean?
18     Q    Yes.
19     A    I'd say, for the most part, yes.
20     Q    He was not faulted on that element during
21 his employment?
22     A    I don't recall.

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 83

1      Q    Are you aware of him being faulted for not
2  topping off the gas in the gas tank of the vehicle as
3  was expected of him?
4      A    I do remember that, yes.
5      Q    What do you remember about that?
6      A    We expected that, each day, he would top the
7  gas tank off before he left the vehicle at the
8  residence for the day, so if Dr. Ladner or Mrs. Ladner
9  went out to use the vehicle, it would always have a
10 full tank of gas.  That was expected of Reggie to do,
11 and I know that was an issue at some point that Ladner
12 raised back to me.
13     Q    Do you recall, if having -- first, did you
14 bring it to Mr. Green's attention?
15     A    Oh, yes.
16     Q    And, to your knowledge, did he adhere to the
17 expectations thereafter?
18     A    I don't know.
19     Q    Would topping off the gas tank and detailing
20 the vehicle be things that Mr. Green would have
21 entered in his logbook?
22     A    I guess sometimes, yes.

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 84

1      Q    Is that a logbook that was retained by the
2  university after his termination?
3      A    If there was a logbook in the first place, I
4  assume you meant his calendar, and that would be the
5  place where he would enter data relative to what he
6  did.
7      Q    Would he enter it strictly electronically or
8  in some kind of hard copy form?
9      A    I don't remember a hard copy form.  My
10 request would have been electronically, so we had a
11 record of what we were doing.
12     Q    Would you expect to see entries
13 electronically for such activities as detailing the
14 car or topping off the gas tank?
15     A    Both of those things are understood and the
16 responsibility of the driver, that the car was kept
17 very clean and that the gas tank was topped off, so,
18 you know, perhaps he entered it or perhaps he didn't.
19 It was an understood thing, and he would enter things
20 that were not a matter of course.
21     Q    That was his practice to do that?  Is that
22 what you're saying?

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 85

1      A    What I'm saying is every thing that he did
2  wasn't necessarily entered in his calendar.
3      Q    Are his electronic entries still available
4  to the university?
5      A    I really have no idea.
6      Q    You have not checked and looked to see if
7  that's the case?
8      A    That's correct, I have not.
9          MR. GNATT:  I would like to make that
10 request.  I'm not asking for your response on the
11 record, but I'm stating on the record that I would
12 like an inquiry, check to see whether or not
13 Mr. Green's log entries, electronic entries, can still
14 be retrieved from their computers.
15         MS. KEARNS:  I want to make sure.  You're
16 not asking her to do it, because your only question
17 was could she check.  You're making an assumption that
18 no one has checked, and if you're asking would someone
19 confirm whether they checked or not, we can do that
20 off the record.
21         MR. GNATT:  Good.
22         MS. KEARNS:  I just wanted to make sure your

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 86

1 request wasn't to have the Witness check.

2     MR. GNATT:  No, it doesn't have to be her.

3 BY MR. GNATT:

4     Q   Do you have any knowledge about what, if

5 any, instructions or training Mr. Green obtained or

6 sought out from employees of the car dealership -- I

7 believe it's a Rosenthal dealership -- relating to the

8 operation of the GPS system?

9     A   I know that he -- that I instructed him to

10 seek their assistance so that he was sure that he

11 understood how to work it.

12     Q   Do you know whether he did or did not?

13     A   I know he told me that he did.

14     Q   The occasion when Dr. Ladner was concerned

15 because Mr. Green appeared at Dr. Ladner's appointment

16 dressed in street clothes, shall we say, and had

17 ridden his motorcycle, was that a dental appointment

18 for Dr. Ladner?

19     MS. KEARNS:  I object.  You just

20 mischaracterized her testimony.  I believe she said he

21 didn't appear in street clothes.  He appeared in a

22 motorcycle outfit.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 87

1 BY MR. GNATT:

2     Q   Is that what your recollection is, that he

3 appeared in motorcycle garb?

4     A   Yes, that is my recollection.  I don't

5 remember if it was a doctor or dentist or the type of

6 physician it was.

7     Q   Do you remember whether it was a medical or

8 dental appointment as opposed to anything else?

9     A   Yeah.  It was a doctor's appointment of some

10 sort.

11     Q   What did you find out from Mr. Green about

12 the circumstances leading up to that?

13     A   I would have to refer back to this.  I don't

14 remember.

15     Q   Would you see if you could find that,

16 please?

17     A   Tell me again exactly what I'm looking for.

18     MS. KEARNS:  The motorcycle outfit.

19     THE WITNESS:  On December the 1st, that's

20 when he showed up at Dr. Ladner's doctor's office in a

21 motorcycle outfit.

22

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 88

1 BY MR. GNATT:

2     Q   What explanatory information did Mr. Green

3 ever provide to you about the events of that day?

4     A   What I recall -- I'm simply reading off of

5 here.  I don't recall anymore than what is written

6 here.

7     Q   Did you discredit or disbelieve anything

8 that Mr. Green presented?

9     A   Well, I don't recall not believing what

10 Reggie said.  What I do recall was that he didn't have

11 dry clothing to put on and needed to go back home to

12 get it.

13     Q   While you're looking at the chronology,

14 would you look again at the September 27th entry?  Do

15 you recall whether Mr. Green was told on that occasion

16 that he was doing a good job or things were going well

17 or something to that effect?

18     A   I don't recall saying that.

19     Q   Do you think that, if you did say that, you

20 would have necessarily made a note of that?

21     A   I would assume that I would make a note of

22 that.

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 89

1     Q   As far as the October 1, 2004, meeting, that

2 included both you and Dr. Ladner.  Do you recall

3 Mr. Green being told things were going well or that he

4 was doing a good job in the course of that meeting?

5     A   In the course of that meeting, Dr. Ladner

6 referred to the issues that he wanted to discuss with

7 Reggie as course corrections and that he wanted to

8 stop -- he wanted to sort of nip in the bud anything

9 that was going down the pathway of not being an

10 accepted way of functioning.  Did Dr. Ladner actually

11 said the words you're doing a good job, I don't know,

12 but the entire meeting was positive.  I mean, Reggie

13 was totally relieved when that was over.  These were

14 really things that just said I've got these couple of

15 issues, and we don't want them to become a big deal.

16     Q   Wasn't one of the issues the coordination of

17 efforts so that he could be available to drive

18 Mrs. Ladner, and when he wasn't driving Dr. Ladner,

19 and Mrs. Ladner needed to be driven, he needed to be

20 available to do that?

21     MS. KEARNS:  Are you reading from one of the

22 numbered --

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 90

1    MR. GNATT:  No.
2    MS. KEARNS:  Yes, the letter in addition to
3 this.
4    THE WITNESS:  Is that what you're saying?
5 BY MR. GNATT:
6    Q    Whether or not it's in there, wasn't that
7 something that was discussed at that meeting?
8    A    I would say, if it was discussed in the
9 meeting, I would expect it to be in my notes.
10    Q    Do you know whether the GPS system can be
11 checked to see when it was on and when it was off?
12    A    I have no idea.
13    MR. GNATT:  That's something else that I'll
14 mention on the record for us to look into, which is
15 whether or not there is that kind of data available
16 that would document whether the GPS was in use or not,
17 in use on or off during the time he worked there.
18 BY MR. GNATT:
19    Q    Do you know whether at the time Mr. Green
20 was hired if he was asked to sign a medical release or
21 authorization?
22    A    An authorization for what?

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 91

1    Q    For the release of his medical records from
2 any doctors that he --
3    A    No.  I certainly never saw that.
4    Q    Is that a procedure that is familiar to you
5 or unfamiliar to you?
6    A    Unfamiliar to me.
7    Q    Are you aware of Mrs. Ladner having said to
8 Mr. Green during his employment in the presence of
9 Dr. Ladner you'll work for us forever?
10    A    I have no knowledge of that.
11    MR. GNATT:  Let's go off the record for a
12 minute.
13    (Brief recess.)
14    THE WITNESS:  I want to make a
15 clarification.  I have to find it first.  As I read
16 these notes over a little bit ago, I did know that it
17 was a colon problem.  I don't remember where exactly I
18 read it, but it is in here, so it refreshed my memory
19 that he said it was a colon problem.  It's a paragraph
20 just above December 1, 2004 -- November 30, 2004,
21 Page 11, the second paragraph.
22

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 92

1 BY MR. GNATT:
2    Q    And you understood what the colon is and
3 that that's related to the digestive system and moving
4 one's bowels and that sort of thing?
5    A    Yeah, I know about the colon.
6    Q    You're aware of a concept of urgency to move
7 one's bowels?
8    A    With respect to Reggie, no.
9    Q    But you're familiar with the concept in
10 general?
11    A    Sure.
12    Q    An urgent need to use the bathroom, move
13 your bowels, that sort of thing?
14    A    Right.
15    Q    Did Sally Ekfelt ever express to you
16 concerns or complaints about Mr. Green's performance?
17    A    Probably.
18    Q    Well, what, if any, such concerns or
19 complaints did she express to you?
20    A    I don't recall them specifically.  Sally and
21 I talked many times a day about many things.
22    Q    Because you had Dr. Ladner and she had Nancy

# BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 93

1 Ladner, and there was lots to coordinate about them?
2    A    About them, but, also, events at the
3 residence and other things related not specifically to
4 them, but to the building itself.
5    Q    But you can't recall any specific concerns
6 or complaints expressed to you by Sally Ekfelt about
7 Mr. Green?
8    A    Not specifically, no, I don't.
9    Q    How about concerns or complaints expressed
10 to you by Nancy Ladner?
11    A    Well, Nancy did tell me about the hugging
12 business at the airport.  She did say that he did
13 that.
14    Q    How did that come about that you were
15 talking to her about that?  I understand that, first,
16 you heard of it from Dr. Ladner.
17    A    And, then, I spoke to Reggie about it on the
18 phone, and, then, I spoke to Reggie about it face to
19 face.
20    Q    How did it come about that you were talking
21 to Nancy Ladner about it?
22    A    I wish I could tell you that I know, but I

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 94

1  don't. I don't know the context of that conversation
2  at all. I also talked to Nancy Ladner fairly often.
3      Q   Do you recall whether you brought it up or
4  she brought it up?
5      A   It wouldn't have been me.
6      Q   Do you remember what she expressed, how she
7  expressed it?
8      A   I'm afraid I don't.
9      Q   Do you recall whether she seemed perturbed,
10  put out, or distressed by it at the time you talked to
11  her or something less serious than that?
12      A   I think she was upset about it. I would
13  characterize her reaction as being upset about it.
14      Q   I'm just talking about, as you recall her
15  expressing it to you, not from Dr. Ladner, not through
16  Dr. Ladner. When she told you about it, how was
17  she --
18      A   She was upset.
19      Q   What did she say?
20      A   She had indicated -- well, she told me what
21  he did. She told me that it was very inappropriate.
22  She felt like he was looking like a family member

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 95

1  coming to get her and not using the proper decorum to
2  receive her. That's really about all I remember.
3      Q   Did she say whether she had been drinking
4  alcohol at the time or prior to the time?
5      A   No.
6      Q   Were you ever aware of her drinking alcohol?
7      A   Yes.
8      Q   Were you ever aware of her drinking alcohol
9  in the daytime?
10      A   I have no first-hand knowledge of that, no.
11      Q   Did you ever get an impression in talking to
12  her during the business day that she had been drinking
13  alcohol?
14      A   I don't think so.
15      Q   When it came time to inform Mr. Green that
16  he was being terminated, to whom fell that
17  responsibility?
18      A   The words "you're terminated," me.
19      Q   You informed him?
20      A   Right.
21      Q   How did that go? Tell me about that.
22      A   He had a lot of questions about why he was

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 96

1  being terminated, and the answer was you're being
2  terminated in the probationary period, and he asked
3  many, many questions that I couldn't answer.
4      Q   So the response was limited to pointing out
5  to him that it's a probationary period termination;
6  therefore, there is no more detail to give?
7      A   Right. And I think I did say we've been
8  talking about problems up to now, but I did not get
9  into the A, B, C thing at all.
10      Q   Did he seem upset?
11      A   Yeah. He was disappointed. I think he said
12  something to me like this is hard to take.
13      Q   Did you respond to that?
14      A   My message was the same throughout, which is
15  I'm sorry, but it's during the probationary period,
16  and this is the end of the line.
17      Q   Were you upset about the situation at the
18  time?
19      A   I don't think I've ever fired an employee
20  when I wasn't upset about having to do it. It's
21  appropriate that I did it, but it's a very difficult
22  thing for me to do, and I don't do it without a lot of

## BRADFORD ASSOCIATES
## MARGARET CLEMMER

Page 97

1  thought.
2      Q   On a personal level, how did you feel
3  towards Reggie Green as of the time you fired him?
4      A   I felt that he deserved to be fired.
5      Q   Well, that's not what I meant by on a
6  personal level. I mean person to person, putting
7  aside your job, putting aside his job, just in the way
8  the two of you had related over those several months.
9  On a personal level, how did you feel towards him?
10      A   Mr. Gnatt, I didn't have any kind of
11  personal relationship with Reggie. I think I've said
12  all I can. I don't like having to fire someone. I
13  know what that must feel like. I don't know what it
14  feels like. I would hate for that to happen to me,
15  and I didn't have a personal relationship with Reggie.
16  We didn't do lunch or whatever. I did what I had to
17  do. I didn't like having to do it, but that was
18  because of what it meant.
19      MR. GNATT:  I have no other questions.
20  Thank you.
21      (Examination concluded at 1:05 p.m.)
22      (Signature not waived.)

