# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| REGINALD GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.  1:07-cv-0052 (RBW) |
| AMERICAN UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Christine N. Kearns (D.C. Bar No. 416339)
Rebecca M. Carr (D.C. Bar No. 488274)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, DC  20037-1122
Telephone: (202) 663-8000
Facsimile: (202) 663-8007
christine.kearns@pillsburylaw.com
rebecca.carr@pillsburylaw.com

*Counsel for Defendants*
*American University and Benjamin Ladner*

Defendants American University (the "University") and Benjamin Ladner submit this reply in support of their Motion for Summary Judgment (Dkt. No. 15). The most striking aspect of Plaintiff's Opposition is his concession that 32 of the 36 material facts set forth in Defendants' Statement of Undisputed Facts ("Statement") (Dkt. No. 15-2) are undisputed. In the limited circumstances in which he does actually try to dispute the evidence, it is to argue that he was disabled (without any evidence) and to express his belief that his performance was, in fact, good. Neither approach saves his case.

The undisputed material facts in this case include, but are not limited to:

- Mr. Green was required to successfully complete a Commercial Driver Fitness Determination before beginning his employment with the University. (Statement at ¶ 3). Mr. Green indicated that he took medications "sometime for anal fissure." (Statement at ¶ 3 citing Exhibit 1). Mr. Green did not refer to "fecal urgency" or indicate any current limitations due to his anal fissure. (*Id.*). Dr. Rolf Neiman then asked Mr. Green if his doctor had given him "any restrictions" because of his anal fissure. (Statement at ¶ 4). Mr. Green answered that his doctor had not, and Dr. Neiman wrote the words "No Limitations" on the Medical Examination Report. (Statement at ¶ 4 citing Exhibit 1).

- Mr. Green commenced working at the University as Dr. Ladner's driver on August 16, 2004. (Statement at ¶ 6).

- Two of the three previous drivers had been terminated for performance-related issues. (Statement at ¶ 7).

- Mr. Green received and acknowledged the Staff Personnel Policies and Benefits Manual ("Manual"), which set forth the terms of the 120 day probationary employment period and explained the procedures for requesting accommodations under the Americans With Disabilities Act. (Statement at ¶¶ 8 – 11 citing Exhibit 1).

- The purpose of the probationary period is to allow the University to determine whether a new staff member will be able to appropriately carry out all aspects of his or her duties. (Statement at ¶ 10 citing Exhibit 3).

- Mr. Green never provided medical certification or information from a health care professional concerning a requested accommodation, as required by the Manual, nor did he ever contact the EEO officer of Human Resources or the executive director of Human Resources to complain about discrimination. (Statement at ¶ 13).

- The only medical record Mr. Green provided to the University was a note from Dr. Candace Love stating that it was "ok for [Mr. Green] to go back to work." (Statement at ¶ 12).

- Ms. Clemmer, Mr. Green's direct supervisor, met with Mr. Green shortly after he began his employment with the University and provided him with two documents: "Driver's Duties and Responsibilities" and "For Conversation with Reggie". (Statement at ¶ 14 citing Exhibits 1, 3). The For Conversation with Reggie document was created because Dr. Ladner wanted "to gather the mistakes made by previous drivers as [] a guideline of things that had gotten previous drivers into problems so to avoid the pitfalls[.]" (Statement at ¶ 14).

- Mr. Green expressed concern to Ms. Clemmer regarding the item on the "For Conversation with Reggie" regarding bathroom stops: "Minimize bathroom stops on long trips - such as to New York. (In the past there have been as many as 4 stops for bathroom in the 4 hour trip.) One is acceptable - zero is preferable." (Statement at ¶ 15 citing Exhibit 1). Ms. Clemmer explained to Mr. Green that this item was listed on the document because of problems the University had in the past with drivers asking to use the restroom when in fact they were taking cigarette breaks. (Statement at ¶ 15).

- It is Ms. Clemmer's practice to take handwritten notes throughout each day "of things that happen, things I need to remember, and things I need to fix. I make notes of things or problems or things that don't stick in my head." (Statement at ¶ 16). Ms. Clemmer used these contemporaneous notes to create a chronology of Mr. Green's work performance while employed by the University. (Statement at ¶ 16 citing Exhibit 4).

- Mr. Green met with Dr. Ladner and Ms. Clemmer together and with Ms. Clemmer alone to discuss "course corrections," relating to the performance of his duties. (Statement at ¶ 17 citing Exhibit 4).

