# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REGINALD GREEN,             )
                                       )
          Plaintiff,      )
                                       )
       v.            )     Case No. 07cv52 (RBW)
                                       )
AMERICAN UNIVERSITY and    )
BENJAMIN LADNER,       )
                                       )
         Defendants.   )

## MEMORANDUM OPINION

Reginald Green, the plaintiff in this civil lawsuit, filed this action under the Americans

with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111-12117 (2006), and the District of

Columbia Human Rights Act of 1977 ("DCHRA"), D.C. Code § 2-1401.01 (2001), against the

defendants, American University and its former president Benjamin Ladner, for allegedly failing

to accommodate his disability and for wrongfully terminating his employment.  Complaint

("Compl.") ¶¶ 1-2.  The plaintiff also asserts a tort claim against the defendants for wrongful

termination of his employment. Compl. ¶¶ 1, 32, 34.  Currently before the Court is the

defendants' motion for summary judgment ("Defs.' Mot.") pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  After carefully considering the various submissions by the parties,[1] the

Court concludes that the defendants' motion must be granted in part and denied in part.

---

[1] Also submitted in connection with the Defendants' Motion for Summary Judgment is their Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("Defs.' Stmt."); the Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); the Plaintiff's Motion for Reconsideration ("Pl.'s Recons. Mot."); the Statement of Genuinely Disputed Issues of Material Fact in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Stmt."); the defendants' Reply in Support of Motion for Summary Judgment ("Reply"); and the defendants' Notice of Supplemental Authority ("Defs.' Supp. Auth.").

## I. Factual Background

The following facts are either admitted or not in dispute.[2]  On May 3, 2004, the plaintiff contacted defendant American University ("the University") inquiring about several job vacancies at the University.  Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("Defs.' Stmt.") ¶ 1; Statement of Genuinely Disputed Issues of Material Fact in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Stmt.") ¶ 1; Defs.' Mot., Exhibit ("Ex.") 1 (Deposition of Reginald Green) ("Green Dep.") at 37-38.  In his written correspondence with the University, the plaintiff represented that he was capable of performing a broad range of jobs including providing security services, operating office machinery, and processing passports and classified materials.  Defs.' Stmt. ¶ 1; Pl.'s Stmt ¶ 1; Defs. Mem., Ex. 1 (Green Dep.) at 38-43.  After his application for employment was processed, the plaintiff was interviewed by Dr. Ladner and two other University employees "for the position for driver for the President." Defs.' Stmt. ¶ 2; Pl.'s Stmt. ¶ 2.

On July 14, 2004, the plaintiff underwent a pre-hiring Commercial Driver Fitness Determination that included completing a Medical Examination Report ("Medical Report").  Defs.' Mot., Ex. 1 (Green Dep.) at 66.  The plaintiff indicated on the Medical Report that he had "[an] illness or injury in the last five years" and "digestive problems."  Defs.' Mot., Ex. 1, Attachment ("Attach.") (Medical Report).  The plaintiff also listed his current medications and indicated they were used "sometime[sic] for anal fissure."  Id.  Upon completing the first two sections of the Medical Report, the plaintiff met with a physician to discuss the answers he

---

[2] Unless otherwise indicated, all of the facts set forth in this opinion are either admitted by both parties or are otherwise undisputed.

provided in the Medical Report.  Defs.' Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.  The physician asked if the

plaintiff's doctor had given him any restrictions due to his anal fissure condition, and the plaintiff

replied that he had not been given any restrictions.  Defs.' Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.

Accordingly, the physician recorded the plaintiff's response on the Medical Examination Report

as "No Limitations."  Defs.' Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.

On August 16, 2004, the defendants hired the plaintiff as a Chauffer/Office Assistant to

Dr. Ladner, who was the President of the University at the time.  Compl. ¶ 10; Answer ¶ 10.  The

plaintiff's duties included providing chauffeuring services for Dr. Ladner, other University

officials, and Mrs. Ladner (Dr. Ladner's wife), along with caring for the vehicles he drove and

performing various administrative duties.  Defs.' Mot., Ex. 1, Attach. (Driver's Duties and

Responsibilities) ("Driver's Duty Document").

Margaret Clemmer, the plaintiff's direct supervisor, met with the plaintiff shortly after his

employment commenced and provided him with the Drivers Duties Document and a document

entitled "For Conversation with Reggie" ("Conversation Document").  Defs.' Stmt. ¶ 14; Pl.'s

Stmt. ¶ 14.  The Conversation Document provided advice concerning how the plaintiff should

avoid various performance problems that had plagued prior drivers.  Defs.' Mot., Ex. 1, Attach.

(Conversation Document).  Some of the relevant advice included "no tail-gating," "no jerky

driving," and "minimize bathroom stops on long trips –. . . [o]ne [stop] is acceptable—zero is

preferable."  Id.  When the plaintiff expressed concern about his inability to drive for long

periods of time without using the restroom, Ms. Clemmer informed him that previous drivers

were actually taking smoke breaks and not really using the restroom.  Defs.' Mot., Ex. 1 (Green

Dep.) at 94-95.

The plaintiff contends that on November 30, 2004, he requested a single accommodation from the University, which was to take bathroom breaks during an upcoming trip to Philadelphia, Pennsylvania.  Defs.' Stmt. ¶ 23; Pl.'s Stmt ¶ 23; Defs.' Mot., Ex. 1 (Green Dep.) at 85-86, 90. According to the plaintiff, Ms. Clemmer discussed the plaintiff's request with Dr. Ladner and Ms. Clemmer told the plaintiff that Dr. Ladner "said it would be okay" for him to stop to use the bathroom.  Id. at 96.

On December 2, 2004, while returning to the District of Columbia following the Philadelphia trip, the plaintiff asked Dr. Ladner if he could stop to use the bathroom.  Id. at 161-62;  Defs.' Stmt. ¶ 25; Pl.'s Stmt ¶ 25.  The plaintiff contends that Dr. Ladner was "adamant about continuing to go on to D.C."  Id. at 162.  The plaintiff then told Dr. Ladner that he had to use the bathroom and that he was "going to soil the seat" if he didn't stop to do so.  Id.  The plaintiff testified that Dr. Ladner "turned blue and pink in the face and mumbled some words" as the plaintiff proceeded to a rest stop to use the bathroom.  Id.

Shortly after the Philadelphia trip, Dr. Ladner informed Ms. Clemmer of his intention to terminate the plaintiff's employment, citing several performance issues during the Philadelphia trip as the basis for his termination.  Defs.' Mot., Ex. 4 (Clemmer Dep.) 58-60.  However, Dr. Ladner did not identify the bathroom stop as one of those reasons.  Id. at 60.  The plaintiff's employment was terminated on December 3, 2004, the day following the completion of the Philadelphia trip.  Defs.' Stmt. ¶ 30; Pl.'s Stmt. ¶ 30; Defs.' Mot., Ex. 1 (Green Dep.) at 11.

## II. Procedural History

Following his termination, the plaintiff filed a charge of discrimination with the District of Columbia Human Rights Commission (the "Commission") on December 21, 2004.  Defs.'

4

Mot., Ex. 1 (Charge of Discrimination) ("DCHRA Charge").  The DCHRA Charge of

Discrimination alleged, inter alia, that the plaintiff was denied the accommodation of using the

restroom on the Philadelphia trip and was terminated thereafter.  Id.  The Commission dismissed

the DCHRA Charge of Discrimination with a "no probable cause determination."  Compl. ¶ 16.