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 98

1
2
3
4    (I have read the foregoing pages 4-97, which contain a
5    correct transcription of the answers given by me to
6    the questions therein recorded, as noted on the
7    attached errata sheet.)
8    _____
9        Margaret Hawthorne Clemmer
10
11
12
13
14
15
16
17
18
19
20
21
22

BRADFORD ASSOCIATES
MARGARET CLEMMER

Page 99

1    DISTRICT OF COLUMBIA :
2        I, TONI R. DeSENZE, a Notary Public of the
3    District of Columbia, do hereby certify that the
4    witness whose testimony appears in the foregoing pages
5    personally appeared before me at the time and place
6    herein set out and, after having been duly sworn by
7    me, was interrogated by counsel.
8        I further certify that the examination was
9    recorded stenographically by me, and this transcript
10   is a true record of the proceedings.
11       I further certify that I am not of counsel
12   to any of the parties, nor an employee of counsel, nor
13   related to any of the parties, nor in any way
14   interested in the outcome of this action.
15
16           Toni R. DeSenze
17           Stenographic Reporter
18
19   My commission expires:
20   November 14, 2009

Exhibit 4

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

Civil Division



REGINALD GREEN,

    Plaintiff,        Case No.

    v.               1:07-cv-0052 (RBW)

AMERICAN UNIVERSITY, et al.,

    Defendants.


Deposition of:


    BENJAMIN LADNER,

Taken on behalf of the Plaintiff, at the Law

Offices of Pillsbury, Winthrop, 2300 N Street,

N.W., Washington, D.C., commencing at

10:20 a.m., Wednesday, September 26, 2007,

before Toni R. DeSenze.

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 2

1       A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4
5       SHELDON GNATT, ESQUIRE
6       Knight, Manzi, Nussbaum & LaPlaca, P.A.
7       14440 Old Mill Road
8       Upper Marlboro, Maryland 20772
9       (301) 952-0100
10
11  FOR THE DEFENDANTS:
12
13      TINA KEARNS, ESQUIRE
14      Pillsbury, Winthrop
15      2300 N Street, N.W.
16      Washington, D.C. 20037
17      (202) 663-9143
18
19  ALSO PRESENT:
20      Reginald Green
21      Rebecca Carr
22

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 4

1       P R O C E E D I N G S
2   WHEREUPON:
3       BENJAMIN LADNER,
4       Was called as a witness and, after first
5   being duly sworn by the Notary Public, was examined
6   and testified as follows:
7       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8   BY MR. GNATT:
9       Q   Good morning, Dr. Ladner.
10      A   Good morning.
11      Q   As you know, my name is Sheldon Gnatt, and
12  I'm the attorney of record representing Reginald Green
13  in his case that's pending in the United States
14  District Court for the District of Columbia against
15  American University and yourself named individually as
16  the Defendant.
17      I'm going to ask you many questions.  I
18  would ask you to make sure you allow me to finish my
19  question before beginning your answer.  For one thing,
20  you may assume the question is going one direction,
21  and that may not be the direction it's going.  For
22  another thing, the court reporter only can take down

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 3

1       C O N T E N T S
2
3   EXAMINATION OF BENJAMIN LADNER        PAGE
4
5   BY MR. GNATT                    4, 41
6   BY MS. KEARNS                   39
7
8       E X H I B I T S
9   BENJAMIN LADNER
10
11  NUMBER                          PAGE
12  1   "For Conversation with Reggie" document   15
13
14
15
16
17
18
19
20
21
22

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 5

1   one speaker at a time.
2       Please answer in words rather than gestures
3   like nodding of the head or shaking of the head, and
4   make sure, if it's a yes or no, that you use those
5   words, rather than something more colloquial like
6   uh-uh or uh-huh.  Do you understand that?
7       A   Yes.
8       Q   If you do not understand my question, please
9   let me know.  I will attempt to make it understandable
10  so that when you do answer my questions, it will be
11  with full understanding on your part of what I was
12  meaning when I asked it.
13      If you need a break for any reason, please
14  do not hesitate to let us know, and we'll do our best
15  to accommodate you at an appropriate moment, all
16  right?
17      A   All right.
18      Q   Please state your full name?
19      A   Benjamin Mance Ladner.
20      Q   Your date of birth?
21      A   10-30-41.
22      Q   What year did you become president of

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 6

1  **American University?**
2  A   Nineteen-ninety-four.
3  **Q   Who was your executive assistant when you**
4  **first became president?**
5  A   I don't remember her name.  She was there as
6  a holdover, and I just don't remember.  She was there
7  a very short time.  I don't remember her name.
8  **Q   Was the next person to hold that position**
9  **Meg Hawthorne, who later became Meg Clemmer?**
10 A   No.
11 **Q   Who was the next person?**
12 A   Marjorie Hadsell, I believe.
13 **Q   When did Meg Hawthorne become your executive**
14 **assistant?**
15 A   I believe she was there eight years before I
16 have left, roughly so.  That would be eight years
17 previous to 2005.  I think that's correct, seven or
18 eight years.
19 **Q   Since leaving American University, what, if**
20 **any, employment have you had?**
21 A   None.
22 **Q   Do you still maintain a residence in Gibson**

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 8

1  knew shortcuts and knew what to do if traffic was tied
2  up and I was late and could take alternative routes
3  et cetera, and he answered affirmatively.
4  **Q   Anything else you remember about the content**
5  **of that session?**
6  A   Just the general atmosphere was cordial, and
7  he seemed eager to have the job and expressed a
8  commitment to meet our standards and do a good job, so
9  I don't remember any specific -- it was a short
10 interview because I relied on Meg Clemmer, who had
11 done an extensive interview.
12 **Q   Is it fair to say that, during that session,**
13 **albeit a short session, you made some judgment about**
14 **or some assessment of Mr. Green's interpersonal skills**
15 **and his communication skills?**
16 A   Yes.
17 **Q   And what was that assessment?**
18 A   That -- and, again, I'm assuming the
19 legitimacy of Meg's prior assessment, which she had
20 briefed me, so my general assessment was that he was
21 cordial, that he was eager to please, and that he
22 wanted the job very badly.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 7

1  **Island in Maryland?**
2  A   No.
3  **Q   Is that a home that you owned and have sold?**
4  A   Yes.
5  **Q   Did you participate in any interview of**
6  **Reginald Green for the driver position?**
7  A   Yes.
8  **Q   Can you describe the first such**
9  **participation in an interview of Mr. Green?**
10 A   Describe the participation you mean?
11 **Q   What I mean is describe who was present.**
12 **Describe where it took place.  Describe what you can**
13 **recall of the content of what was said.**
14 A   My recollection is that Meg Clemmer was
15 present.  At the time, her name was Meg Hawthorne, as
16 I recall.  She, I think, had interviewed him a couple
17 times and felt it was worth my time to interview him
18 as a candidate.  I don't remember a lot about the
19 conversation because she had briefed me about her
20 observations, which seemed reasonable.
21 I do remember asking one specific question,
22 and that was if he knew Washington as a driver and

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 9

1  **Q   Did he ever change with respect to being**
2  **cordial and eager to please throughout the time he was**
3  **employed?**
4  A   I would say that he became confused about
5  his responsibilities.  Whether that exhibited a lack
6  of eagerness to please, I don't know.  I couldn't make
7  that judgment, but he certainly was unable to bear the
8  responsibilities that showed he was serious about his
9  commitment.
10 **Q   So that may or may not have a bearing on the**
11 **description of him as being eager to please, is what**
12 **you're saying?  You're not asserting that that**
13 **definitely relates to an eagerness to please; that may**
14 **not have changed; you're not sure?**
15 A   No, I wouldn't assert that.
16 **Q   In terms of being cordial, did he remain**
17 **cordial throughout his employment, would you say?**
18 A   Yes.  It depends on how you define cordial.
19 In general, he was affable, yes.
20 **Q   During the interview session that we talked**
21 **about, did you make some assessment or judgment about**
22 **his knowledge of VIP protocol?**

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 10

1    A    The IP protocol?

2    **Q    No. VIP protocol.**

3    A    I don't recall making an assessment.

4    **Q    Did anything come up specifically on the**

5    **subjects of the protocols relating to opening car**

6    **doors, using umbrellas, or handling luggage?**

7    A    Not that I recall.

8    **Q    Was there another occasion that you**

9    **participated in some way in what could be described as**

10    **an interview of Mr. Green?**

11    A    You mean prior to his being hired?

12    **Q    Yes.**

13    A    No. I think I had only one.

14    **Q    Was there any occasion that Mr. Green drove**

15    **you on what could be described as a test drive prior**

16    **to him officially starting --**

17    A    I believe, because we had been without a

18    driver for six months, trying a program of using local

19    hired companies and had been through a number of

20    candidates, we were very eager to settle on a

21    candidate, and because he looked like a potentially

22    good hire, we actually took a very small run because I

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 12

1    A    There was a period that kept getting

2    extended because I was never clear about the details

3    when he arrived, as I recall, with a broken foot or

4    leg or something, and this made it extremely difficult

5    for him to get to either side of the car either to

6    hold umbrellas or open doors and so forth.

7    **Q    So how was that problem handled?**

8    A    I did it myself.

9    **Q    Would you say that that was not a situation**

10    **where Mr. Green was unaware of the protocol?**

11    A    I don't know. I wouldn't be surprised

12    because Meg had briefed him thoroughly on the

13    protocol.

14    **Q    Did you form an impression or draw a**

15    **conclusion that these situations that you just**

16    **referred to were evidence of Mr. Green's knowing**

17    **violation of the protocol?**

18    A    No.

19    **Q    It was just a situation that --**

20    A    That's what I recollect.

21    **Q    -- was the result of him being in a cast?**

22    A    Yes.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 11

1    wanted to be in the car. That was an extremely short

2    trip. I don't remember where it was, and it seemed

3    okay in general.

4    **Q    Do you remember where the point of departure**

5    **was for that short run?**

6    A    The president's office.

7    **Q    Approximately how long in terms of time were**

8    **you out?**

9    A    I don't remember. I just remember it was

10    short. I remember discussing with Meg I just wanted

11    to be in the car before we hired him, and it wasn't a

12    long run at all. I don't know how short it was.

13    **Q    Did you notice any issues of concern about**

14    **his driving during that run?**

15    A    No.

16    **Q    To your recollection, during the entire time**

17    **that he worked for the university, were there ever any**

18    **issues or concerns about the three protocols that I**

19    **mentioned a moment ago, opening car doors, use of**

20    **umbrellas, handling of luggage?**

21    A    Yes.

22    **Q    Which of those three?**

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 13

1    **Q    The document that lists the responsibilities**

2    **of the driver states that a working knowledge of**

3    **cities such as Philadelphia and New York is needed,**

4    **but that a knowledge lesser than that of Washington is**

5    **acceptable. Are you familiar with that general**

6    **expectation or requirement of the job?**

7    A    Yes.

8    **Q    Do you know whether Mr. Green's knowledge of**

9    **Philadelphia was a subject of inquiry during the**

10    **hiring process?**

11    A    I do not. Meg did most of the detailed

12    questioning.

13    **Q    At the point in time when Mr. Green was**

14    **terminated, after having been with him on a trip to**

15    **Philadelphia and back, did you consider him to have**

16    **somewhat of a working knowledge of Philadelphia?**

17    A    No.

18    **Q    You considered him to have no working**

19    **knowledge of Philadelphia?**

20    A    Yes.

21    **Q    You feel that that is what he demonstrated**

22    **on that trip to Philadelphia?**

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 14

1    A    He did demonstrate that, yes.
2    Q    You stayed at the Four Seasons Hotel in
3    Philadelphia?
4    A    I believe so, yes.
5    Q    Did Mr. Green deliver you to that hotel
6    during the Philadelphia trip?
7    A    Yes, he did.
8    Q    Did you direct him to that hotel?
9    A    I did, because he was lost.
10    Q    So, upon your arrival in Philadelphia
11    en route to the hotel, Mr. Green got lost?
12    A    That's right.
13    Q    And it was as a result of your directions to
14    him that you were able to arrive at your destination,
15    the Four Seasons Hotel?
16    A    That's correct.
17    Q    Are you aware of whether the Four Seasons
18    Hotel faxed any directions to Meg or Mr. Green or
19    someone at the university?
20    A    Whether the hotel faxed directions to Meg or
21    the university, I don't know.
22    Q    Are you familiar with a document that has

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 16

1    BY MR. GNATT:
2    Q    Is that piece of paper familiar to you at
3    all?
4    A    I believe, now that I see it, I saw this in
5    reviewing some papers prior to this meeting, but I'm
6    familiar with the issues.  It looks like something
7    that Meg may have typed up for herself and her
8    conversation with him.  I'm not sure I ever saw it
9    formally as a document.
10    Q    Do you know in what way you may have
11    contributed to the entries, the bullets that are on
12    that document?
13    A    It would be routine for Meg and me to sit
14    and assess.  We met almost every morning to talk about
15    issues of the day and scheduling, appointments, and so
16    forth for us to both compare notes on his performance
17    because he was being evaluated during a probationary
18    period, of course, so I'm sure we discussed these and
19    compared notes.
20    Q    Is it your understanding that this is a
21    document that deals with performance issues that had
22    arisen with Mr. Green's performance?