- Mr. Green maintains five-lengths between cars while driving. (Statement at ¶ 17 citing Exhibit 4). Mr. Green once sat outside of the Ladner's residence for two hours when there was no scheduled pick-up. (Statement at ¶ 19 citing Exhibit 4). After missing a scheduled pick up of Dr. Ladner entirely on December 1, 2004, Mr. Green arrived late at Dr. Ladner's dentist appointment on his motorcycle in his motorcycle attire. (*Id.*).

- Mr. Green only requested one accommodation from the University, which was to take bathroom breaks during car rides. (Statement at ¶ 20). No one at the University ever suggested to Mr. Green "in words or otherwise" that he could not take a bathroom break when he needed one. (Statement at ¶ 22).

- Mr. Green did stop to use the bathroom while driving on several occasions during his employment at the University. (Statement at ¶ 21).

3

- When Mr. Green expressed concern over having to stop to use the bathroom during a planned drive to Philadelphia with Dr. Ladner, Ms. Clemmer shared these concerns with Dr. Ladner.  (Statement at ¶ 23).  Dr. Ladner told her "Margaret, that related to Jeff Madden [the driver who stopped to smoke]; if Reggie needs to go to the bathroom, he needs to go to the bathroom; of course, we can stop."  (*Id.*).

- Mr. Green drove Dr. Ladner to Philadelphia on December 1, 2004.  (Statement at ¶ 24). On the drive back to Washington from Philadelphia on December 2, 2004, Mr. Green stopped to use the bathroom.  (*Id.* at ¶ 25).

- According to Ms. Clemmer, after the trip to Philadelphia, Dr. Ladner reported to Ms. Clemmer numerous issues that he had with Mr. Green's performance during the Philadelphia trip.  (Statement at ¶ 26 citing Exhibit 4).  During this conversation, Dr. Ladner informed Ms. Clemmer that he had decided to terminate Mr. Green's employment with the University before he completed his probationary period, which was just two weeks away.  (Statement at ¶ 28 citing Exhibit 4).  Dr. Ladner did not mention to Ms. Clemmer during this conversation that Mr. Green had stopped to use the bathroom. (Statement at ¶ 27 citing Exhibit 4).

- Dr. Ladner testified that it was not the Philadelphia trip that caused Mr. Green's termination, but rather that he had "reviewed [Mr. Green's] total performance, and the trip to Philadelphia was certainly a disaster in terms of his performance, and it confirmed tendencies we observed in other contexts."  (Statement at ¶ 29).  Ms. Clemmer testified that Dr. Ladner explained to her that "he just did not feel safe in the car with Reggie and [that Reggie] had demonstrated many instances of both unprofessional behavior and extremely poor judgment."  (*Id.*).

- Mr. Green had surgery on May 21, 2003, to alleviate his symptoms associated with an anal fissure.  (Statement at ¶ 31).  Mr. Green's medical records state that by June 9, 2003, his pain had become "minimal," that he could he could sit and drive, and that he was weaning off his medication.  (Statement at ¶ 31 citing Exhibit 6).  In addition, Mr. Green agreed to go through withdrawal from Percocet.  (*Id.*).  Mr. Green's medical records state that by January 1, 2004, he presented to the doctors with "resolution of anal fissure" and that there were "no issues to address at [that] time."  (*Id.*).  Further, Mr. Green denied that he had any "pain, nausea, vomiting, constipation, diarrhea, blood, [or] melena."  (*Id.*). This is the information that the University would have learned from his medical records had it reviewed his medical records at the time it hired him.  (Statement at ¶ 31).

- There is only one medical record referring to any symptoms for fecal urgency during all of 2004.  (Statement at ¶ 33 citing Exhibit 7).  On April 14, 2004, four months before he began his employment at the University, Mr. Green went to the doctors because of "body pains" which he believed to be a result of his "[Post Traumatic Stress Disorder] which ha[d] been acting up."  (*Id.*).  During the visit, Mr. Green told the doctor that he had "rectal pain and fecal urgency which ha[d] been bothering him," but "nitroglycerin ha[d] been helping."  (*Id.*).

- The first medical record regarding Mr. Green's bowel movements after April 14, 2004, is dated September 6, 2005, seventeen months later and nine months after the University terminated Mr. Green.  (Statement at ¶ 33 citing Exhibit 7).  This medical record has no reference to fecal urgency, but states that Mr. Green had seen "bright red blood in his stool once 3 weeks ago.  He has experienced no recent weight loss, and has noted no change in bowel habits."  (*Id.*).  Mr. Green had gone to the doctors on that occasion because of "abdominal pain, heartburn, and regurgitation."  (*Id.*).