The plaintiff filed a request for reconsideration and the Commission affirmed the "no probable

cause" finding on January 24, 2006.  Compl. ¶ 17.  The United States Equal Employment

Opportunity Commission ("EEOC") reviewed the Commission's findings and issued a Dismissal

and Notice of Rights dated August 28, 2006. Compl., Attach. (Dismissal and Notice of Rights)

("EEOC Dismissal").  The plaintiff filed his Complaint in the Superior Court of the District of

Columbia on November 27, 2006, and the defendants removed the case to this Court pursuant to

28 U.S.C. §§ 1331, 1367(a), and 1441 (2006) on the ground that a federal question was being

raised by the plaintiff.

### III. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one

that is capable of affecting the outcome of the litigation, and a genuine issue of material fact

exists if due to the fact "a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When considering a motion for

summary judgment, a court must "view the evidence in the light most favorable to the

nonmoving party and draw all reasonable inferences in [his] favor."  Galvin v. Eli Lilly & Co.,

488 F.3d 1026, 1031 (D.C. Cir. 2007) (internal citation and quotation marks omitted); see also

Greene v. Amritsar Auto Servs. Co., 206 F. Supp. 2d 4, 7 (D.D.C. 2002).  The party moving for

summary judgment may not rely solely on conclusory allegations, but must also set forth facts

that are significantly probative.  Anderson, 477 U.S. at 249-50 (citations omitted).  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge . . . ."  Id. at 255.  To survive a motion for summary

judgment in a case of this type, the non-moving party must show that a reasonable jury could

conclude from all of the evidence that an "adverse employment decision was made for a

discriminatory reason."  Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing Aka v.

Wash. Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)).   However, if the Court

concludes that "the non[-]moving party has failed to make a sufficient showing on an essential

element of h[is] case with respect to which []he has the burden of proof," then the moving party

is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### IV. Legal Analysis

### (A)     The Plaintiff's Administrative Charge of Discrimination

The defendants first argue that the plaintiff's administrative Charge of Discrimination

alleged only that he was not given the reasonable accommodation of being permitted "to use the

bathroom on long car trips" and that he is therefore restricted to pursuing that claim before this

Court.  Defs.' Mot. at 4-5.  In fact, the plaintiff alleges nothing more, as his administrative

complaint asserts that the defendants failed to accommodate his disability and then wrongfully

terminated him because of his request for the accommodation.  Defs.' Mot., Ex. 1 (DCHRA

Charge).  Therefore, the only claims  the plaintiff has pled in this action were included in his

administrative Charge of Discrimination and accordingly they are properly before this Court.

**(B)     The Plaintiff's ADA and DCHRA Claims**

The plaintiff alleges that he was denied a reasonable accommodation for his disability and

that he was wrongfully terminated because of his disability in violation of both the ADA and

DCHRA.  The standard for establishing a prima facie case of discrimination in the employment

context under both the ADA and DCHRA[3] is satisfied by the plaintiff showing (1) that he had a

disability within the meaning of the statutes; (2) that the defendant had notice of his disability;

(3) that with reasonable accommodations he could perform the essential functions of his job; and

(4) that the defendant refused to provide the requested accommodation, or that the defendant

terminated his employment due to his disability.  See Duncan v. Wash. Metro. Area Transit

Auth., 240 F.3d 1110, 1114 (D.C. Cir. 2001); Thompson v. Rice, 422 F. Supp. 2d 158, 165-66

(D.D.C. 2006); Norden v. Samper, 503 F. Supp. 2d 130, 144 (D.D.C. 2007). The Court will

address whether the plaintiff has satisfied each of these elements below.

**(1)     The Plaintiff's Evidence of his Disability**

The ADA defines a person with a "disability," in part, as having either: "(A) a physical . .

. impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment."  42

---

[3] Guidance for analyzing DCHRA claims may be found in case law that has construed the ADA. Morgenstein v. Morgan Stanley DW Inc., No. 05-2123 (JR), 2007 WL 315090, at *4 n.7 (D.D.C. Jan. 31, 2007) ("Because the DCHRA and the Americans with Disabilities Act (ADA) are substantially similar, courts considering DCHRA claims frequently look to ADA case law for persuasive authority."); see Whitbeck v. Vital Signs, Inc., 116 F.3d 588, 591 (D.C. Cir. 1997) (observing that District of Columbia courts interpret the DCHRA by reference to cases arising under federal civil rights statutes); Chang v. Institute for Public-Private Partnerships, Inc., 846 A.2d 318, 324 (D.C. 2004) (construing the DCHRA under the same standards as the ADA in regards to comparable sections of the two statutes).

U.S.C. § 12102(2) (2006).  The defendants argue that the plaintiff does not have an impairment, and is not substantially limited in the major life activity of eliminating bodily waste based on the severity of his symptoms and the absence of relevant medical records.  Defs.' Mot. 8-12.[4]  On the other hand, the plaintiff argues that his condition, which is similar to irritable bowel syndrome ("IBS") and causes fecal urgency,  is an impairment that substantially limits the major life activity of eliminating bodily waste.  Pl.'s Opp'n at 6-14.

The first step of the Court's analysis in assessing whether the plaintiff has a qualifying disability is to determine whether the plaintiff has a physical impairment.  EEOC regulations define a physical impairment as: "(1) Any physiological disorder, or condition… affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine."  29 C.F.R. § 1630.2(h)(1) (2008) (emphasis added).  To receive ADA and DCHRA protection, the existence of a disability must be demonstrated at the time the plaintiff requested and was refused a reasonable accommodation.  Heasley v. D.C. Gen. Hosp., 180 F. Supp. 2d 158, 167 (D.D.C. 2002).  It is the impairment itself, not the medical diagnosis of the condition, that determines whether a particular ailment qualifies as an impairment under the Act.  Scarborough v. Natsios, 190 F. Supp. 2d 5, 20 (D.D.C 2002).

The defendants contend that the plaintiff has presented no evidence of an impairment and has failed to produce any medical records concerning his condition during the relevant time period.  Defs.' Mot. at 8.  The medical records submitted by the plaintiff do not document the continuous presence of his condition during the relevant period, but rather document his

---

[4] The plaintiff does not assert that he satisfies the third prong of the ADA's definition of a disability by being regarded as having an impairment that substantially limits one or more major life activities.

condition both before and after his employment.[5]  However, the plaintiff's medical records do indicate that on April 14, 2004 he had "rectal pain and fecal urgency which ha[d] been bothering him" and that nitroglycerin had been alleviating these problems.  See Defs.' Stmt.¶ 33.  In addition, as stated earlier, the plaintiff completed a medical examination report when he applied for employment with the defendants, which listed his current medications and indicated they were used "sometime[sic] for anal fissure."  Defs.' Mot., Ex. 1, Attach. (Medical Report). Moreover, the plaintiff testified that during the relevant time period he "physically [had] bowel movement[s] maybe three or four times [a day] . . . [and] in one day's time [felt] like [he had] to go to the bathroom about 10 to 15 times."  Defs.' Mot., Ex. 1 (Green Dep.) at 130.  Significantly, while employed by the University, the plaintiff testified that he soiled himself on one occasion. Id. at 135-36.  Collectively, the plaintiff's evidentiary submissions affirm the existence of a physiological disorder or condition affecting his digestive system.  Additionally, there is evidence in the record that supports an inference that the plaintiff had the potential of soiling