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 15

1    been labeled "For Conversation with Reggie"?
2    A    I don't think so.
3    Q    While I'm getting it, do you recall
4    participating in some way with Meg in compiling a list
5    of concerns, issues that had arisen with drivers
6    previous to Reggie Green so that those issues could be
7    reviewed with Mr. Green so as to avoid a repetition of
8    those kinds of problems during his employ?
9    A    Yes.
10    Q    What was your participation in that process?
11    A    Well, Meg kept notes, and I made small
12    notes, and we met, and she kept a running list of
13    this, not only in relation to Reggie, but previous
14    drivers, as well.
15    Q    And that was a running list, but, then, how
16    did it come about that a document would be prepared?
17    And you can old off answering until I show you the
18    exhibit.
19        (Plaintiff's Deposition Exhibit No. 1 was
20    marked for identification by the reporter and is
21    attached.)
22

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 17

1    A    As I said, although you haven't told me, I
2    believe this is her document, which she didn't present
3    to me.  It must have been her notes for discussion
4    with him, so I don't know whether she did that in the
5    context of saying these are all of the issues related
6    specifically to you, or those are a combination of
7    issues that we are concerned about that are holdovers
8    from previous issues of other drivers.  I just don't
9    know.
10    Q    Do you remember discussing with Meg the idea
11    of compiling a list of problems with previous drivers
12    and giving them to Mr. Green early on so that he could
13    try to steer clear of those kinds of problems?
14    A    Yes.
15    Q    Do you know whether that type of document
16    was used with any driver that was employed before
17    Mr. Green?
18    A    No.
19    Q    You don't know, or it was not?
20    A    I don't know.
21    Q    Was any such document or the contents of a
22    document like that used with any successor driver,

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 18

1  **successor to Mr. Green?**
2      A   I'm trying to think who the successor was.
3   I think there was only one, very late, in fact, only a
4   few weeks before I left.
5      **Q   Well, if I may assist you, the name that I**
6   **understand is Steven Price?**
7      A   Steven Price, right. I don't know whether
8   such a document was presented to him.
9      **Q   So, then, you probably also don't know**
10  **whether any additional items were added based on the**
11  **experiences with Mr. Green?**
12     A   I do know that, over the seven or eight
13  years Meg was there, she made it a point to collect
14  all of the observations about various staff members
15  and their performance, so it would be typical to say
16  to the next driver these are issues that we have faced
17  before, and we want to make you aware of and the same
18  thing that she did with Reggie.
19     **Q   During Mr. Green's employment, did you make**
20  **any first-hand observations about the care taken by**
21  **him of the president's vehicle?**
22     A   Yes.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 19

1      **Q   What were those observations?**
2      A   Well, there were several. I knew he had
3   been briefed on the protocols of the care of the
4   vehicle, and he seemed not to be able to follow
5   through on some of those. He would leave rags and
6   food in the car. He would fail to leave the car
7   unlocked, which was an issue because the car would
8   self-lock, and we were trying to discover if there was
9   a problem. He would forget to turn the lights on to
10  auto, which could be problematic because we were used
11  to them turning on by themselves, and they may not be
12  on at dusk, for example, if we were driving, so there
13  were a number of issues just in terms of care of the
14  vehicle that he seemed not to be able to follow
15  through on.
16     **Q   How about the detailing and cleaning of the**
17  **car?  You've already mentioned that he left personal**
18  **items, rags and food in the car.  That aside, how well**
19  **did he take care of the car in terms of cleaning it**
20  **and detailing it?**
21     A   I can think of only one occasion in which I
22  think Meg mentioned to me he had not cleaned the

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 20

1   outside of the car to her standards. Other than that,
2   I think generally it was okay.
3      **Q   If you would look at Exhibit 1, one of the**
4   **bullets refers to "no tailgating."  Do you see that on**
5   **there?**
6      A   Yes.
7      **Q   What prompted that one for inclusion, if you**
8   **know?**
9      A   I do know. The previous driver had actually
10  had an accident due to tailgating.
11     **Q   Do you know the name of that driver?**
12     A   Jeff Madden, M-A-D-D-E-N, I believe.
13     **Q   So what was your prescription for avoiding**
14  **accidents like that?  Rather than no tailgating, how**
15  **would you express it in a prescriptive positive way?**
16        MS. KEARNS: I want to object to the form of
17     that question. If you can answer, go ahead.
18        THE WITNESS: I can't answer because that's
19     how I would express it:  No tailgating. It seems to
20     be commonsense.
21  BY MR. GNATT:
22     **Q   Instead of tailgating, what is it that you**

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 21

1   **wanted the driver to do?**
2      A   Instead of tailgating?
3      **Q   Yes.**
4      A   To drive normally without tailgating.
5      **Q   And what is normally in this context?**
6      A   Obviously, it depends on the situation. If
7   you're highway driving or driving in the city,
8   et cetera, but if you're at high speeds, three car
9   lengths in the city and one car length for something.
10  I don't know.
11     **Q   You don't have a prescribed formula for**
12  **that?**
13     A   Of course not, no.
14     **Q   Did you ever discuss with Mr. Green the**
15  **question of whether he was a smoker?**
16     A   No, I don't recall that I did.
17     **Q   Were you ever aware of him smoking during**
18  **work hours?**
19     A   No.
20     **Q   There's an item on Exhibit 1 relating to**
21  **bathroom stops, and there's a handwritten asterisk**
22  **near it.  From my review of documents that have been**

# BRADFORD ASSOCIATES
# BENJAMIN LADNER

Page 22

1  provided and deposition testimony, it's my
2  understanding that that item was meant to address a
3  problem with the previous driver, Jeff Madden, who
4  apparently used bathroom stops as an excuse for taking
5  a smoking break on out-of-town trips; is that
6  accurate?
7      A  Yes.
8      Q  One of your concerns was that your wife is
9  severely allergic to smoke; is that accurate?
10     A  Yes.
11     Q  And you yourself do not like being exposed
12  to smoke?
13     A  Yes.
14     Q  And after a so-called bathroom stop for Jeff
15  Madden, when he would get back in the car, he would
16  smell of smoke or wreak of smoke?
17     A  Correct.
18     Q  And that smell of smoke would attach to the
19  vehicle or linger in the vehicle in some way?
20     A  Yes.
21     Q  Does that item with the asterisk next to it
22  also accurately express your preference, smoking issue

# BRADFORD ASSOCIATES
# BENJAMIN LADNER

Page 24

1      Q  And you've mentioned your schedule.  Is it
2  also accurate that you preferred to minimize stops on
3  trips because of the time that it would add to your
4  travel time?
5      A  Yes.
6      Q  Do I gather correctly that you yourself
7  typically did not find the need to stop on trips of
8  the length of, say, Philadelphia or New York to use
9  the bathroom?
10     A  Correct.
11     Q  So you typically are not asking the driver
12  to make a stop, a bathroom stop, for you on such a
13  trip; is that correct?
14     A  I don't recall ever doing that.
15     Q  Am I correct in assuming that you do not
16  have any medical condition that causes you to need to
17  stop, such as a prostate condition that would cause
18  you to stop to urinate?
19     A  No.
20     Q  And you do not have a condition that creates
21  fecal urgency for you?
22     A  No.

# BRADFORD ASSOCIATES
# BENJAMIN LADNER

Page 23

1  aside, that bathroom stops be kept to a minimum and
2  preferably zero?
3      MS. KEARNS:  I would just object to the form
4  of the question.
5      THE WITNESS:  This is actually her wording.
6  I don't recall saying zero is preferable, but it had
7  been such a problem that we just wanted a driver to be
8  aware that stopping every 30 minutes or every hour or
9  every time they needed to smoke or whatever was an
10  unacceptable pattern due primarily to my schedule.  I
11  was actually late for an appointment due to stopping
12  four or five times on one trip for a previous drive,
13  so it was a problem we didn't want to be exacerbated
14  by succeeding drivers.
15  BY MR. GNATT:
16     Q  I understand that it was Meg's wording.  My
17  question to you, though, is -- and I understand that
18  you don't recall using the words preferably zero, but
19  does that accurately express your preference
20  that bathroom stops be kept to a minimum?
21     A  If your question is they be kept to a
22  minimum, the answer is yes.

# BRADFORD ASSOCIATES
# BENJAMIN LADNER

Page 25

1      Q  If you know, what was the length of the
2  probationary period applicable to Mr. Green and the
3  position that he held?
4      A  I believe it was a university policy of four
5  months.
6      Q  Prior to departing for Philadelphia on the
7  trip the beginning of December, what, if anything, did
8  you and Mr. Green discuss about any medical conditions
9  of his?
10     A  Nothing.
11     Q  And I assume, when you say nothing, that's
12  putting aside any conversation or comments that may
13  have been made relating to the cast on his foot, the
14  accident, the injury that he had sustained before
15  coming to work?
16     A  On the day before we left?
17     Q  No, no.  My original question was:  From the
18  time you first ever talked to Mr. Green at an
19  interview until the departing for Philadelphia, what,
20  if any, conversation did you have with him about any
21  medical condition?
22     A  Only his foot or leg, yeah.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 26

1   Q   Did you see the written report of his
2   physical or medical examination that was done at the
3   time he was being hired?
4       A   No.
5   Q   Did there come a time prior to departing for
6   Philadelphia that you became aware of a concern of
7   Mr. Green's about being able to stop to use the
8   bathroom on that trip?
9       A   My only recollection is that Meg mentioned
10  something that I took to be a fairly low level --
11  either he had been sick or had a cold.  It was not
12  something that I was concerned about, and as I recall,
13  I said that's no problem; certainly, we can stop if he
14  needs to stop.
15  Q   What do you recall Meg saying to you about
16  this?
17      A   About what?
18  Q   About Mr. Green's concern about being able
19  to stop to use the bathroom on the trip to
20  Philadelphia?
21      A   I recall very little, because it was not a
22  major item for me or her.  She just wanted to alert

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 27

1   me, as I recall, but I don't recall the content of the
2   conversation at all.
3   Q   Did she mention the underlying reason for
4   the request or concern of Mr. Green's?
5       A   I don't recall that she did.
6   Q   Did you understand whether the concern and
7   request was related to stopping for purposes of
8   urination or for purposes of a bowel movement?
9       A   I have no knowledge of that.
10  Q   So your recollection is that she mentioned
11  it, it wasn't a major item, and your response was, in
12  keeping with that, it's not a problem?
13      A   Right.
14  Q   Approximately how long had Jeff Madden held
15  the position of driver to the president?
16      A   I don't recall exactly, a year or two.  I
17  don't have the dates.
18  Q   It seems like a year or two?
19      A   I really don't recall the exact timeframe.
20  Q   Was there a precipitating reason for his
21  termination?
22      A   There were several.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 28

1   Q   Several precipitating?
2       A   Right.
3   Q   And several ongoing before the
4   precipitating?
5       A   I don't understand the distinction.
6   Q   Several ongoing problems and concerns about
7   his performance before the precipitating events?
8       MS. KEARNS:  I'd object to the form.  He's
9   just asking if that's the straw that broke the camel's
10  back, I think.
11      THE WITNESS:  I think it was the
12  accumulation of a number of issues that kept
13  reoccurring that he seemed not to be able to resolve.
14  I don't recall a single incident.
15  BY MR. GNATT:
16  Q   Describe what those recurring problems were
17  with Jeff Madden?
18      A   I would have to go back and see Meg's notes,
19  which I haven't thought about in quite a while.
20      One was obviously smoking.  He had indicated
21  that he was not a smoker and would not be smoking; two
22  was he was a bad tailgater and ended up having a wreck

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 29

1   in New York as a result of that; three was he did not
2   know the city very well and would get lost on the way
3   to various appointments.
4   Q   By city, you mean D.C.?
5       A   D.C., yeah, primarily.  According to Meg, in
6   her dealings with him, he routinely misrepresented the
7   facts and was not truthful, and he missed several
8   pickups, was late, et cetera.  Those are some of the
9   things that I remember.  There may be more.  I don't
10  know.
11  Q   Even though it may not have been treated as
12  the straw that broke the camel's back, do you remember
13  what the later occurring problem was with him
14  immediately prior to his termination?
15      A   At the moment, I do not.
16  Q   If the records were to reflect that he was
17  employed in that position for approximately three
18  years, would you have any reason to disagree with
19  that?
20      A   No.  Whatever the facts are on his personnel
21  records would be the facts.
22  Q   Would you say that his inability to get

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 30

1  around Washington and the fact that he would get lost
2  was a recurring problem?
3      A   Yes.
4      Q   And being a bad tailgater was a recurring
5  problem?
6      A   Yes.
7      Q   And that was not just in New York, on that
8  occasion when he had an accident, but also in
9  Washington on a regular basis?
10     A   Yes.
11     Q   He was spoken to about that, I assume?
12     A   Yes.
13     Q   And he was spoken to about being late for
14  pickups?
15     A   Yes.
16     Q   And he was spoken to about misrepresenting
17  facts to Meg?
18     A   Yes.
19     Q   He was spoken to about the disingenuous
20  description of himself as a nonsmoker?
21     A   Yes.
22     Q   And he did not demonstrate adequate

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 31

1  improvement in these areas as time went by?
2      A   Correct.
3      Q   What do you remember about the discussion
4  and the circumstances of his termination and your role
5  in that?
6      A   As I recall, Meg, who was his immediate
7  supervisor, is the one who called him into her office
8  and terminated him, went over the issues and so forth.
9  Immediately after that, she buzzed me and said that
10  Jeff would like to speak with me, so I said send him
11  in. He came in and he said, President Ladner, this is
12  not the first job I've lost; I've had a terrible
13  childhood; my father abused me terribly; I've had
14  trouble holding jobs, but I want you to know, on
15  leaving, I think you're a wonderful person; you're
16  doing a hell of a job for the university, and It's
17  been an honor to work for you. I said thank you very
18  much, Jeff. I hope you do get help because I know you
19  have personal issues that you're struggling with, and
20  I said I wish you well, and he said thank you very
21  much, and he left.
22     Q   Are we certain that Jeff's termination

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 32

1  occurred after he had completed his probationary
2  period?
3      A   Yes.
4      Q   Did some or all of these performance issues
5  appear and show themselves during his probationary
6  period?
7      A   I don't recall.
8      Q   Prior to Jeff Madden, it's my understanding
9  that James Person held the position?
10     A   Correct.
11     Q   For about three years and, then, retired?
12     A   Sounds right.
13     Q   And prior to that, Val Gidda?
14     A   Val Gidda, yes.
15     Q   Who held the position for, perhaps,
16  something less than a year and was fired after using
17  profanity towards a woman who worked in the residence?
18     A   Correct.
19     Q   Do you know what specific instructions
20  Mr. Green was given about how to go about coordinating
21  the need to drive you with the need to at times drive
22  Mrs. Ladner?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 33