- Mr. Green's medical records reflect that he was seen by doctors on a regular basis for a broken ankle between July and December 2004, attending at least eleven medical appointments.  (Statement at ¶ 35 citing Exhibits 6, 7).

- There is no evidence of Mr. Green scheduling appointments or making any request to take time off from his duties at the University to attend medical appointments for his fecal urgency.  (Statement at ¶ 36).

- Mr. Green never missed a day of work while working at the University for medical reasons.  (Statement at ¶ 34).

- As of the summer of 2004, he had a bowel movement "maybe three or four times" a day.  (Statement at ¶ 34).  He felt like he had to go to the bathroom about ten to fifteen times a day.  (*Id.*).  During the almost four months that he worked there, he had only one accident where he soiled himself because he could not get to the bathroom on time.  (*Id.*).  After soiling himself, he went to the bathroom and cleaned himself off and changed his underwear.  (*Id.*).  Despite that incident, Mr. Green testified that he was able to complete his job duties that day.  (*Id.*).

Faced with these material undisputed facts, Mr. Green submits three arguments in opposition to the Defendants' Motion for Summary Judgment.  First, Mr. Green asserts that he is disabled under the law.  He presents, however, no evidence to support this argument instead relying primarily on medical records from years long before his employment and long after.  Moreover, the cases upon which Mr. Green relies are most helpful in contrast to the evidence presented here, because they concern plaintiffs with evidence of conditions far more severe than Mr. Green's, who has no evidence of pain, inability to work, doctor's appointments or that he was "significantly restricted as to the condition, manner or duration under which [he could] perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity[.]"

5

Plaintiff's Opposition at 6 (Dkt. No. 16), citing *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 195-96 (2002).

Second, Mr. Green argues that he was not granted an accommodation, because Dr. Ladner "kind of turned blue and pink in the face and mumbled some words" when he asked to use the bathroom on the return trip from Philadelphia. (*Id.* at 16). The undisputed facts, however, clearly establish that Dr. Ladner stated unequivocally that "if Reggie needs to go to the bathroom, he needs to go to the bathroom; of course, we can stop." (Statement at ¶ 23). Moreover, Mr. Green stopped to use the bathroom on several occasions while he was working, including the return trip from Philadelphia. Most significant, Mr. Green concedes that no one at the University ever told him "in words or otherwise" that he could not use the bathroom when he needed to do so. (*Id.* at ¶ 22).

Third, Mr. Green argues that the Defendants' assertion that he was not performing his job well is pretextual. He asserts that another poorly performing driver worked at the University for much longer before being terminated. He disputes that he was spoken to about all of the problems with his work. He provides excuses for the various performance issues that he admits. He attacks Dr. Ladner as a difficult and demanding employer. None of this is sufficient to overcome the clear record of significant and continuous performance problems established by Ms. Clemmer's contemporaneous notes or the absence of any evidence at all that Dr. Ladner did not "feel safe in the car with Reggie." (*Id.* at ¶ 29 citing Exhibit 4).

Finally, Mr. Green does not address Defendants' arguments regarding his wrongful discharge claims (Counts III and IV) in his Opposition at all and, therefore, has conceded summary judgment on those claims.

I.    **ARGUMENT**

A.    **Mr. Green is Not Disabled Under the ADA.**

Mr. Green concedes, as he must, that he must demonstrate that he was disabled at the time he made the request for accommodation from the University. *See Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 167 (D.D.C. 2002) ("To receive ADA protection, a disability must be demonstrated at the time plaintiff requested and was refused a reasonable accommodation."); *Lytes v. D.C. Water & Sewer Auth.,* No. 05-204 (RMC), 2007 U.S. Dist. LEXIS 91154, at ** 24-25 (D.D.C. Dec. 13, 2007) (granting Defendant's motion for summary judgment because "it is not relevant that Mr. Lytes was once truly disabled.  He did not qualify as disabled according to the ADA in September 2003, when he requested light/sedentary duty, or in March 2004, when he was discharged."); *Brown v. Snow*, 407 F. Supp. 2d 61, 69 n.8 (D.D.C. 2005) ("Because the plaintiff has not shown that one of his major life activities was substantially limited during the time period relevant to the instant dispute, he has not established the first prong of his prima facie case of disability discrimination.").  There is no evidence that Mr. Green suffered from any disability, as a matter of law, between August 16, and December 3, 2004, while he was employed by the University.