---

[5] The plaintiff's medical records establish the following timeline. On April 15, 2002, the plaintiff's medical provider, Kaiser Permanente Hospital ("Kaiser"), provided a note stating the plaintiff "[a]dmits to being late often due to having to pull over to use the bathroom when he has the urge." Pl.'s Opp'n, Ex. 6 ("April 15, 2002 Note"). On June 27, 2002, Kaiser provided a letter describing fecal urgency and stating the plaintiff's fecal urgency was "not under voluntary control." Pl.s' Opp'n, Ex. 6 ("June 27, 2002 Letter"). On February 6, 2003, another Kaiser note reflects that the plaintiff changed his diet, which had "an amazing difference in his colon pain and [a bowel movements]", but that he had colon pain described as a "burning sensation approx[imately] 20 minutes after having [bowel movement]." Pl.s' Opp'n, Ex. 6 ("February 6, 2003 Note"). The plaintiff had surgery on May 21, 2003, to alleviate symptoms associated with his anal fissure. Defs.' Mot., Ex. 1 (Green Dep.) at 88. On June 9, 2003, a Kaiser office visit summary stated that the plaintiff's pain was "now minimal-can sit!!!& drive." Defs.' Mot., Ex. 6 ("June 9, 2003 Summary"). On January 20, 2004, another Kaiser summary stated that there were "[n]o issues to address at this time. Denies pain, nausea, vomiting, constipation, diarrhea, blood, melena." Defs.' Mot., Ex. 6 ("January 20, 2004 Summary"). On April 14, 2004, a record from the plaintiff's new medical provider, The George Washington University Hospital ("GWU Hospital"), noted that the plaintiff "states that he has rectal pain and fecal urgency[,] which has been bothering him, the nitroglycerin has been helping," and that the plaintiff would "continue with fiber, water and nitroglycerin [as needed]." Defs.' Mot., Ex. 6 ("April 14, 2004 Record"). On November 9, 2005, a GWU Hospital progress note recorded that the plaintiff experienced "20 trips to bathroom [with] 10 defecations." Pl.s' Opp'n, Ex. 7 ("November 9, 2005 Progress Note"). The plaintiff's other medical records from 2002 to 2006 demonstrate that he experienced rectal bleeding and various other symptoms. See Defs.' Mot., Ex. 6, 7; Pl.s' Opp'n, Ex. 6, 7.

himself while on the job when he felt the urge to have a bowel movement, particularly during the trip back from Philadelphia when he indicated that if he was unable to stop he would soil himself.  Pl.'s Opp'n at 10, 15-16.  Given that a medical diagnosis is not specifically required under the ADA, the Court finds that a reasonable jury could conclude that the plaintiff had an impairment during the time period relevant to this case.  See Scarborough, 190 F. Supp. 2d at 20.  The primary dispute therefore hinges on whether, during the relevant time period, the plaintiff's fecal urgency substantially limited one or more major life activities.  See 42 U.S.C. § 12102(2).

Major life activities have been defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Bragdon v. Abbott, 524 U.S. 624, 638-39 (1998) (quoting Rehabilitation Act Regulation 45 C.F.R. § 84.3(j)(2)(ii) (1997)) (noting that "the ADA must be construed to be consisted with regulations issued to implement the Rehabilitation Act").  This list, however, "is illustrative, not exhaustive," id. at 639, and the Supreme Court has noted that "the touchstone for determining an activity's inclusion under the statutory rubric is its significance," id. at 638.  Additionally, major life activities include, but are not limited to, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." ADA Amendments Act of 2008, Pub. L. No. 110-325, § 3, 122 Stat. 3553, 3555 (2009).  Although the District of Columbia Circuit has not assessed whether the malady that afflicts the plaintiff constitutes a major life activity, the ADA Amendments Act of 2008 includes the functioning of the bowels as a major life activity.  Furthermore, although the ADA Amendments Act of 2008 only recently included this bodily function as a major life activity, other courts have long allowed for the possibility.  See Crawford v. N.Y. Life Ins., Co.,

10

No. 04-CV-1853, 2006 WL 2792779, at *4 (E.D.N.Y. Sept. 27, 2006) (finding that the plaintiff's

symptoms affecting her bowels impaired the major life activity of eliminating bodily waste);

Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999) ("jury could have decided that

controlling one's bowels is a major life activity"); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867,

871-73 (2nd Cir. 1998) (finding that the elimination of bodily waste may constitute a major life

activity).  That possibility is now not an open question.

Having determined that the plaintiff has shown that he had a physical impairment

affecting a major life activity at the time relevant to this case, the Court must now address

whether the impairment amounted to a substantial limitation on one or more of the plaintiff's

major life activities.  42 U.S.C. § 12102(1)(A).  Although the ADA does not define the term

"substantially limits," to satisfy this requirement courts "'require that an individual be "[u]nable

to perform a major life activity that the average person in the general population can perform" or

[be] '[s]ignificantly restricted as to the condition, manner or duration under which an individual

can perform a major life activity' as compared to the average person in the general population.'"

Heasley, 180 F. Supp. 2d at 166 (quoting Siragy v. Georgetown Univ., No. CIV. A. 97-2557

(RMU) 1999 WL 767831, slip op. at *3 (D.D.C. Aug. 20, 1999) (quoting 29 C.F.R. §

1630.2(j)(1)(i)-(ii)).  The factors to be considered in making this determination are: "(1) [t]he

nature and severity of the impairment; (2) [t]he duration or expected duration of the impairment;

and (3) [t]he permanent or long term impact, or the expected permanent or long term impact of or

resulting from the impairment."  Desmond v. Mukasey, 530 F.3d 944, 956 (D.C. Cir. 2008)

(quoting 29 C.F.R. § 1630.2(j)(2)).  And "i[n] determining whether a limitation is substantial,

courts must [also] take into account any mitigating or corrective measures."  Id. (internal citation omitted).

The defendants argue that the plaintiff's condition does not satisfy the substantial limitation requirement, noting that the plaintiff reports that he only had three to four actual bowel movements per day, and that he has failed to produce any evidence showing that this number of bowel movements is significantly greater than that of an average person.  See Pl.'s Opp'n, Ex. 1 (Green Dep.) at 172.   However, the record also indicates the plaintiff experienced an additional six to eleven daily occasions when he felt the urge to go to the bathroom.  Although he did not qualify the degree of urgency he experienced on those occasions, the plaintiff did testify that on one occasion he soiled himself while attempting to make it to the bathroom.  Defs.' Mot., Ex. 1 (Green Dep.) at 135-36.

Similar to the plaintiff in this case, the plaintiff in Crawford also suffered from an impairment affecting the bowels, i.e., irritable bowel syndrome.  2006 WL 2792779 at *1.  The court in Crawford found that the plaintiff adequately demonstrated that she suffered an impairment which affected a major life activity, but failed to show that such an impairment was a substantial limitation on a major life activity. However, Crawford is nonetheless instructive as the court intimated that had the plaintiff alleged that her impairment "requir[ed] her to run to the bathroom without notice, or soil[] herself", she may have been able to satisfy this requirement. See id. at *5.