1      A   Meg is the one who took care of that, but it
2  would have been our protocol to coordinate between
3  Sally Ekfelt, who was Mrs. Ladner's assistant, and
4  Meg, who was my assistant.
5      Q   So Mr. Green would carry out the plan as
6  arranged by those two assistants, Sally and Meg?
7      A   Correct.
8      Q   So Mr. Green was dependent on their
9  coordination of effort in order to know how these
10  conflicting situations were going to be addressed and
11  resolved?
12         MS. KEARNS: I object to the form of that
13  question.
14         THE WITNESS: It's confusing, but as I
15  understand it, he knew that his immediate supervisor
16  was Meg, and all questions ultimately ended up with
17  her to be resolved.
18  BY MR. GNATT:
19     Q   And the protocol was for Meg and Sally to
20  work out the conflicts so that Meg, in turn, could
21  tell Mr. Green what was expected of him?
22     A   The answer to that is, yes, but I must

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 34

1  equivocate in the following way:  The residence was
2  right on campus.  It was not a matter of being
3  downtown and having to coordinate it.  That was a very
4  simple coordination, and there was not a lot of
5  complicated things that had to be worked out.  It was
6  simply a matter every day of talking to each other and
7  knowing schedules and things that had to be done and
8  so forth.
9      Q    Are you aware of times when there were some
10  problems that arose where there was a conflict between
11  your need to be driven somewhere and your wife's need
12  to be driven somewhere and that the arrangements had
13  not been made to resolve that conflict?
14      A    I'm not aware that the arrangements had not
15  been made.  I'm aware that Mr. Green failed to follow
16  the arrangements that had been made.
17      Q    Is that on one occasion that you're thinking
18  of or more than one?
19      A    More than one.
20      Q    Can you be specific about any of them?
21      A    Yes.  I can remember an occasion -- I think
22  it was a Sunday morning or Saturday morning -- when he

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 35

1  was sitting in the driveway early in the day, and it
2  was discovered that he had not read his arrangements
3  that had been put on his Blackberry by Meg, which said
4  there was to be no pickup.
5      I can recall his letting me out at the
6  Metropolitan Club and telling me as I was getting out
7  of the car that he would not be picking up me because
8  he had to pick up Mrs. Ladner, leaving me to find my
9  own way home.
10      Those are two that come to mind, but, in
11  general, he seemed not to be able to follow
12  directions, to check his daily schedule, and so it was
13  not that the arrangements were problematic.  It was
14  that the he was unable to follow the arrangements.
15      MR. GNATT:  Mr. Green, as yesterday, needs
16  to leave, and he hopes to come back while we're still
17  in progress, but at this point I would also like to go
18  off the record, so as he's leaving, he can mention
19  something to me that I will follow up on after he's
20  gone.  We're off the record.
21      (Mr. Green leaves the deposition and brief
22  recess.)

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 36

1      MR. GNATT:  Back on the record.
2  BY MR. GNATT:
3      Q    Dr. Ladner, the incident at the Metropolitan
4  Club and your understanding as to how that problem
5  became a problem is based on information you received
6  from Meg and/or Sally?
7      A    Probably Meg, yeah, because in that
8  situation, I would have called her immediately.
9      Q    So the notion that it was Mr. Green who was
10  responsible for the problem is based on information
11  furnished to you by Meg?
12      A    That's right.
13      Q    As of the time that you were getting ready
14  to embark on the trip to Philadelphia, was Mr. Green
15  being considered for termination of his employment?
16      A    I don't recall that there was a discussion
17  about termination at all.  I think both Meg and I were
18  concerned about an accumulation of issues that seemed
19  not to be resolved by Mr. Green, and we were
20  concerned, but it was not a moment in which we said
21  we're now considering him for termination.
22      Q    And just to be clear with my question, I

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 37

1  don't mean to ask was that particular moment a moment
2  when you had that discussion?  What I mean is:  Up to
3  that point, was he under consideration for
4  termination?
5      A    That is the meaning of probation, as a
6  matter of fact.  We always assume employees have to
7  measure up.  As I said, there's no moment which we
8  said, now, we're considering termination.  We simply
9  said you have four months; some employees make it;
10  some don't, and he was in that process.
11      Q    But, as you say, there had been no
12  discussion about terminating him?
13      A    I don't recall one.
14      Q    You were aware of the beginning and ending
15  dates approximately of that four-month probationary
16  period?
17      A    At the time, yes.
18      Q    So you knew even before leaving for the
19  Philadelphia trip that his probationary period was due
20  by sometime in mid-December --
21      A    I knew at the time, yes.  I don't know now.
22      Q    I gather that you are asserting at this

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 38

1  point that, on the return trip from Philadelphia, you
2  were the only passenger in the car with Mr. Green
3  driving?
4      A   Yes.
5      Q   As you're aware, a previous answer in your
6  interrogatories indicated that Al Checcio was in the
7  vehicle on the return trip and that answer had been
8  amended, and there was a correction. The information
9  was provided to me informally, correcting that
10  information some time ago. My question is: How did
11  that incorrect information come to be in your Answers
12  to Interrogatories in the first place?
13      MS. KEARNS: I would just -- you can answer
14  the question, but I would obviously caution you that
15  you can't reveal communications with your lawyer, so
16  to the extent you can answer that without talking
17  about what you discussed with me, you can try to
18  answer it.
19      MR. GNATT: You can tell me that you had
20  communication with your attorney and that that played
21  a part in this process of correcting information. The
22  only thing you can't tell me is the actual words

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 40

1  sent.
2      Q   Did you read it before you signed it?
3      A   I did.
4      Q   Did you believe, at the time you signed it,
5  it was accurate?
6      A   Absolutely.
7      Q   At some point thereafter, did your
8  recollection change?
9      A   Yes.
10      Q   Did you have a subsequent communication with
11  your lawyer about anything after that, yes or no?
12      A   About anything?
13      Q   About the topic, about the interrogatory.
14      A   Yes.
15      Q   And did you review or revise the
16  interrogatory?
17      A   Yes.
18      Q   At the time you signed it, was it your best
19  recollection of the facts?
20      A   Yes.
21      Q   Is that the interrogatory we provided to
22  Mr. Gnatt yesterday?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 39

1  spoken between you and your attorney and your attorney
2  to you. That's just an amplification on what your
3  attorney has just said, and she may not even agree
4  with what I just said, but I don't want you to be
5  unduly limited by what she said either.
6      MS. KEARNS: Can I make a proposal that I
7  think could resolve this? Because he can't talk about
8  content. If I could -- it's your deposition, but I
9  think you can get the answer to this. May I ask him a
10  few questions? It will get your answer.
11      MR. GNATT: Okay.
12      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
13  BY MS. KEARNS:
14      Q   Do you recall signing the first
15  interrogatory answer that refers to Al Checcio being
16  in the car?
17      A   Yes.
18      Q   Did you talk to your lawyer before signing
19  that interrogatory?
20      A   Meaning you?
21      Q   Yes.
22      A   Only, I believe, saying that it was being

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 41

1      A   I assume so.
2      MR. GNATT: Thank you for that much. I
3  still have a question or two.
4      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
5  BY MR. GNATT:
6      Q   When you reviewed the first prepared Answers
7  to Interrogatories that said that Al Checcio was in
8  the vehicle, you thought that was correct information;
9  is that correct?
10      A   That's right.
11      Q   What made you think, if you can answer this,
12  that that was correct?
13      A   Well, I've discussed this with you, so I
14  assume I can't answer.
15      MS. KEARNS: You can answer not what you
16  said. There's no big mystery here. He thought about
17  it further and realized it was a different trip when
18  he was in the car on the way back. I'm not sure what
19  you think you're going to get out of this. He gave
20  his best memory on the first one. He thought about it
21  further, and he realized he wasn't on that car trip
22  back, so we did a new one to be accurate. It's not a

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 42

1 mystery, so you can press it as much as you want.
2 BY MR. GNATT:
3      Q   You have been on trips from Philadelphia to
4 Washington or at least one in which Al Checcio was a
5 passenger in the vehicle?
6      A   And/or New York.  I traveled extensively, so
7 I would often be accompanied by vice presidents or
8 trustees, or what have you.
9      Q   Did you have any recollection of Mr. Checcio
10 being involved in the discussion with Mr. Green about
11 making a bathroom stop on the way back from
12 Philadelphia?
13     A   He wasn't on the way back from Philadelphia.
14     Q   But when you first participated in preparing
15 the Answers to Interrogatories, did that come to mind?
16     A   In my first interrogatory, yes.
17     Q   What came to mind?  What did you remember?
18     A   I remembered because Al Checcio had been
19 with me on other trips that we had made, other stops
20 with other drivers, obviously.
21     Q   And you had asked on those occasions whether
22 making the stop was okay with Al?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 43

1      A   Right.
2      Q   Did you remember ever discussing with Al
3 Checcio your observations of the way Mr. Green was
4 driving and his manner of conducting himself on that
5 return trip from Philadelphia?
6      A   No, I have no memory, and he was not on the
7 return trip.
8      Q   So there isn't anyone that you could have
9 talked to about those observations?  There's no one
10 with whom you could have shared any observations
11 because there was no one else there?
12     MS. KEARNS:  Objection.  You mean at the
13 time of the trip?
14     MR. GNATT:  Yes.
15     THE WITNESS:  There was no one else in the
16 car.
17 BY MR. GNATT:
18     Q   While in Philadelphia, there were periods of
19 time while Mr. Green was driving on the trip in
20 December, December 2, 2004, periods of time that Al
21 Checcio was in the car, correct?
22     A   Correct.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 44

1      Q   During that entire trip, was anyone besides
2 yourself and Al Checcio and the driver, Reggie Green,
3 in the car?
4      A   I think not.  I was trying to remember if we
5 gave a ride to one of the persons we met with, but I
6 think the answer is no.
7      Q   Al Checcio lives in Pennsylvania; is that
8 correct?
9      A   No.  He lives in New York City, but he has a
10 home in Pennsylvania that he's had for many years.
11     Q   Is that home in the environment of the city
12 of Philadelphia?
13     A   Yes.
14     Q   So it's your impression that Al Checcio
15 knows his way around Philadelphia quite well?
16     A   Yes.
17     Q   Better than you?
18     A   Yes.
19     Q   And there came a point in time during the
20 time that you were in Philadelphia with Mr. Checcio in
21 the car that you asked Mr. Checcio to give Mr. Green
22 driving directions?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 45

1      A   I would state it differently.  There was
2 almost no point in which Mr. Green knew where he was
3 and knew where he was going, so the entire time
4 Mr. Checcio had to give -- I didn't turn to him and
5 ask.  He simply had to give directions for us to get
6 to our appointments.
7      Q   So you would say Mr. Checcio jumped in and
8 provided directions that were needed because Mr. Green
9 didn't know where he was?
10     A   I wouldn't say jumped in.  I think it was
11 commonsense.  He didn't know where he was, so he
12 provided the directions.
13     Q   He offered his help with directions?
14     A   That's right.
15     Q   Did Mr. Checcio signal to you during any of
16 this time distress, dismay over Mr. Green's
17 difficulties with navigating the streets of
18 Philadelphia?
19     A   Yes.
20     Q   What did he say?
21     A   He said, of the drivers you've had, he is by
22 far the worst.

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 46

1    **Q    When did he say that to you?**
2    A    I don't recall if it was at the end of the
3    day or during the day.
4    **Q    Did he provide further detail as to what he**
5    **was basing that on, or was the context something that**
6    **made it obvious?**
7    A    The context was obvious.
8    **Q    And the context was what?**
9    A    We had spent a day or two -- I don't
10   remember the length of the visit with Mr. Green
11   totally unable to perform his duties adequately.
12   **Q    Specifically what?**
13   A    Being lost, being unable to find us, being
14   unable to get from Point A to Point B to be on time,
15   driving, if not recklessly, at least turning right out
16   of the left-hand lane, et cetera.
17   **Q    Did you and Mr. Checcio talk in any specific**
18   **terms about these various things you just ticked off?**
19   A    I don't recall. The context was so obvious,
20   and it was such a bad driving experience that there
21   was no need for extensive conversation.
22   **Q    Mr. Checcio remains an employee of the**

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 48

1    agree that "Plaintiff, Reggie Green, received no
2    written document expressing concerns about his job
3    performance"?
4    A    I don't know.
5    **Q    On the return trip to Washington from**
6    **Philadelphia on December 2, 2004, Mr. Green informed**
7    **you that it was urgent that he stop to use the**
8    **bathroom.  Do you agree with that statement?**
9    A    No.
10   **Q    What did he inform you?**
11   A    My recollection is that he asked if he could
12   stop to go to the bathroom.
13   **Q    What was your response?**
14   A    Sure.
15   **Q    Did he then stop to use the bathroom?**
16   A    That's my recollection.
17   **Q    Do you know approximately how much time**
18   **passed between his request, your answer, and, then,**
19   **the stop itself?**
20   A    No.  I assume it was the next exit where
21   there was a facility.
22   **Q    Do you recall approximately how long the**

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 47

1    university?
2    A    No.
3    **Q    What was his title?**
4    A    Vice president, University Relations, I
5    believe.
6    **Q    Did he have an office in Washington?**
7    A    Yes.
8    **Q    Do you know where he currently resides?**
9    A    New York City.
10   **Q    Do you agree with this statement that**
11   **"Plaintiff, Reggie Green, received no written document**
12   **expressing concerns about his driving style while he**
13   **was employed with the university"?**
14   A    Well, in light of this document, I don't
15   know whether this was presented to him as a written
16   document or whether it was simply Meg's own briefing
17   paper for a discussion, so I don't know.
18   MS. KEARNS:  Just so the record is clear,
19   the Witness is pointing to Ladner Exhibit No. 1 as he
20   was speaking.
21   BY MR. GNATT:
22   **Q    Similar but different question:  Do you**