Mr. Green claims a disability called "fecal urgency."[1]  (Plaintiff's Opposition at 1).  He fails.  First, Mr. Green's own description of his condition does not establish a disability. Mr. Green never missed a day of work or was prevented from completing his duties because of

---

[1] Mr. Green claims that his disability of fecal urgency is distinct from his anal fissure.  (Plaintiff's Statement at ¶ 38).  However, he presents no medical records to describe how these conditions are distinct.  Further, Mr. Green specifically identified his anal fissure on his Medical Examination Report, but made no reference to fecal urgency.  (Statement at ¶ 3 citing Exhibit 1).

medical difficulties. (Statement at ¶ 34). He has no evidence of pain from fecal urgency while he was working at the University. Although he felt like he needed to go to the bathroom ten to fifteen times a day, he actually had only three or four bowel movements. (*Id.* at ¶ 34). He testified to one accident in which he soiled himself while employed by the University, but that did not interfere with his duties. (*Id.*). Any bleeding was addressed by wearing a pad. (*Id.*). That is it.

Second, Mr. Green also does not dispute that there is not a single medical record in this case regarding fecal urgency during his employment with the University. (Statement at ¶ 35). He relies on a single doctor's note from four months prior to commencing work that states that Mr. Green had "rectal pain and fecal urgency which ha[d] been bothering him," but that "nitroglycerin ha[d] been helping[.]" (Statement at ¶ 33 citing Exhibit 7). The medical records do not again refer to his bowel movements until September 6, 2005, seventeen months later and nine months after the University had terminated him. (*Id.*). The September 6, 2005 medical does not, however, demonstrate that Mr. Green was having any difficulty with fecal urgency or feeling the need to use the bathroom. It does not mention fecal urgency at all. The record states that Mr. Green had seen "bright red blood in his stool <u>once</u> 3 weeks ago." (*Id.*) (emphasis added). It further notes that he had "experienced no recent weight loss, and has noted <u>no change in bowel habits</u>." (*Id.*) (emphasis added).[2]

---

[2] Mr. Green also references a July 14, 2005 letter from Mr. Green's psychiatrist, Dr. Wadeson. That note also does not demonstrate that Mr. Green was having difficulty with fecal urgency or feeling the need to use the bathroom <u>while at the University</u> – it simply states that his then current symptoms included rectal bleeding. (*See* Exhibit 8 to Plaintiff's Statement of Genuinely Disputed Facts) (Dkt. No. 16-2).

Mr. Green also points to a medical record dated January 24, 2005, written by Candace Love, NP, relating to an office visit on October 20, 2004, that contains an admonishment to Mr. Green "to make and keep his appointments in order to continue monitoring progress [relating to his ankle fracture.]"  Plaintiff's Statement of Undisputed Facts ("Plaintiff's Statement" at ¶ 36) (emphasis added) (Dkt. No. 16-2).  This note regarding Mr. Green's failure to keep his appointments for his ankle fracture does not, however, constitute evidence of the alleged disability of "fecal urgency" during his employment at the University.  In addition, the medical records that Mr. Green claims Kaiser Permanente was authorized to produce to the University reflect that he had surgery to alleviate his symptoms associated with his anal fissure (including fecal urgency) on May 21, 2003, and that by June 9, 2003, his pain and had become "minimal," that he could sit and drive, and he agreed to go through withdrawal from his pain medication; and by January 1, 2004, he had no "pain, nausea, vomiting, constipation, diarrhea, blood, [or] melena" and he presented to the doctors with "resolution of anal fissure."  (Statement at ¶ 31 citing Exhibit 6).[3]