As further support for their contention that the plaintiff was not suffering from a substantial impairment, the defendants reference the fact that the plaintiff never had to miss a day of work or was prevented from completing his duties because of his condition, even after the

soiling incident occurred.  Defs.' Mot. at 9, 11.  In response, the plaintiff argues that having a

qualifying disability does not necessarily require a person to miss work.  Pl.'s Opp'n at 12.  The

Court agrees that whether a plaintiff had to miss work due to his impairment is a relevant inquiry

in assessing the severity of the impairment.  However, the Court agrees with the plaintiff that

missing work is not a prerequisite for establishing the existence of a substantial impairment.  In

fact, having too many absences from work could actually defeat the plaintiff's prima facie case of

discrimination.  For example, in Nesser v. Trans World Airlines, Inc., the plaintiff was unable to

satisfy the third element of a prima facie case of discrimination under the ADA because his

number of absences made it impossible for him to "establish that he could perform the essential

functions of his job [with or] without accommodation."  160 F.3d 442, 445 (8th Cir. 1998).  So

to require a plaintiff to show that he had to miss work to establish one component of his case,

while on the other hand holding such absences against him to defeat another component of his

case would unfairly doom every case brought under the ADA and the DCHRA where an

employee claims that the employer failed to reasonably accommodate his or her disability.  In

this case, the plaintiff's job required him to be available to provide chauffeur services whenever

those services were needed.  Therefore, consistent attendance was an essential function of the

plaintiff's employment with the University; thus, requiring the plaintiff to show that he had to be

absent from work to establish the substantial limitation requirement would fatally compromise

his ability to prove a prima facie case of discrimination under the ADA and the DCHRA.  This,

the Court cannot do, and it therefore finds that on this record the issue of whether the plaintiff

was substantially limited in the major life activity of waste elimination is a question for the jury.

　　　　Even if the Court was unable to find that the plaintiff actually suffers from an impairment

"that substantially limits one or more [of his] major life activities," 42 U.S.C. § 12102(1)(A),

summary judgment would still be inappropriate, as a jury could reasonably find that the plaintiff

qualified as being disabled because he had a "record of . . . an impairment" that substantially

limited a major life activity, id. § 12102(1)(B).  The defendants argue that the plaintiff cannot

make this showing because he has presented neither medical records nor any other tangible

documentation of his impairment during the time that he was employed by the defendants.

Defs.' Mot. at 8.  However, documentation of this nature is not required to establish a record of

an impairment.  Adams v. Rice, 531 F.3d 936, 946 (D.C. Cir. 2008).  Rather, the plaintiff must

show that he "has a history of a [qualifying] impairment."  Id.

   A jury could reasonably find that the plaintiff's proffered evidence establishes a sufficient

history of his impairment, despite the absence of any type of records documenting the plaintiff's

condition during his employment with the University.  The plaintiff's medical records from

April, 14, 2004, four months before he commenced his employment with the University, state

that he had "rectal pain and fecal urgency" and that he was taking medication that aided his

condition.  Defs.' Mot., Ex. 7 (April 14, 2004 Note).  As early as 2002, the plaintiff's medical

records show that his fecal urgency was "not under voluntary control."  Pl.'s Opp'n, Ex. 6 (June

27, 2002 Letter).  The plaintiff testified that during the relevant time period he felt the urge to go

to the bathroom more often than he actually had to have a bowel movement.  Pl.'s Opp'n, Ex. 1

(Green Dep.) at 172.  It is unclear, however, to the Court from the record before it whether the

plaintiff was able to distinguish between mere urges and the actual need to go to the bathroom.

See Defs.' Mot. at 9; Pl.'s Opp'n, Ex. 1 (Green Dep.) at 173 & Ex. 7 (November 9, 2005

Progress Note).  In April 2002, the plaintiff's medical records indicate that he was often late

arriving at work as a result of having the urge to have a bowel movement and therefore having to stop while driving to work to use the bathroom.  Pl.'s Opp'n, Ex. 6 (April 15, 2002 Note). Although these stops did not always result in the plaintiff actually having a bowel movement, one of the plaintiff's physicians suggested that ignoring the urge could result in the plaintiff soiling his clothing.  See Pl.'s Opp'n, Ex. 6 (April 15, 2002 Note & June 27, 2002 Letter).  Additionally, the plaintiff's 2002 records indicate it was unlikely the plaintiff's condition would be cured. Pl.'s Opp'n, Ex. 6 (June 27, 2002 Letter).

It is unnecessary for the plaintiff's medical records to reflect that the plaintiff was constantly affected by his condition; thus, the plaintiff can still show that he suffered from a disability, even if the manifestations of his symptoms were unpredictable.  In fact, the court in Criado v. IBM Corp. found that the plaintiff had a qualifying disability under the ADA as a result of experiencing "periods of depression." 145 F.3d 437, 442 (1st Cir. 1998).  Here, the plaintiff's medical records clearly indicate that he experienced fecal urgency on numerous occasions and the fact that his fecal urgency symptoms were mitigated with medication "does not establish that [he] does not have a disability."  Id. (stating that although the plaintiff's "depression had been adequately treated . . . in the past and was expected to be adequately treated . . . in the future [did] not establish that she [did] not have a disability.").  The plaintiff has also proffered medical records describing his condition following his termination, namely that in 2005 he experienced "20 trips to the bathroom w/ [sic] 10 defecations" during the course of a single day.[6]  Pl.'s Opp'n, Ex. 7 (November 9, 2005 Progress Note).  Additionally, the plaintiff has offered his Medical Report, which was prepared immediately before the commencement of his employment with the

---

[6] The record suggests that the plaintiff's medical records indicate what he was experiencing on a single day in 2005.  See Pl.'s Opp'n, Ex. 1 (Green Dep.) at 172.

University, on which he indicated that he had "[an] illness or injury in the last five years" and "digestive problems," and listed his current medications, explaining that they were used "sometime[sic] for anal fissure." Defs.' Mot., Ex. 1, Attach. ("Attach.") (Medical Report). On this record a jury could reasonably conclude that the plaintiff had a record of having a substantial impairment.

Accordingly, the Court finds that the plaintiff has raised a genuine issue of material fact concerning whether he had a qualifying disability during his employment by the University under both the ADA and the DCHRA.

(2)   The Defendants' Notice of the Plaintiff's Disability

The Court must next address whether the defendants had notice of the plaintiff's disability. Adequate notice is provided if the employee supplies "enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." Thompson, 422 F. Supp. 2d at 176 (internal citation and quotation marks omitted) (emphasis omitted). It is uncontested that the defendants had notice of the plaintiff's requests to use the bathroom on long trips. Defs.' Mot. at 13-14; Pl.'s Opp'n at 15. Some disagreement does exist, however, as to the amount of information available to the defendants regarding the nature and impact of the plaintiff's fecal urgency between August 16, 2004, and December 3, 2004, the dates during which the University employed the plaintiff. Pl.'s Opp'n at 15; Reply in Support of Motion for Summary Judgment ("Reply") at 8. However, the Court is compelled to accept the plaintiff's factual allegations and deposition testimony that during his interviews he told both Ms. Clemmer and Dr. Ladner about his condition and the limitations it placed on his ability to travel for long periods of time without stopping to use the bathroom, as

the Court is required to "view the evidence in the light most favorable to the nonmoving party."

Galvin, 488 F.3d at 1031 (internal citation and quotation marks omitted).  Specifically, the

plaintiff alleges in his opposition papers and testified at his deposition that during the first job

interview he discussed his colon surgery and his condition that caused his frequent urges to use

the bathroom.  Pl.'s Stmt. ¶ 2; Defs.' Mot., Ex. 1 (Green Dep.) at 57.  The plaintiff also contends

that at a third interview with Dr. Ladner, he discussed his "colon issues" and "how long [he] had

been disabled."  Pl.'s Stmt. ¶ 2; Defs.'s Mot. (Green Dep.) at 65.

   To establish the employer's knowledge of his disability, "notice under the ADA need not

be precise, but it must put the employer sufficiently on notice of the existence and nature of the

disability."  Evans v. Davis Memorial Goodwill Indus., 133 F. Supp. 2d 24, 28 (D.D.C. 2000).