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 49

1    stop lasted?
2    A    No.  I would --
3    MS. KEARNS:  It sounds like you're about to
4    guess.
5    THE WITNESS:  No.  I was about to say it was
6    unexceptional.  I have no recollection of it being
7    something to comment on.
8    BY MR. GNATT:
9    **Q    You remained in the vehicle during the stop?**
10   A    I did.
11   **Q    That's your general practice?**
12   A    Right.
13   **Q    And that goes back to a previous answer that**
14   **you gave me, which is, on a trip the length of a trip**
15   **from New York or Philadelphia, you don't typically**
16   **need a bathroom break?**
17   A    Plus I have a sort of mini-office in the
18   back seat, and I was in the middle of working.  That's
19   typical.
20   **Q    But you don't have a bathroom in the**
21   **vehicle?**
22   A    Is that a serious question?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 50

1     Q  Not totally. So you deny that you told
2 Mr. Green that you preferred not to have to stop?
3     A  Absolutely.
4     Q  Do you agree or disagree with this
5 statement: "Mr. Green did use the GPS system prior to
6 the trip to Philadelphia"?
7     A  Disagree.
8     Q  It's your contention that he never used it?
9     A  Correct.
10     Q  Is it also your contention that he never
11 used it during the trip to Philadelphia?
12     A  Correct.
13     Q  Who made the decision to terminate
14 Mr. Green's employment?
15     A  I did.
16     Q  Did you have full say in the matter?
17     A  Did I have full say? I made the decision.
18 I'm not sure what you're asking.
19     Q  You made the decision. Was that your
20 decision to make and yours alone?
21     A  Yes. He was my staff member.
22     Q  What, if any, discussions did you have with

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 51

1 Meg or anyone else about terminating his employment?
2     A  She and I met and reviewed her observations
3 and compared them with my observations, because I had
4 to make a decision about his going off of probation
5 and continuing or not continuing, so we met and
6 thoroughly reviewed all of his performance.
7     Q  When did that take place?
8     A  Sometime between the first and 15th of
9 December, if December 15th was the termination date
10 for probation. I'm sure it was during that two-week
11 period.
12     Q  Is it your testimony that the Philadelphia
13 trip was not a straw that broke the camel's back
14 event?
15     MS. KEARNS: Objection to the form of that
16 question, because his testimony was not -- it's just
17 hard to follow. You can try.
18     THE WITNESS: Repeat the question.
19 BY MR. GNATT:
20     Q  Is it your testimony that the trip to
21 Philadelphia was not a, quote, unquote, "straw that
22 broke the camel's back event" triggering his

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 52

1 termination?
2     MS. KEARNS: I object to the form of that
3 question, but you can answer it.
4     THE WITNESS: I wouldn't put it that way,
5 because in making the decision, I reviewed his total
6 performance, and the trip to Philadelphia was
7 certainly a disaster in terms of his performance, and
8 it confirmed tendencies we observed in other contexts.
9 BY MR. GNATT:
10     Q  Do you know the date of his termination?
11     A  I do not.
12     Q  Are you aware you signed a letter
13 terminating him?
14     A  Yes.
15     Q  What, if any, practice did Meg Clemmer
16 follow that you're aware of regarding taking notes of
17 what occurred each day?
18     A  I don't know her exact practice. I do know
19 that it was her habit to take notes on what was going
20 on every day for her area of responsibility, but I
21 don't know how she did this or with whom she shared
22 them.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 53

1     Q  Did you ever review any of her notes?
2     A  No.
3     Q  What, if any, concerns or complaints did
4 Sally Ekfelt ever express to you on her own
5 initiative, as opposed to any questions or comments
6 from you, about Mr. Green's performance or conduct on
7 the job?
8     A  As you know, Ms. Ekfelt worked in the
9 residence, so she was there every day when I came
10 home, and we saw a great deal of her and the residence
11 staff. On several occasions, she indicated how odd
12 and even bizarre his behavior seemed to be in relation
13 to the staff and some of the assignments that he
14 misunderstood and so forth.
15     Q  Were those occasions when she initiated
16 those comments, or were those in response to comments
17 or questions from you or Mrs. Ladner?
18     A  My recollection is she's such a nice person
19 that she probably around each of the two or three
20 events that I recall began by just wanting to
21 apologize for the mixup of Reggie not following
22 through with his assignment.

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 54

1    Q   What, if any, concerns or complaints did
2  your wife express to you on her own initiative, rather
3  than in response to questions or comments from you,
4  about Mr. Green's performance or his conduct on the
5  job?
6    A   One of the outstanding ones was when she
7  returned from a trip at either National or Dulles -- I
8  think it was Dulles -- and he greeted her by hugging
9  and kissing her, and she was so shocked, she came home
10  and said that is the most bizarre thing that I can
11  imagine, and she also expressed concern about his
12  driving and feeling unsafe and what an odd demeanor he
13  seemed to have.
14    Q   What, if any, description of his demeanor
15  did she provide?
16    A   I don't recall specific situations, but, in
17  general, she felt that he related to her and the staff
18  in an unusual and odd way, and the hugs were one
19  example.
20    Q   Any other examples that you know of?
21    A   He seemed not to understand assignments or
22  comprehend the context in which we all operated, for

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 56

1    A   Yes.
2    Q   What words did she use that conveyed to you
3  that she was offended?
4    A   I don't recall the exact words.
5    Q   Did she say that she had initiated the hug?
6    A   Absolutely not.
7    Q   Did she say whether she had anything
8  alcoholic to drink at the time?
9    A   She did not, and it would not be her custom.
10    Q   Would Meg Clemmer have initiated discussion
11  with you about concerns that she had about Mr. Green,
12  or would she only have dealt with those things as you
13  brought them up to her?
14    A   You mean during his entire employment?
15    Q   Yes.
16    A   It would be both.  She would express
17  concerns.  I would express concern.  We would compare
18  notes about performance.
19    Q   What concerns do you recall her bringing up
20  to you on her own initiative?
21    A   Many of the ones listed on Deposition
22  Exhibit No. 1.

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 55

1  example, sitting in the driveway when he didn't have
2  an assignment and similar things.
3    Q   That was one occasion where that occurred?
4    A   There were several occasions.  I think that
5  happened two or three times, but the mixup of her
6  schedule and my schedule was no problem for other
7  drivers.  She just commented that he seemed not to be
8  able to comprehend how to carry out his assignments.
9    Q   When Mrs. Ladner mentioned to you that
10  Mr. Green had greeted her with a hug and, you think, a
11  kiss at the airport, did she express that to you as
12  information or as a complaint or as a criticism or as
13  something else?
14    A   I'm not sure how to parse out those three
15  words.  She was shocked and bewildered.
16    Q   Was she offended?
17    A   Of course.
18    Q   Well, you say "of course."
19    A   Well, you asked me, so I said "of course."
20  I'm the one you asked.
21    Q   Did she express to you that she was
22  offended?

# BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 57

1    Q   As concerns that she had about Mr. Green's
2  performance on the job to date?
3    A   To date?
4        MS. KEARNS:  I object to the question.  I'm
5  sorry --
6        THE WITNESS:  I don't know what you mean.
7  BY MR. GNATT:
8    Q   Meg Clemmer initiated discussion with you
9  about many of the things that are listed on Exhibit 1
10  as being concerns that she had about Mr. Green's
11  performance on the job?
12    A   Correct.
13    Q   Did Mr. Green keep the vehicle topped off
14  with gas in a satisfactory manner?
15    A   I don't recall that as an issue.
16    Q   Do you know whether Al Checcio ever rode
17  with you when Jeff Madden was the driver?
18    A   Yes.
19    Q   Did Mr. Checcio make any comments about Jeff
20  Madden's performance or comments?
21    A   I don't recall that he did.
22    Q   How would you compare Mr. Green's

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 58

1 performance in the position with that of Jeff Madden?
2    A   I would say that Mr. Green was much worse.
3    Q   Can you be specific on what score you would
4 consider him much worse?
5    A   He was totally unable to deal with the GPS,
6 to enter navigational data, which is a fairly simple
7 thing to do, to navigate, especially when you're out
8 of town.  He was a much worse driver.  He did not know
9 the city of Washington at all and was continually
10 taking wrong turns and delaying my arrival.  He was
11 confused about the assignments, about the schedule.
12 He acted inappropriately with passengers in terms of
13 chitchat, in terms of his response to Mrs. Ladner, to
14 trustees that he picked up at the airport.  He seemed
15 unable to correct the simplest of faults, leaving rags
16 in the car and food in the car, et cetera.  He dressed
17 inappropriately, showed up in his motorcycle uniform
18 and his helmet to drive one day, for example.  He
19 represented to me that his broken foot would be healed
20 in just a matter of a week or two.  It seemed to take
21 months.  He seemed to have that disability for a
22 while.  In general, he was disconnected, I would say,

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 59

1 from the requirements of the job and seemed unable to
2 assimilate the duties that were obvious ones for him
3 to perform.
4    Q   He didn't tailgate, did he?
5    A   Five car lengths back, I don't call
6 tailgating.
7    Q   He didn't have any crashes?
8    A   No.
9    Q   The occasion when he was in a motorcycle
10 suit was a day when you had what appointments to go
11 to?
12    A   I had a dental appointment.
13    Q   Ultimately, you were provided with some
14 explanation of what had happened that led him to be
15 showing up in a motorcycle suit; am I right?
16    A   He said something about car trouble or
17 something.  I don't recall the particulars at the
18 time.
19    Q   He offered some explanation?
20    A   Yes, he offered some explanation.
21    Q   Did you give credence to what he said?
22    A   Well, only partially, because it was his

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 60

1 responsibility to call Meg if there was a problem
2 about not being picked up, and when it got to be time
3 for me to be at my appointment, he was not there, and
4 Meg didn't know where he was, and it would have been a
5 simple thing for him to simply check in with me, which
6 were his instructions, so I didn't trust exactly his
7 explanation.
8    Q   Were there advantages that you perceived of
9 having a driver employed by the university, such as
10 Mr. Green, such as Jeff Madden overusing a private
11 limousine company such as Carey?
12    A   Yes.
13    Q   What were those advantages?
14    A   We actually did an experiment, I think, for
15 about six months after Mr. Madden left to see if, from
16 the standpoint of costs, of efficiency, and so forth
17 that we could make that experiment work.  It turned
18 out that the cost was not a factor.  It was not
19 cheaper to use them, but the hassle was much more
20 difficult.  They couldn't always guarantee the best
21 drivers.  There would be people who would show up who
22 just started and didn't know Washington, and when I

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 61

1 would be under a time deadline to get to an
2 appointment, knowing about the quality of the cars,
3 and, often, you would have to call two or three
4 different car providers in order to get a schedule,
5 and my schedule changed during the day a great deal as
6 events happened, and I might have to go someplace that
7 wasn't on my schedule initially and so forth, and they
8 were not good about being able to respond immediately
9 to those kinds of needs, so, on balance, it was both
10 Meg's and my conclusion that it was more efficient
11 from the standpoint of cost and my schedule and so
12 forth to have a driver on staff, and previous
13 presidents had drivers and so forth, and we felt that
14 was the best judgment.
15    Q   Do you know Mr. Saul, S-A-U-L, of Chevy
16 Chase Bank?
17    A   I met him once.
18    Q   Where did that meeting occur?
19    A   In his office.
20    Q   Have you ever spoken with him on the
21 telephone?
22    A   No.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 62

1    Q   In general, what was the purpose of the
2  meeting in his office?
3    A   It was typical of our vice president of
4  finance to introduce me to the heads of major banks
5  and corporations and so forth with whom we were doing
6  business, and we had just allowed them to take over a
7  bank branch on our campus, and he arranged an
8  introduction.
9    Q   Do you recall whether your visit to him at
10  his office was a trip that Mr. Green drove you on?
11    A   I don't recall.
12    Q   After that meeting, have you had any form of
13  communication with Mr. Saul?
14    A   None.  I would not recognize him on the
15  street.
16    Q   No phone contact, no e-mail contact, and no
17  person-to-person contact?
18    A   N-O-N-E, none.
19    Q   Did you ever come to find out that Mr. Saul
20  or Chevy Chase Bank had hired Mr. Green as Mr. Saul's
21  driver?
22    A   Yesterday.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 63

1    Q   That was the first time?
2    A   First time.
3    Q   Did Mrs. Ladner in your presence once say to
4  Mr. Green something to the effect that you'll work for
5  us forever?
6    A   No.
7    Q   Did she ever say something in your presence
8  that was similarly optimistic, positive,
9  complimentary, however you want to view it?
10    A   No.  I'm sure she was nice to him, but I'm
11  sure she knew he was like any other employee, a new
12  employee on a probationary basis, and she would never
13  make those comments.
14    Q   Did you ever hear her say very complimentary
15  things to him about his performance on the job?
16    A   No.  As I say, it would be typical of her to
17  be very nice, and she might have said thank you for
18  opening my door or bringing me here or something, but
19  I don't recall anything positive other than being
20  nice.
21    MR. GNATT:  Let's go off the record for a
22  minute.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 64

1    (Discussion off the record.)
2  BY MR. GNATT:
3    Q   Do you remember during the hiring stage
4  there being a question raised by someone, maybe Meg,
5  maybe you, about why there was a significant gap in
6  Mr. Green's employment record and wanting to
7  understand the explanation for that gap?
8    A   No.
9    Q   Are you aware of a request being made of
10  Mr. Green to authorize the release of medical
11  information as part of the hiring process?
12    A   No, but it would not be atypical of our
13  Human Resources Department to follow the protocol of
14  asking for all records, but I have no specific
15  knowledge for a request.
16    Q   Do you remember, as you first arrived in
17  Philadelphia on the trip in question, finding
18  yourselves in an area that did not seem to be the
19  route as you would know it to get to the hotel?
20    A   Right.
21    Q   What impression did you have about the
22  situation as you observed it?  What was your

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 65

1  impression?
2    A   My impression relating to what?
3    Q   How did you interpret what was going on?
4    A   Well, as I was working in the back, I think,
5  on my computer, and as I realized we were coming down
6  the interstate toward Philadelphia, I knew roughly
7  that we'd have to go downtown to take the exit, and he
8  took what seemed to me to be an early exit, and I
9  asked if it was the right exit, and he said, yes, so I
10  continued my work and looked up again, and we were in
11  a section where there was just an endless line of
12  18-wheelers backed up to warehouses, unloading
13  material, et cetera, et cetera, and I said do you know
14  where we are?  And he said, well, not really at the
15  moment, or something to that effect, and I said, well,
16  couldn't you put it in on the GPS and get us to the
17  right place?  And he said, no, I don't know how to do
18  that, so I said go up to the next corner; I can get us
19  downtown, and it was simply a matter of looking at the
20  tall buildings and getting to the center city,
21  Philadelphia, so I directed him to get back on the
22  main drag that took us down streets I had on my notes