---

[3] Mr. Green points to a host of medical records from before and after Mr. Green's employment at the University to demonstrate that Mr. Green suffers from "fecal urgency."  (Plaintiff's Statement at ¶ 37).  As an initial matter, these records are irrelevant because they are not evidence of Mr. Green's medical condition while he was employed by the University.  Further, six of the ten records to which Mr. Green refers pre-date his May 21, 2003 surgery, after which Mr. Green presented with resolution of his anal fissure, his pain was minimal and he could sit and drive.  (Statement at ¶ 3 citing Exhibit 6).  Moreover, they do no all refer to "fecal urgency."  The remaining four records do not establish fecal urgency as a disability either.  The first post-surgery record is the April 14, 2004 medical record discussed above.  According to this record, while Mr. Green noted to the doctor that his fecal urgency had been bothering him, Mr. Green did not go to the doctor because of fecal urgency.  Mr. Green presented because of his  "body pains" which he believed to be a result of his "PTSD which ha[d] been acting up."  (Statement at ¶ 33).  The next record, also discussed above, is dated September 6, 2005.  Again, Mr. Green did not go to the doctor because of fecal urgency.  On this occasion, Mr. Green presented with "abdominal pain, heartburn, and regurgitation."  (Id.).  During this visit, Mr. Green simply noted to the doctor that he had seen "bright red blood in his stool once 3 weeks ago."  (Id.).  However, he also informed the doctor that he had not experienced weight loss or noted any "change in bowel habits."  (Id.).  The November 9, 2005 record (almost a year after he worked at the University) does not contain an explanation for why Mr. Green was being seen by a doctor, but notes "20 trips to bathroom with 10 defecations."  (Plaintiff's Statement at ¶ 37).  The final medical record to which Mr. Green cites is dated August 16, 2006.  This record states that Mr. Green was suffering from rectal bleeding due to hemorrhoids.  (Id.).  These records do not constitute evidence of fecal urgency during or around the time Mr. Green was employed by the University.

The evidence in this case is not even close to what is required to demonstrate a disability based on the major life activity of eliminating waste under the ADA.  *See Crawford v. N.Y. Life Ins. Co.,* No. 04-CV-1853, 2006 U.S. Dist. LEXIS 69585, at **15-16 (E.D.N.Y. Sept. 27, 2006) (granting summary judgment on plaintiff's ADA claims where plaintiff "conceded that [her irritable bowel syndrome] did not prevent her from completing any work assignment or otherwise limit her life activities beyond requiring frequent trips to the bathroom"); *Rivera v. Orange County Sch. Bd.*, No. 6:98-CV-1153-ORL-3ABL(19), 2000 U.S. Dist. LEXIS 14304, at **14-19 (M.D. Fa. May 1, 2000) (granting summary judgment on plaintiff's ADA claim because she failed to establish that her irritable bowel syndrome substantially limited her major life activities: "Although Rivera testified that she needed to use the restroom approximately fifteen times during the day, the evidence reflects that she was able to control the timing of her use of a restroom to a significant degree.").

Finally, the cases upon which Mr. Green relies do not help him.  Mr. Green cites cases that do not concern the removal of waste, and involve plaintiffs, unlike Mr. Green, whose conditions prevented them from performing manual tasks.  *See Bugg-Barber v. Radnstad US, L.P.*, 271 F. Supp. 2d 120, 128 (D.D.C. 2003) (diabetic plaintiff was unable to control her blood sugar levels and when her diabetes was severe her ability to perform manual tasks was substantially affected); *Otting v. J.C. Penney Co.*, 223 F.3d 704, 710 (8th Cir. 2000) (plaintiff, who suffered from epilepsy, was prohibited by law from driving and could not take baths due to the risk of drowning).  In contrast, Mr. Green represented to the University that he could perform a broad range of jobs and told Dr. Neiman that his doctor had not given him any limitations or restrictions.  (Statement at ¶¶ 1, 4).

400771560v1

Mr. Green also cites numerous cases with respect to evidence of an individual's ability to remove waste that provide a useful contrast to the total absence of evidence in this case. In three of the cases, the court grants summary judgment to the employers because the employees could not even perform the essential functions of their jobs due to their conditions and, therefore, they were not "qualified individuals with a disability." *See Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 680-82 (8th Cir. 2001) (holding that the plaintiff was not "qualified" because regular attendance was an essential function of his job and during flare ups of his IBS he was "prevented from leaving his home to go to work, performing manual tasks, or interacting with supervisors, co-workers, and store patrons"); *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998) (holding that the plaintiff was not "qualified" because his Chron's Disease prevented him from attending work on a regular basis); *Mazza v. Bratton*, 108 F. Supp 2d 167, 175 (E.D. N.Y. 2000) (holding that plaintiff was not a "qualified" because his colitis prevented him from being able to report to work "even with accommodations") *aff'd*, 9 Fed. Appx. 36 (2d Cir. 2001). There is no evidence that Mr. Green could not report to work or perform the functions of his job due to his alleged disability.