Therefore, because establishing a prima facie case under the ADA requires that the defendants

have knowledge of the plaintiff's disability, the Court will limit its inquiry to the information

made available to the University at the time of the alleged discrimination.  The plaintiff points to

medical records documenting his condition both before and after his employment to establish his

fecal urgency condition.  Pl.'s Opp'n at 13-14.  The defendants argue that these records did not

provide the defendants knowledge of the plaintiff's alleged disability during the time of his

employment.  Reply at 9 n.3.  The plaintiff, in response, alleges that the defendants knew or

should have known about his disability because he was requested by his supervisors to

reschedule appointments to see a doctor about his rectal bleeding during the time of his

employment.  Pl.'s Opp'n at 7.  Additionally, the plaintiff maintains that he informed Ms.

Clemmer and Dr. Ladner of his disability when he interviewed for employment with the

University.  Defs.' Mot., Ex. 1 (Green Dep.) at 80.

Reviewing the evidence that would have been available to the defendants at the time of the alleged discrimination, the Court notes the following: the defendants would have been aware of the June 27, 2002 Letter depicting the chronic nature of the plaintiff's fecal urgency and explaining that the condition is unlikely to be cured, Pl.'s Opp'n, Ex. 6 (June 27, 2002 Letter), and the January 20, 2004 Note from a follow-up doctor's visit, which described the plaintiff's digestive symptoms, would have been the most current statement of the status of the plaintiff's condition, Defs.' Mot., Ex. 6 (January 20, 2004 Note).[7]  The defendants assert that because the Medical Report the University required to be completed before the plaintiff was hired (during which the plaintiff presumably had the opportunity to identify any ongoing symptoms) and the note from the doctor treating the plaintiff's fractured ankle, which expressed that the plaintiff had no apparent physical limitations, should be viewed by the Court as evidence that the defendants were not put on notice that the plaintiff had a disability.  However, in her deposition testimony, Ms. Clemmer admits that she knew that the plaintiff had a "colon problem."  Pl.'s Opp'n, Ex. 3 (Clemmer Dep.) at 91.  Additionally, the plaintiff maintains that he provided the University with an article describing his surgery and post-traumatic stress disorder which, he contends, would have alerted the University to his disability.  Pl.'s Opp'n, Ex. 1 (Green Dep.) at 116-17.  But, the article was not submitted to the Court with the parties' submissions, so the Court cannot assess whether it would have put the defendants on notice of the plaintiffs' disability.[8]

---

[7] The plaintiff did not testify that he authorized or attempted to authorize the release of his George Washington University Hospital medical records.  Taking as true, however, the plaintiff's testimony that he signed a release for his Kaiser Permanente medical records, Defs.' Mem., Ex. 1 (Green Dep.) at 86, the Court can infer either that the defendants would have had the plaintiff's pre- and post-operative records from surgery performed to alleviate symptoms associated with his anal fissure or that they had the opportunity to acquire these records. Therefore, the Court can infer that the defendants either knew or should have known the contents of these records.

[8] In the Court's view, the article would only provide notice to the defendants of the plaintiffs' disability if

(continued...)

18

On this record, if the plaintiff's evidence is credited, a reasonable jury could decide that the defendants had sufficient notice of the plaintiff's disability.   Thus, based upon Ms. Clemmer's testimony, the plaintiff's assertions, and the June 27, 2002 Letter describing the plaintiff's fecal urgency, the Court must defer to the jury in its role as the fact-finder the question of whether the defendants were on notice of the plaintiff's disability during his employment with the University.   Accordingly, awarding summary judgment to the defendants on the basis that they were not provided sufficient notice of the plaintiff's disability and desire for an accommodation is inappropriate.

(3)   The Plaintiff's Ability to Perform the Essential Functions of the Job

To satisfy this component of his <u>prima facie</u> case, the plaintiff must show that he is a qualified individual with a disability under the ADA and the DCHRA.   And to establish that he is a "qualified individual with a disability" the plaintiff must show that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position [from which he was terminated]." <u>Woodruff v. Peters</u>, 482 F.3d 521, 527 (D.C. Cir. 2007)  (quoting 42 U.S.C. § 12111(8)) (internal quotation marks omitted).   The parties do not appear to dispute which functions of the plaintiff's prior employment are essential, but rather dispute whether the plaintiff satisfied certain standards of safety and professionalism. Defs.' Mot. 15; Pl.'s Opp'n 19-20.

The defendants claim that the plaintiff was terminated because he did not satisfactorily perform his required duties.  Defs.' Mot. at 15-16.  In attempting to establish the honesty of their belief that the plaintiff was not satisfactorily performing his job, the defendants have offered

---

[8](...continued)

the article referenced a correlation between the plaintiffs' post traumatic stress disorder and his fecal urgency.

19

evidence of ongoing concerns about plaintiff's job performance, including his driving habits before and during the Philadelphia trip, showing up for work in a motorcycle outfit "after having missed the initial pick-up entirely," waiting at the Ladner's home for two hours when there was no pickup scheduled, and hugging Mrs. Ladner after she returned from a trip.  Defs.' Mot. at 15-16.  Ms. Clemmer also kept notes on concerns Dr. Ladner had about the plaintiff, which were outlined into a document after the plaintiff filed his EEOC complaint.  See Reply at 14; Pl.'s Opp'n, Ex. 3 (Clemmer Dep.) at 67-68.  Such concerns included the plaintiff's driving style, namely, the plaintiff speeding up and then slowing down for no apparent reasons, driving at least five car-lengths behind other cars, making turns from the wrong lane, stopping completely before proceeding over speed bumps, failing to learn how to use the Global Positioning [Navigation] System ("GPS"), his failing to keep the car clean and neat, along with scheduling and professionalism concerns.  Defs.' Mot., Ex. 4, Attach. (Chronology) at AU 0134 - AU 0144.  The plaintiff disputes the defendants' contention that his performance fell below the standard required for his position and asserts that the defendants' characterization of his job performance is pretextual.  Pl.'s Opp'n at 19.

   In responding to the defendants' allegations concerning his performance, the plaintiff testified that he rode a motorcycle to work on one occasion because his car had a flat tire, that his driving style was designed to promote safety, that he attended an instructional course on GPS use and was able to use it properly thereafter, that misunderstandings caused the unscheduled two hour wait, and that Mrs. Lander, who was drunk at the time, initiated the hugging incident.  Pl.'s Stmt. ¶¶ 17, 19.  The Court must assess whether a reasonable jury could find, based on the plaintiff's explanation, that he was adequately performing the essential functions of his job

despite the defendants' evidence to the contrary.  See Ayedemi v. District of Columbia, 525 F.3d

1222, 1226 (D.C. Cir. 2008) (evaluating evidence offered in conjunction with a motion for

summary judgment based upon what a reasonable jury could find).  In Desmond v. Mukasey, the

Circuit Court found that "by vigorously disput[ing] the validity of the reasons cited by [the

defendant], the plaintiff had creat[ed] a genuine dispute over these material facts and had

proffered ample evidence by which a reasonable jury could conclude that [the defendant's] stated

reasons [we]re unworthy of credence."  530 F.3d 944, 963-64 (D.C. Cir. 2008) (citation and

internal quotation marks omitted).  However, even if the plaintiff disputes the reasons for his

termination, "it will not do for the plaintiff to show that the employer's stated reason was false if

the employer believed it in good faith; the plaintiff must establish a basis to conclude that the

employer has lied about the reason or, more directly, that the reason was discriminatory."  Id.

Moreover, this Court is not permitted to assess "the correctness or desirability of the reasons

offered but whether the employer honestly believes in the reasons it offers."  Woodruff, 482 F.3d

at 531 (citation omitted).