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 66

1  for wherever the Four Seasons was.
2  **Q   You had some notes about where it was?**
3  A   No.  I simply had a travel address that Meg
4  provided me for all my travels.  It was a single
5  statement of where it was and addresses and so forth.
6  **Q   Do you know whether there was some problem**
7  **with the normal correct exit that led Mr. Green to**
8  **take a different exit?**
9  A   I do know.  There was no problem.
10  **Q   How do you know that?**
11  A   Because I was looking.
12  **Q   I thought you were working on your --**
13  A   I was, but I looked up and saw the city and
14  noticed he had turned off early, and it was the normal
15  exit, and I asked him if it was the right exit, and he
16  said yes.
17  **Q   Can you describe which exit he took?**
18  A   No.
19  **Q   Can you describe the exit that he should**
20  **have taken?**
21  A   Describe it, no.
22  **Q   Identify it?**

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 68

1  headlights in the automatic position, which you
2  mentioned earlier, and not in the off position.  Did
3  he comply?
4  A   Inconsistently.
5  **Q   Also mentioned is putting the passenger seat**
6  **back in the normal position.  Did he comply with that?**
7  A   Inconsistently.
8  **Q   These items that he complied with**
9  **inconsistently, did they ever become the subject of**
10  **follow-up counseling or discussion?**
11  A   To the best of my recollection, yes.  I
12  think Meg met with him several times, and, then, I met
13  with him with Meg to review items that needed
14  attention, and I imagine that those were on the list.
15  **Q   When she refers to removing all personal**
16  **items, you mentioned specifically food and rags for**
17  **cleaning.  Was that the extent of the personal items**
18  **that were found in the vehicle?**
19  A   I recall, one time, he left as a personal
20  item some book or notebook or something of his own
21  that he just left on the front seat.  I don't know
22  what it was.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 67

1  A   No.
2  **Q   Meg Clemmer's chronology indicated that, on**
3  **September 9, 2004, she spoke with Reggie expressing**
4  **your concerns about how the car is left at the end of**
5  **the workday.  One of the things she mentioned was that**
6  **the driver's seat should be put back in the number one**
7  **memory position.  Do you recall that being an issue,**
8  **or was that just one of the things on a checklist of**
9  **things?**
10  A   It was -- it became an issue that he
11  couldn't seem at the end of the day to go through that
12  checklist, but it was one on a checklist of things
13  that was to get ready to drive the next morning.
14  **Q   Is it your understanding that, at that time,**
15  **the purpose of Meg speaking with Reggie was to**
16  **reinforce these items that are on the checklist?**
17  A   That's what I recollect at the moment.
18  **Q   And did Mr. Green subsequently comply with**
19  **that particular request?  Did he get it right after he**
20  **was spoken to about it?**
21  A   Inconsistently.
22  **Q   The next item mentioned is leaving the**

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 69

1  **Q   Could it have been some kind of map book?**
2  A   No.
3  **Q   Meg has a notation in the chronology dated**
4  **October 1, 2004, at which time she says that you spoke**
5  **to Reggie, and she took notes.  There's mention of the**
6  **door locking problem having resurfaced again.  Do you**
7  **recall Mr. Green either attempting to or succeeding in**
8  **fixing that door locking problem?**
9  MS. KEARNS:  I just want to object one
10  moment.  I have an objection to you asking questions
11  and reading off of an exhibit that you have in front
12  of you and I have in front of me but that the Witness
13  doesn't have in front of him.  I think that's a little
14  unfair since you're asking about the contents of the
15  document.
16  MR. GNATT:  You would like him to have it in
17  front of him?
18  MS. KEARNS:  I think that would be
19  appropriate since you're asking questions about it.
20  MR. GNATT:  That's fine.  I'm putting in
21  front of Dr. Ladner the exhibit that was identified
22  yesterday as Clemmer Deposition Exhibit No. 6.

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 70

BY MR. GNATT:
2  **Q  I'm looking at a page that's Bates-stamped**
3  **AU 0135 at the bottom and 04 at the top and,**
4  **specifically, an entry that starts with the date of**
5  **October 1, 2004, and I'm looking at Paragraph 3 at the**
6  **end, the last sentence that refers to the famous door**
7  **locking problem, and my question is: Were you aware**
8  **of any effort made by Mr. Green to fix that problem?**
9    A   Not specifically, but I know that Meg had
10  asked him to either take it or call the service
11  department or something, because over a period of
12  months, it would self-lock when you got out of the
13  car, and I'm sure she birddogged that in a way with
14  the drivers that we had to try to see if we could
15  correct it, so I don't have specific knowledge that he
16  did something to correct it, but I know she was
17  working on that.
18  **Q  No. 6 refers to the amount of distance**
19  **between cars.  Your feeling was that the amount of**
20  **distance that Mr. Green was leaving went beyond**
21  **reasonable defensive driving; is that correct?**
22    A   Correct.

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 71

1  **Q  Did it also feel like this practice was**
2  **slowing down the trip?**
3    A   Yes.  I missed several lights because he was
4  so far back.
5  **Q  You missed several green lights?**
6    A   Traffic lights, yes.
7  **Q  And had to stop?**
8    A   That's right.
9  **Q  Were there any specific incidents where**
10  **safety was jeopardized by this practice of his?**
11   A   Well, in my judgment, it confused the cars
12  around us, because they would blow their horns.
13  People would try to cut in front of us.  They didn't
14  know if we were stalled.  I think you have to admit
15  that, driving in Washington, D.C., you rarely see a
16  car five car lengths back, stopped at the stoplight,
17  so I felt it was not a safe practice.
18  **Q  Specifically stopping that far back at a**
19  **stoplight when you're fully stopped?**
20   A   That's right.
21  **Q  How about, as you're driving along, keeping**
22  **this extra distance between you and the car in front**

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 72

1  **of you, did that create any specific safety hazards?**
2    A   Yes, in my judgment, for the reasons I just
3  cited.
4  **Q  The confusion --**
5    A   Right.
6  **Q  No. 7 talks about it's not necessary to stop**
7  **and, then, crawl over a speed bump, and I gather it's**
8  **also your concern that, when he saw a construction**
9  **zone, he was slowing down more than he needed to?**
10   A   No.  It was not a construction zone.  It was
11  ordinary speed bumps that are built into routine
12  streets that, ordinary drivers in driving, you would
13  simply show down and go over them, which is the intent
14  of a speed bump.  He would come to a speed bump and
15  come to a complete stop as if there was a stop sign
16  there and, then, very slowly creep over it.
17  **Q  Wouldn't you agree that, by doing that, he**
18  **would minimize the impact of the bump on the drive, on**
19  **the trip, on the passenger?**
20   A   Not really.  If you've ever done that, it
21  actually gives you a heightened sense of going up, and
22  it's also so unnatural and weird that it caused me

BRADFORD ASSOCIATES
BENJAMIN LADNER

Page 73

1  each time to stop what I was doing in the back,
2  whether I was reading or working on my computer and so
3  forth, so I wouldn't agree with that.
4  **Q  Well, No. 7 seems to combine the speed bump**
5  **issue with also a construction work issue.  Do you**
6  **remember that being an issue, that, upon entering a**
7  **construction zone, he slowed down more than you**
8  **thought he needed to?**
9    A   I don't remember a specific site.  Let me
10  just say, in general, that he drove so slowly that it
11  was in, my judgment, a safety issue.  He would drive
12  45 miles an hour on the interstate, for example, and,
13  then, he would speed up and, then, drop down to 35.
14  He would drive the speed limit going downtown to
15  Washington, and, then, he'd drop down to 15 miles an
16  hour for no reason, and he'd stop for speed bumps, and
17  it was a bizarre driving pattern, so I don't remember
18  a specific construction site, but I can easily imagine
19  he did the same thing if we came to one.
20  **Q  What is the meaning of No. 8, especially**
21  **about the part when Mrs. Ladner is sitting behind him,**
22  **to be mindful of her comfort?**

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 74

1    A   The particular car that we had, the model of
2  the car was an infinity, which had a unique design
3  compared to other cars that would give a very narrow
4  leg space in the back, and it was simply to remind him
5  not to push too far back because she would have to sit
6  sideways, or her knees would go into the back of the
7  front seat.
8    Q   It says that you thanked him for the manner
9  in which he handled Mrs. Ladner up to now.  What were
10 you aware of as to the manner in which he had handled
11 her up until then?
12   A   I take that to mean in relation to the seat
13 and adjusting for her comfort in the car.
14   Q   Just that?
15   A   Just that.
16   Q   As to Paragraph 9, as of October 1st, can
17 you estimate how many occasions you had observed
18 Mr. Green make a right-hand turn from the left lane?
19   A   I don't recall any occasions in which he did
20 not do that.  Coming to the president's office and
21 hitting Ward Circle, which is the main circle there,
22 he would be in the left lane and refuse to get into

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 75

1  the right lane until it was time to turn and, then,
2  cut in front of other cars.  He always did that.
3    Q   So is that the basis for this item of
4  concern, the way he handled Ward Circle?
5    A   No.  He would do it in other -- it was
6  typical of him not to be able to judge when he was
7  going to turn appropriately, and sometimes he would
8  straddle a line of two lanes, and sometimes he would
9  be in the left lane and turn right and sometimes in
10 the right lane and turn left.
11   Q   The October 15, 2004, entry appears to be
12 one that you've talked about already.  Do you know
13 when Mr. Green was first advised that there was a need
14 to take Mrs. Ladner somewhere?
15   A   No.
16   Q   Do you remember how ultimately your pickup
17 was handled that day?
18   A   No, I don't.
19   Q   If Mr. Green were to testify that he came
20 back and got you after taking Mrs. Ladner where she
21 needed to be, would you have any reason to negate that
22 or to dispute that?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 76

1    A   No.  I don't remember.  Meg worked out a
2  solution.  I just don't remember what she.
3    Q   Prior to today, had Meg or anyone else
4  suggested to you -- not suggested it to you, but told
5  you that Reggie Green in response to being told about
6  the hugging incident at the airport was contending
7  that Mrs. Ladner had initiated the hug?
8    MS. KEARNS:  I would object to the extent
9  you're asking him to reveal information he may have
10 learned from counsel, but aside from that, you can
11 answer the question.
12   THE WITNESS:  No.
13 BY MR. GNATT:
14   Q   On Page 6, AU 0137, the entry for
15 November 4th to the 5th, 2004, how familiar are you
16 with the situation that was described in there?
17   A   I'm familiar that Meg reported to me that
18 she had this discussion with him and made these
19 points.  Is that what you're asking?
20   Q   I'm really asking how familiar were you with
21 the situation that is described here and Mr. Green's
22 culpability, if you will, for what happened?

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 77

1    A   Well, as I've testified earlier, these were
2  all issues that kept coming up, so Meg and I discussed
3  them.  I was certainly aware of them, and we compared
4  notes and our evaluation of his performance, so I was
5  certainly aware of them.
6    Q   This is now at the top of Page 7.  Did
7  Trustee Leslie Baines, vice chair, bring this issue up
8  as a complaint?
9    MS. KEARNS:  I just need to object to the
10 form of the question, because it assumes he had a
11 conversation with Leslie Baines about this.  Bring it
12 up to whom?
13 BY MR. GNATT:
14   Q   What is your knowledge about how Leslie
15 Baines addressed this issue, to whom and what did she
16 say?
17   A   I don't know other than what you've -- what
18 Meg has written here.
19   Q   So you don't know whether Leslie Baines was
20 expressing dismay or a complaint or anything like
21 that?
22   A   No.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 78

1   Q   Were there mixups when Jeff Madden was the
2   driver about needing to take Mrs. Ladner somewhere,
3   needing to take you somewhere, and having some
4   conflict that presented itself as a problem?
5   A   Every day, there were scheduled adjustments
6   to be made because of competing schedules. I wouldn't
7   say that they were mixups in the same way that Reggie
8   seemed, not to able to call in and find out what his
9   own schedule was. It was just part of doing business,
10  that she had a schedule and a staff; I had a schedule
11  and a staff; she had appointments; I had appointments;
12  and we tried to adjust those, and that's why we had a
13  procedure between her assistant and my assistant to
14  work those out on a daily basis; so there's a
15  difference between having schedule conflicts which
16  were resolved and having mixups which seemed to be the
17  pattern with Reggie.
18  Q   It looks like, from the entry on Paragraph 4
19  on Page 7, that Sally Ekfelt took some responsibility
20  for what had occurred as described above and that
21  there was some going-forward arrangements that were
22  made to try to improve on the situation. Would that

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 79

1   be fair to say?
2   A   It looks like that. I didn't get involved
3   in the details of how they worked out these
4   procedures.
5   Q   Well, are you aware generally that that
6   situation was not laid at the feet of Reggie Green
7   entirely and exclusively?
8   A   That specific one, I knew there was a mixup,
9   and I did not feel that he was totally at fault,
10  although, as I'm reviewing this, it says it had been
11  made clear to him that the 9:00 a.m. entry slot was to
12  make him generically aware, and he was to look into
13  his Blackberry for further details, which he didn't
14  do.
15  Q   Well, do you know of specific instances
16  after November 7th or 8, 2004, that he didn't do it?
17  A   As cited on Page 8, No. 4, it looks like he
18  had not read the notes for his calendar entry.
19  Q   But that's part of the November 7 and 8
20  entry, is it not?
21  A   Is it? Okay.
22  MS. KEARNS: I think the question is:

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 80

1   Sitting here today, do you remember anything about him
2   not reading his Blackberry after November 7 and 8?
3   THE WITNESS: Oh. I don't remember the
4   specific date of November 8th, but I do remember it
5   was a recurring problem, that he seemed not to be able
6   to operate his Blackberry in a way that would allow
7   him to know where he was, so he'd end up in our
8   driveway. He would not be present for a pickup, and
9   he would not call Meg. There seemed to be a general
10  confusion about his ability to keep up with the
11  schedule and his assignments.
12  BY MR. GNATT:
13  Q   As you look at the detail that's included in
14  this document, is it your impression that the notes
15  that Meg Clemmer took day-to-day were in this level of
16  detail?
17  MS. KEARNS: I object to the form of the
18  question, but you can answer if you know.
19  THE WITNESS: I have no idea.
20  BY MR. GNATT:
21  Q   Would you look on Page 11, please? The
22  paragraph just preceding the December 1st entry where

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 81

1   it says, "I did tell BL that Reggie had a past colon
2   problem, and it may cause a need for him to use the
3   restroom during the trip." Does reading that entry
4   serve to refresh your recollection at all as to how
5   much information Meg Clemmer provided to you?
6   A   No. I still have the impression that
7   whatever she said didn't make an impression. I don't
8   remember a colon problem. I saw it that he may have
9   to stop because he had been sick or something, and it
10  was a very small thing. I said, sure, no problem. I
11  don't recall any specific words being used, actually.
12  Q   On Page 12, December 3, 2004, Paragraph 2,
13  do you know where Reggie went after dropping you and
14  Al Checcio at the restaurant?
15  A   No, I don't.
16  Q   Was there any expectation or requirement
17  from you as to what he could or could not do during
18  the time you were at the restaurant?
19  A   No. My assumption was that he would go eat,
20  but I have no knowledge of that.
21  Q   And your understanding or assumption would
22  also be that, when you and Mr. Checcio were done at

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 82

1   the restaurant, you would call Mr. Green on the cell
2   phone and ask him to pick you up; is that correct?
3       A    In that specific instance, my recollection
4   is that I told him we would be through in about an
5   hour-and-a-half, and he should be prepared to be
6   there. Ordinarily, drivers would be on the safe side
7   and show up 15 minutes before a stated time.
8       Q    You did not see him at the restaurant when
9   you emerged?
10      A    Right.
11      Q    So you did call him on his cell, and this
12  says that Reggie said where is that when you said you
13  were ready to be picked up at the restaurant, right?
14      A    Right.
15      Q    This was a cell phone conversation that you
16  yourself had with him?
17      A    That's right.
18      Q    Approximately how long did it take for
19  Reggie to arrive at the restaurant where you were
20  waiting for him?
21      A    I would estimate 15 minutes.
22      Q    Do you recall whether Al Checcio was on the

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 84

1       Q    Could you hear any words being uttered?
2       A    They were soft, and I don't recall anything
3   that he actually said, just that he was talking.
4       Q    He wasn't directing his words at traffic and
5   other vehicles or drivers?
6       A    No.
7       Q    It just seemed to be --
8       A    Stream of conscious sort of thing.
9       Q    -- to himself?
10      A    Or some imagined person. I have no idea.
11      Q    It didn't seem to you that it was directed
12  to you or for your listening, for your hearing?
13      A    Clearly, it was not.
14          MR. GNATT:  Those are all of the questions I
15  have.
16          MS. KEARNS:  He'd like to read and sign his
17  deposition.
18          (Examination concluded at 12:33 p.m.)
19          (Signature not waived.)
20
21
22

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 83

1   phone with him the entire time directing him?
2       A    Most of the time, yes. Once Reggie seemed
3   to be totally without any memory of where we were or
4   what his responsibility was, I said do you know where
5   you are? And he said, no, let me find a sign or
6   something, and I said I'm going to give the phone to
7   Al because he can get you here, and Al stayed on the
8   phone to give him landmarks and so forth until he
9   arrived, yes.
10      Q    In Paragraph 4, it says that Reggie started
11  talking to himself out loud while he was driving on
12  the return trip.  What do you mean by that?
13      A    Reggie, one of the disturbing things about
14  him was his bizarre behavior, and on that particular
15  trip, he got into a really weird rocking motion, very
16  slowly going back and forth up against the steering
17  wheel and back to the seat and muttering to himself
18  and seemed to be sort of in another world; and this
19  disturbed me because I really didn't know if he -- and
20  he would also slow down to 40 miles an hour and, then,
21  speed up to 60, and this combination of behavior, I
22  found to be very disturbing.

## BRADFORD ASSOCIATES
## BENJAMIN LADNER

Page 85

1
2
3   (I have read the foregoing pages 4-84, which contain a
4   correct transcription of the answers given by me to
5   the questions therein recorded, as noted on the
6   attached errata sheet.)
7
8       Benjamin Ladner
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# BRADFORD ASSOCIATES
# BENJAMIN LADNER

Page 86

1   DISTRICT OF COLUMBIA :

2        I, TONI R. DeSENZE, a Notary Public of the

3   District of Columbia, do hereby certify that the

4   witness whose testimony appears in the foregoing pages

5   personally appeared before me at the time and place

6   herein set out and, after having been duly sworn by

7   me, was interrogated by counsel.

8        I further certify that the examination was

9   recorded stenographically by me, and this transcript

10  is a true record of the proceedings.

11       I further certify that I am not of counsel

12  to any of the parties, nor an employee of counsel, nor

13  related to any of the parties, nor in any way

14  interested in the outcome of this action.

15

16               Toni R. DeSenze

17               Stenographic Reporter

18

19  My commission expires:

20  November 14, 2009

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

For Conversation with Reggie –

These are various problems that have presented themselves in the past with former drivers and resulted in counseling type conversations. Quickly they become performance issues if not dealt with quickly and professionally. They are offered here simply for your information.

- Be honest about mistakes – own your responsibility
- Smoking – The cars are to be kept totally fragrance free – no smoking, no air freshener, no cologne – also, be careful about strong smelling cleaners
- Cleaning – the cleaning of the cars must be on-going and kept in tip-top shape
- Car is to be cleaned by the driver personally not a cleaning service.
- Top-off the gas tanks at the end of the day – not the start of the next day
- Pre-driving to various locations that aren't totally familiar
- Talking out loud to other drivers
- Driving is not a group exercise
- Never told him to only use "main roads" and not side streets – other than crossing to River on 46th
- Don't tell BL where to find you – It's your responsibility to find him
- Get in the car and get on the way – this isn't the time for captured conversation
- No personal chit/chat
- No tail-gating – and no anxious driving
- Don't pay attention to conversations in the car when you are not being spoken to. And, don't remark or laugh at things said or done in the back seat.
- No jerky driving – remember you are transporting people not cargo – and bumps, swerves and the like are felt more in the back seat than by the driver.
- Don't <u>do</u> distracting things while driving or be distracted by things going on elsewhere. No personal phone calls or text messaging while driving. And, no playing around with the GPS while driving.
- Minimize bathroom stops on long trips – such as to New York. (In the past there have been as many as 4 stops for bathroom in the 4 hour trip.) One is acceptable – zero is preferable.
- When problems occur let meg know – this is a requirement not an option.
- If you are asked by someone other than meg -  to make a repair on the car – be sure to tell meg and then proceed to get it done. In other words, keep meg in the loop and informed. If something can not be fixed/repaired quickly, be sure to let meg know so BL can be kept up to date.



**DEPOSITION EXHIBIT**

Ladner No. 1
9-26-07 m

# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REGINALD GREEN,                          )
                                         )
        Plaintiff,            )
                                         )
    v.                           )     Case No.: 1:07-cv-0052 (RBW)
                                         )
AMERICAN UNIVERSITY, et al.,             )
                                         )
        Defendants            )
                                         )

## PLAINTIFF, REGINALD GREEN'S, RESPONSE TO DEFENDANT, AMERICAN UNIVERSITY'S FIRST REQUEST FOR ADMISSIONS OF FACT

Reginald Green, Plaintiff, by and through his undersigned counsel, Sheldon L. Gnatt, Andrew W. Nussbaum and Knight, Manzi, Nussbaum & LaPlaca, P.A., hereby responds to the Request for Admissions of Fact filed in this matter by Defendants, American University, et al., and in response to the specific inquiries as set forth in the Request, states as follows:

1.     You were a probationary employee at the time of your termination by AU.

ANSWER:   Denied.

2.     On September 27, 2004, Meg Clemmer spoke to you regarding Dr. Ladner's concerns about your driving style.

ANSWER:   Denied.

3.     On October 1, 2004, Benjamin Ladner spoke to you regarding his concerns about your driving style, in the presence of Ms. Clemmer.

ANSWER:   Denied.

4.     On October 28, 2004, Meg Clemmer told you that you needed to be "up to speed" with the GPS system prior to your trip to Philadelphia with Dr. Ladner.

ANSWER:    Plaintiff is without knowledge or information sufficient to either admit or deny the date of the conversation. Plaintiff admits the substance of the remainder of Request No. 4.

5.    On October 29, 2004, Meg Clemmer spoke to you on the phone regarding Dr. Ladner's concerns about your job performance.

ANSWER:    Denied.

6.    On November 2, 2004, Meg Clemmer spoke to you in person regarding Dr. Ladner's concerns about your job performance.

ANSWER:    Denied.

7.    On November 29, 2004, Meg Clemmer asked if you were prepared for the trip to Philadelphia with Dr. Ladner and reminded you that Dr. Ladner would be expecting you to use the GPS system during the trip, and in response, you told her that you would use the GPS system during the trip.

ANSWER:    Admitted.

8.    On November 30, 2004, Meg Clemmer told you not to worry about stopping to use the bathroom on the way to Philadelphia and that the problems in the past with a driver needing bathroom breaks were due to drivers stopping for cigarette breaks.

ANSWER:    Admitted.

9.    On December 1, 2004, Meg Clemmer told you that she and Dr. Ladner had discussed your potential need to stop and use the bathroom on the trip to Philadelphia and that you told her you were glad to not have to worry about it.

ANSWER:    Plaintiff admits that Ms. Clemmer told him that she and Dr. Ladner had discussed his potential need to stop and use the bathroom on the trip to Philadelphia. Plaintiff is unable to recall, therefore, he is unable to admit or deny that he told her he was glad to not have to worry about it.

10.    You never turned on the GPS system during your drive to Philadelphia on December 1, 2004.

ANSWER:    Denied.

11.    You got lost trying to find the Four Seasons Hotel in Philadelphia on December 1, 2004.

ANSWER:    Denied.

12.    Al Checcio had to direct you back to the restaurant where you had dropped Dr. Ladner off in order to pick Dr. Ladner up after his dinner on December 1, 2004.

ANSWER:    Denied.

13.    Al Checcio had to give you directions from the back seat while driving around Philadelphia on December 2, 2004.

ANSWER:    Denied.  Mr. Checcio gave me directions because Dr. Ladner instructed that I not use the GPS but, instead, take directions from Mr. Checcio.

14.    You made right-hand turns from the left-hand lanes while driving around Philadelphia on December 2, 2004, while passengers were in the car.

ANSWER:    Denied.

15.    You rocked back and forth in the driver's seat and talked out loud to yourself on your return trip to Washington from Philadelphia on December 2, 2004.

ANSWER:    Denied.  Plaintiff acknowledges that he was visibly upset over Dr. Ladner's refusal to allow him to stop to use the bathroom and that his body language reflected his urgent need to stop to use the bathroom.  Plaintiff also acknowledges that he may have muttered words under his breath.

DATED:  April 23, 2007              Respectfully submitted,

                                   KNIGHT, MANZI, NUSSBAUM
                                   & LaPLACA, P.A.


                                   Andrew W. Nussbaum
                                   Sheldon L. Gnatt
                                   14440 Old Mill Road
                                   Upper Marlboro, Maryland 20772
                                   (301) 952-0100
                                   *Attorney for Plaintiff, Reginald Green*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of April, 2007, a copy of the foregoing Response to Request for Admissions of Fact was mailed via first class, postage prepaid, to:

Christine N. Kearns, Esq.
Rebecca M. Carr, Esq.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, DC 20037-1128
*Attorneys for Defendant, American University*

Sheldon L. Gnatt
*Attorney for Plaintiff, Reginald Green*

KNIGHT, MANZI, NUSSBAUM
  & LaPLACA, P.A.
14440 Old Mill Road
Upper Marlboro, MD 20772
(301) 952-0100

4

# Exhibit 6

| DATE | VISIT/ PROB. # | | WRITE ON THIS SIDE FIRST |
|------|------|------|------|

GREEN, REGINALD C
681203729

**Kaiser Permanente**
**Provider Note**

NOTE DATE: 01/17/2002
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: BRADLEY, JACQUELINE J NP
NOTE TYPE: PHONE ENCOUNTER
DIAGNOSIS: Sedated Flex Sig

Returned patient's call regarding scheduling a sedated Flex Sig. Patient was originally scheduled to have the procedure on 1/10. Called and cancelled the appt, stating that he was too nervous to have the procedure w/o sedation. A refrral was placed to GI at that time. Today he states he is "flowing w/ blood". Patient advised to go to the nearest ER for emergent treatment if he is "flowing w/. blood". Message left for Dr. Maffei regarding the patient.

Jaki Bradley, CRNP

WRITE THIS SIDE FIRST

DATE

VISIT/PROB. #

TIME 8-05    PROVIDER 24/5

ALLERGIES NKDA    CURRENT RX YES

BP 140 & Wt 201 96 P 76 R 20

3/29/02

SMOKER YES    (NO)

REASON FOR VISIT: Prostate check

GREEN, REGINALD C
681203729
681203729
GREEN, REGINALD C
M        M
02/05/1958

**Kaiser Permanente**
**Provider Note**

3902

NOTE DATE: 03/29/2002
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: BRADLEY, JACQUELINE J NP
NOTE TYPE: FOLLOW-UP VISIT
DIAGNOSIS: Rectal Bleeding

S: Patient in was seen in GI for rectal bleeding and epigastric discomfort.
Has a negative EGD bx and limited colonsocopy. Patient states he was unable to
complete the colonoscopy and then later the BAE due to "pain". Requesting a CT
of colon. Admit to cont. to use stool softners and an OTC herbal laxative.
Patient advised to stop all OTC laxative in the past. Declined a rectal exam

VS: 98.7 76 20 140/80 wt. 201 lbs NKDA

MEDICATIONS
────────
DESYREL 150 MG  - 1/2 tab at HS
REGLAN 10 MG  - 1 tab qid
VIAGRA 100 MG  - 1/2 tab as directed

O: No exam. Entire appt spent discussing rationale for f/u w/ Dr. Maffei & the
additional tests to be ordered.