In the remaining cases, the plaintiffs presented substantial evidence of a disability that is simply not present here. *See Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 463 (6th Cir. 1999) (plaintiff presented evidence of "a painful condition, which manifests itself occasionally in bouts of constipation and diarrhea, . . . one doctor likened [her condition] to a 'charlie horse' in her colon[,]" and two leaves of absence for surgery).[4]

---

[4] *See also EEOC v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 584-85 (D. Md. 2002) (denying employer's motion for summary judgment where plaintiff with Chron's disease had several surgeries to drain her intestinal abscesses, missed work, and would sharply limit the foods that she ate and her food intake generally to avoid having uncontrollable diarrhea); *Banks v. CBOCS West, Inc.*, No. 01 C 795 2005 U.S. Dist. LEXIS 9503, ** 2, 21 (N.D. Ill. May 9, 2005) (denying employer's motion for summary judgment where plaintiff with Chron's

## B.    Defendants Did Not Deny Mr. Green's Request For Accommodation.

Mr. Green maintains that his request for reasonable accommodation was denied. This is nonsense based upon undisputed evidence. Mr. Green does not dispute that the only accommodation he requested from the University was to take bathroom breaks during car rides. (Statement at ¶ 20).[5] Mr. Green admits that no one at the University ever suggested to Mr. Green "in words or otherwise" that he could not take a bathroom break when he needed one. (*Id.* at ¶ 22). Indeed, he stopped to use the bathroom while driving on several occasions during his employment at the University. (*Id.* at ¶ 21). It is also undisputed that when Mr. Green expressed concern over having to stop to use the bathroom during his drive to Philadelphia with Dr. Ladner, Ms. Clemmer shared these concerns with Dr. Ladner, and Dr. Ladner told her "Margaret, that related to Jeff Madden; if Reggie needs to go to the bathroom, he needs to go to the bathroom; of course, we can stop." (*Id.* at ¶ 23). He, in fact, stopped to use the bathroom during the drive back to Washington from Philadelphia on December 2, 2004. (*Id.* at ¶ 25).

---

(Continued from Previous Footnote)

disease suffered daily from pain and diarrhea and during flare ups, which could last one day or "linger for up to one year," was unable to attend work or perform any work); *Carrasco v. Spectrum Health Hosps.*, No. 1:06-CV-781, 2008 U.S. Dist. LEXIS 8666, at **1-2, 12-15 (W.D. Mich. Feb. 6, 2008) (denying employer's motion for summary judgment where plaintiff's IBS was so severe that she could not even lift heavy things without losing control of her bowels and was sometimes tardy or absent from work); *Duncan v. Quality Steel Prods.*, No. 06-11590, 2007 U.S. Dist. LEXIS 53626, at **3-6, 20-21 (E.D. Mi. July 25, 2007) (denying employer's motion for summary judgment where plaintiff with Chron's disease was hospitalized four times and took additional absences from work during the last year of her employment); *Boles v. Polyloom Corp. of Am.*, 459 F. Supp. 2d 647, 651-52 (E.D. Tenn. 2006) (denying employer's summary judgment motion where plaintiff with Chron's disease was hospitalized for two weeks and then took additional time off to receive treatment); *Hodge v. Henry County Med. Ctr.*, 341 F. Supp. 2d 968, 970 -74 (W.D. Tenn. 2003) (denying employer's motion for summary judgment where plaintiff who suffered from "one of the most virulent forms of Chron's disease" could not eat certain foods, suffered from severe diarrhea, during flare-ups had to go to the bathroom as many as forty times a day, had to go to the bathroom during sex, and took leave for corrective surgery and then requested additional leave to recover from the surgery).

[5] Mr. Green also states that he requested the accommodation of having "ready access to a bathroom in the President's office." (Plaintiff's Opposition at 2). There is no evidence that he requested such an accommodation. In addition, this accommodation was not mentioned in his EEOC Charge, Exhibit 1 to Statement, and should not be considered by the Court.

The <u>only</u> so-called evidence that Mr. Green presents is that when Mr. Green stopped to use the bathroom, Dr. Ladner "kind of turned blue and pink in the face and mumbled some words," expressed concern that he was in a hurry to get back to D.C., did not speak to Mr. Green after he used the bathroom, and looked "like he was very perturbed." (Plaintiff's Opposition at 16). This is not evidence of a denial of accommodation. Dr. Ladner turning "pink and blue" and looking "very perturbed" could very well have been a result of Mr. Green's pronouncement that he was going "to soil" Dr. Ladner's car seat. (Plaintiff's Statement at ¶ 25). Moreover, even if this was evidence of Dr. Ladner's supposed displeasure, it does not demonstrate a denial of accommodation. Indeed, Mr. Green stopped to use the bathroom as he had on multiple prior occasions. (Statement at ¶ 21).