        The plaintiff's testimony and statements made by Ms. Clemmer contradict the

defendants' assertions about the plaintiff's familiarity with the streets in Philadelphia, the

cleanliness in which he maintained the car, and the general adequacy of the plaintiff's job

performance during his probationary period.  Pl.'s Opp'n at 19-21.  Because the defendants'

proffered evidence regarding the plaintiff's ability to perform his job functions is largely based

on the opinions of Dr. Ladner and Ms. Clemmer, the Court must evaluate the evidence with care,

as "courts traditionally treat explanations that rely heavily on subjective considerations with

caution."  Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1298 (D.C. Cir. 1998) (explaining the

relative weight of subjective decisions in a hiring context).  As stated earlier, the plaintiff responds to the defendants' criticisms of his job performance, asserting: that on one occasion when his car had a flat tire he rode a motorcycle to work and therefore wore motorcycle clothing; that his driving style was designed to promote safety; that he was able to use the GPS properly after he attended an instructional course on GPS use; that a misunderstanding caused the unscheduled two hour wait outside the Ladners' house; and that Mrs. Ladner, who was drunk at the time, initiated the hugging incident.  Pl.'s Stmt. ¶¶ 17, 19.  It is not proper for the Court to resolve such disputes between the plaintiff and the defendants concerning the plaintiff's job performance on a motion for summary judgment.  The Court must again defer to the jury's role as the fact-finder in making determinations regarding the credibility of such conflicting evidence.

The plaintiff's testimony about the events that occurred on the Philadelphia trip directly contradicts the defendants' allegations concerning his performance.  Pl.'s Opp'n at 20-21.  Ms. Clemmer also testified that she was satisfied with the plaintiff's performance regarding a number of the issues the defendants raise concerning his performance.  Id. at 21.  Moreover, there was no indication that any of these alleged concerns prompted any earlier discussions about terminating the plaintiff's employment.  Id.  Taken together, this evidence casts doubt on the honesty of the defendants' asserted reasons for terminating the plaintiff's employment.  See Desmond, 530 F.3d at 963-64.  Contra Hussain v. Gutierrez, 593 F. Supp. 2d 1, 10 (D.D.C. 2008) (distinguishing Desmond and finding no pretext where employee could not "point to any positive evaluation of her performance or any testimony by co-workers that tend[ed] to shed doubt on the [defendant's] statements about her performance").  A reasonable jury could choose to credit either the defendants' characterization of the plaintiff's performance or the plaintiff's disputation of that

characterization.  Accordingly, the Court finds that the evidence proffered by the plaintiff raises a

genuine issue of material fact as to whether he was qualified to perform the essential functions of

the job from which he was terminated.

(4)     The Plaintiff's Accommodation Request and Termination

Finally, the Court turns to the plaintiff's assertion that the defendants refused to

accommodate his disability and wrongfully terminated his employment under the ADA and

DCHRA because of his request for that accommodation during the Philadelphia trip.  To satisfy

this final element of a claim of discrimination under the ADA, the plaintiff must establish that

the defendants refused to accommodate his disability or that the defendants terminated him due

to his disability.  See Thompson, 422 F. Supp. 2d at 165-66.  The plaintiff contends he has met

his burden, arguing: (1) that the defendants refused to accommodate his disability when Dr.

Ladner through his words and actions indicated his opposition to the plaintiff stopping to use the

restroom on the return trip from Philadelphia, Pl.'s Opp'n at 16, and (2) that the defendants then

wrongfully terminated his employment based on his request for the accommodation, id. at 17.

The Court will address each of these assertions in turn.

(a)     The Plaintiff's Accommodation Request

The defendants argue that they did in fact accommodate the plaintiff's request to use the

bathroom, even if direct authorization was never granted.  Reply at 12-13.  In response, the

plaintiff argues that Dr. Ladner's known preference for zero stops during car trips and his

negative reaction to the plaintiff's request to stop so he could use the bathroom amounted to the

denial of the accommodation.  Pl.'s Opp'n at 16.  The Court agrees with the plaintiff.

The parties do not dispute that the plaintiff made requests for accommodations during his

23

orientation and again prior to the Philadelphia trip.  Defs.' Mot. at 13-14; Pl.'s Opp'n at 15.  At

no point prior to the Philadelphia trip was the plaintiff told that he would not be allowed to stop

and use the bathroom if he needed to do so.  Defs.' Mot., Ex. 1 (Green Dep.) at 97.  In fact, Ms.

Clemmer spoke with Dr. Ladner at the plaintiff's request before the Philadelphia trip and was

told that "of course" the plaintiff could stop and use the bathroom.  Pl.'s Opp'n, Ex. 3 (Clemmer

Dep.) at 51-52.  On its own, the language in the Conversation Document stating that "one [stop]

is acceptable—zero is preferable" does not amount to a refusal to accommodate the plaintiff's

disability.  Defs.' Mot., Ex. 1, Attach. (Conversation Document). However, a reasonable jury

could infer a refusal to accommodate from the totality of the relevant circumstances.

The critical section of plaintiff's testimony regarding the alleged refusal to accommodate

his disability is the following:

| | |
|---|---|
| Q | At one point did you ask Dr. Ladner if you could stop to use the restroom? |
| A | Yes I did. |
| Q | And what did he say? |
| A | He was adamant about continuing to go on to D.C., could I wait. |
| Q | So he said no? |
| A | He was adamant about continuing to go on to D.C. |
| Q | And did you continue on to D.C.? |
| A | I told him that I must use the restroom. If I don't stop, I'm going to soil the seat in his car. |
| Q | What did he do? |
| A | He kind of turned blue and pink in the face and mumbled some words and I proceeded to go and stop at the rest stop at the Maryland House or Chesapeake House, one of those. |
| Q | And when you got back in the car did he say anything to you? |
| A | He didn't say one word to me. He looked like he was very perturbed at what I just did. |

Defs.' Mot., Ex. 1 (Green Dep.) at 161-62.  This testimony, if believed, could cause a jury to

reasonably conclude that Dr. Ladner had indicated through his words and actions that he was

opposed to the plaintiff stopping to use the bathroom.  Admittedly, however, it is unclear from

the testimony how adamant Dr. Ladner was about not stopping or exactly how long the oral

exchange lasted.  And the defendants argue that "[t]he only so-called evidence" of a refused

accommodation was the plaintiff's testimony that when he informed Dr. Ladner that he might

soil himself, Dr. Ladner "'kind of turned blue and pink in the face and mumbled some words,'

expressed concern that he was in a hurry to get back to D.C., did not speak to Mr. Green after he

used the bathroom, and looked 'like he was very perturbed.'"  Reply at 13 (citations omitted)

(emphasis in original).  This, the defendants opine, is actually "not evidence of a denial of [an]

accommodation."  Id.  Importantly, however, is the undisputed fact that at no time during the

exchange did Dr. Ladner tell the plaintiff he was permitted to stop to use the bathroom.  In

addition, almost immediately following Dr. Ladner's return from Philadelphia, he informed the

plaintiff's supervisor that the plaintiff was to be terminated.  Defs.' Stmt. ¶¶ 26, 30.  Given the

totality of these circumstances, a reasonable jury could refuse to credit the defendants' theory that

because the plaintiff actually stopped and use the bathroom that there was no refusal of the

accommodation.  In other words, the jury could infer that Dr. Ladner's words and actions

constituted a failure to accommodate the plaintiff's request for an accommodation as he never

actually acquiesced to the plaintiff's request to use the bathroom.  Moreover, a reasonable trier-

of-fact could find that the plaintiff's accommodation request and his termination shortly after the

Philadelphia trip were interrelated, with the termination amounting to proof-certain that the

plaintiff's request to use the bathroom whenever he needed to do so as an accommodation had

been denied.