A: Rectal Bleeding

P: 1. CBC, OCB x 3
   2. Will message Dr. Maffei re: to the above.

J. BRADLEY, CRNP
NORTH CAPITOL MEDICAL CENTER
INTERNAL MEDICINE TEAM II 2415

**GREEN,REGINALD C**
**681203729**

### Kaiser Permanente History
### Provider Note

EVENT DATE: 04/15/2002
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: BRADLEY,JACQUELINE J NP
SPECIALTY: INTERNAL MEDICINE
NOTE TYPE: PHONE ENCOUNTER
DIAGNOSIS: CT Scan

: Spoke w/ patient regarding referral for CT Scan. He apologizing stating that he thought that we would make the appt for the CT scan and call him w/ a date. Extremely anxious today, stating that he under quite q bit of pressure at work due to time and attendance. Admits to being late often due to having pull over to use the bathroom when he has the urge. At times he may pull off (gas station, etc) & not have a BM, even though he had the urge. States he is in the process of suing his employer & that he discussed the s/sx's the fell are post traumatic stress syndrome symptoms. Not c/o any blood on the tissue, in toilet or on the stool today. Cont. to have constipation.

Patient stated he has the number to schedule the CT scan and will do so. Reviewed medication usage since last appt. PACE revealed an increased use of Percocet & Oycontin. Reminded him that bot agent are constipating and to use the Lactulose as instructed by Drs Maffei and Clamp.

Finally, ask patient if he received the message last week regarding H. Pylori results (less than last time tested). Had gastric upset w/ medical treatment 1 year ago & declined treatment at this time.

P: 1. Make an appt to see 2415
   2. Make the appt for CT scan as directed last week and today.

J. BRADLEY,CRNP
NORTH CAPITOL MEDICAL CENTER
INTERNAL MEDICINE TEAM II 2415

=================================================

June 27, 2002

To whom it may concern:

This letter is written on behalf of Mr. Reginald Green. Mr. Green has been under my care for the last 9 months for chronic cephalgia which is refractory to treatment and exacerbated by life stress issues. I Prescribe for him, oxycodone 10mg in a sustained release formula every 12 hours. He also uses oxycodone in a dosage of 5 mg as needed up to three times a day if the sustained release formula does not provide adequate relief. This dosage regimen has been stable for the past 9 months. He has been faithful to keeping his appointments with me and in abiding by our agreement that he will not alter his diosage except at my recommendation. He has never appeared to me to have sedation or impaired mental function due to his medication. While medication in this category can cause altered mental function and sedation, that is an individualized response and I have not observed it in Mr. Green, nor has he reported it to me as a side effect. This medication has been necessary to preserve quality of life and functionality for Mr. Green. It is my opinion that his use of this medication has been safe for himself and does not impair his ability to perform his duties as a motor vehicle operator. It is also my opinion that the failure to treat his chronic cephalgia would significantly impair his ability to perform his duties safely, increase tardiness and absenteeism from work and negatively impact his quality of life and his ability to deal with the life stressors that have been at least exacerbating, if not causative of his problem.

Mr. Green has explained to me that the reason for his frequent early morning tardiness to work is his problem with fecal urgency. This is a problem in which there is overwhelming urgency to have a bowel movement. It is not under voluntary control. People who suffer with this malady have to stop what they are doing and evacuate the large bowel or risk the embarrassing situation of soiled clothing, furniture and the offense of family and coworkers. Mr. Green has had an extensive workup done and no pathology has been identified in his large or small bowel. It is likely that this is constitutional. Medications may ameliorate symptoms but are unlikely to "cure" their condition.

Thank you for your kind assistance of Mr. Green. Please do not hesitate to contact me if I can be of further assistance to you.

Sincerely,

Adrienne J. Clamp, MD
Department of Integrative Medicine
Kaiser Permanente – Prince Georges Center

GREEN,REGINALD C
681203729

## Kaiser Permanente History
## Provider Note

EVENT DATE: 02/06/2003
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: BENZEL,RENEE PHARMD
SPECIALTY: PHARMACEUTICAL CARE SERVICES
NOTE TYPE: FOLLOW-UP VISIT
DIAGNOSIS: Pain Management Service

CC:  pt states he is doing well
      feels the oramorph is helpful with the percocet
   is taking BID Oramorph 30mg and has reduced his percocet use to max of
      3 tabs daily.
      States he has changed his diet per our initial appt and has added senna
conc
      which has made an "amazing" difference in his colon pain and BM's.

Pain:  Pain is well controlled with exception of flare-ups of colon pain -
   Describes this pain as burning sensation approx 20 minutes after having BM
   Has "not had any headaches at all".

Current Medications:
Percocet  1 tabs Q 8 hours PRN
Elavil 25mg - taking q 3rd night -
Lactulose - d/c'd
Senna - 2 tabs HS PRN
Viagra - PRN

Ht: 5'7"
Wt: 185#     Usual Wt: 200-205#
Allergies: methadone - states he had trouble breathing

Exercise:  Runs one mile QOD - 10-12mins; walks dog

Bowel Habits:  States much improved - "what a difference"
            IBS - one BM 2 x daily; has increased fiber in diet and is
now
            using senna PRN.

Sleep:  retires at 11-12m,  rises at 6:30-7am  - taking elavil PRN which is
helpful.

Nutrition: Changed diet to high fiber and is following the "headache" diet per
         initial appt 2 weeks ago.
(Continued)

GREEN, REGINALD C
681203729

## Kaiser Permanente History
## Provider Note

EVENT DATE: 02/11/2003
MEMBER'S HOME CENTER: NORTH CAPITOL
AUTHOR: JOHNSON-BAILEY, DENVIA PA
SPECIALTY: INTERNAL MEDICINE
NOTE TYPE: INITIAL VISIT
DIAGNOSIS: Chronic Rectal Pain

S: 45 y.o. male with known rectal pain he states from Post- Traumatic Stress
Syndorme; wants Diasability forms completed. Mentions he wants it docu-
mented that he has severe rectal pain; being treated by Chronic Pain Group
& sees Mental Health- W.E. Center.

O: VS= BP: 130/100  Wt: 182 lb.  T.: 98.2  P: 84  R: 20
ABD.= Midline vertical scar; from hernia repair per pt.
RECTAL= Clear externally; digital exam- unable to insert digit
completely. Gualac= Negative.

A: Chronic Rectal Pain

P: Pt. asked to continue current meds.
Given phone numbers to W. E. & Largo Medical Centers.
Pt. made aware this Provider is unable to complete forms; but Mental
Health can.
Flu with Dr. Maffei- G.I.

Denvia B. Johnson-Bailey, PA-C
#1796
Internal Medicine
North Capitol Center

========================================================

January 24, 2005

RE: Mr. Reginald C. Green (#1479)
   Office Visit of October 20, 2004

TO WHOM IT MAY CONCERN:

The above named individual treated for a fracture of Left ankle in our facility. I counseled Mr. Green re: the importance of keeping his appointments with the orthopedic specialist and me, in order to monitor his progress and modify treatment as needed. Mr. Green missed several scheduled appointments, which he claimed was due to not being able to leave his employment during the day. I advised him to refrain from extensive walking and climbing stairs while his ankle was healing. He indicated that his job duties required both extensive walking and stair climbing.

Mr. Green was advised during office visit to make and keep his appointments in order to continue monitoring progress. Advised he follow through with recommendation for physical therapy, which he states he has referral and will schedule appointments for same.

The above named patient has signed a release of information for this document.


Candace Love, NP

# Exhibit 7

# MEDICAL FACULTY ASSOCIATES
### THE GEORGE WASHINGTON UNIVERSITY

## AMBULATORY CARE CENTER
## PROGRESS NOTES

| PATIENT NAME | | DOB | |
|---|---|---|---|
| Green, Reginald | | 3/5/08 | |

(PATIENT IDENTIFICATION)

| MEDICAL RECORD NO. | DEPARTMENT | ACCOUNT NO. | ALLERGIES |
|---|---|---|---|
| 2214650 | Surgery | | |

| DATE | |
|---|---|
| | Date 11/9/05 BP 146/97    (164/107) →BP |
| | T 99.6 P 90 R / |
| | LMP / |
| | wt. 186.9 lbs. |
| | WHC - DR DAVIS |
| | anal fissure, colonoscopy |
| | pt c/o intermittent Abd pain, Ⓝ fever |
| | and 20 trips to bathroom. w/ 10 defecate |
| | Abd - soft, NT, ND |
| | Ⓝ peritonitis, +BS |
| | Rct - Ⓝ CCE |
| | Plan - Flagyl 500mg QID |
| | RTC if bm's don't improve in 1 wed |

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   REGINALD CALVIN GREEN
MRN: 2214650
DOB: Feb 05, 1958

Aug 16 2006  4:00PM

## Division of Gastroenterology and Liver Diseases

PATIENT:  Green, Reginald
MRN:  2214650
DOB:  02/05/1958
DOS:  08/16/2006

**REFERRING PHYSICIAN:**  Kalpana Jain, M.D.

**HISTORY OF PRESENT ILLNESS:**  A 48-year-old African-American male referred for rectal bleeding of four days' duration and abnormal CT scan and multiple medical problems including dysphagia. The patient also has symptoms of severe gastroesophageal reflux disease for which he takes Prilosec 40 mg twice a day and is status post Nissen fudoplication neither of which prevent heartburn or epigastric pain.He also complained of epigastric painand rectal bleeding. On 8/4 colonoscopy revealed only mild sigmoid diverticulosis and internal hemorrhoids. EGD was negative except for evidence of past Nissan fundoplication. There was no esophagitis or ulcers

**PAST MEDICAL HISTORY:**  Nissen fundoplication in 1978, longstanding GERD, cholecystectomy one year ago for gallstones and right upper quadrant pain.  Initially the surgery helped the pain, but now the pain has recurred.  The patient also has posttraumatic stress syndrome secondary to the war in Vietnam.

**FAMILY HISTORY:**  Negative for colon cancer.

**REVIEW OF SYSTEMS:**  GI:  Present illness, GERD.  The patient also complains of dysphagia with food sticking in the upper chest for the last few months leading to regurgitation.  He has also had excess burping.  He has had a Nissen fundoplication many years ago for GERD and requires Prilosec 40 mg twice a day.  Pulmonary: Negative.  No asthma or sleep apnea, but has a chronic cough presumably related to GERD.  Cardiovascular:  Negative.  Endocrine:  No thyroid disease or diabetes. Musculoskeletal: No arthritis.  Neurologic:  The patient has migraine as well as posttraumatic stress syndrome.  Weight is stable.

**MEDICATIONS:**  Prilosec 40 mg twice a day, Elavil for posttraumatic stress syndrome, Percocet and OxyCotin for stomach pains in the right upper quadrant and left upper quadrant.

**PHYSICAL EXAMINATION:**  Vital Sign:  Weight: 188 pounds.  Blood pressure: 130/92.  Pulse rate: 74.
Skin: Normal.
Chest: Clear.
Heart:  Normal sinus rhythm.

GREEN, REGINALD CALVIN

Abdomen:  Healed old midline scar above the umbilicus from Nissen fundoplication and smaller scars in right upper quadrant where laparoscopic cholecystectomy was performed.  The patient has mild tenderness in both right and left upper quadrants.  No abdominal masses and no organomegaly.

**IMPRESSION:** Symptoms related to post traumatic  stress disorder rather  than GI pathology.  Rectal bleediing hemorrhoidal.
GERD symptoms don;t fit negative endoscopy and lack of response to Prilosec bid and Nissen fundoplication, suggesting psychiatric cause. Mild dysphagia could be related to tight surgical fundoplication but mild symptoms don't warrant further surgery.

**RECOMMENDATION:** Psychiatric therapy for post traumatic stress disorder and drug dependence.

Electronically signed by:ALLEN L GINSBERG M.D.  Aug 16 2006  5:00PM EST

# Exhibit 8

# Dr. Wadeson Psychiatric Center, P.C.

◊◊◊

9135 Piscataway Road, Suite 235
Clinton, Maryland 20735
301-868-8291 ◊ Fax 301-868-9008

July 14, 2005

Washington DC Veterans Affairs Medical Center
50 Irving Street, NW
Washington, DC 20422

      RE:   **Reginald C. Green**
              **DOB 02/05/1958**
              **SSN 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**

To Whom It May Concern:

     This letter concerns Reginald Green, whom I evaluated on April 26, 2005. His diagnosis is Post Traumatic Stress Disorder (PTSD) due to his having been court martialled and jailed while serving in the military. During his session he was tearful and emotional as he spoke of the incidents that occurred during his time in the military. During the evaluation Mr. Green was alert, aware, responsive and his information seemed reliable. His language was coherent, his mood agitated, and his self-esteem, appetite and libido are poor. His affect and memory are good. His stream of thought was coherent. He does not have homicidal thoughts.

     He revealed that he had been incarcerated by the military and it was during this time that Mr. Green was sexually assaulted. He has had esophageal reflux surgery and anal fission surgery as a direct result of having been assaulted. His current symptoms include insomnia, rectal bleeding, suicidal thoughts, nightmares, headaches and stomach pains due to the PTSD which is a direct result of his injuries suffered while enlisted in the military. It is my opinion that these symptoms are most likely a result of having been sexually assaulted during his enlistment.

Sincerely,

Ralph W. Wadeson, Jr., M.D.

1