### C. There Is No Evidence of Pretext.

Mr. Green makes several arguments as to why Defendants' legitimate nondiscriminatory reason for his termination, his poor work performance, is pretextual. As described below, each of these arguments is insufficient to demonstrate that "a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Adeyemi v. Dist. of Columbia*, No. 04-1684 (CKK), 2007 U.S. Dist. LEXIS 24179, at *11 (D.D.C. Mar. 31, 2007) (internal citations and quotations omitted).

### 1. The University's Termination of Prior Drivers Demonstrates The University's Desire to Find a Good Driver.

It is undisputed that the University terminated two of the three drivers for performance related issues prior to hiring Mr. Green. (Statement at ¶ 7). It is also undisputed that as a result of these terminations, Dr. Ladner instructed Ms. Clemmer to create the "For Conversation with Reggie" document – Dr. Ladner wanted "to gather the mistakes made by previous drivers as [] a guideline of things that had gotten previous drivers into problems so to avoid the pitfalls[.]" (*Id.*

at ¶ 14). Mr. Green nevertheless asserts that the poor performance of the driver who immediately preceded him, Jeff Madden, demonstrates pretext because the University terminated Mr. Green during his probationary period, but terminated Mr. Madden after over three years. This logic is seriously flawed.

First, none of the problems that Dr. Ladner had with Mr. Madden's performance contradicts the undisputed evidence that Dr. Ladner felt Mr. Green was an unsafe driver. Ms. Clemmer testified that Dr. Ladner told her that "he just did not feel safe in the car with Reggie[.]" (Statement at ¶ 24). Second, it is undisputed that Mr. Green was the first driver to be given this document outlining the mistakes to avoid making. (Statement at ¶ 14 citing Exhibit 4). Even with this guidance, Mr. Green still performed poorly. Third, the very purpose of the probationary period is to allow the University to determine whether a new staff member will be able to satisfactorily carry out all aspects of his or her duties. (Statement at ¶ 10). It is undisputed that Dr. Ladner was aware that the probationary period was coming to an end when he made the decision to fire Mr. Green, and that was a motivating factor in the decision. (Statement at ¶ 26 citing Exhibit 4). Finally, there is no evidence that Mr. Madden ever had performance problems during a probationary period.

**2.    Dr. Ladner Believed Mr. Green Was Not a Good Driver.**

Mr. Green does not dispute that Ms. Clemmer took contemporaneous handwritten notes throughout each day and that she compiled a chronology of Mr. Green's work performance while employed by the University based upon these contemporaneous handwritten notes. (Statement at ¶ 16). This chronology documents ongoing and pervasive problems with Mr. Green's performance raised by Dr. Ladner and witnessed by Ms. Clemmer, prior to the bathroom stop on the return trip from Philadelphia.

Mr. Green first disputes that he was ever told that there were problems with his performance. This assertion is not evidence of pretext. Mr. Green does not dispute that Dr. Ladner made complaints to Ms. Clemmer about Mr. Green or that Ms. Clemmer recorded her own issues with Mr. Green's performance, as reflected in Ms. Clemmer's contemporaneous notes. Mr. Green also does not dispute that he sat down with Ms. Clemmer and Dr. Ladner to discuss "course corrections," on more than one occasion. (Statement at ¶ 17 citing Exhibit 4).

Likewise, Mr. Green's various excuses for the performance problems detailed in Ms. Clemmer's chronology are not evidence of pretext. Mr. Green does not dispute that he sat outside of the Ladner's residence for two hours when there was no scheduled pick-up, that he maintained five-car lengths between cars while driving, and that on one occasion, he showed up on his motorcycle in his full motorcycle attire to pick Dr. Ladner up from an appointment. (*Id.* at ¶¶ 17, 19 citing Exhibit 4).

Mr. Green's self-serving assertions that he is a good and experienced professional driver are irrelevant. *See Singleton v. Potter*, 402 F. Supp. 2d 12, 31 (D.D.C. 2005) (Plaintiff "cannot establish pretext simply based on [his] own subjective assessment of [his] own performance, for plaintiff's perception of [himself], and of [his] work performance is not relevant. It is the perception of the decisionmaker which is relevant.") (citing *Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000)). What is important here is that Dr. Ladner genuinely believed that Mr. Green was performing poorly and was an unsafe driver. Whether Dr. Ladner's decision was correct is not at all material. *See Evans v. Davis Mem'l Goodwill Indus.*, 133 F. Supp. 2d 24, 29 (D.D.C. 2000), *aff'd*, 1 Fed. Appx. 3 (D.C. Cir. 2001) (holding that once an employer has asserted a non-discriminatory reason for an adverse job action, "the issue is not

'the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers'").