In Hadley v. Wal-Mart Stores, Inc., a plaintiff brought a disability discrimination action,

25

arguing that the defendant failed to accommodate his disability by waiting two weeks to transfer

him after he delivered a doctor's note explaining that he should not continue working his current

position because of nausea and overheating.  No. CV-00-1433-HU, 2001 WL 34039486, at *2

(D. Or. Nov. 19, 2001).  There, the court found that whether the delay was reasonable was a

question for the jury.  Id. at *11.  Similarly, here, the Court finds that summary judgment in favor

of the defendants is not appropriate on the issue of whether there was a refusal to accommodate

the plaintiff's disability.  A jury could reasonably find that Dr. Ladner's reaction to the plaintiff's

request to stop so he could use the bathroom, paired with his almost immediate termination,

constituted a failure to accommodate the plaintiff's disability.  And with this finding, the plaintiff

has satisfied the required elements necessary to make out a prima facie case of discrimination

under both the ADA and the DCHRA.

(b)      The Plaintiff's Termination

Additionally, the plaintiff argues that the defendants wrongfully terminated him in

violation of the ADA and the DCHRA when they ended his employment on the day following

the Philadelphia trip.  Pl.'s Opp'n at 16-23.  The District of Columbia Circuit recently reiterated

a streamlined approach it had announced earlier, see Brady v. Office of the Sergeant at Arms,

520 F.3d 490, 494 (D.C. Cir. 2008), for analyzing wrongful termination claims brought under the

ADA:

> [I]f an employer asserts a legitimate, nondiscriminatory reason for an adverse
> employment action, the district court must conduct one central inquiry in considering
> an employer's motion for summary judgment or judgment as a matter of law: whether
> the plaintiff produced sufficient evidence for a reasonable jury to find that the
> employer's asserted non-discriminatory reason was not the actual reason and that the
> employer intentionally discriminated against the plaintiff on a prohibited basis.

26

Adeyemi, 525 F.3d at 1226.  For a plaintiff to avoid summary judgment in such a case, he must

proffer "specific and substantial" evidence that the defendants' alleged non-discriminatory

justifications are pretextual.  See Hadley, 2001 WL 34039486 at *13.  However, such evidence

need not be direct.  Aka, 156 F.3d at 1292 ("it is improper to require plaintiffs to produce direct

evidence of discriminatory intent . . . " to demonstrate pretext in ADA cases) (citing U.S. Postal

Serv. v. Aikens, 460 U.S. 711, 714 n.3, 717 (1983)) .  Rather, discrimination may be inferred

from an analysis of the totality of the circumstances.  See Hadley, 2001 WL 34039486 at *13-14.

        Here, the plaintiff alleges that the defendants terminated his employment because of his

disability.  Pl.'s Opp'n at 17.  On the other hand, the defendants have asserted non-discriminatory

reasons for terminating the plaintiff, citing job-related deficiencies in the safety of the plaintiff's

driving, his professionalism when interacting with Mrs. Ladner, and his inability to comply with

scheduled driving appointments.  Defs.' Mot. at 15-16.  The plaintiff contends, however, that the

defendants' non-discriminatory reasons are pretextual because similarly situated employees were

not terminated for similar transgressions, his performance was not deficient, and the proximity of

his termination to the Philadelphia trip create an inference of discrimination.  Pl.'s Opp'n at 17-

22.  The Court will address these contentions in turn.

(i)       The Similarly Situated Employee Allegation

        To show that another employee is similarly situated, "[a] plaintiff must . . . demonstrate

that all of the relevant aspects of [his] employment situation were nearly identical to those . . .

employee[s] [who are not members of the plaintiff's protected class]."  Holbrook v. Reno, 196

F.3d 255, 261 (D.C. Cir.1999) (citation and internal quotation marks omitted); see Waterhouse v.

District of Columbia, 298 F.3d 989, 995-96 (D.C. Cir. 2002) ("In the absence of evidence that

27

the comparators were actually similarly situated to her, this allegation added nothing to Waterhouse's claim that the defendants' explanation for her termination was mere pretext."). Here, the plaintiff argues that the defendants allowed previous drivers with performance records more deficient than his to remain employed for years before terminating them. Pl.'s Opp'n at 17-18. The defendants acknowledge that problems with past drivers persisted for lengthy periods of time, but contend that the previous drivers' conduct does not diminish the safety concerns posed by the plaintiff's driving performance, that the plaintiff was the first driver to receive the Conversations Document setting forth the responsibilities of the position, and that there is no evidence that any problems occurred during the other drivers' probationary periods. Reply at 13-14. The Court will discuss the defendants' conclusions regarding the plaintiff's performance in the next section and turn immediately to whether the previous drivers were similarly situated to the plaintiff.

Whether two employees are similarly situated ordinarily presents a question of fact for the jury. George v. Leavitt, 407 F.3d 405, 414-15 (D.C. Cir. 2005). There is no dispute that, unlike the previous drivers, the plaintiff received the written Conversation Document outlining the defendants' expectations for the position. However, the plaintiff has proffered evidence that University supervisors of one earlier driver, Mr. Madden, repeatedly discussed Mr. Madden's driving habits with him. Pl.'s Opp'n at 18. These two circumstances raise an issue of fact as to whether having provided the Conversation Document to the plaintiff distinguished what the plaintiff knew about the defendants' expectations of him from what former employee Madden knew was expected of him. Determinations of this type are the province of the jury and not the Court.

However, because the plaintiff was on probation at the time of his termination, while the other employees he seeks to compare himself with were not, a different analysis must be employed.  In McKenna v. Weinberger, 729 F.2d 783 (D.C. Cir. 1984), the Circuit Court held that probationary and non-probationary federal employees are not similarly situated with respect to the circumstances under which they can be terminated.  Id. at 789-90; see also George, 407 F.3d at 415 (same); Holbrook, 196 F.3d at 262 (acknowledging distinction between probationary and non-probationary employees for comparison purposes); accord Feingold v. New York, 366 F.3d 138, 153 (2d Cir. 2004).  Other Circuits have recognized this distinction in the non-federal employee context.  Elgabi v. Toledo Area Reg'l Transit Auth., 228 F. App'x 537, 542 (6th Cir. 2007) (finding probationary employee's comparison to non-probationary employees irrelevant in assessing whether a prima facie case of discrimination had been established).  Here, the plaintiff has not produced any evidence of the previous drivers' conduct during their probationary periods.  Without such evidence, the plaintiff cannot show that he is similarly situated to these other drivers.  Accordingly, the plaintiff cannot establish pretext by showing that the defendants treated the other drivers differently.

(ii)      <u>The Plaintiff's Job Performance</u>

The plaintiff disputes the defendant's contention that his performance fell below the standard required for his position.  This conflict raises a material issue of fact as to the quality of the plaintiff's job performance, see supra Part IV.B.3, therefore putting into question whether the plaintiff's failure to perform the essential functions of his job were the true reasons for his termination.  See Anderson, 477 U.S. at 255 ([c]redibility determinations . . . are jury functions").

29

(iii)   <u>Temporal Proximity of the Philadelphia Trip to the Plaintiff's Termination</u>

Finally, the plaintiff is not "limited to arguing that the employer's explanation is wrong on the merits, but he can also attempt to show by other means that the explanation was made up to disguise illegitimate bias." <u>Aka</u>, 156 F.3d at 1299.  Here, because the plaintiff was terminated on the day following the Philadelphia trip, the plaintiff asserts that a reasonable jury could find that discrimination was the real reason for his termination.  In <u>Woodruff</u>, the District of Columbia Circuit noted, in the retaliation context, that "temporal proximity can indeed support an inference of causation… but only where two events are 'very close' in time."  482 F.3d at 529 ("a reasonable finder of fact could infer causation in that area without more" where three and a half weeks separated the protected activity and the adverse employment action).  The <u>Woodruff</u> court held, however, that "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations [by the employer] are genuine."  <u>Id.</u> at 530.