The fact that Ms. Clemmer testified that Mr. Green performed some aspects of his job well in no way refutes the evidence that Dr. Ladner found Mr. Green's overall performance unsatisfactory.[6] *See Royall v. Nat'l Ass'n of Letter Carriers*, No. 05-1711 (RBW), 2007 U.S. Dist. LEXIS 63655, at *108 (D.D.C. Aug. 29, 2007) ("The plaintiff cannot create a genuine issue of material fact as to whether the NALC 'honestly believes in the reasons it offers or his termination simply by contesting some portion of the defendant's account of his performance or citing certain instances in which he correctly performed the duties of his job.  It is nonsensical to suppose that a plaintiff should be able to demonstrate that an employer's stated reason for its adverse action is pretextual merely because the employer cannot prove that the plaintiff was deficient in *every* aspect of his job performance.") (internal citations omitted).  In addition, Ms. Clemmer's own chronology reveals that she too had problems with important aspects of Mr. Green's performance, such as his trouble following his instructions on his blackberry. (Statement at ¶ 19 citing Exhibit 4).  Nothing that Mr. Green has presented demonstrates that Dr. Ladner - and Ms. Clemmer - did not genuinely believe that Mr. Green was not performing his job well.

Mr. Green makes much of Dr. Ladner's preference not to stop during long trips because he does not like to be late.  However, there is no evidence that this preference has anything to do with Mr. Green's termination for failing to perform his job at an adequate level.  It is undisputed that after the trip to Philadelphia, Dr. Ladner explained to Ms. Clemmer that he had decided to

---

[6] Mr. Green also relies on Mrs. Ladner's alleged statement to him that she thought he was doing a good job. This statement is not evidence of pretext as it is hearsay and was made by a non-party to this suit.  (Plaintiff's Statement at ¶ 45).

terminate Mr. Green before the completion of his probationary period, which was just two weeks away.  (Statement at ¶ 28-29).[7]  Dr. Ladner told Ms. Clemmer that "he just did not feel safe in the car with Reggie and [that Reggie] had demonstrated many instances of both unprofessional behavior and extremely poor judgment."  These instances were documented by Ms. Clemmer throughout Mr. Green's employment.  There is no evidence that Dr. Ladner ever mentioned that Mr. Green had stopped to use the bathroom, much less that this played any role in the termination decision.  (*Id.* at ¶ 27).

Mr. Green also alludes to the fact that the timing of Mr. Green's termination suggests pretext.  He must do more to survive summary judgment.  He entirely ignores the cases cited by Defendants demonstrating that timing in and of itself does not establish pretext, (Motion at 18 and authorities cited therein,) and cites no law to support his position.  Further, it is undisputed that the University made the decision when it did <u>because</u> Mr. Green was approaching the end of his probationary period.  (*Id.* at ¶ 28).  There is no evidence to the contrary.

Ultimately, Mr. Green is left to argue that Dr. Ladner is a demanding employer.  Indeed, he fired two previous drivers.  Dr. Ladner's high standards do not, however, constitute evidence of discrimination against Mr. Green or anyone else.

## II.    CONCLUSION

For these reasons, and those set forth in Defendants' Motion for Summary Judgment, Defendants respectfully request that the Court grant summary judgment on all of Mr. Green's claims.

---

[7] Mr. Green disputes that there were any problems during the Philadelphia trip.  Whether or not Mr. Green was driving poorly in Philadelphia is irrelevant because it is undisputed that Dr. Ladner testified that he did not terminate Mr. Green because of the Philadelphia trip.  (Statement at ¶ 29).

DATED:       March 7, 2008                    Respectfully submitted,


                                    _____/s/_____
                                    Christine N. Kearns (D.C. Bar No. 416339)
                                    Rebecca M. Carr (D.C. Bar No. 488274)
                                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                                    2300 N Street, N.W.
                                    Washington, DC  20037-1122
                                    Telephone: (202) 663-8000
                                    Facsimile: (202) 663-8007
                                    christine.kearns@pillsburylaw.com
                                    rebecca.carr@pillsburylaw.com

                                    *Counsel for Defendants*
                                    *American University and Benjamin Ladner*

18

400771560v1