Here, it is clear that the plaintiff's termination was "very close" in time to the Philadelphia trip, as he was terminated on the day after the trip.  Defs.' Stmt ¶ 30.  Therefore, there is sufficient temporal proximity between the request for the accommodation and the adverse employment action for a reasonable jury to infer that the plaintiff's termination was motivated by discrimination.  <u>See, e.g.</u>, <u>Woodruff</u>, 482 F.3d at 529 (finding that "less than a month" between protected event and adverse action was sufficiently close in time to infer discrimination); <u>Goos v. Nat'l Ass'n of Realtors</u>, 715 F. Supp. 2, 4 (D.D.C. 1989) (finding that just over five weeks between the protected action and the plaintiff's termination was short enough time lapse to infer a causal connection).  While this proximity alone is insufficient to

30

overcome the presumptive truth of the defendants' explanations for the actions they took, see Woodruff, 482 F.3d at 530, the plaintiff has also proffered "positive evidence beyond mere proximity" by vigorously disputing the defendants' version of what occurred during the Philadelphia trip and the defendants' characterization of his job performance generally, Pl.'s Opp'n at 20-21; see supra Part IV.B.3.  Moreover, the plaintiff offers as support for his position the testimony of Ms. Clemmer indicating that there had been no discussion of terminating him prior to the Philadelphia trip, Pl.'s Opp'n at 21, and that the assessment of his job performance at an October 1, 2004 meeting between the plaintiff, Dr. Ladner, and Ms. Clemmer was "positive," Pl.'s Opp'n, Ex. 3 (Clemmer Dep.) at 89.

Additionally, the plaintiff has proffered evidence that he was never made aware of any earlier complaints regarding his performance that would result in his termination.  Specifically, Ms. Clemmer testified that the plaintiff received no written documents expressing concerns about his work.  Pl.'s Opp'n, Ex. 3 (Clemmer Dep.) at 57.  Additionally, the plaintiff claims that Dr. Ladner's wife, for whom he also provided chauffeur services, told him he was "doing a good job."  Pl.'s Opp'n, Ex. 1 (Green Dep.) at 126.  Finally, plaintiff testified that no one at the University discussed with him any concerns about his driving style or his practice of keeping distance between his vehicle and vehicles in front of him.  Id. at 151.  In fact, the Conversation Document, which Ms. Clemmer discussed with the plaintiff at the beginning of his employment, contained a bullet point saying "no tail-gating."  Pl.'s Opp'n, Ex. 3 (Clemmer Dep.) at 38.  A reasonable jury could therefore infer that the plaintiff's practice of maintaining a proper distance between the vehicle he was driving and other vehicles in front of him was in response to the advice given him by Ms. Clemmer at the beginning of his employment.

Taken collectively, the plaintiff's proffered evidence has created a genuine issue of material fact as to the credibility of the defendants' legitimate reason for terminating him, making summary judgment on the plaintiff's ADA and DCHRA claims inappropriate.  Isse v. American Univ., 540 F. Supp. 2d 9, 22-23 (D.D.C. 2008) (finding that factual disputes raised by the plaintiff's proffered evidence created a genuine dispute which precluded summary judgment)

**(C)      The Plaintiff's Wrongful Termination Tort Claims.**

The plaintiff has failed to address the defendants' arguments in their motion for summary judgment challenging the survivability of his common law wrongful termination tort claims.  The defendants therefore assert the plaintiff has conceded the sustainability of these claims (Counts III and IV).  In Hooker-Robinson v. Rice, the defendant moved to dismiss the plaintiff's complaint and presented several grounds on which to do so, one being the plaintiff's failure to respond to several of the defendant's grounds for dismissal.  No. Civ.A. 05-321, 2006 WL 508343, at *3 (D.D.C. March 1, 2006).  This court determined that "[b]ecause the plaintiff only addressed some of the defendant's challenges in her response, the Court will consider those challenges not addressed by the plaintiff in her response as conceded."  Id.; see also Twelve John Does v. District of Columbia, 117 F.3d 571, 577 (D.C. Cir. 1997) ("Where the district court relies on the absence of a response as a basis for treating the motion as conceded, we honor its enforcement of the rule.").   Similarly, here, in light of the plaintiff's failure to address the defendants' arguments as to these claims, the Court considers the dismissal of these claims conceded, and grants the defendants summary judgment on Counts III and IV of the complaint.[9]

However, even if the plaintiff had not conceded Counts III and IV, those counts would

---

[9] The Court notes that the plaintiff acknowledges this concession in his motion for reconsideration.  Pl.'s Recons. Mot. ¶ 4.

still be barred for the reason that follows. The plaintiff alleges that his termination was "without just cause or provocation, contrary to the clear mandate of public policy set forth by the ADA and the DCHRA." Compl. ¶¶ 32, 34. Although the District of Columbia Court of Appeals recognizes the tort of wrongful termination, it is limited to narrowly defined exceptions to the at-will employment doctrine, see Carl v. Children's Hosp., 702 A.2d 159, 160 (D.C. 1997) (recognizing narrow [whistleblower] exception to the at-will doctrine), which permits an employer to "discharge an at-will employee at any time and for any reason, or for no reason at all[,]" Adams v. George W. Cochran & Co., Inc., 597 A.2d 28, 30 (D.C. 1991); see also id. at 33 (recognizing exception to at-will employment doctrine where employee is terminated by employer for refusing to violate municipal regulation). Both the ADA and the DCHRA provide "a specific and significant remedy" for employees who claim that their employment was wrongfully terminated. See Nolting v. Nat'l Capital Group, Inc., 621 A.2d 1387, 1390 (D.C. 1993) ("[W]e do not think [a public policy exception to the doctrine of at-will employment] can be invoked where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation."). Accordingly, the defendants argue that the plaintiff has not alleged facts sufficient to establish that his situation falls within one of the limited exceptions to the at-will doctrine. Defs.' Mot. at 19-20. The Court agrees. The plaintiff has not alleged that he was required to violate any laws, as was the situation in Adams, 597 A.2d at 33, or that he was curtailed in any attempts to speak publicly, as in Carl, 702 A.2d at 160, and the plaintiff has identified no additional "public policy" concerns that merit recognizing his wrongful termination tort claims in the situation presented to the Court in this case. Thus, the Court finds that even if these claims had not been conceded, the

circumstances of the plaintiff's termination, especially considering the statutory remedies available to him, are insufficient to defeat the defendant's entitlement to summary judgment. Thus, summary judgment is awarded to the defendants on the plaintiff's common law wrongful termination tort claims as pled in Counts III and IV of the complaint.

## V. Conclusion

For the foregoing reasons, the Court will **GRANT** the defendants' motion for summary judgment on Counts III and IV of the complaint - the common law wrongful termination claims - and **DENY** the motion as to Counts I and II of the complaint alleging the failure to accommodate the plaintiff's disability and his wrongful termination under both the ADA and DCHRA.[10]

**SO ORDERED** this 21st day of August, 2009.

_____
Reggie B. Walton
United States District Judge

---

[10] This Memorandum Opinion is being issued contemporaneously with an Amended Order which amends the Order issued by the Court on September 30, 2008.